IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,     )    <u>16-CR-1585-JLS</u>
      PLAINTIFF,     )
                     )
VS.                   )    SAN DIEGO, CA
                     )    APRIL 19, 2017
MARIA DE JESUS LOPEZ,     )    9:30 A.M.
      DEFENDANT.     )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE JANIS L. SAMMARTINO

UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

FOR THE GOVERNMENT:  OFFICE OF THE U. S. ATTORNEY
                    BY:  ADRIANA E. AHUMADA, ESQ.
                        SHANE P. HARRIGAN, ESQ.
                    880 FRONT STREET, RM. 6293
                    SAN DIEGO, CA  92101

FOR THE DEFENDANT:   BURCHAM & ZUGMAN APC
                    BY:  DAVID J. ZUGMAN, ESQ.
                    1010 SECOND AVE., SUITE 1800
                    SAN DIEGO, CA  92101

COURT REPORTER:      FRANK J. RANGUS, OCR
                    U. S. COURTHOUSE
                    333 W. BROADWAY, SUITE 420
                    SAN DIEGO, CA  92101
                    (619) 318-8590


PROCEEDINGS RECORDED BY ELECTRONIC STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER.

I N D E X

WITNESSES

ON BEHALF OF

THE DEFENDANT:

| | DR | CR | RD | RC |
|---|---|---|---|---|
| ANDRE FALCO JIMENEZ | 7 | 22 | 57/80 | 66 |

ON BEHALF OF

THE GOVERNMENT:

| MATTHEW B. DEVANEY | 84 | 124 | 142 | 145 |
|---|---|---|---|---|
| GABRIEL BARRAGAN | 147 | 174 | -- | -- |

1             THE DEPUTY CLERK:  NUMBER ONE ON THE CALENDAR,

2    16-CR-1585, UNITED STATES VS. MARIA DE JESUS LOPEZ, FOR AN

3    EVIDENTIARY HEARING.

4             THE COURT:  OKAY.  GOOD MORNING, COUNSEL.

5             APPEARANCES, PLEASE.

6             MS. AHUMADA:  GOOD MORNING, YOUR HONOR.

7             ADRIANA AHUMADA AND SHANE HARRIGAN FOR THE UNITED

8    STATES.

9             THE COURT:  OKAY.  THANK YOU.

10             MR. HARRIGAN:  GOOD MORNING, YOUR HONOR.

11             THE COURT:  GOOD MORNING.

12             MR. ZUGMAN:  GOOD MORNING, YOUR HONOR.

13             DAVID ZUGMAN ON BEHALF OF MISS LOPEZ.  SHE IS

14    PRESENT.

15             THE COURT:  OKAY.  VERY WELL.  GOOD MORNING.

16             MR. ZUGMAN:  GOOD MORNING.

17             THE COURT:  ARE WE PREPARED TO PROCEED?

18             MR. ZUGMAN:  YES, YOUR HONOR.

19             MS. AHUMADA:  YES, YOUR HONOR.

20             THE COURT:  OKAY.  PLEASE GO AHEAD.

21             MR. ZUGMAN:  YOUR HONOR, BEFORE WE CALL OUR FIRST

22    WITNESS, I WAS THINKING THAT THERE ARE PROBABLY SOME THINGS WE

23    CAN DO BY STIPULATION SO WE DON'T HAVE, YOU KNOW, REPETITIVE

24    TESTIMONY.  WE ALL AGREE THAT MARIA LOPEZ WAS ARRESTED AT THE

25    CHECKPOINT ON HIGHWAY 86 AND THAT SORT OF FAMILIAR BACKGROUND

1   FACTS THE GOVERNMENT NEED NOT FULLY REVIEW.

2          THE COURT:  LISTEN, IF THERE ARE FAMILIAR BACKGROUND

3   FACTS THAT BOTH SIDES WISH TO STIPULATE TO, PRESENT IT TO ME

4   IN WRITING, SIGNED BY BOTH SIDES.  I NEED A FIRM EVIDENTIARY

5   RECORD TO RULE ON HERE.  THAT'S EXCELLENT, MR. ZUGMAN, BUT I

6   WOULD LIKE IT ON THAT BASIS, UNLESS YOU HAVE A PREPARED

7   STATEMENT THAT YOU'RE GOING TO READ INTO THE RECORD.

8          MR. ZUGMAN:  I DON'T.

9          YOUR HONOR, I'D ALSO MOVE TO EXCLUDE WITNESSES, AND

10  IF I COULD, I THINK IT'S MY BURDEN TECHNICALLY, BUT IF IT'S

11  NOT MY BURDEN AND THE GOVERNMENT WANTS TO GO FIRST, I'D ASK

12  THAT WE DO DEVANEY AND THEN MR. FALCO, BECAUSE THOSE TWO ARE

13  GOING TO SEE EACH OTHER'S TESTIMONY.

14         MS. AHUMADA:  RIGHT.  SO, YOUR HONOR, I UNDERSTAND

15  THE REASON FOR EXCLUDING OUR AGENT, AGENT BARRAGAN, BUT I

16  THINK THAT IT IS APPROPRIATE TO HAVE THE EXPERT IN THE

17  COURTROOM --

18         MR. ZUGMAN:  AGREED.

19         MS. AHUMADA:  -- WHILE THE OTHER EXPERTS ARE

20  TESTIFYING.

21         THE OTHER THING THAT I WOULD ASK THE COURT TO

22  CONSIDER IS TO CONSIDER JUST HAVING AN EVIDENTIARY HEARING ON

23  THE DOG RELIABILITY IN THIS CASE AND LIMIT IT TO THAT, BECAUSE

24  IN THIS PARTICULAR CASE THIS IS A DRUG CASE.  WE DID FILE

25  EVIDENCE ABOUT CONCEALED HUMANS, BUT ULTIMATELY I THINK THAT

1    THE COURT SHOULD CONSIDER JUST NARROWING THE SCOPE DOWN,

2    BECAUSE WE DID HEAVILY BRIEF THE FACT THAT WE'RE ALLOWED TO

3    HAVE A CANINE FOR, THAT CAN SNIFF ANYTHING AT ANY CHECKPOINT

4    AS LONG AS WE DON'T DETAIN ANYBODY FOR A PROLONGED PERIOD

5    BEYOND WHAT THE CHECKPOINT IS NECESSARY AND ASSUMING THE

6    CHECKPOINT IS VALID.  SO WE CAN SKIP THE CONCEALED HUMAN

7    ISSUE, ALTHOUGH WE ARE PREPARED TO MOVE FORWARD ON THAT.  IT'S

8    JUST WHAT THE COURT WOULD FIND USEFUL.

9          THE COURT:  MR. ZUGMAN, WHAT'S YOUR VIEW OF THAT?

10          MR. ZUGMAN:  AS IS LAID OUT IN MY PAPERS, I DON'T

11    THINK THE CONCEALED HUMAN STUFF IS GOING TO HOLD UP.  THAT'S

12    THE WHOLE ARGUMENT I'M MAKING.  SO I WOULDN'T AGREE TO NARROW

13    THE FIELD IN THAT RESPECT, BUT I WOULD AGREE THAT THE EXPERTS

14    SHOULD BE ABLE TO WATCH EACH OTHER, AND I DO BELIEVE THAT IT

15    WOULD BE GREAT IF THEY WERE THE FIRST ONES TO TESTIFY.  I

16    THINK AFTER THAT THE GOVERNMENT WILL WANT TO SUPPLEMENT THE

17    TESTIMONY WITH AGENT BARRAGAN'S TESTIMONY.

18          MS. AHUMADA:  AND I AGREE WITH THAT, YOUR HONOR, AND

19    BECAUSE WE HAVEN'T RECEIVED A DECLARATION FROM THE DEFENSE

20    EXPERT, WE DO BELIEVE THAT IT WOULD BE HELPFUL TO HAVE THE

21    DEFENSE EXPERT COME UP FIRST.  WE'VE ONLY RECEIVED THE PAPERS.

22          MR. ZUGMAN:  YES.

23          THE COURT:  OKAY.  VERY WELL.

24          IS THE GOVERNMENT PREPARED TO PROCEED?

25          MS. AHUMADA:  YES, THE GOVERNMENT IS PREPARED TO

1     PROCEED.

2           THE COURT:  OKAY.  LET'S GO AHEAD.

3           MS. AHUMADA:  THE DEFENSE EXPERT, I THINK, WOULD BE

4     COMING UP FIRST.

5           THE COURT:  OKAY.

6           MR. ZUGMAN:  YES.

7           THE COURT:  GO AHEAD, MR. ZUGMAN.

8           MR. ZUGMAN:  YOUR HONOR, MISS LOPEZ CALLS MR. FALCO

9     JIMENEZ AS HER EXPERT, AND WE NOW MOVE FOR THE EXCLUSION OF

10    MR. BARRAGAN.

11          MS. AHUMADA:  HE'S ALREADY LEFT.

12          THE COURT:  THE WITNESSES ARE EXCLUDED EXCEPT THE

13    EXPERTS.

14          MS. AHUMADA:  HE'S LEFT.  THESE ARE BORDER PATROL

15    AGENTS THAT ARE WATCHING IN THE BACK, BUT THEY DON'T HAVE ANY

16    INVOLVEMENT IN THIS CASE, SO THEY'RE NOT WITNESSES.

17          THE COURT:  OKAY.

18          THE DEPUTY CLERK:  SIR, PLEASE RAISE YOUR RIGHT HAND.

19          (WITNESS SWORN.)

20          THE WITNESS:  I DO.

21          THE DEPUTY CLERK:  THANK YOU.  HAVE A SEAT OVER HERE.

22          PLEASE SPEAK INTO THE MIKE.  STATE YOUR FULL NAME AND

23    SPELL YOUR LAST NAME SLOWLY.

24          THE WITNESS:  MY NAME'S ANDRE FALCO JIMENEZ.  THE

25    LAST NAME IS J-I-M-E-N-E-Z.

1          ANDRE FALCO JIMENEZ, SWORN WITNESS, TESTIFIES:

2          DIRECT EXAMINATION BY MR. ZUGMAN:

3   Q.  GOOD MORNING, MR. JIMENEZ.

4   A.  GOOD MORNING.

5   Q.  WHAT DO YOU DO FOR A LIVING?

6   A.  I CURRENTLY OWN A COMPANY CALLED FALCO ENTERPRISES, INC.,

7   ALSO KNOWN AS FALCO K9 ACADEMY.

8   Q.  AND WHAT DOES FALCO K9 ACADEMY SPECIALIZE IN?

9   A.  OVER THE YEARS, WE'VE SPECIALIZED IN TRAINING POLICE DOGS

10  FOR PATROL, S.W.A.T. TRAINING, THAT TYPE OF THING.  DETECTION,

11  GOING FOR NARCOTICS AND EXPLOSIVES.  WE'VE EXPANDED OUT THE

12  TRAINING OF DETECTION DOGS FOR E. COLI/SALMONELLA DETECTION,

13  PEANUT DETECTION, AND OTHER ODORS.

14  Q.  DO GOVERNMENTAL AGENCIES, STATE OR FEDERAL, PURCHASE DOGS

15  FROM FALCO K9 ACADEMY?

16  A.  YES, THEY HAVE.

17  Q.  DO YOU HAVE LICENSES IN THAT REGARD?

18  A.  I HAVE HELD LICENSES FOR THE, FOR DEA FOR POSSESSION OF

19  NARCOTICS FOR TRAINING AND ATF FOR EXPLOSIVES DETECTION DOG

20  TRAINING IN THE PAST.

21  Q.  NOW, ARE YOU A TRAINER AT THE FALCO K9 ACADEMY?

22  A.  YES.

23  Q.  ARE YOU THE HEAD TRAINER, THE SOLE TRAINER?

24  A.  THE HEAD TRAINER.

25  Q.  OKAY.  LET'S TALK ABOUT YOUR EXPERIENCE IN THAT REGARD.

1    WHEN DID YOU FIRST GET INVOLVED IN DOG TRAINING?

2    A.  AS A RESERVE POLICE OFFICER FOR THE CITY OF ANAHEIM, I WAS

3    INTERESTED IN DOG TRAINING, SO THEY BROUGHT ME IN TO FIRST BE

4    THE DECOY, THE PERSON THAT WOULD WEAR THE EQUIPMENT, THE

5    PERSON THAT WOULD HIDE THE NARCOTICS SO THAT THEY DIDN'T

6    ALWAYS HAVE THE ODOR OF THE HANDLER OR THE TRAINER ON THEM.

7    SO I WOULD HIDE THEM FOR THEM.  SO I WAS BASICALLY THE HELPER

8    AS A RESERVE, AND THEN I WENT FULL-TIME.

9    Q.  LET ME SLOW YOU DOWN THERE.  WHAT YEAR WAS THAT?

10   A.  THAT WAS IN 1984.

11   Q.  1984.  SO --

12   A.  YEAH.

13   Q.  -- 33 YEARS OF EXPERIENCE IN THIS FIELD?

14   A.  AT LEAST, YES.

15   Q.  HAVE YOU SINCE -- DO YOU FOCUS PRIMARILY ON DOG TRAINING

16   AND RELATED SUBJECTS, SUCH AS TESTIFYING IN CRIMINAL AND CIVIL

17   CASES?

18   A.  YES.

19   Q.  SO LET'S GO BACK TO YOUR EXPERIENCE.  ONCE YOU STOPPED

20   BEING THE DECOY OR THE PERSON TO BE FOUND, WHAT SORT OF

21   TRAINING AND EXPERIENCE DO YOU HAVE WITH RESPECT TO DOG

22   TRAINING?

23   A.  I CONTINUED TO DO THAT UNTIL 1989.  I PUT IN FOR AN

24   OPENING AS A FULL-TIME POLICE OFFICER FOR THE CANINE UNIT AND

25   WAS SELECTED AS A HANDLER, AND THEN DURING MY PERIOD OF TIME

1    AS A HANDLER I --

2    Q.  LET ME SLOW YOU DOWN THERE.  DESCRIBE YOUR TRAINING AS A

3    HANDLER.  HOW DID YOU LEARN TO DO THE DOG DETECTION?

4    A.  WELL, I -- THEY SELECTED MY DOG FOR ME.  I GOT A POLICE

5    DOG, A GERMAN SHEPHERD.  WE THEN WENT THROUGH A FOUR-WEEK

6    ACADEMY AT THE ADLERHORST INTERNATIONAL IN RIVERSIDE.  I

7    WOULDN'T SAY IT WAS THE MOST EXTENSIVE TRAINING AT THE TIME,

8    BUT THAT WOULD COME INTO PLAY LATER ON IN MY CAREER.  AFTER

9    GOING THROUGH THE PATROL ACADEMY WHERE WE TEACH THE DOGS TO

10   FIND HUMAN BEINGS THAT ARE HIDING, THAT ARE SUSPECTS IN FELONY

11   CRIMES --

12   Q.  LET ME STOP YOU THERE.  HOW DO YOU DO THAT?  HOW DO YOU

13   TEACH A DOG TO FIND SOMEONE WHO IS MISSING, OR HIDDEN, OR OUT

14   OF VIEW?

15   A.  IT'S ACTUALLY PRETTY EASY.  IN THE SELECTION PROCESS FOR

16   THE DOGS, WE WANT DOGS THAT HAVE A STRONG DESIRE FOR A TOY, A

17   BURLAP TUG, A TENNIS BALL, A KONG.  WHATEVER TOY THAT A DOG

18   WILL FETCH OR SEARCH FOR AND FIND, WE USE THAT TO MOTIVATE THE

19   DOG QUITE OFTEN.  THAT THEN TRANSLATES INTO BITING THE

20   EQUIPMENT, BECAUSE THE DOG WILL BELIEVE THE SLEEVE WE'RE

21   WEARING IS PART OF THAT TOY, AND IT JUST TRANSITIONS OUT TO

22   BITE SUITS AND THAT TYPE OF THING.  THERE'S OTHER LITTLE

23   TWEAKS, BUT THAT WOULD TAKE A LONG TIME FOR ME TO EXPLAIN.

24   BUT, ESSENTIALLY, A DOG IS LOOKING FOR THAT EQUIPMENT IN THE

25   BEGINNING.

1    Q.  HOW DOES THE DOG NOT KNOW WHO TO BITE?  HOW DOES A DOG

2    KNOW NOT TO BITE JUST YOU OR THE FIRST PERSON THEY SEE?

3    A.  BECAUSE WE REPEAT THIS GAME WHERE THE DOG WILL SEE THE

4    PERSON EITHER HOLDING A BURLAP TOY OR WEARING EQUIPMENT GO RUN

5    AND HIDE SOMEWHERE.  THE DOG LEARNS HE NEEDS TO GO OUT AND

6    FIND SOMEBODY THAT'S ESSENTIALLY HIDING SOMEWHERE.

7    Q.  DO YOU GIVE A COMMAND TO PROMPT THAT BEHAVIOR?

8    A.  WELL, YES.  IT'S A WORD.  IT COULD BE *VORAN*, WHICH IS THE

9    GERMAN WORD THAT WE USE FOR PATROL DOGS TO GO SEARCH AND HIDE,

10   OR FIND SOMEBODY THAT'S HIDING.  BUT, YEAH, USUALLY THERE'S

11   SOME TYPE OF CUE WORD THAT WE GIVE THE DOG TO SEARCH FOR THAT

12   HUMAN BEING.

13   Q.  AND HOW DO YOU MAKE SURE THAT THE DOG DOESN'T TURN ON AT

14   THE WRONG POINT?  HOW DO YOU STOP THE DOG FROM SIMPLY ALWAYS

15   GOING TO FIND THE HIDDEN PERSON?

16   A.  IT'S PRETTY EASY.  I MEAN, REALLY, THE SELECTION PROCESS

17   IS, WE WANT DOGS THAT ARE SOCIAL.  SO WE WANT DOGS THAT ARE

18   FRIENDLY AROUND PEOPLE GENERALLY AND THAT THEY ONLY, THEY

19   UNDERSTAND THAT THEY'RE ONLY SUPPOSED TO BITE THOSE PEOPLE

20   THAT ARE HIDING OR ACTIVELY FIGHTING, AND THAT JUST COMES FROM

21   REPETITION IN TRAINING.  A DOG BEGINS TO LEARN.  IF YOU'RE

22   WORKING WITH TWO OTHER OFFICERS AS YOUR BACKUP AS YOU'RE

23   COMING INTO A BUILDING, THE DOG LEARNS WHO THOSE PEOPLE ARE,

24   BECAUSE IN TRAINING WE OFTEN HAVE A TRAINER NEXT TO US OR WE

25   HAVE ANOTHER HANDLER THAT'S WATCHING AND THE DOG REALLY BEGINS

1    TO LEARN WHO THAT ENTRY TEAM IS.

2    Q.  DO YOU TEACH A STOP COMMAND?

3    A.  SURE.

4    Q.  AND THAT WORKS ON THE DOG TO GET IT TO RELEASE WHOEVER

5    THEY'VE FOUND?

6    A.  TO STOP BITING, TO LET GO?  YES.

7    Q.  YES.  IF YOU RELEASE THEM, THEY'RE RELEASED FROM THEIR

8    JAWS?

9    A.  YES.

10   Q.  AND IS THAT A COMMAND THAT YOU TAKE GREAT EFFORT TO

11   INSTILL IN THE DOG?

12   A.  OF COURSE.

13   Q.  THE STOP, STOP WHAT YOU'RE DOING COMMAND, RIGHT?

14   A.  YES.  WE USUALLY USE THE WORD OUT.

15   Q.  OKAY.  AND DO YOU HAVE -- LET ME STRIKE THAT.

16       LET'S GO ON.  IS IT FAIR TO SAY THAT THE FIND, THE

17   CONCEALED PERSON, THAT'S NOT A SCENT-BASED TRAINING PROGRAM,

18   RIGHT?

19   A.  IT IS.  IN PATROL WORK, IT'S DIFFERENT BECAUSE THERE'S

20   AGGRESSION INVOLVED IN PATROL DOGS.  WHEN WE WANT A PERSON TO

21   FIND SOMEBODY, THE DOG HAS IT IN HIS MIND THAT AT SOME POINT

22   HE'S GOING TO FIGHT WITH THAT MAN WHO'S HIDING.  SO PATROL

23   WORK IS A LITTLE BIT DIFFERENT THAN, SAY, SEARCH AND RESCUE.

24   SEARCH AND RESCUE, THE DOG THINKS HE'S GOING TO GET THIS TOY

25   AT THE END OF THAT FIND.

1    Q.  WELL, TELL ME IF THIS IS A FAIR SUMMARY OF HOW DOG

2    TRAINING FOR FINDING NARCOTICS, OR EXPLOSIVES, OR DEAD BODIES.

3    WHEN YOU SCENT-TRAIN A DOG, YOU FOLLOW THE SAME PROGRAM YOU

4    DESCRIBED, RIGHT?  THAT THERE'S A TOY REWARD IF THE DOG FINDS

5    THE SCENT.

6    A.  CORRECT.

7    Q.  AND YOU PRIME THE DOG ON THE SCENT, RIGHT?

8    A.  WE PUT THE ODOR -- THE EASIEST ONE FOR ME TO USE IS, SAY,

9    MARIJUANA.  YOU TAKE SOME MARIJUANA AND YOU PUT IT IN THE SAME

10   LOCATION THAT YOU HAVE THE DOG'S TOY -- THIS IS ONE WAY OF

11   DOING IT -- AND THE DOG WILL COME BY AND HE'S SEARCHING FOR

12   HIS TOY IN THE BEGINNING, BECAUSE THE DOG HAS NO IDEA WHAT

13   MARIJUANA IS AND SO HE'S SEARCHING FOR HIS TOY.  HE SMELLS HIS

14   TOY, AND BECAUSE THE MARIJUANA IS WITH HIS TOY, HE'LL SMELL

15   THOSE TWO THINGS TOGETHER, AND WE REPEAT THAT OVER AND OVER

16   AGAIN.  SO, ESSENTIALLY, A DOG GOES, EVERY TIME MY TOY IS NEAR

17   THIS MARIJUANA, I SOMEHOW GET MY TOY.

18   Q.  YOU LINK UP A SCENT --

19   A.  UH-HUH.

20   Q.  -- AND A REWARD, RIGHT?

21   A.  YES.

22   Q.  DO YOU DO THAT WITH CONCEALED PEOPLE?

23   A.  YES, WHEN WE'RE TALKING ABOUT SEARCH AND RESCUE OR FINDING

24   PEOPLE THAT ARE NOT COMBATIVE.

25   Q.  OKAY.  CAN YOU DO THAT ON A CLOSED VEHICLE WHERE THERE ARE

1    PEOPLE ALREADY PRESENT?

2    A.  SURE.  YOU CAN GIVE SOMEBODY THAT'S PRESENT THE TOY, AND

3    THEN WHEN THE DOG FINDS THE PERSON THAT'S PRESENT, THEN THEY

4    GIVE THEM THE TOY.

5    Q.  I DIDN'T ASK THAT CORRECTLY.  IS THE DOG ABLE TO

6    DISTINGUISH BETWEEN THE SMELLS OF PEOPLE THEY CAN SEE AND

7    PEOPLE THAT ARE HIDDEN?

8    A.  NO.

9    Q.  WHY NOT?  WHY CAN'T YOU DO THAT?

10   A.  BECAUSE IT DOESN'T SMELL DIFFERENT WHEN THEY'RE HIDDEN AS

11   OPPOSED TO WHEN THEY'RE VISIBLE.

12   Q.  ARE YOU AWARE OF ANY TRAINING PROTOCOL THAT COULD ACHIEVE

13   THAT GOAL OF TEACHING A DOG TO DISTINGUISH BETWEEN THE SMELL

14   OF SOMEONE PRESENT AND THE SMELL OF SOMEONE HIDDEN?

15   A.  NO.

16   Q.  IS IT THE CASE THAT DOGS WHO ARE TRAINED TO ALERT TO HUMAN

17   SMELLS WILL OFTEN ALERT TO THINGS LIKE GYM BAGS, OR LAUNDRY,

18   OR ANY ARTICLE OF CLOTHING THAT CONTAINS A STRONG HUMAN SCENT?

19   A.  IT HAS HAPPENED, BUT IT'S NOT, IT'S NOT -- IT DEPENDS ON

20   HOW LONG THAT ARTICLE OF PRE-WORN CLOTHING HAS BEEN WORN.

21   Q.  DO YOU WANT SOME WATER?

22   A.  NO.  I'M JUST SORRY.  I HAVE A REALLY BAD COLD.  I

23   APOLOGIZE.

24   Q.  I KNOW.  THAT'S OKAY.

25   A.  I'LL DRINK SOME WATER TO SEE IF IT HELPS.

1    Q.  LET'S RETURN TO YOUR TRAINING.  SO, AFTER YOU DID YOUR

2    FIRST FOUR-WEEK PROGRAM IN 1989, WHAT WAS YOUR NEXT STEP IN

3    YOUR DOG-TRAINING CAREER?

4    A.  THEN WE GO BACK TO ADLERHORST INTERNATIONAL TO LEARN HOW

5    TO TRAIN THE DOGS TO FIND NARCOTICS.

6    Q.  AND HOW ARE DOGS TRAINED TO FIND NARCOTICS?  DOES IT

7    DIFFER FROM WHAT YOU JUST DESCRIBED?

8    A.  YES, BECAUSE THIS SOLELY INVOLVES A TOY AS OPPOSED TO A

9    HUMAN BEING, AND SO IN ADLERHORST TRAINING, AND WE STILL DO IT

10   AT THIS TIME ALSO, WE TAKE THE MARIJUANA AND PUT IT INSIDE A

11   PIECE OF CLOTH AND ROLL THE CLOTH UP LIKE A BURRITO AND THEN

12   TIE IT OFF ON BOTH ENDS WITH A RUBBER BAND AND WE PLAY FETCH.

13   SO THE DOG'S ESSENTIALLY PLAYING FETCH WITH A MARIJUANA TOY,

14   AND SO, AGAIN, THE DOG IS ASSOCIATING THAT MARIJUANA ODOR WITH

15   THEIR TOY.  BY PICKING IT UP, THE DOG ACTUALLY ALSO SMELLS

16   THROUGH HIS MOUTH.  SO, WHEN HE'S BITING DOWN ON IT, HE'S

17   TAKING IN THAT ODOR, AND IT REALLY INCREASES THE IMPRINTING

18   PROCESS A LOT QUICKER.  YOU CAN'T DO THAT WITH COCAINE OR

19   HEROIN OR METHAMPHETAMINE BECAUSE THE DOG WILL DIE VERY

20   QUICKLY.  SO YOU CAN'T HAVE THEM BITING THAT.  BUT WITH

21   MARIJUANA, IT'S A GREAT WAY TO START THE DOGS OFF.

22   Q.  THE TOXICITY OF THE MARIJUANA, SO IT DOESN'T KILL THE DOG,

23   WHEREAS HEROIN WOULD.

24   A.  YES.

25   Q.  HOW DO YOU DO DEAL WITH THE STRONGER DRUGS?

1    A.  WELL, ONCE YOU TRAIN A DOG TO ASSOCIATE AN ODOR WITH ITS

2    TOY, THEN IT'S PRETTY SIMPLE AFTER THAT POINT.  THEN YOU CAN

3    SIMPLY TAKE THAT SAME TYPE OF TOY, THE BURLAP OR TERRY-CLOTH

4    TOWEL, AND NOW YOU JUST PUT THE TWO TOGETHER, COCAINE AND THE

5    TOY ITSELF, IN, SAY, A CLOSED ENVIRONMENT, LIKE A DRAWER OR

6    INSIDE A CINDERBLOCK WITH ANOTHER CINDERBLOCK ON TOP OF IT,

7    AND THE DOG WILL COME BY AND SMELL THAT SAME TOY ALONG WITH

8    THE COCAINE, AND THEN VERY QUICKLY THE DOG PICKS UP THE OTHER

9    ODORS VERY FAST.

10   Q.  I TAKE IT IT'S A NON-TOXIC DOSE OF COCAINE, OR HEROIN, OR

11   WHATEVER.

12   A.  NO, BECAUSE IT'S IN THE SAME, BUT NOW IT'S IN A CLOSED

13   CONTAINER, THE DOG CAN'T GET TO IT.

14   Q.  OH.  HE CAN'T SWALLOW.

15   A.  NO, BECAUSE HE CAN SMELL IT AND HE GOES, OH, MY TOY'S IN

16   THERE NOW, AND NOW YOU JUST REWARD HIM WITH A SECOND TOY OR

17   YOU PULL THE ONE OUT THAT'S IN THERE AND GIVE HIM THAT ONE.

18   Q.  NOW, ARE YOU FAMILIAR WITH DOG TRAINING IN GENERAL?

19   A.  YES.  WE TRAIN THOUSANDS OF PET DOGS EVERY YEAR.

20   Q.  IS IT FAIR TO SAY THAT THE METHOD YOU JUST DESCRIBED IS

21   THE PRIMARY METHOD USED BY LAW-ENFORCEMENT AGENCIES TO TRAIN

22   THEIR DOGS TO FIND NARCOTICS?

23   A.  YES.

24   Q.  SAME TRAINING THEY USE FOR EXPLOSIVES?

25   A.  YES.

1    Q.  SAME TRAINING THEY USE FOR FINDING PEOPLE LOST IN AN

2    AVALANCHE?

3    A.  YES.

4    Q.  SO THAT'S SCENT-BASED TRAINING.  CORRECT?

5    A.  CORRECT.

6    Q.  HAVE YOU EVER HEARD OF ANOTHER METHODOLOGY OF DOG TRAINING

7    THAT USES SOMETHING OTHER THAN SCENT?

8    A.  OTHER THAN SCENT?

9    Q.  YES.  CAN YOU TRAIN A DOG TO HAVE REALLY GOOD VISION?

10   A.  NO.

11   Q.  CAN YOU TRAIN HIM TO HAVE EXCELLENT HEARING?  IS IT ALWAYS

12   SCENT-BASED?

13   A.  NO, BUT I WOULD SAY THAT SOME ASPECTS OF, YOU KNOW,

14   FINDING ANYTHING THAT'S LIVING HAS TO DO -- WELL, THE HEARING

15   WILL COME INTO PLACE AT SOME POINT, BECAUSE THE DOG WILL

16   SOMETIMES WANT TO CONFIRM THAT THEY HEAR THE PERSON HIDING

17   INSIDE, OR SOMETHING LIKE THAT.  BUT IT STARTS WITH THE NOSE.

18   UNLIKE US, OUR EYES ARE THE PRIMARY IN MOST CASES, WHERE WITH

19   A DOG THE NOSE IS THE PRIMARY THING THEY USE TO IDENTIFY

20   SOMETHING AND THEN THE OTHER SENSES COME INTO PLAY.

21   Q.  ALL RIGHT.  THE LITERATURE SEEMS TO SAY THAT A DOG'S NOSE

22   IS 40 TIMES MORE SENSITIVE THAN A HUMAN'S.

23   A.  IT DEPENDS WHAT STUDY YOU'RE READING.  IT COULD BE

24   ANYTHING FROM A HUNDRED THOUSAND TIMES TO A MILLION TIMES, BUT

25   WE KNOW THAT IT'S A LOT BETTER THAN OURS.

1  Q.  FAIR ENOUGH.  SO, SORRY TO INTERRUPT YOUR TRAINING, BUT

2  TAKE US BACK TO THE NEXT PHASE OF YOUR DOG-TRAINING

3  EXPERIENCE.

4  A.  WELL, I GUESS THE MOST IMPORTANT THING AFTER THAT IS THAT

5  I BEGAN TO THEN HAVE SOME SUCCESS NOT ONLY IN THE STREETS WITH

6  MY PATROL DOG IN FINDING PEOPLE THAT WERE HIDDEN AND

7  NARCOTICS, BUT I ALSO BEGAN TO COMPETE IN COMPETITIONS.  IT

8  CAUGHT THE EYE OF A TRAINER IN CANADA, WHO ASKED ME TO JOIN A

9  TRAINING TEAM CALLED THE INTERNATIONAL POLICE CANINE

10  CONFERENCE, AND SO THERE ARE ABOUT 15 OF US EXPERTS IN THE

11  CANINE WORLD WHO BEGAN TO THEN TRAVEL THROUGHOUT NORTH

12  AMERICA, AND EVEN ONE OR TWO TIMES IN SOUTH AMERICA, TO JUST

13  HOLD THESE WEEK-LONG CONFERENCES WHERE WE TAUGHT CANINE

14  HANDLERS AND ADMINISTRATORS ON HOW TO HAVE AN EFFECTIVE POLICE

15  CANINE UNIT.

16  Q.  IS IT FAIR TO SAY THAT THERE ARE TWO KINDS OF TRAINING

17  METHODOLOGIES, ONE THAT RELIES A LITTLE MORE HEAVILY ON FORCE

18  AND ANOTHER THAT RELIES A LITTLE MORE HEAVILY ON REWARDS?

19  A.  YES.

20  Q.  CESAR MILAN WOULD BE THE EXAMPLE OF THE FORCE-BASED

21  TRAINING, NOT TO SAY THAT THERE'S ANYTHING WRONG WITH IT, JUST

22  THAT HE WOULD USE AVERSIVES.

23  A.  YES.  HE AND I HAVE WORKED TOGETHER A COUPLE OF TIMES, BUT

24  HE DOES BELIEVE IN THE REWARD SYSTEM.  IT JUST SEEMS LIKE THE

25  CORRECTION, WHEN HE'S DOING IT, SEEMS TO GET MORE OF THE, MORE

1    OF THE HEADLINES THAN ANYTHING ELSE.

2    Q.  FAIR ENOUGH.  BUT OTHER THAN THOSE WHO DEBATE ABOUT

3    WHETHER YOU SHOULD USE FORCE OR WHETHER YOU SHOULD JUST USE

4    REWARDS, IS THERE ANY DISAGREEMENT IN THE POLICE DOG TRAINING

5    COMMUNITY ABOUT WHAT DOGS ARE CAPABLE OF?

6    A.  THERE'S A LOT OF DISAGREEMENT IN THE LAW-ENFORCEMENT

7    COMMUNITY.  ANYTHING INVOLVING DOGS HAS A LOT OF DISAGREEMENT.

8    BUT I THINK, BACK IN THE EIGHTIES AND NINETIES, FORCE, USING

9    CATTLE PRODS AND HITTING DOGS WITH STICKS AND SHARPENING THE

10   PINCH COLLAR SO IT CAME TO A POINT WAS FAIRLY POPULAR BACK IN

11   THAT PERIOD OF TIME.  I THINK MY ROLE AS I CAME IN, I

12   REALLY -- BECAUSE THAT'S HOW I WAS TRAINED.  I WAS REALLY GOOD

13   AT HITTING DOGS WITH STICKS AND I WAS GOOD AT A LOT OF THOSE

14   TYPES OF TRAINING METHODS, BUT QUICKLY AS A HANDLER FOUND THAT

15   WAS PROBABLY NOT THE BEST WAY TO TRAIN DOGS, THAT A DOG

16   WORKING OUT OF MOTIVATION WAS MUCH BETTER AND WAY MORE

17   EFFECTIVE AND BEGAN TO, AT LEAST IN MY WORLD, BEGAN TO CHANGE

18   THAT ASPECT.  SO I THINK THERE'S STILL MANY TRAINERS THAT

19   STILL USE THE OTHER METHODS, BUT I THINK WE'RE SEEING A, YOU

20   KNOW, A NUMBER OF THEM SWITCHING OVER TO A MORE REWARD-BASED

21   SYSTEM.

22   Q.  OKAY.  SO I SENT YOU THE DISCOVERY IN THIS CASE, RIGHT?

23   A.  YES.

24   Q.  AND YOU'VE BEEN RETAINED AS MISS LOPEZ'S EXPERT, RIGHT?

25   A.  YES.

1   Q.   YOU'RE BEING PAID TO BE HERE.

2   A.   CORRECT.

3   Q.   GIVE US THE NUMBER.  HOW MUCH ARE YOU BEING PAID?

4   A.   FOR TESTIMONY, IT'S $400 AN HOUR.

5   Q.   OKAY.  SO I'LL BE FINISHED IN A MINUTE.  LET'S, THEN,

6   LET'S SPEED UP TO THE *COUP DE GRACE*.  HAVE YOU SEEN PICTURES

7   OF THE HIGHWAY 86 CHECKPOINT?

8   A.   YES.

9   Q.   DO YOU KNOW WHAT CHECKPOINTS LOOK LIKE?

10   A.   YES.

11   Q.   IS IT FAIR TO SAY THAT A CHECKPOINT HAS A PRIMARY

12   INSPECTION POINT, LIKE A LINE ACROSS THE ROAD?

13   A.   YES.

14   Q.   CARS DRIVE UP TO IT?

15   A.   YES.

16   Q.   AND BORDER PATROL AND OTHER POLICE AGENCIES HAVE DOGS THAT

17   COME SNIFF THOSE CARS.

18   A.   YES.

19   Q.   AND CAN THOSE DOGS BE SEARCHING FOR CONCEALED HUMANS

20   SIMPLY BY SCENT?

21   A.   YES.

22   Q.   SO MISS LOPEZ DRIVES UP TO THE HIGHWAY 86 CHECKPOINT IN A

23   HONDA CIVIC.  SHE'S THE VISIBLE PERSON.  CAN THE DOG

24   DISTINGUISH BETWEEN THE SMELL OF MISS LOPEZ AND THE SMELL OF A

25   CONCEALED PERSON?

1    A.  NO.

2    Q.  IS THERE ANY WAY TO TRAIN A DOG TO DISTINGUISH BETWEEN

3    THOSE KINDS OF SCENTS?

4    A.  NO.

5    Q.  HAVE YOU READ THE TESTIMONY OF MR. DEVANEY?

6    A.  YES.

7    Q.  OKAY.  MR. DEVANEY SEEMS TO SAY THAT THEY DON'T KNOW HOW

8    THEY DO IT, BUT IT CAN BE DONE, THAT DOGS CAN BE TRAINED TO

9    FIND HIDDEN HUMANS.  WE DON'T KNOW HOW IT HAPPENS, BUT IT

10   HAPPENS.  ARE YOU FAMILIAR WITH THAT SECTION?

11   A.  YES.

12   Q.  DO YOU AGREE WITH THAT?

13   A.  NO.

14   Q.  WHY NOT?

15   A.  BECAUSE WE, WE KNOW HOW DOGS USE THEIR OLFACTORY SYSTEM

16   AND THEIR SENSES TO LOCATE PEOPLE.

17   Q.  WELL, IS THERE ANY WAY TO -- I MEAN, MAYBE YOU'RE JUST NOT

18   BEING IMAGINATIVE ENOUGH.  IS THERE SOME WAY THAT YOU COULD

19   HAVE A DOG GO AROUND A CAR AND, YOU KNOW, JUST RUB ON IT OR

20   TOUCH IT AND FIGURE OUT IF SOMEONE WAS IN THE TRUNK OR NOT?

21   A.  NO.  IT WOULD BE LIKE PUTTING A MARIJUANA LEAF ON THE

22   WINDSHIELD AND TEACHING THE DOG TO IGNORE THAT SCENT COMING

23   FROM THAT MARIJUANA LEAF AND ALERT TO THE ONE THAT'S IN THE

24   TRUNK.  IT'S, IT'S STILL GOING TO BE, THE ODOR'S STILL GOING

25   TO BE COMING OUT OF THE VEHICLE.

1    Q.  BECAUSE ALL THE DOG CARES ABOUT IS THE SMELL, RIGHT?

2    A.  BECAUSE THE SMELL IS TIED TO THE TOY.  THE DOG JUST SIMPLY

3    WANTS HIS TOY.  THE DOG DOES NOT KNOW IF IT'S A NARCOTICS DOG,

4    OR A HUMAN DOG, OR A BOMB DOG.  THE DOG IS LOOKING FOR ANY

5    ODOR THAT WILL LEAD HIM TO HIS TOY, AND SO A HUMAN IS A HUMAN

6    WHETHER THEY'RE COMING FROM SOUTH OF THE BORDER OR NORTH OF

7    THE BORDER.

8    Q.  I SENT YOU THE TRAINING RECORDS OF MR. BARRAGAN AND HIS

9    DOG, PECKY.  CORRECT?

10   A.  YES.

11   Q.  DID YOU HAVE ANY, NOTICE ANYTHING ABOUT THOSE RECORDS,

12   ANYTHING YOU THOUGHT WAS PARTICULARLY IMPORTANT?

13   A.  WELL, AS I'VE DISCUSSED IN OTHER CASES INVOLVING THESE,

14   THESE TRAINING RECORDS, IS THAT THEY'RE DIFFICULT FOR THE

15   AVERAGE PERSON TO DECIPHER BECAUSE THEY USE NUMBERS.  IT'S NOT

16   CLEAR HOW THE TRAINING TOOK PLACE, WHERE IT TOOK PLACE, THE

17   CIRCUMSTANCES INVOLVING THE SCENARIOS WHERE THEY'VE DONE THEIR

18   TRAINING.  THERE'S A LOT OF INFORMATION THAT'S MISSING, IN

19   ADDITION TO BEING DIFFICULT TO READ.

20   Q.  DID YOU SEE ANYTHING IN THOSE TRAINING RECORDS THAT WOULD

21   SHOW BORDER PATROL TRYING TO PUT THE SKILL IN PECKY THAT SHE

22   COULD BE TAKEN AROUND A HONDA CIVIC DRIVEN BY A HUMAN BEING,

23   SMELL THAT VEHICLE AND DETERMINE WHETHER THERE WAS A HUMAN

24   HIDDEN WITHIN IT?

25   A.  I SAW THAT THERE WERE SCENARIOS WHERE A PERSON WAS BEING

1    USED AS THE DECOY AND THEN USED IN A SCENARIO, BUT THERE'S

2    NOTHING TO SHOW ME HOW IT WAS BEING TRAINED TO DISCERN BETWEEN

3    A PERSON THAT THE DOG COULD SEE AND SOMEBODY THAT WAS HIDDEN.

4    Q.  YOU'RE FAMILIAR WITH BORDER PATROL'S TRAINING PROTOCOLS?

5    A.  YES.

6    Q.  CAN YOU DESCRIBE THEM?

7    A.  WELL, YEAH, THERE'S -- WELL, THERE'S TWO DIFFERENT

8    VERSIONS THAT I SEE.  I HAVE THE HANDLER MANUAL THAT I'VE READ

9    AND LOOKED AT CLOSELY AND THEN WHAT I HEAR THAT HAPPENS, YOU

10   KNOW, IN, OF COURSE, CASES THAT I'VE BEEN INVOLVED IN, AND

11   THEN I'VE BEEN A JUDGE AT COMPETITIONS THAT BORDER PATROL HAS

12   BEEN AT, AND SO THERE HAS BEEN REALLY NOTHING DIFFERENT.

13   Q.  DOES BORDER PATROL HAVE SOME TRADE SECRET THAT THEY AREN'T

14   SHARING WITH THE INDUSTRY?

15   A.  NO.  IT'S ALL THE SAME.

16          MR. ZUGMAN:  I THINK THAT'S ALL I HAVE.

17          THANK YOU, YOUR HONOR.

18          THE COURT:  OKAY.  THANK YOU.

19          GOVERNMENT'S WITNESS.

20          CROSS-EXAMINATION BY MS. AHUMADA:

21   Q.  SO, MR. JIMENEZ, YOU'VE BEEN WORKING AS AN EXPERT SINCE AT

22   LEAST 2011, RIGHT?

23   A.  I HAVE BEEN ASKED TO LOOK AT CASES SINCE THEN, YES.

24   Q.  AND YOU SAID WORKING AS A DEFENSE EXPERT IS PRETTY

25   LUCRATIVE, RIGHT?

1   A.  IT CAN BE, YES.

2   Q.  SO, AS YOU DISCUSSED, YOU'RE BEING PAID $400 AN HOUR FOR

3   BEING HERE TODAY.

4   A.  YES.

5   Q.  AND THAT'S BECAUSE YOU DON'T NEED TO TRAVEL.  OTHERWISE,

6   YOU'D BE RECEIVING $2,000 A DAY, RIGHT?

7   A.  CORRECT.

8   Q.  AND HOW MANY TIMES DID YOU SAY YOU'VE TESTIFIED IN THE

9   LAST FEW YEARS SINCE YOU STARTED WORKING AS AN EXPERT?

10  A.  PROBABLY 25 TIMES IN THE LAST COUPLE YEARS.

11  Q.  YOU'VE GOT MOST OF THOSE LISTED ON YOUR RESUME.  ISN'T

12  THAT TRUE?

13  A.  MOST OF THEM, YES.

14  Q.  AND THOSE, ALMOST ALL THOSE TIMES, NOT ALL OF THEM, HAVE

15  BEEN FOR THE DEFENSE.  ISN'T THAT ALSO TRUE?

16  A.  CORRECT.

17  Q.  YOU HAVEN'T BEEN TESTIFYING FOR THE GOVERNMENT OR ANY

18  POLICE AGENCY FOR YEARS.

19  A.  CORRECT.

20  Q.  PROBABLY THE LAST TIME YOU TESTIFIED FOR LAW ENFORCEMENT

21  WAS WHEN YOU WERE A LAW-ENFORCEMENT OFFICER, RIGHT?

22  A.  (PAUSE)

23  Q.  OR ASSOCIATED WITH DUTIES AS A LAW-ENFORCEMENT OFFICER

24  EVEN AFTER YOU LEFT.

25  A.  CORRECT.  I THINK THERE WAS ONE OR TWO IN THERE, BUT TO

1    ASK ME TO RECALL WHAT THOSE WERE, I COULDN'T TELL YOU.

2    Q.  ALL RIGHT.  SO LET'S GO TO YOUR C.V.  YOU'RE FAMILIAR WITH

3    ALL THE CONTENTS THAT ARE ON YOUR C.V., RIGHT?

4    A.  YES.

5    Q.  YOU PROVIDED A COPY TO MR. ZUGMAN.

6    A.  YES.

7    Q.  SO YOU KNOW THAT I GOT IT.

8    A.  YES.

9    Q.  YOU TESTIFIED THAT I DID.

10   A.  CORRECT.

11   Q.  ALL RIGHT.  AND YOU'RE FAMILIAR WITH THE CASES THAT YOU

12   HAVE LISTED ON HERE.

13   A.  YES.

14   Q.  ALL RIGHT.  ONE OF THOSE CASES WAS AGAINST A JULIO

15   MORALES, RIGHT?

16   A.  IF IT'S ON THERE, YES.

17   Q.  AND IN THAT PARTICULAR CASE, YOU TESTIFIED IN 2015?

18   A.  YES.

19   Q.  AND THIS INVOLVED A TRAFFIC STOP THAT WAS RECORDED BY A

20   DASH-CAM.

21   A.  YES.

22   Q.  THE OFFICER AND THE CANINE DROP OUT OF VIEW AS THEY GO

23   AROUND THE VEHICLE, RIGHT?

24   A.  YES.

25   Q.  YOU INDICATED THAT THERE WAS A SUDDEN MOVEMENT THAT CAUSED

1   THE DOG TO INDICATE.

2   A.   THAT I CAN'T (PAUSE) -- IS THERE MORE DETAIL?

3   Q.   AS THE DOG, AS YOU WALKED THE DOG -- SORRY -- THE OFFICER

4   WALKED THE DOG AROUND, YOU SAID THAT SOMETHING THAT THE

5   OFFICER DID AT THAT POINT CAUSED THE DOG TO INDICATE, THAT THE

6   DOG WAS MAYBE BEING MOVED AROUND TOO QUICKLY, OR SOMETHING IN

7   THAT REGARD.

8   A.   ALL RIGHT.  I DON'T INDEPENDENTLY REMEMBER THAT EXACT

9   MOMENT, BUT IF YOU'RE SAYING THAT'S WRITTEN SOMEWHERE, THEN

10  (PAUSE) --

11  Q.   I HAVE THE OPINION, IF YOU WOULD LIKE TO REVIEW IT.

12  A.   THAT WOULD BE AWESOME.  IF YOU'RE ASKING ME TO RECALL IT,

13  THEN THAT WOULD HELP.

14  Q.   OKAY.

15  A.   CAN YOU TELL ME WHAT STATE THAT WAS IN, OR CITY?

16  Q.   I'LL GIVE YOU THE OPINION IN A SECOND.  THEN IT WILL BE

17  QUITE EASY TO REMEMBER.  SO THIS LOOKS LIKE IT WAS OUT OF THE

18  DISTRICT OF KANSAS, A FEDERAL CASE.

19  A.   OKAY.

20       MS. AHUMADA:  WE'LL MARK THAT AS GOVERNMENT'S EXHIBIT

21  10, YOUR HONOR.

22       BY MS. AHUMADA:

23  Q.   DO YOU REMEMBER IT?

24  A.   IT'S RINGING A BELL.  IS THERE A PAGE THAT YOU WANT ME TO

25  REFER TO?

1    Q.  NO.  NO, NOT NECESSARILY, NOT A SPECIFIC PAGE.  BUT THE

2    COURT DISCOUNTED YOUR OPINION IN THIS CASE.  ISN'T THAT TRUE?

3    A.  IF YOU'RE TELLING ME, YES.

4    Q.  WELL, YOU WORK AS A DEFENSE EXPERT.  ISN'T THAT TRUE?

5    A.  I DO.

6    Q.  AND YOU PROBABLY HAVE AN INTEREST IN REVIEWING THE CASES

7    AFTER THEY'RE DECIDED.  ISN'T THAT ALSO TRUE?

8    A.  SOMETIMES, WE DO, YES.

9    Q.  AND YOU DO THAT BECAUSE YOU WANT TO IMPROVE YOUR

10   TESTIMONY.

11   A.  SOMETIMES, YES.

12   Q.  AND YOU HAVE THIS CASE LISTED ON YOUR C.V., RIGHT?

13   A.  I DO.

14         MR. ZUGMAN:  I DON'T MEAN TO INTERRUPT, BUT CAN I

15   HAVE A COPY OF WHATEVER YOU'RE REFERRING TO?

16         (OFF-THE-RECORD DISCUSSION BETWEEN COUNSEL)

17         BY MS. AHUMADA:

18   Q.  IN THIS CASE, YOU SAID THAT YOU FOCUS ON A MOVEMENT WHEN

19   THE DOG SAT DOWN AND THEN THE COURT LATER DISCOUNTED YOUR

20   OPINION.  ISN'T THAT TRUE?

21   A.  AGAIN, IF THAT'S WHAT IT SAYS, THEN YES.

22   Q.  ALL RIGHT.  SO LET'S KEEP GOING.  SO YOU'VE TESTIFIED IN

23   OTHER CASES, TOO.

24   A.  I HAVE.

25   Q.  AND IN ANOTHER ONE OF THOSE CASES, U.S. V. MELCHIOR AND

1    BRENNAN, YOU SAW A DOG, YOU TESTIFIED ABOUT A DOG SNIFFING

2    AROUND AN R.V.  DO YOU RECALL THAT ONE?

3    A.  WHAT STATE?

4    Q.  WELL, IT'S ACTUALLY -- I BELIEVE IT'S NEBRASKA.

5    A.  I'VE DONE A LOT OF CASES IN NEBRASKA.

6    Q.  IT'S THE SECOND -- IT'S ONE OF THE MOST RECENT CASES, IN

7    2016.  IT'S, IN FACT, THE SECOND-TO-THE-TOP CASE ON YOUR OWN

8    C.V.

9    A.  OKAY.  I'M SO SORRY.  I WAS IN NEBRASKA THREE TIMES THIS

10   YEAR ALREADY.

11   Q.  ALL RIGHT.  WERE ALL OF THEM ABOUT R.V.S?

12   A.  YEAH.  AS A MATTER OF FACT, I THINK ALL THREE INVOLVED

13   R.V.S.

14   Q.  IN THIS PARTICULAR CASE, YOU SPECIFICALLY CRITIQUED THE

15   AMOUNT OF TIME THE SEARCH TOOK.

16   A.  OKAY.

17   Q.  YOU SAID THAT THE SEARCH -- THAT A DOG'S JUST GOING TO

18   ALERT AT SOME POINT AFTER TWO-AND-A-HALF MINUTES.

19   A.  CORRECT.  I THINK THAT SEARCH WAS SOMEWHERE IN THE

20   NEIGHBORHOOD OF 15 MINUTES OR 20 MINUTES OF THAT VEHICLE.

21   Q.  THE COURT FOUND THAT IT WAS A MINUTE, 35.

22   A.  HMM.  OKAY.

23   Q.  THIS WAS CASE 16-CR-3033.  YOU DIDN'T REVIEW THAT DECISION

24   AFTER IT WAS MADE?

25   A.  I'VE MOVED ON SINCE THAT CASE.  BUT, YEAH, THERE'S A LIMIT

1   TO HOW LONG YOU WANT TO BE SEARCHING A VEHICLE.  IT SHOULD NOT

2   TAKE THAT LONG.

3   Q.  THAT'S NOT WHAT I ASKED.  DID YOU REVIEW THIS DECISION?

4   A.  I PROBABLY DID, BUT THAT WAS A YEAR AGO.

5   Q.  THE COURT PUT A TIME STAMP ON THERE INDICATING FROM WHEN

6   THE SEARCH BEGAN TO WHEN THE SEARCH ENDED IN ITS DECISION.

7   A.  OKAY.

8   Q.  THE COURT FOUND THAT YOU LACKED CREDIBILITY, IN FACT,

9   BECAUSE YOU EXAGGERATED THE TIME OF THE SEARCH.  YOU SAID THE

10  SEARCH ACTUALLY TOOK OVER FOUR MINUTES, NOT 15.

11  A.  OKAY.  BECAUSE (PAUSE) --

12  Q.  YOU DON'T REMEMBER THAT?

13  A.  I DO NOT REMEMBER THE DETAILS THAT YOU'RE SPEAKING OF, BUT

14  I KNOW THERE WAS A LONG PERIOD OF TIME FOR THAT SEARCH TO TAKE

15  PLACE.

16          MS. AHUMADA:  JUST FOR THE COURT'S RECORD, I'M GOING

17  TO MARK THIS AS, THE OPINION AS GOVERNMENT'S EXHIBIT 11, AND

18  I'LL PROVIDE COPIES TO DEFENSE COUNSEL AFTERWARDS.  THESE ARE

19  PUBLICLY AVAILABLE DOCUMENTS, THOUGH.

20          BY MS. AHUMADA:

21  Q.  ALL RIGHT, AND SO, IN SUM, YOU PROBABLY TESTIFIED IN HOW

22  MANY CASES EVERY YEAR FOR THE DEFENSE?

23  A.  EVERY YEAR?  IT'S INCREASED THIS YEAR, BUT IT CAN BE

24  ANYWHERE FROM TEN TO 25 TIMES, I GUESS.

25  Q.  ABOUT HOW MUCH MONEY DO YOU MAKE A YEAR, ON AVERAGE?

1    A.  I DON'T KNOW.  IT GETS ALL LUMPED INTO THE CORPORATION.  I

2    GET PAID FROM OTHER THINGS AS WELL AS TESTIFYING IN COURT.

3    Q.  SO LET'S TALK ABOUT YOUR TESTIFYING SPECIFICALLY, THOUGH.

4    AROUND 35,000?

5    A.  LAST YEAR?  PROBABLY, YES.

6    Q.  YOU EARN ABOUT 35,000 ALSO FROM YOUR RETIREMENT FROM

7    ANAHEIM.

8    A.  YES.

9    Q.  AND ONLY ABOUT A THOUSAND TO $1500 A MONTH FROM YOUR

10   ACADEMY.

11   A.  NO.  THAT'S FROM A LICENSING OF MY LOGO AND NAME FOR

12   PET-DOG TRAINING IS $1500 A MONTH.

13   Q.  AND YOU'VE ALSO WRITTEN A BOOK, IN FACT.  ISN'T THAT TRUE?

14   A.  A FEW, YES.

15   Q.  ONE OF THESE IS ABOUT TESTIFYING IN PARTICULAR.

16   A.  IT'S ABOUT BEING AN EXPERT.

17   Q.  IT'S CALLED *BIG INCOME EXPERTISE*.

18   A.  CORRECT.

19   Q.  HOW YOU CAN, EVEN YOU CAN BE AN EXPERT ON ANYTHING AND HOW

20   TO PROFIT FROM IT.

21   A.  CORRECT.

22          MS. AHUMADA:  I'LL MARK THIS AS GOVERNMENT'S EXHIBIT

23   12.

24          BY MS. AHUMADA:

25   Q.  IS THIS A COPY -- CAN YOU SEE IT FROM HERE?

1    A.  YES.

2    Q.  IS THIS A COPY OF YOUR BOOK?

3    A.  YES.

4    Q.  NOW, LET'S TALK ABOUT SOME OF YOUR QUALIFICATIONS.  YOU

5    WORKED AS A POLICE OFFICER, RIGHT?

6    A.  YES.

7    Q.  AND AS AN OFFICER, YOU GAINED EXPERIENCE ABOUT DETERMINING

8    PROBABLE CAUSE.

9    A.  YES.

10   Q.  AND WHAT PERCENTAGE OF SUCCESSFUL ALERTS IS NECESSARY FOR

11   PROBABLE CAUSE?

12   A.  HOW YOU'RE USING THE TERM ALERTS, BECAUSE BORDER PATROL --

13   Q.  WELL, LET'S DO --

14   A.  -- USES THE TERM DIFFERENT THAN I DO.

15          MR. ZUGMAN:  YOUR HONOR, I'M NOT PROFFERING HIM AS AN

16   EXPERT ON THE LAW.  I'M PROFFERING HIM AS AN EXPERT ON DOGS.

17   SO I DON'T THINK HE SHOULD BE OFFERING AN OPINION ABOUT THE

18   LAW.

19          THE COURT:  AND YOUR RESPONSE TO THAT OBJECTION, MISS

20   AHUMADA?

21          MS. AHUMADA:  RELIABILITY.  THE AMOUNT OF ALERTS AND

22   THE RELIABILITY OF THE CANINE IS PART OF WHAT'S GOING ON.  WE

23   HAVE TO PROVE THAT THE CANINE IS RELIABLE.

24          THE COURT:  WHY DON'T YOU REFRAME YOUR QUESTION SO IT

25   DOESN'T CALL FOR A LEGAL RESPONSE?

1          MS. AHUMADA:  SURE.

2          BY MS. AHUMADA:

3    Q.  IN YOUR EXPERIENCE IN LAW ENFORCEMENT, WHAT PERCENTAGE OF

4    THE TIME DO YOU EXPECT A DOG TO SUCCESSFULLY ALERT?

5    A.  AGAIN, THE TERMS ARE IMPORTANT BECAUSE I USE ALERT

6    DIFFERENTLY THAN --

7    Q.  I'M USING ALERT IN THE WAY YOU USE ALERT, BUT IF YOU'D

8    PREFER, IT CAN BE INDICATION FOR BORDER PATROL.  IT'S THE

9    ACTUAL BEHAVIOR THAT THEY'RE SUPPOSED TO DO.  THE RESPONSE IS

10   SITTING, OR POINTING, OR (PAUSE) --

11   A.  THE TRAINED BEHAVIOR.

12   Q.  THE TRAINED BEHAVIOR.

13   A.  AND NOW ASK A QUESTION.

14   Q.  SO, WHAT PERCENTAGE OF THE TIME WOULD YOU EXPECT TO SEE

15   THE TRAINED BEHAVIOR ASSOCIATED WITH A SUCCESSFUL FIND OF THE

16   ITEM THAT YOU'RE LOOKING FOR?

17   A.  THERE'S TWO DIFFERENCES.  YOU'VE GOT YOUR TRAINING AND

18   THEN YOU HAVE YOUR ACTUAL DEPLOYMENTS.  IN TRAINING, OFTEN, WE

19   EXPECT THERE TO BE SOMEWHERE IN THE 90 PERCENTILE, BECAUSE WE

20   CONTROL EVERYTHING IN TRAINING.  THERE'S SOMEBODY IN THE ROOM

21   THAT KNOWS WHERE THE TRAINING AIDS ARE, AND IN MANY CASES THE

22   DOG AND THE HANDLER USUALLY ARE ENCOURAGED TO CONTINUE TO

23   SEARCH UNTIL THE DOG ACTUALLY MAKES THE FIND.  SO THE

24   PERCENTAGES ARE GOING TO BE MUCH HIGHER IN TRAINING JUST

25   BECAUSE WE'RE OFTEN WORKING ON THE EFFECTIVENESS OF THE

1    SEARCH, THE SEARCHING PATTERNS, THE HANDLING SKILL, AND ALL

2    THAT.  IN THE REAL WORLD, IN DEPLOYMENTS, IF WE START SEEING

3    ANYTHING BELOW ABOUT 70 PERCENT WHERE A DOG ACTUALLY LOCATES

4    SOMETHING THAT ACTUALLY EXISTS AND SITS AS OPPOSED TO WHEN HE

5    SITS AND THERE'S NOTHING FOUND, IF IT GETS BELOW 70 PERCENT,

6    THEN WE'LL BEGIN LOOKING AT, YOU KNOW, IS THERE SOMETHING

7    GOING WRONG WITH OUR TRAINING?  IS THERE SOMETHING WRONG WITH

8    THE DOG?  BUT IT CAN FLUCTUATE, DEPENDING ON A FEW FACTORS.

9    BUT MOSTLY IN REAL LIFE, WE DON'T CONTROL EVERYTHING.

10   Q.  RIGHT.  AND THEN THE REASON THAT THE AMOUNT IS LOWER,

11   YOU'RE SAYING THE AMOUNT IS LOWER IS BECAUSE, PRECISELY

12   BECAUSE YOU DON'T CONTROL EVERYTHING.  YOU DON'T CONTROL

13   WHETHER SOMEONE'S RECENTLY SMOKED MARIJUANA, FOR EXAMPLE,

14   RIGHT?

15   A.  CORRECT.

16   Q.  HAD METHAMPHETAMINE RECENTLY IN THEIR CAR.

17   A.  CORRECT.

18   Q.  HAD A METH PIPE IN THEIR CAR.

19   A.  HAD A METH WHAT?

20   Q.  METH PIPE IN THEIR CAR.

21   A.  YES.

22   Q.  JUST PARAPHERNALIA.

23   A.  CORRECT.

24   Q.  ALSO BECAUSE YOU MIGHT NOT NECESSARILY FIND THE NARCOTICS,

25   DEPENDING ON HOW LONG YOU HAVE TO CONDUCT THE SEARCH, RIGHT?

1    A.  CORRECT.

2    Q.  IT'S POSSIBLE THAT THERE'S HUMAN ERROR INVOLVED.

3    A.  CORRECT.

4    Q.  NOW, JUST TO BE CLEAR, YOU'VE NEVER WORKED FOR BORDER

5    PATROL, RIGHT?

6    A.  NO.

7    Q.  YOU NEVER WORKED AT AN IMMIGRATION CHECKPOINT.

8    A.  NO.

9    Q.  AND THE COMPANY YOU OWN RIGHT NOW DOESN'T HAVE ANY

10   CONTRACTS WITH POLICE DEPARTMENTS ANYMORE, RIGHT?

11   A.  CORRECT.

12   Q.  THAT'S WHY YOU MENTIONED TRAINING PETS, NOT

13   LAW-ENFORCEMENT CANINES.

14   A.  I DON'T EVEN TRAIN PETS ANYMORE.

15   Q.  ALL RIGHT.  AND SO HOW LONG HAVE YOU BEEN NOT, NOT BEEN

16   TRAINING PETS ANYMORE?

17   A.  HMM.  PROBABLY GOING ON A YEAR.

18   Q.  BUT YOU'RE STILL THE LEAD TRAINER FOR YOUR COMPANY?

19   A.  YES.  I JUST HAD A MEETING TWO DAYS AGO WITH THE TRAINERS

20   TO MAKE SURE THAT THEY WERE UP ON WHAT SKILLS THEY WERE DOING,

21   AND I REVIEWED THEIR TRAINING PROBABLY FOUR DAYS AGO AND THE

22   TRAINING OF A DOG JUST TO WATCH AND OBSERVE AND MAKE SURE THAT

23   THEY'RE DOING WHAT THEY'RE SUPPOSED TO BE DOING.

24   Q.  ALL RIGHT.  AND ONE OF THOSE THINGS THAT I WOULD ASK YOU

25   IS, YOU'VE ACTUALLY NEVER SEEN BORDER PATROL CERTIFICATIONS IN

1    PROCESS, RIGHT?

2    A.  I'VE SEEN BORDER PATROL AT CERTIFICATION BECAUSE I WAS ONE

3    OF THE JUDGES.

4    Q.  THAT WAS A COMPETITION; THAT WASN'T CERTIFICATION.

5    A.  THE CERTIFICATION WAS TAKING PLACE AT THE SAME TIME AS THE

6    COMPETITION.

7    Q.  ALL RIGHT.  WHAT YEARS WERE YOU DOING THAT?

8    A.  I BELIEVE IT WAS 2004, MAYBE IT WAS 2003, TILL ABOUT 2008,

9    IF I RECALL.  THOSE DATES ARE APPROXIMATIONS.  I COULDN'T TELL

10   YOU FOR SURE.

11   Q.  SO IT'S BEEN ALMOST A DECADE SINCE YOU'VE SEEN BORDER

12   PATROL IN ACTION?

13   A.  YES.

14   Q.  NOW, YOU'VE NEVER BEEN TO THE SCHOOLS FOR BORDER PATROL OR

15   CUSTOMS AND BORDER PROTECTION IN EL PASO, HAVE YOU?

16   A.  NO.

17   Q.  NEVER IN VIRGINIA.

18   A.  NO.

19   Q.  YOU DON'T KNOW HOW MANY TRAINERS THERE ARE THERE, OR HOW

20   THE TRAINING AIDS ARE USED.

21   A.  I THINK THERE WAS TESTIMONY ABOUT THAT IN ONE OF THE OTHER

22   CASES, BUT I CAN'T RECALL WHAT IT IS.

23   Q.  BUT YOU DON'T HAVE ANY PERSONAL EXPERIENCE, RIGHT?

24   A.  NO.

25   Q.  AND YOU DON'T KNOW HOW THE TRAINING AIDS ARE USED.

1   A.  HOW THE WHAT?

2   Q.  THE TRAINING AIDS ARE USED, OR HOW THEY'RE PUT TOGETHER.

3   A.  I PROBABLY DO.

4   Q.  YOU AREN'T ACTUALLY AT THE SCHOOL, RIGHT?

5   A.  NO.

6   Q.  YOU'RE NOT WATCHING THEM PUT THE TRAINING AIDS TOGETHER.

7   YOU DON'T KNOW, FOR EXAMPLE, WHETHER THEY WEAR GLOVES WHEN

8   THEY'RE PUTTING ON THE, PUTTING IN THE COCAINE TO SOME THINGS

9   SO THAT IT CAN EMIT SMELL.

10  A.  HAVE I SEEN THEM, HOW THEY DO IT?  NO.

11  Q.  AND YOU DON'T KNOW, FOR EXAMPLE, HOW THEY BURY PEOPLE WHEN

12  THEY'RE TRYING TO HIDE THEM IN CONCEALED VEHICLES.

13  A.  NO.

14  Q.  AND YOU DON'T KNOW WHAT THEY DO TO TRAIN THE CANINES IN

15  TERMS OF HOW TO DETECT A CONCEALED HUMAN, BECAUSE YOU HAVEN'T

16  BEEN THERE.

17  A.  LIKE I SAID, I'VE READ THEIR HANDLER MANUAL, WHICH HAS

18  MANY DETAILS ON HOW THEY DO THAT, BUT I'VE NOT BEEN AT THE

19  LOCATION WHEN THEY'VE DONE IT.

20  Q.  SO ONE OF THE THINGS THAT YOU LOOKED AT WAS THE

21  CERTIFICATION.  ISN'T THAT TRUE?

22  A.  IN THIS CASE?  YES.

23  Q.  AND THE CERTIFICATION PROCESS, IN FACT, JUST TELLS FLAT

24  OUT THAT ONE OF THE THINGS THAT THE CANINES HAVE TO DO IS

25  SEARCH FOR HUMANS IN VEHICLES.

1    A.  CORRECT.

2    Q.  AND I BELIEVE THAT THEY ALSO, IF YOU GIVE ME A MOMENT,

3    THAT THEY ALSO HAVE TO HAVE SOME KIND OF PERSON IN THE VEHICLE

4    AT THE TIME.

5    A.  CORRECT.

6    Q.  AT LEAST IN ONE OF THEM.

7    A.  YES.

8    Q.  SO THAT MEANS THAT THEY TEST, AT LEAST THE MATERIALS SAY

9    THAT THEY TEST ON FINDING A CONCEALED HUMAN WITH A PERSON IN

10   THE VEHICLE AS PART OF THEIR CERTIFICATION.

11   A.  YES.

12   Q.  AND SO THE POINT IS THAT, WHEN THEY'RE DOING THAT TEST,

13   THERE'S SOMEBODY THAT'S VISIBLE IN THE CAR AT THE SAME TIME,

14   LIKE A DRIVER OR A PASSENGER.  THAT'S WHAT THE TEST

15   CERTIFICATION STANDARDS SAY, RIGHT?

16   A.  CORRECT.

17   Q.  AND IN FACT, WHEN YOU LOOK AT THE ANNUAL CERTIFICATION

18   STANDARDS, IT OFTEN SAYS THAT -- IT HAS A LITTLE ASTERISK WITH

19   A CONCEALED PERSON AT THAT POINT BECAUSE THEY'RE SEARCHING FOR

20   A CONCEALED PERSON, RIGHT?

21   A.  YES.

22   Q.  AND THAT THE CERTIFICATION STANDARDS FOR RECERTIFICATION

23   ARE THE SAME AS THE INITIAL CERTIFICATION, RIGHT?

24   A.  YES.

25   Q.  SO THEY'RE TESTED ON THIS EVERY YEAR.

1    A.  YES.

2    Q.  IN A CONTROLLED ENVIRONMENT.

3    A.  YES.

4    Q.  AND YOU REVIEWED PECKY'S RECORD.  ISN'T THAT TRUE?

5    A.  CORRECT.

6    Q.  SHE PASSED.

7    A.  OKAY.

8    Q.  YES, SHE PASSED?

9    A.  WELL, IF THE DOG IS ALERTING ON A CAR THAT HAS SOMEBODY

10   YOU CAN SEE AND THERE'S SOMEBODY IN THE TRUNK, THAT YOU ASKED

11   IF THE DOG WAS ALERTING ON THE PERSON THAT THEY CAN SEE OR THE

12   PERSON THAT WAS IN THE TRUNK?

13   Q.  WELL, ISN'T THE WHOLE TEST FOR A CONCEALED PERSON?  THAT'S

14   WHAT THE CERTIFICATION STANDARD SAYS, RIGHT?

15   A.  IT'S STILL ALERTING ON A CAR THAT HAS A VISIBLE PERSON AND

16   A PERSON IN THE TRUNK.

17   Q.  BUT THE CERTIFICATION REQUIREMENT SAYS THAT THEY HAVE TO

18   ALERT TO THE CONCEALED PERSON, NOT THE VISIBLE PERSON.  ISN'T

19   THAT CORRECT?  THAT'S WHAT YOU REVIEWED.

20   A.  CORRECT.  IT'S STILL HUMAN ODOR COMING OUT OF THAT

21   VEHICLE.

22   Q.  WELL, LET'S TALK ABOUT THAT FOR A SECOND.  SO HUMAN SMELL

23   DEGRADES RELATIVELY QUICKLY, RIGHT?

24            MR. ZUGMAN:  OBJECTION, YOUR HONOR.  I'M NOT SURE

25   HE'S QUALIFIED TO ANSWER THAT QUESTION.

1              MS. AHUMADA:  HE SAID HE'S --

2              THE COURT:  WELL, LET'S LAY SOME FOUNDATION.

3              MS. AHUMADA:  SURE.

4              BY MS. AHUMADA:

5    Q.  YOU'VE TRAINED CANINES TO DETECT CONCEALED PEOPLE BEFORE,

6    RIGHT?

7    A.  CORRECT.

8    Q.  YOU TESTIFIED TO THAT ON DIRECT, RIGHT?

9    A.  YES.

10   Q.  AND YOU'VE TALKED ABOUT, FOR EXAMPLE, ALERTING TO OTHER

11   ITEMS, LIKE GYM BAGS.

12   A.  YES.

13   Q.  AND YOU, IN FACT, TALKED ABOUT HOW LONG THE PERSON HAD

14   PREVIOUSLY WORN THOSE ITEMS, BECAUSE THE HUMAN SMELL DEGRADES,

15   RIGHT?

16   A.  IT CHANGES OVER TIME.

17   Q.  AND IT CHANGES PRETTY QUICKLY, RIGHT?

18   A.  IT DEPENDS ON THE TEMPERATURES OUTSIDE.  IT DEPENDS ON

19   WIND.  THERE'S A FEW FACTORS THAT ARE INVOLVED THAT WE'VE

20   NOTICED IN OUR TESTING AND OUR --

21   Q.  BUT IT HAPPENS --

22   A.  -- EVALUATIONS.

23   Q.  BUT IT HAPPENS PRETTY QUICKLY, RIGHT?

24   A.  IT DEPENDS WHAT QUICKLY IS, BUT IT HAPPENS, IT BEGINS TO

25   HAPPEN AT THE MOMENT IT BECOMES DETACHED FROM THE HUMAN BEING.

1  Q.  ALL RIGHT.  AND SO IF A PERSON'S REMOVED FROM THE VEHICLE

2  AND THE CANINE IS ALERTING TO THE CONCEALED PERSON BECAUSE

3  THERE ARE NO OTHER PEOPLE IN THE VEHICLE AND THE DOG ALERTS

4  AGAIN AND THEY'RE NOT ALERTING TO THE SPACE WHERE THE HUMAN

5  WAS PREVIOUSLY FOUND, THAT DOESN'T COUNT AS AN ALERT, TO YOU,

6  TO A CONCEALED PERSON?

7  A.  WELL, YEAH, THE DOG'S STILL GOING TO ALERT.  WHEN YOU OPEN

8  THE DOOR, WHEN YOU OPEN THE DOORS AND THE PERSON COMES OUT,

9  THERE'S A PRETTY QUICK RUSH OF AIR FLOW THROUGH THAT VEHICLE,

10  SO IT WILL QUICKLY WASH AWAY THE LARGE AMOUNT OF ODOR THAT'S

11  STILL IN THE COMPARTMENT, AND AS YOU CLOSE THE DOOR, THERE'S

12  ANOTHER BIG RUSH, WHICH PUSHES THE ODOR OUT ANY OF THE

13  OPENINGS OF THE VEHICLE.  THE ONLY REASON WE KNOW THIS IS

14  BECAUSE WE'LL PUT SMOKE GRENADES IN VEHICLES AND WE'LL REPEAT

15  AND WE'LL WATCH AND WE'LL SEE WHAT HAPPENS.  SO BY WASHING

16  AWAY WHAT ODOR IS IN THE COMPARTMENT AND YOU'RE BRINGING THE

17  DOG BACK AROUND, THE ONLY ODOR THAT'S REALLY LEFT THAT'S BEEN

18  STAGNANT AND STILL AND ABLE FOR, AND AVAILABLE FOR THE DOG TO

19  FIND WILL BE THAT OF THE PERSON THAT'S STILL IN THE TRUNK.

20  Q.  BUT YOUR EXPLANATION DOESN'T EXPLAIN HOW THE DOG IS

21  ALERTING TO THE PERSON IN THE TRUNK AS OPPOSED TO THE MAIN

22  CABIN OF THE VEHICLE.

23  A.  BECAUSE NOW THAT'S THE ONLY ODOR THAT'S LEFT.  THE ODOR

24  THAT'S BEEN IN THE COMPARTMENT, THE MAJORITY OF IT HAS BEEN

25  BLOWN AWAY, IS THE BEST WAY I COULD PUT IT.  WHEN YOU OPEN A

1   DOOR, THERE'S A VACUUM EFFECT.  RIGHT?  AND WE'VE ALL

2   FELT THAT.  WHEN WE OPEN A DOOR, WE FEEL THAT BIG RUSH OF AIR,

3   AND THEN WE HAVE SOMETIMES A BIG SMELL, IF IT'S A SMELLY CAR,

4   AND THEN WHEN YOU CLOSE THE DOOR, IT DOES IT AGAIN, AND SO THE

5   ONLY THING LEFT AT THAT POINT IS THAT PERSON THAT'S STILL IN

6   THE VEHICLE, WHICH IS IN THE TRUNK.

7   Q.  BUT THE LONG AND SHORT OF IT IS, IT CAN ALERT TO THE

8   PERSON IN THE TRUNK.

9   A.  I NEVER SAID THEY DIDN'T.

10  Q.  ALL RIGHT, AND -- BUT YOU'RE NOT, YOU'RE NOT -- WELL, I'LL

11  MOVE ON.  SO YOU HAVE SOME ORGANIZATIONS LISTED ON YOUR C.V.,

12  RIGHT?

13  A.  CORRECT.

14  Q.  YOU'RE NO LONGER A MEMBER OF ANY OF THOSE.

15  A.  NO.

16  Q.  AND HAVEN'T BEEN FOR A SIGNIFICANT PERIOD OF TIME.  ISN'T

17  THAT TRUE?

18  A.  CORRECT.  WHATEVER SIGNIFICANT TO YOU IS.

19  Q.  A FEW YEARS?

20  A.  A COUPLE YEARS, YEAH.

21  Q.  AND YOU LISTED THESE MEMBERSHIPS ON YOUR RESUME BECAUSE

22  YOU BELIEVE THESE ORGANIZATIONS ARE RELIABLE, RIGHT?

23  A.  HMM.  YEAH.  PROBABLY THE MOST RELEVANT ORGANIZATIONS IN

24  OUR INDUSTRY, NOT ALWAYS NECESSARILY RELIABLE.

25  Q.  SO YOU LIST THEM ON YOUR C.V. EVEN THOUGH YOU DON'T THINK

1    THEY'RE RELIABLE?

2    A.   IT'S THEIR MEMBERSHIPS THAT I'VE BEEN INVOLVED IN.

3    THERE'S NOTHING WRONG WITH BEING INVOLVED IN AN ORGANIZATION

4    THAT MAY BE LESSER THAN SOME OF THE OTHERS.  IT'S ALL ABOUT

5    INFORMATION, ABOUT WHAT THEIR STANDARDS ARE.  I THINK ANY

6    INFORMATION THAT YOU CAN LEARN, EVEN SOMETIMES IF IT'S NOT

7    GREAT INFORMATION, IS RELEVANT BECAUSE IT'S WHAT PEOPLE ARE

8    BEING TAUGHT.  A DISCUSSION I HAD JUST LAST NIGHT WAS ABOUT

9    THE WDDO AND SOME OF THE STANDARDS THAT HAVE CHANGED OVER --

10   WDDO BEING THE WORLD DETECTOR DOG ORGANIZATION.  SO, OVER THE

11   LAST COUPLE OF YEARS, WE'VE SEEN A CHANGE IN THE WAY THEY

12   CONDUCT CERTIFICATIONS.  SO THESE DISCUSSIONS, THESE KEEPING

13   TRACK OF ORGANIZATIONS, I THINK, IS IMPORTANT.

14   Q.   SO THE VENTURA COUNTY ANNUAL TRAINING, WAS THAT ONE OF THE

15   TRAININGS THAT YOU WERE PART OF AS PART OF ONE OF THESE

16   ORGANIZATIONS?

17   A.   IT WAS THE INTERNATIONAL POLICE CANINE CONFERENCE, AND I

18   BELIEVE, IF I'M NOT MISTAKEN, THE UNITED STATES POLICE CANINE

19   ASSOCIATION HAD SOME PART IN IT, BUT I COULD BE MISTAKEN.

20   SOMETIMES, WE DID SOME CROSS (PAUSE) -- YOU KNOW, AT SOME

21   EVENTS, WE HAD, YOU KNOW, TWO ORGANIZATIONS THAT WERE PART OF

22   THE SAME EVENT.  LIKE IN TEXAS, IN DALLAS, WE HAD THE U. S.

23   POLICE CANINE ASSOCIATION AND THE INTERNATIONAL POLICE CANINE

24   CONFERENCE.

25   Q.   BUT YOU ACTUALLY, IN FACT, JUDGED AS PART OF A CNCA EVENT.

1    THAT WAS PART OF WHAT YOU WERE JUDGING WHEN YOU JUDGED BORDER

2    PATROL, RIGHT?  CALIFORNIA NARCOTICS CANINE ASSOCIATION.

3    A.  CORRECT.

4    Q.  AND YOU SAID YOU DID THAT FROM 2004 TO 2008?

5    A.  AGAIN, THOSE ARE APPROXIMATIONS.  I KNOW -- THE ONLY

6    REASON I REMEMBER SOME OF THE DATES IS BECAUSE ONE OF THE LEAD

7    TRAINERS PASSED AWAY, I BELIEVE, IN 2007.  SO IT WAS A COUPLE

8    YEARS BEFORE THAT, AND THEN UP TO HIS DEATH I WAS A PART OF

9    IT.

10    Q.  DID YOU KEEP TRACK OF WHAT HAPPENED IN THOSE EVENTS

11    AFTERWARDS?

12    A.  NO.

13    Q.  ARE YOU AWARE THAT -- YOU SAID THAT BORDER PATROL DIDN'T

14    DO ONE OF THOSE.  CORRECT?  EARLIER.

15    A.  IN ONE OF THEM, THERE WAS SOME DIFFICULTY IN SOME OF THE

16    EXERCISES.

17    Q.  AND I'LL SHOW YOU GOVERNMENT'S EXHIBIT 13.  DID YOU

18    PARTICIPATE IN THIS EVENT IN 2009?

19    A.  IN VENTURA?

20    Q.  UH-HUH.

21    A.  NO.

22    Q.  THAT'S A PARAGRAPH OF BORDER PATROL WINNING THAT

23    COMPETITION.  ARE YOU AWARE OF THAT?

24    A.  WHAT, INDEPENDENTLY?  NO.

25    Q.  NOW, LET'S TALK ABOUT ANOTHER CASE IN WHICH YOU TESTIFIED.

1   YOU TESTIFIED IN ANOTHER CASE --

2            MR. ZUGMAN:  YOUR HONOR, CAN WE TALK ABOUT THIS CASE?

3            THE COURT:  WELL, LET'S HEAR THE QUESTION.  I WOULD

4   TENTATIVELY SAY IT'S GOING TO HAVE TO BE EXTREMELY ON ALL

5   FOURS, AND THAT'S NOT LIKELY.  BUT POSE YOUR QUESTION, AND

6   HE'S NOT -- AND DON'T ANSWER, SIR, BECAUSE THERE'S GOING TO BE

7   AN OBJECTION THAT WE MAY HAVE TO DISCUSS.

8            MS. AHUMADA:  SURE.

9            BY MS. AHUMADA:

10  Q.  YOU'VE PREVIOUSLY RENDERED OPINIONS IN WHICH, AN OPINION

11  IN WHICH YOU SAID THAT THE CALIFORNIA CANINE NARCOTICS

12  ASSOCIATION WAS UNRELIABLE, EVEN THOUGH THEY INDEPENDENTLY

13  CERTIFIED THE LAS VEGAS PD.  ISN'T THAT TRUE?

14  A.  (PAUSE)

15           THE COURT:  IT'S NOT DRAWING AN OBJECTION.  YOU MAY

16  ANSWER.

17  A.  I DON'T RECALL THAT, NO.

18  Q.  THIS WAS U.S. V. HUNSBERGER.  IT'S ON YOUR RESUME.

19  A.  ALL RIGHT.  THERE'S OFTEN MORE THAT GOES ALONG WITH

20  WHATEVER IT IS THAT YOU'RE STATING, SO I'M NOT SURE OF ALL THE

21  INFORMATION.

22  Q.  SURE.  SO IN THIS PARTICULAR CASE THIS WAS THE LAS VEGAS

23  P.D.  YOU PREVIOUSLY WORKED WITH THE LAS VEGAS P.D.  ISN'T

24  THAT TRUE?

25  A.  I HAVE.

44

1    Q.  AND WHEN YOU PREVIOUSLY WORKED WITH THE LAS VEGAS P.D.,

2    YOU HELPED WITH THEIR INTERNAL CERTIFICATION, BECAUSE THEY

3    CERTIFY THEMSELVES.

4    A.  I DON'T BELIEVE I HELPED WITH THEIR CERTIFICATION.  I

5    THINK I WAS THERE TO ASSIST IN SOME ASPECT OF THEIR TRAINING.

6    I DON'T KNOW THAT IT HAD ANYTHING TO DO WITH CERTIFICATION.

7    Q.  ALL RIGHT.  SURE.  AND YOU RENDERED AN OPINION ABOUT

8    INDEPENDENT CERTIFICATION, RIGHT?

9    A.  YES.

10   Q.  IT'S YOUR OPINION THAT INDEPENDENT CERTIFICATION IS, IN

11   FACT, REQUIRED IN ORDER TO HAVE A RELIABLE CERTIFICATION, OR

12   AT LEAST IT HAS BEEN IN THE PAST.

13   A.  IT'S RECOMMENDED.

14   Q.  AND IN THAT PARTICULAR CASE, YOU ORIGINALLY RENDERED AN

15   OPINION SAYING THAT THE LAS VEGAS POLICE DEPARTMENT CANINES

16   WERE UNRELIABLE.

17   A.  THAT THAT DOG IN THAT CASE WAS UNRELIABLE?

18   Q.  YES.  BUT YOU ALSO SAID THAT THE INDEPENDENT, THAT THERE

19   WAS NO INDEPENDENT CERTIFICATION, SO THAT DOG CERTIFICATION

20   WAS UNRELIABLE.

21   A.  OKAY.  I DON'T REMEMBER ALL THE DETAILS OF THAT CASE.

22   Q.  WELL, I'M HAPPY TO HAND IT TO YOU AND YOU CAN PERUSE IT,

23   IF YOU LIKE, BUT YOU RENDERED AN OPINION ESSENTIALLY SAYING

24   THAT THE DOG CERTIFICATION WAS UNRELIABLE BECAUSE THE DOG

25   HADN'T BEEN INDEPENDENTLY CERTIFIED.

1    A.  OKAY.

2    Q.  AND THEN YOU DIDN'T CHANGE YOUR OPINION AFTER YOU FOUND

3    OUT THAT THE CALIFORNIA NARCOTICS CANINE ASSOCIATION HAD, IN

4    FACT, INDEPENDENTLY CERTIFIED THE CANINE.

5    A.  ALL RIGHT.

6    Q.  IF YOU WANT, I CAN SHOW IT TO YOU.  IT STARTS, ROUGHLY, ON

7    THIS PAGE OF GOVERNMENT'S EXHIBIT 14.

8              THE COURT:  I'M SORRY.  WHAT EXHIBIT?

9              MS. AHUMADA:  14.

10             MR. ZUGMAN:  YOUR HONOR, MAYBE WE CAN PUT IT ON THE

11   ELMO SO WE CAN ALL SEE IT.

12             THE COURT:  THAT WOULD BE FINE.

13             MS. AHUMADA:  SURE.  MAY I STEAL THIS FROM YOU?

14             THE WITNESS:  UH-HUH.

15             BY MS. AHUMADA:

16   Q.  SO HERE -- I APOLOGIZE.  IT'S A LITTLE HARD TO SEE.  THE

17   EVIDENCE PRESENTED AT THE EVIDENTIARY HEARING SHOWED THAT YAYA

18   HAS BEEN CONTINUALLY CERTIFIED AS A NARCOTICS SNIFFING CANINE

19   ON A BIANNUAL BASIS SINCE 2012.  THEY ARE CERTIFIED DURING THE

20   FIRST HALF OF THE YEAR BY THE LVMPD, WHICH IS THE LAS VEGAS

21   METROPOLITAN POLICE DEPARTMENT?

22   A.  YES.

23   Q.  FOR WHOM THEY WORK, AND DURING THE SECOND YEAR BY CNCA, A

24   BONA FIDE, INDEPENDENT CERTIFICATION.  THAT'S THE SAME

25   ORGANIZATION FOR WHICH YOU JUDGE, RIGHT?

1    A.  YES.

2    Q.  AND YOU JUDGE THAT ONE BECAUSE YOU BELIEVE THAT THAT

3    CERTIFICATION WAS RELIABLE.  OTHERWISE, YOU WOULDN'T ASSOCIATE

4    YOUR NAME WITH IT, RIGHT?

5    A.  YES.  I'M READING.  SORRY.

6    Q.  OKAY.  AND EVEN THOUGH THIS CANINE WAS CERTIFIED BY CNCA,

7    YOU STILL DEEMED THAT THAT CANINE WAS UNRELIABLE.  THAT DIDN'T

8    CHANGE YOUR OPINION, RIGHT?

9    A.  NO, BECAUSE THERE ARE OTHER FACTORS THAT WERE INVOLVED IN

10   THE TRAINING RECORD AND SOME OTHER EVIDENCE THAT WAS IN THE

11   DISCOVERY IN THAT PARTICULAR CASE.

12   Q.  AND ORIGINALLY, YOU RENDERED AN OPINION BECAUSE YOU DIDN'T

13   KNOW THAT HE WAS CERTIFIED OR YOU THOUGHT HE WAS ONLY

14   CERTIFIED BY THE LAS VEGAS POLICE DEPARTMENT.  ISN'T THAT

15   TRUE?

16   A.  THAT'S BECAUSE OF ALL THE DISCOVERY THAT I WAS GIVEN.

17   Q.  BUT YOUR OPINION DIDN'T CHANGE AFTER YOU FOUND OUT THAT

18   THE DOG WAS CERTIFIED BY CNCA.

19   A.  NO, BECAUSE THAT WAS NOT THE ONLY FACTOR.  THERE WERE

20   OTHER FACTORS INVOLVED IN THE DETERMINATION OF THE RELIABILITY

21   OF THAT DOG THAT WERE PROBABLY FAR MORE CONCLUSIVE THAN

22   WHETHER OR NOT IT WAS CERTIFIED BY CNCA OR NOT.

23   Q.  ALL RIGHT.

24          MR. HARRIGAN:  ONE MOMENT, YOUR HONOR.

25          THE COURT:  CERTAINLY.  TAKE YOUR TIME.

1      BY MS. AHUMADA:

2    Q.  ALL RIGHT.  SO LET'S TALK ABOUT -- LET'S GO BACK.  SO YOU

3    SAID THAT CANINES DO HAVE, IN FACT, OTHER FAIRLY STRONG

4    SENSES, RIGHT?  LIKE THEIR HEARING IS PRETTY STRONG.

5    A.  CORRECT.

6    Q.  MUCH STRONGER THAN HUMAN HEARING.

7    A.  CORRECT.

8    Q.  AND SO -- AND CANINES CAN STILL SEE, RIGHT?  THEY MAY BE

9    COLOR-BLIND, BUT THEY CAN USE THEIR VISUAL SENSE, RIGHT?

10   A.  CORRECT.

11   Q.  AND SO A CANINE CAN BE TRAINED TO RELY ON MORE THAN ONE

12   SENSE, RIGHT?  EVEN IF THEIR SCENT DOMINATES.

13   A.  YOU'RE GOING TO HAVE TO ASK THAT QUESTION AGAIN.

14   Q.  SURE.  CANINES CAN BE TRAINED TO RELY ON THINGS OTHER THAN

15   JUST SENSE ALONE.

16   A.  (PAUSE)

17   Q.  RIGHT?

18   A.  WELL, THE REASON WE USE DOGS IS BECAUSE OF THEIR THEIR

19   NOSE.  I'M NOT QUITE SURE HOW YOU MEAN OTHER SENSES.  AGAIN,

20   IN HUMAN BEINGS, WE USE OUR EYES WHEN WE WALK IN THE ROOM TO

21   SEARCH.  WE DON'T USUALLY USE OUR NOSE.  A DOG, WHEN THEY

22   ENTER A ROOM OR ARE IN A NEW ENVIRONMENT, THEIR NOSE IS

23   USUALLY THE FIRST THING THAT COMES INTO PLAY.

24   Q.  BUT THEIR NOSE ISN'T THE ONLY THING THAT COMES INTO PLAY.

25   A.  NO.  JUST LIKE US, WE USE OTHER SENSES AS WE WALK INTO AN

1    ENVIRONMENT.

2    Q.  SO YOU CAN USE THE TRAINING TO TRAIN A DOG TO IGNORE

3    CERTAIN THINGS THAT THEY SEE AND KEEP GOING, MOVING ON, RIGHT?

4    JUST LIKE THEY IGNORE WHEN SEARCH AND RESCUE IN, FOR EXAMPLE,

5    9/11, THEY IGNORED ALL THE SEARCH-AND-RESCUE PEOPLE AROUND

6    THEM AND SEARCHED FOR PEOPLE IN THE RUBBLE.

7    A.  THAT'S, THAT'S BECAUSE, YEAH, THE DOG USES HIS NOSE TO

8    FIND THINGS THAT HE CAN'T FIND WITH HIS EYES OR HIS EARS, THAT

9    HE'S USING HIS NOSE TO FIND PEOPLE THAT ARE HIDDEN.

10   Q.  ALL RIGHT.  AND YOU TESTIFIED A COUPLE WEEKS AGO IN

11   ARIZONA, RIGHT?  IN A STATE CASE.

12   A.  WELL, I TESTIFIED IN TUSCON AND PHOENIX.  WHICH ONE ARE

13   YOU TALKING ABOUT?

14   Q.  PHOENIX.

15   A.  YES.

16   Q.  AND THERE YOU DID ADMIT THAT YOU COULD, IN FACT, TRAIN A

17   CANINE TO DETECT CONCEALED VS. UNCONCEALED PEOPLE OR VISIBLE

18   PEOPLE.

19   A.  I ADMITTED?

20   Q.  YOU SAID IN RESPONSE TO A QUESTION REGARDING THE WHOLE

21   DISCUSSION WE HAD ABOUT CONCEALED AND UNCONCEALED OR CONCEALED

22   AND VISIBLE PEOPLE, CAN A DOG BE TRAINED ACCURATELY TO DETECT

23   CONCEALED PEOPLE, YOU RESPONDED YES.

24   A.  CAN YOU FIND CONCEALED PEOPLE?  YES.

25   Q.  ALL RIGHT.  AND THERE YOU ALSO ADMIT THAT YOU'VE BEEN

```
 1    TRAINED TO FIND HIDDEN PEOPLE FOR YEARS; YOU'VE TRAINED
 2    THOUSANDS OF DOG TO FIND HIDDEN PEOPLE.  RIGHT?
 3    A.  CORRECT.
 4    Q.  AND THAT IMPLIES THAT THEY'RE IGNORING THE VISIBLE PEOPLE.
 5    A.  IF A DOG WERE TO ENTER THIS ROOM WHERE HE COULD SEE ALL
 6    THESE PEOPLE, THE DOG, A PATROL DOG WOULD BE USED TO FIND
 7    SOMEBODY THAT'S HIDDEN.
 8    Q.  WELL, THE QUESTION WAS WHETHER YOU TESTIFIED TO THAT.  I'D
 9    LIKE YOU TO TURN TO (PAUSE) -- CAN YOU TURN TO TAB NINE AND
10    THEN FLIP TO --
11              THE COURT:  DO YOU HAVE A BINDER?
12              MS. AHUMADA:  YOU HAVE A BINDER.  YOU HAVE IT UP
13    THERE.
14              THE WITNESS:  UH-HUH.
15              BY MS. AHUMADA:
16    Q.  AND FLIP TO PAGE 47.
17    A.  I'M SORRY.  27?
18    Q.  47.  GOING TO LINE 21.  SO IT'S NO SECRET.  I MEAN, WE
19    HAVE BEEN TRAINING DOGS TO --
20              THE COURT:  WAIT.  LET'S LET EVERYBODY GET THERE,
21    COUNSEL.  JUST A SECOND.  PAGE 47, LINE?
22              MS. AHUMADA:  21 TO 23.
23              BY MS. AHUMADA:
24    Q.  DO YOU SEE IT?
25    A.  YES.
```

1    Q.  AND YOU SAID THAT, RIGHT?

2    A.  CORRECT.

3    Q.  ALL RIGHT.  AND IF YOU THEN GO TO THE PAGE BEFORE THAT,

4    LOOK AT LINE 18, STARTING THERE, YOU TESTIFIED, AND SO WHAT

5    MAKES A HIDDEN PERSON DIFFERENT IS A DOG WILL SOMETIMES HAVE

6    TO USE HIS EARS TO CONFIRM THAT THERE'S A HUMAN BEING EITHER

7    IN A COMPARTMENT OR INSIDE THE TRUNK.  THE DOG CAN HEAR A

8    FIELD MOUSE ABOUT A HUNDRED YARDS AWAY TO 200 YARDS AWAY, AND

9    THAT'S AGAIN BEEN PROVEN IN STUDIES, AND I'M NOT A SCIENTIST,

10   BUT IT'S BEEN WRITTEN A LOT, AND SO THE HEARING IS ALMOST AS

11   GREAT AS THEIR SMELL.  YOU TESTIFIED TO THAT, RIGHT?

12   A.  CORRECT.

13   Q.  AND THEN IF YOU CAN FLIP TO PAGE 134, STARTING ON LINE 17.

14   THE QUESTION POSED IS --

15           THE COURT:  JUST LET US GET THERE, COUNSEL.  PAGE

16   134, LINE 17.

17           MS. AHUMADA:  YES, YOUR HONOR.

18           THE COURT:  THANK YOU.  GO AHEAD.

19           BY MS. AHUMADA:

20   Q.  SO YOU CAN TRAIN FOR THAT.  YOU CAN TRAIN FOR A CONCEALED

21   HUMAN IN A VEHICLE WITH A VISIBLE HUMAN.  ANSWER:  ABSOLUTELY.

22   THOSE WERE YOUR WORDS, RIGHT?

23   A.  CORRECT.

24   Q.  SO YOU ADMITTED HERE THAT YOU CAN, IN FACT, TRAIN --

25   THAT'S WHAT IT SAYS; THAT WAS YOUR ANSWER -- YOU CAN TRAIN A

1    DOG TO IGNORE A VISIBLE PERSON, RIGHT?

2    A.  I DIDN'T SAY THAT IN THAT SENTENCE.  I DIDN'T SAY ANYTHING

3    ABOUT IGNORING A VISIBLE PERSON.

4    Q.  YOU CAN TRAIN FOR A CONCEALED HUMAN, FOR A DOG TO ALERT

5    FOR A CONCEALED HUMAN IN A VEHICLE WITH A VISIBLE HUMAN.

6    THAT'S WHAT IT IMPLIES.

7    A.  IT DOESN'T IMPLY ANYTHING.  INSIDE THAT VEHICLE IS BOTH A

8    CONCEALED AND VISIBLE HUMAN BEING.  THE DOG ALERTS ON THE

9    VEHICLE.

10   Q.  ALL RIGHT.  LET'S LOOK AT THE ANSWER.  LET'S LOOK AT LINE

11   TEN JUST A LITTLE BIT ABOVE THAT.  HOW ABOUT A VISIBLE,

12   OCCUPIED CAR WITH A CONCEALED PERSON IN THE CAR?  DID YOU EVER

13   TRAIN A CANINE FOR THAT?  ANSWER:  YES.  QUESTION:  YOU HAVE?

14   WHERE?  ANSWER:  IN OUR TRAINING, ANYTHING WE CAN DO TO ADD TO

15   THE DIFFICULTY TO OUR TRAINING OR SOMETHING TO THROW THE

16   HANDLERS OFF, WE HAVE DONE THAT SOMETHING.

17   A.  IS THERE A QUESTION, OR ARE YOU JUST TELLING ME?

18   Q.  WELL, YOU'RE ADDING THE CONCEALED -- YOU'RE ADDING THE

19   VISIBLE PERSON IN THERE TO THROW THE HANDLER OFF, RIGHT?  AND

20   THE CANINE.  THAT'S ESSENTIALLY WHAT YOU'RE SAYING, AND YOU'VE

21   TRAINED FOR THAT.

22   A.  NO.  IT'S ACTUALLY TO THROW THE HANDLER OFF, BECAUSE THE

23   HANDLER WILL SOMETIMES BELIEVE THAT THE DOG IS ALERTING ON A

24   VEHICLE BECAUSE IT'S THE PERSON SITTING THERE, AND SO IT'S

25   SOUND TRAINING FOR TACTICAL PURPOSES.  WE DO BOTH, IN TACTICS,

1    IN PATROL WORK, SO THAT --

2    Q.  BUT THERE IT'S TALKING ABOUT A CONCEALED VS. A VISIBLE

3    PERSON, RIGHT?

4    A.  BUT THE QUESTION WAS WHETHER I ACTUALLY EVER HAD A PERSON

5    THAT WAS VISIBLE AND A PERSON CONCEALED IN THE SAME VEHICLE.

6    Q.  ALL RIGHT.  BUT YOU'RE TRAINING THEM TO ALERT TO CONCEALED

7    PEOPLE, NOT VISIBLE PEOPLE, RIGHT?  THAT'S THE WHOLE POINT.

8    A.  THERE'S HUMAN ODOR COMING OUT OF THE CAR.  BOTH OF THEM

9    ARE LIVING.  BOTH OF THEM, THEIR HEARTS ARE BEATING.  BOTH OF

10   THEM ARE BREATHING.  IT'S IN THE SAME VEHICLE, BUT IT'S NOT

11   THE DOG DISCERNING THE DIFFERENCE BETWEEN THE PERSON IN THE

12   TRUNK AND THE PERSON WHO CAN BE SEEN.

13   Q.  OKAY.  SO YOU WOULD AGREE WITH ME THAT YOU ADD

14   DISTRACTIONS DURING TRAINING TO MAKE THEIR TRAINING MORE

15   EFFECTIVE, TO MAKE SURE THAT THE DOG IGNORES CERTAIN THINGS

16   THAT MIGHT BE TEMPTING TO THE DOG OR MIGHT BE CONFUSING TO THE

17   DOG, RIGHT?

18   A.  LIKE TENNIS BALLS OR A LOUD ALARM NOISE, THOSE ARE ALL

19   DISTRACTIONS.

20   Q.  OR DOG URINE.

21   A.  DOG URINE LIKE ON A TIRE.

22   Q.  FOOD.

23   A.  FOOD.

24   Q.  SO -- AND YOU WOULD ADMIT THAT WHEN YOU'RE TRAINING A DOG

25   TO ALERT BETWEEN A CONCEALED PERSON AND A VISIBLE PERSON, YOU

1    WANT TO AVOID THE DOG ALERTING TO VISIBLE PEOPLE, RIGHT?

2    THAT'S THE WHOLE POINT OF THE CONCEALED VS. VISIBLE PERSON

3    TRAINING.

4    A.   THE VISIBLE PERSON IN A VEHICLE IS ALMOST (PAUSE) --

5    Q.   YES OR NO.

6    A.   -- UNIQUELY VISIBLE TO THE HUMAN BEING, NOT THE DOG.

7    REMEMBER, THE DOG IS ONLY ABOUT A FOOT AND A HALF OFF THE

8    GROUND.

9    Q.   YES OR NO.

10          THE COURT:  I THINK HE'S TRYING TO ANSWER THE

11   QUESTION.  LET'S SEE WHAT HE HAS TO SAY, COUNSEL.

12          GO AHEAD.  FINISH YOUR ANSWER.

13   A.   SO THE VISIBILITY OF A HUMAN BEING IN A VEHICLE IS RELATED

14   TO THE SIZE OF THE VEHICLE.  A DOG APPROACHING, IF YOU WERE TO

15   WATCH THEIR EYESIGHT WHEN THEY'RE SEARCHING, THEY'RE OFTEN

16   LOOKING AT THE CRACKS AND CREVICES OF THE VEHICLE.  THE FACT

17   OF SOMEBODY BEING VISIBLE OR NOT IS REALLY NOT RELEVANT,

18   NECESSARILY, TO A DOG.  AGAIN, THE DOG'S USING HIS NOSE TO

19   FIND HUMAN ODOR.

20   Q.   BUT YOU --

21   A.   WHEN A DOG GOES TO A VEHICLE WHERE THERE'S MORE THAN ONE

22   VEHICLE IN THE VEHICLE, ONE PERSON IN THE VEHICLE, WHETHER

23   THEY'RE IN THE TRUNK OR LAYING DOWN IN THE BACK, IT DOESN'T

24   MATTER.  IT'S STILL, THERE'S STILL HUMAN ODOR EMITTING FROM

25   THAT VEHICLE.

1   Q.  BUT HERE YOU'RE TALKING ABOUT USING A VISIBLE PERSON AS A

2   DISTRACTION IN A VEHICLE AND YOU'RE STILL TRYING TO TRAIN THEM

3   TO ALERT TO A CONCEALED PERSON.

4   A.  I NEVER SAID ANYTHING ABOUT A VISIBLE PERSON BEING A

5   DISTRACTION.

6   Q.  BUT THAT'S WHAT'S IN YOUR TESTIMONY HERE.

7   A.  NOT IN MY TESTIMONY.  IT'S WHAT YOU'RE READING INTO THE

8   TESTIMONY.

9   Q.  WELL, YOU DID GO TO PHOENIX, RIGHT?  AND TESTIFY IN THIS

10  CASE.  IS THAT TRUE?

11  A.  I DID.

12  Q.  RIGHT.  YOU SAID IN HERE, ANYTHING WE CAN DO TO ADD TO THE

13  DIFFICULTY TO OUR TRAINING OR SOMETHING TO THROW THE HANDLERS

14  OFF, WE HAVE DONE THAT SOMETHING.  THOSE ARE YOUR WORDS,

15  RIGHT?

16  A.  THEY ARE.  THE HANDLER OFF.  I DIDN'T SAY ANYTHING ABOUT

17  THE DOG.

18  Q.  BUT YOU ARE TRAINING -- IN THIS SCENARIO, YOU'RE TALKING

19  ABOUT TRAINING, YOUR QUESTIONS ARE ABOUT TRAINING IN CONCEALED

20  PERSONS, RIGHT?  IN SEARCHING FOR A CONCEALED PERSON.

21  A.  NO.  WHEN I'M BEING ASKED QUESTIONS BY YOU OR EVEN THE

22  COUNSEL THAT I'M WORKING FOR, I LISTEN TO THE WORDS AND I

23  ANSWER THE QUESTION.

24  Q.  WELL --

25  A.  THE QUESTION WAS, HAVE YOU EVER TRAINED WITH A VISIBLE

1    PERSON AND A HIDDEN PERSON, AND THE ANSWER IS YES.  THERE WAS

2    NO QUESTION AS TO ANYTHING OTHER THAN, HAVE I EVER DONE THAT?

3    Q.  WELL, LET'S LOOK A LITTLE BIT EARLIER ON THAT SAME PAGE.

4    YOUR ANSWER:  AND WE TRAIN DOGS TO FIND CONCEALED SUSPECTS.

5    THAT'S PROBABLY THE MOST COMMON THING WE TRAIN FOR.  THOSE ARE

6    YOUR WORDS, AREN'T THEY?

7    A.  CORRECT.

8    Q.  AND THEN AFTER THAT, HOW ABOUT VEHICLES?  THAT WAS THE

9    QUESTION POSED.  YOUR ANSWER:  SOMETIMES, THEY'RE IN A

10   VEHICLE.  SOMETIMES, THEY'RE OUT OF VEHICLES.  SOMETIMES,

11   THEY'RE HIDING IN THE DRIVE SHAFT OF A SEMI-TRUCK.  MY DOG

12   FOUND TWO PEOPLE HIDING IN A GREASE-FILLED DRIVE SHAFT OF A

13   SEMI-TRUCK.  THOSE ARE YOUR WORDS.

14   A.  CORRECT.

15   Q.  AND THEY WERE IN RESPONSE TO A QUESTION ABOUT CONCEALED

16   SUSPECTS, RIGHT?

17   A.  CORRECT.

18   Q.  NOW, JUST TO BE CLEAR, YOU WEREN'T THERE THAT DAY ON JUNE

19   10TH, 2016, RIGHT?

20   A.  I WAS NOT.

21   Q.  AND YOU HAVEN'T ACTUALLY INTERACTED WITH PECKY, RIGHT?

22   A.  I HAVE NOT.

23   Q.  NOT IN PERSON.  YOU JUST REVIEWED HER TRAINING RECORDS,

24   RIGHT?

25   A.  YES.

1    Q.   THOSE TRAINING RECORDS DO HAVE SEARCHES FOR CONCEALED

2    INDIVIDUALS.

3    A.   YES.

4    Q.   AND YOU'RE NOT SAYING THAT PECKY'S, PECKY'S OTHERWISE

5    UNRELIABLE.  YOU'RE JUST MAKING A DIFFERENT CONCLUSION, RIGHT?

6    A.   I'M SORRY.  SAY THAT AGAIN.

7    Q.   YOU'RE NOT TAKING ISSUE WITH PECKY'S TRAINING HERE, RIGHT?

8    A.   (PAUSE)

9    Q.   AT LEAST NOT WITH RESPECT TO NARCOTICS.

10   A.   NO.  BUT IN TRAINING, QUITE OFTEN, THE PERSON THAT'S

11   HIDING HAS A TOY, SO WE HAVE TO ALWAYS MAKE SURE TO KEEP THAT

12   INTO (PAUSE) --

13   Q.   YOU HAVEN'T ACTUALLY --

14   A.   -- INTO THE FACTS, BECAUSE A DOG WILL OFTEN SMELL THE TOY,

15   PROBABLY MORE SO THAN THE HUMAN BEING HIDING INSIDE.  SO,

16   AGAIN, THE TRAINING RECORDS DON'T REFLECT ENOUGH ABOUT HOW

17   THAT TRAINING IS BEING HANDLED TO KNOW WHETHER IT'S EFFECTIVE

18   OR NOT.

19   Q.   SO YOU'RE SAYING YOU JUST DON'T KNOW ABOUT HER TRAINING.

20   A.   CORRECT.  THERE'S NOT ENOUGH INFORMATION.

21   Q.   AND YOU'RE SAYING THAT YOU DIDN'T SEE ANYTHING IN THE

22   TRAINING THAT MAKES HER UNRELIABLE, RIGHT?

23   A.   THERE'S NOT ENOUGH INFORMATION TO MAKE ANY CONCLUSION ON,

24   AS TO HOW THE TRAINING IS BEING CONDUCTED.

25   Q.   AND YOU'D AGREE THAT SHE PASSED ALL OF HER TESTS.

1    A.  I WAS NOT THERE.

2    Q.  YOU'D AGREE THAT THE PAPERS INDICATE SHE PASSED ALL HER

3    TESTS.

4    A.  WELL, THERE'S SOME INDICATION THAT THE DOG HAS HAD TROUBLE

5    PERFORMING THE SIT BEHAVIOR.  IN THE HANDLER MANUAL, IF A DOG

6    DOES NOT ACTUALLY SIT, WHICH IS THEIR INDICATION, IT SAYS THAT

7    THAT IS A FAILURE, AND SO IF IN THE NARRATIVE IT SAYS THE DOG

8    HAS FAILED TO SIT AND THE DOG HAS DIFFICULTY SITTING, THAT IT

9    SHOULDN'T BE PASSING, AND YET IT'S STILL PASSING.  SO THAT'S

10   MY DIFFICULTY WITH THIS PARTICULAR RESPONSE.

11           MR. ZUGMAN:  YOUR HONOR, WE DIDN'T OFFER MR.

12   JIMENEZ'S TESTIMONY TO SAY THAT PECKY'S TRAINING RECORDS ARE

13   UNRELIABLE.  THAT'S NOT WHY I'M OFFERING HIM, SO.  AND I AGREE

14   THAT HIS TESTIMONY DOES NOT INTRUDE ON PECKY'S RECORDS, AND

15   I'M NOT TAKING ISSUE.  I MAY TAKE ISSUE WHEN MR. BARRAGAN IS

16   UP THERE, BUT NOT MR. JIMENEZ.

17           THE COURT:  OKAY.  THANK YOU.

18           MS. AHUMADA:  ALL RIGHT.  THANK YOU, YOUR HONOR.

19           MR. ZUGMAN:  REDIRECT?

20           THE COURT:  YES, REDIRECT, MR. ZUGMAN.

21           REDIRECT EXAMINATION BY MR. ZUGMAN:

22   Q.  OKAY.  SO LET'S TALK ABOUT ALL THE KANSAS AND NEBRASKA

23   STUFF.  SO IN ONE OF THOSE CASES -- WAS IT THE NEBRASKA ONE?

24   -- YOU OFFERED AN OPINION ABOUT A DOG, WHETHER IT WOULD JUMP

25   UP INTO A CAR ON ITS OWN.  DO YOU RECALL THAT?

1    A.  YES.

2    Q.  AND YOU SAID, NO, BECAUSE IT'S A GERMAN SHEPHERD AND THEY

3    DON'T DO THAT, RIGHT?

4    A.  CORRECT.

5    Q.  AND THEN IT TURNED OUT YOU WERE TOLD IT WAS A GERMAN

6    SHEPHERD, RIGHT?

7         MS. AHUMADA:  OBJECTION, YOUR HONOR.  THAT MISSTATES

8    THE CASE LAW.

9         MR. ZUGMAN:  WELL, IT'S WHAT HAPPENED IN THE CASE.

10        THE COURT:  WELL, I'M GOING TO LET MR. ZUGMAN GO

11   AHEAD.

12        MR. ZUGMAN:  I MAY BE TALKING ABOUT ANOTHER NEBRASKA

13   CASE WHERE -- AND MAYBE IT'S NOT THESE TWO CASES.  MR.

14   FALCO --

15        THE COURT:  THE COURT HAS NO IDEA, BECAUSE I DON'T

16   HAVE ANY OF THOSE CASES.

17        MR. ZUGMAN:  YOU KNOW WHAT?

18        THE COURT:  SO GO AHEAD, MR. ZUGMAN.  YOU CAN ASK IT

19   IF YOU WOULD LIKE, SIR.

20        MR. ZUGMAN:  I'M GOING TO PUT THOSE ASIDE.  I'LL JUST

21   LEAVE THOSE ALONE.

22        THE COURT:  OKAY.

23        BY MR. ZUGMAN:

24   Q.  MR. JIMENEZ, IS IT FAIR TO SAY THAT WHEN YOU BEGAN

25   TESTIFYING AS A DEFENSE EXPERT, YOUR GOVERNMENT WORK DRIED UP?

1    A.  CORRECT.

2    Q.  DID YOU EXPECT THAT TO HAPPEN?

3    A.  NO.  I MEAN, I STILL GET REQUESTS.  I'M, I'M TIRED OF

4    BEING BIT BY DOGS, BEING CHASED BY DOGS, AND THAT KIND OF

5    THING, SO THERE CAME A POINT WHEN CONSULTING AND LICENSING OUT

6    MY NAME HAS BECOME A LOT MORE RELAXING, AND SO I JUST GOT

7    CALLED, I THINK IT WAS FOUR WEEKS AGO, ABOUT TRAINING POLICE

8    DOG IN LOS ANGELES.  SO IT'S NOT NECESSARILY THAT IT'S

9    COMPLETELY DRIED UP.  IT'S JUST I THINK, MORE OR LESS, THAT

10   I'VE GONE INTO CONSULTING MORE THAN TRAINING POLICE DOGS.

11   Q.  AND ASIDE FROM THE FACTS OF A PARTICULAR CASES OR WHAT

12   ORGANIZATIONS YOU MAY BE A MEMBER OF, HAS ANYONE TOLD YOU

13   WHAT'S WRONG WITH YOUR OPINION, WHY YOU'RE WRONG ABOUT WHAT

14   YOU'RE SAYING?

15   A.  NO.

16   Q.  SO IN THE OPINION THAT I'M ELICITING IN THIS CASE IS THAT

17   PECKY, THE DOG, COULDN'T BE SEARCHING FOR HUMANS BY CIRCLING

18   AROUND MISS LOPEZ'S CAR ACTING ON SMELL.  THAT'S JUST YOU

19   CAN'T TRAIN A DOG TO DISTINGUISH BETWEEN THE VISIBLE OCCUPANT

20   SMELL AND THE HIDDEN PERSON SMELL.

21   A.  IF THE DOG IS TRAINED TO FIND HUMAN ODOR, IT'S GOING TO

22   FIND HUMAN ODOR.

23   Q.  AND THAT'S WHAT MAKES IT DIFFERENT WITH DRUGS, RIGHT?  YOU

24   CAN PUT THE DOG'S DEFAULT BEHAVIOR BEING, IF YOU SMELL

25   METHAMPHETAMINE, BARK.  IF YOU SMELL MARIJUANA, SIT.  IF YOU

1  SMELL, DO YOUR TRAINED BEHAVIOR, AND THAT CAN BE THEIR DEFAULT

2  BEHAVIOR, RIGHT?

3  A.  CORRECT.

4  Q.  BUT YOU CAN'T DO THAT WITH HUMAN ODOR.

5  A.  LIKE TO DIFFERENTIATE BETWEEN ONE HUMAN TO THE NEXT?

6  Q.  YES.

7  A.  NO, YOU CAN'T DO THAT.

8  Q.  DID YOU REVIEW ALL OF THE BORDER PATROL MANUAL?

9  A.  THE -- WELL, THERE ARE PARTS THAT WERE REDACTED.

10  Q.  OKAY.  DID YOU SEE ANY TRAINING METHODOLOGY THAT WOULD

11  ALLOW THE DOG TO DISTINGUISH BETWEEN A HUMAN PRESENT AND A

12  HUMAN HIDDEN IN A SINGLE, CLOSED VEHICLE IF IT'S DOING IT BY

13  SCENT?

14  A.  NO.

15  Q.  I'M GOING TO SHOW YOU PAGE 79 OF THE DISCOVERY.

16      MR. ZUGMAN:  I'M GOING TO GIVE THE GOVERNMENT A

17  SECOND TO CATCH UP.

18      MS. AHUMADA:  THE GENERAL PROTECTIVE ORDER?

19      MR. ZUGMAN:  YES.

20      THE COURT:  I'M SORRY.  WHAT ARE WE LOOKING AT?

21      MR. ZUGMAN:  PAGE 79.  IT'S THE PHILOSOPHY OF THE

22  CUSTOMS AND BORDER PROTECTION CANINE PROGRAM, CONCEALED HUMAN

23  DETECTION.

24      THE COURT:  AND THAT'S EXHIBIT NUMBER?

25      MR. ZUGMAN:  THIS WOULD BE DEFENSE EXHIBIT 1, I

1    SUPPOSE.

2         THE COURT:  OKAY.

3         MR. ZUGMAN:  I ASSUME THE GOVERNMENT HAS IT.  I'VE

4    TAKEN THE LIBERTY -- I MEAN, IT'S A REGULATION, SO I THINK

5    IT'S JUDICIALLY NOTICEABLE, BUT I DON'T THINK THE GOVERNMENT

6    IS TAKING ISSUE WITH IT.

7         BY MR. ZUGMAN:

8    Q.  I'VE TAKEN THE LIBERTY OF HIGHLIGHTING THE MIDDLE TWO

9    PARAGRAPHS.  CAN YOU READ THAT?  DO YOU NEED IT A LITTLE

10   CLOSER?

11   A.  I'VE GOT IT.

12   Q.  HERE WE GO.  NOW, THIS IS THEIR MANUAL, RIGHT?

13   A.  YES.

14   Q.  AND THEY SAY THAT HOW DOGS -- I'M GOING WITH THE EXACT

15   METHOD, THE THIRD SENTENCE IN THIS PARAGRAPH.  THE EXACT

16   METHOD THE CANINE USES TO MAKE THE DISTINCTION BETWEEN A

17   CONCEALED PERSON AND VISIBLE INDIVIDUALS OR HUMAN SCENT

18   SAMPLES REMAINS UNKNOWN.  IF IT'S UNKNOWN, DOES THAT MEAN WE

19   DON'T KNOW HOW TO TRAIN ON IT?

20   A.  NO.

21   Q.  WHAT DOES IT MEAN?

22   A.  I HAVE NO IDEA.

23   Q.  DO YOU UNDERSTAND WHAT THEY ARE ATTEMPTING TO SAY?

24   A.  THAT SOMEHOW THE DOG JUST KNOWS HOW TO DO IT.

25   Q.  CAN YOU TRAIN THE DOG ON THIS MYSTERIOUS ABILITY?

1    A.  NOT IF IT'S MYSTERIOUS.

2    Q.  IS THERE ANY BORDER PATROL TRAINING THAT FOCUSES ON

3    TRAINING THE DOG'S EARS OR SOME OTHER SENSE THAT IT HAS SO

4    THAT IT CAN MAKE THIS DISTINCTION BETWEEN THE PERSON PRESENT

5    AND THE PERSON HIDDEN?

6    A.  NO.

7    Q.  IS IT POSSIBLE?

8    A.  NO.

9    Q.  DON'T DOGS HAVE INHERENT LIMITATIONS?

10   A.  OF COURSE.

11   Q.  THEY CAN'T TESTIFY, RIGHT?

12   A.  CORRECT.

13   Q.  YOU GET A SINGLE SIGNAL FROM THEM, RIGHT?

14   A.  IF YOU TRAIN THEM PROPERLY, YES.

15   Q.  THEY ALERT.

16   A.  THEY SIT.

17   Q.  OKAY.  AND ONE OF THE BIG PROBLEMS IN THE JOB IS KEEPING

18   THE DOG EXCITED, RIGHT?

19   A.  IT DEPENDS ON THE DOG.

20   Q.  WELL, YOU KNOW, POOR LITTLE PECKY IS OUT THERE ON THE

21   FREEWAY WALKING AMONG CARS.  IT COULD GET A LITTLE BIT BORING,

22   RIGHT?

23   A.  YES.

24   Q.  AND THE DOG, YOU WANT TO HAVE KIND OF AN EXCITABLE DOG.

25   A.  CORRECT.

1   Q.   ONE THAT'S INTERESTED.

2   A.   CORRECT.

3   Q.   OKAY.  NOW, I ASK FOR A LITTLE LATITUDE, BUT I HAVE A DOG.

4   HER NAME IS DAISY, AND SHE'S VERY EXCITABLE.  SHE JUMPS UP ON

5   PEOPLE WHENEVER SHE SEES THEM.  IF I TOOK DAISY DOWN TO THE

6   PORT OF ENTRY AND WALKED HER IN THE LANES, IS THERE A CHANCE

7   SHE COULD ALERT TO A PERSON HIDDEN IN A VEHICLE?

8   A.   IT'S POSSIBLE.

9   Q.   YOU'VE TRAINED DOGS, RIGHT?

10  A.   CORRECT.

11  Q.   HAVE YOU EVER HAD PUPPIES?

12  A.   YES.

13  Q.   HAVE YOU EVER PUT YOUR HAND UNDER THE BLANKET?

14  A.   YES.

15  Q.   AND WHAT DO THEY DO?

16  A.   THEY GET, THEY GET EXCITED.

17  Q.   THEY ARE ALWAYS CURIOUS ABOUT PEOPLE WHO ARE HIDDEN.

18  A.   CORRECT.

19  Q.   THINGS THAT ARE HIDDEN.

20  A.   CORRECT.

21  Q.   BUT WHEN A DOG IS WALKING THAT LINE AT THE CHECKPOINT

22  AROUND VEHICLES, YOU CAN'T HAVE A DOG RUNNING AROUND, CAN YOU?

23  A.   NO.

24  Q.   A DOG MIGHT GET HIT.

25  A.   CORRECT.

1    Q.  DOGS COST MONEY.

2    A.  YES.

3    Q.  TAKE A WHILE TO TRAIN.

4    A.  YES.

5    Q.  WE RECERTIFY THEM.

6    A.  YES.

7    Q.  IS THERE ANY WAY THAT YOU COULD HAVE A TRAINED, A DOG

8    TRAINED PER BORDER PATROL'S METHOD THAT WOULD ALLOW THAT DOG

9    TO EFFECTIVELY SEARCH FOR CONCEALED HUMANS IN A VEHICLE

10   DRIVING INTO PRIMARY AT THE PORT OF ENTRY?

11   A.  WHETHER -- NO.  WHETHER OR NOT THE HUMAN BEING INSIDE OF

12   IT?  NO.

13   Q.  ISN'T IT TRUE THAT WHEN YOU ARE ASKING THE DOG TO FIND THE

14   PERSON, DON'T YOU GIVE THEM A SPECIFIC COMMAND, GO GET THEM?

15   A.  YES.  SOMETIMES, IT'S A VERBAL COMMAND.  SOMETIMES, IT'S A

16   ROUTINE OR A, A RITUAL THAT WILL HAPPEN, THAT THE DOG WILL

17   RECOGNIZE.

18   Q.  IT CAN'T BE A DEFAULT BEHAVIOR, RIGHT?

19   A.  NO.

20   Q.  IT WOULD BE A BIG PROBLEM IF POLICE DOGS WERE TAKING OFF

21   AND TO TRY TO FIND AND BITE THE CONCEALED PEOPLE.

22   A.  CORRECT.

23   Q.  A DOG MIGHT NOT UNDERSTAND THAT THAT'S JUST A PERSON

24   TAKING A REST.

25   A.  CORRECT.

1    Q.  YOU DID MENTION SOMETHING ABOUT TRAINING THE HANDLER, AND

2    I GUESS I'VE BEEN FOCUSING TOO MUCH ON THE DOG.  WHY IS IT

3    IMPORTANT TO TRAIN THE HANDLER?

4    A.  ACTUALLY, THE HUMAN IS THE MOST IMPORTANT PART OF THE

5    TEAM.  THE DOG SIMPLY, WE LIKE TO SAY, IS JUST THE NOSE.  THE

6    HUMAN IS THE BRAIN AND IS THE ONE WHO IS THE MANAGER OF EVERY

7    SEARCH, AND SO TO MAKE SURE THAT THE HUMAN IS MANAGING THE

8    SEARCH PROPERLY, WE HAVE TO MAKE SURE THAT THEY HAVE ALL THE

9    TOOLS AVAILABLE, ALL THE TRAINING AND UNDERSTANDING OF DOG

10   BEHAVIOR AND ANIMAL BEHAVIOR TO DO IT WELL.

11   Q.  NOW, CAN I GIVE YOU A HYPOTHETICAL?

12   A.  YES.

13   Q.  LET'S SAY THAT THERE'S A TRUCK DRIVING INTO A CHECKPOINT

14   AND IT'S GOT TWO PEOPLE WHO ARE HIDDEN ON THE BOTTOM OF THE

15   UNDERCARRIAGE OF THE VEHICLE AND YOU KNOW BORDER PATROL CAN'T

16   SEE THEM, BUT THERE ARE PEOPLE THERE.  MIGHT THE DOG ALERT TO

17   THAT SITUATION?

18   A.  YES.

19   Q.  WOULD THE DOG HAVE BEEN TRAINED TO ALERT TO THAT

20   SITUATION?

21   A.  YES.

22   Q.  HOW WOULD YOU TRAIN A DOG TO DO THAT?

23   A.  SAME WAY.  IN THE BEGINNING, IF I WERE TO GO THROUGH THE

24   STEPS, IS THAT YOU WOULD HAVE A SEMI-TRUCK.  YOU'D HAVE

25   SOMEBODY (PAUSE) --

1    Q.  WOULD IT BE DONE BY SCENT?

2    A.  SCENT AND A TOY AS THE REWARD GIVEN TO THE PERSON THAT'S

3    GOING TO HIDE.

4    Q.  OKAY.  SO WHY CAN'T YOU DO THAT IN THE MISS LOPEZ

5    SITUATION WHERE YOU HAVE PECKY GOING AROUND THE HONDA CIVIC?

6    HOW WOULD YOU TRAIN HER TO FIND A CONCEALED HUMAN IN THAT

7    INSTANCE?

8    A.  IN REGARD TO WHAT ACTION?

9    Q.  WELL, THEY'RE SNIFFING THE VEHICLES THAT GO BY, RIGHT?

10   A.  CORRECT.

11   Q.  SO, IS THERE ANY WAY TO TRAIN THEM ON SOME PARTICULAR

12   SCENT THAT THEY COULD LOOK FOR AND THEN FIND THOSE CONCEALED

13   HUMANS?

14   A.  NO.  JUST HUMAN.

15           MR. ZUGMAN:  THAT'S ALL I HAVE.

16           THANK YOU, YOUR HONOR.

17           THE COURT:  OKAY.

18           MISS AHUMADA, DO YOU HAVE FURTHER QUESTIONS?

19           MR. HARRIGAN:  ONE MOMENT, YOUR HONOR.

20           THE COURT:  SURE, SURE.

21           MR. HARRIGAN:  YOUR HONOR, IF I MAY.

22           THE COURT:  CERTAINLY.

23           RECROSS-EXAMINATION BY MR. HARRIGAN:

24   Q.  MR. JIMENEZ, MY NAME'S SHANE HARRIGAN.  I'M CO-COUNSEL ON

25   THIS CASE.  HOW ARE YOU DOING TODAY?

1    A.  VERY -- WELL, MOSTLY GOOD.

2    Q.  OKAY.  I HOPE YOU FEEL BETTER.

3    A.  THANK YOU.

4    Q.  I HAVE A QUESTION FOR YOU.  GIVEN YOUR PREVIOUS TESTIMONY

5    THAT A DOG WILL ALERT TO HUMAN ODOR IN A CAR AND WON'T BE ABLE

6    TO DISTINGUISH BETWEEN THE DRIVER OR A CONCEALED PERSON IN THE

7    TRUNK OR, SAY, IN THE ENGINE COMPARTMENT, RIGHT?

8    A.  CORRECT.

9    Q.  YOU KNOW WE'VE FOUND PEOPLE FOUND IN THE ENGINE

10   COMPARTMENT.  CORRECT?

11   A.  YES, SIR.

12   Q.  AND ONE OF YOUR REASONS IS YOU SAY IT'S A CLOSED

13   COMPARTMENT, RIGHT?

14   A.  YES.

15   Q.  IN OTHER WORDS, THE CAR IS A SINGLE UNIT AND AIR TENDS TO

16   FLOW THROUGH THERE, SO THE DOG IS ALWAYS GOING TO BE SMELLING,

17   NO MATTER WHAT, THE ODOR OF THE DRIVER IN ALL CASES.

18   A.  THE ODOR OF HUMAN EMITTING.  IT DEPENDS ON WHERE THEY'RE

19   AT.

20   Q.  THE SCENT OF THE DRIVER.

21   A.  IT DEPENDS ON WHERE THE DOG IS ON THE VEHICLE AND WHERE

22   THE ODORS ARE COMING OUT OF THE VEHICLE.  THE PROBLEM WITH A

23   VEHICLE IS THAT THERE'S A LOT OF --

24   Q.  I'M SORRY.  I DIDN'T WANT A EXPLANATION.  LET ME TRY TO

25   CLARIFY THAT FOR YOU.

1    A.  OKAY.

2    Q.  SO CORRECT ME.  I JUST WANT TO KNOW IF I'M GETTING YOUR

3    PRIOR TESTIMONY RIGHT, AND I THINK YOU TESTIFIED THAT THERE'S

4    NO WAY THAT PECKY OR ANOTHER DOG TRAINED, ANY DOG, YOU COULD

5    RELY ON AN ALERT FROM THEM AS TO A CONCEALED PERSON WHERE

6    THERE IS ANOTHER VISIBLE PERSON AND YOU COULDN'T SAY ON THAT

7    ALONE THEY'RE ALERTING ON THE CONCEALED PERSON.  IS THAT YOUR

8    TESTIMONY?

9    A.  CORRECT.

10   Q.  OKAY.  AND SO YOU RECOGNIZE THAT PECKY AND MANY BORDER

11   PATROL DOGS ARE CROSS-TRAINED, RIGHT?  CONCEALED HUMANS AND

12   NARCOTICS.

13   A.  YES.

14   Q.  AND THERE'S NO WAY FOR EVEN A TRAINER OR A HANDLER TO KNOW

15   WHEN A DOG'S ALERTED WHETHER IT'S HUMAN SCENT OR NARCOTICS

16   SCENT.  THEY ALERT THE SAME WAY, RIGHT?

17   A.  IN THE CASE OF BORDER PATROL, YES.

18   Q.  YES.  WELL, DOGS GENERALLY ARE TRAINED FOR ODOR.  WHEN WE

19   SAY ALERT, IT MEANS CHANGE IN RESPIRATION.  CORRECT?  CHANGE

20   IN BODY POSTURE.  IT'S THE INTEREST THEY SHOW.  YOU CALL IT

21   SECONDARY BEHAVIOR.  CORRECT?

22   A.  YES.

23   Q.  OKAY.  AND THEN THE ACTUAL INDICATION IS WHERE THEY'RE

24   TRAINED TO, AS YOU SAY, SIT OR THERE COULD BE ANOTHER PASSIVE

25   INDICATION LIKE POINT, STARING.  CORRECT?

1    A.  YES.

2    Q.  OKAY.  AND SO AT THE BORDER PATROL, YOU REALIZE THERE ARE

3    A LOT OF CARS COMING THROUGH THE CHECKPOINTS.  CORRECT?

4    A.  YES.

5    Q.  AND DOGS ARE ROUTINELY RUN ON THOSE CARS.  CORRECT?

6    A.  CORRECT.

7    Q.  OKAY.  AND THOSE AREN'T AUTOMATED CARS, RIGHT?  THERE'S A

8    DRIVER IN THE CAR.

9    A.  YES.

10   Q.  OKAY.  AND CAN YOU EXPLAIN UNDER YOUR THEORY, IF THE DOGS

11   ARE ALWAYS ALERTING OR WILL ALWAYS CATCH THE SCENT OF HUMAN

12   ODOR, WHY BORDER PATROL DOGS AREN'T ALERTING TO EVERY CAR?

13   THEY DON'T ALERT TO EVERY CAR.  ISN'T THAT CORRECT?

14   A.  CORRECT.

15   Q.  SO THERE'S A LOT WE DON'T KNOW ABOUT DOGS, RIGHT?

16   A.  HMM.  NO.  YOU HAD A QUESTION EARLIER.  DO YOU WANT ME TO

17   ANSWER THAT QUESTION OR ANOTHER QUESTION?

18   Q.  THERE'S A LOT WE DON'T KNOW ABOUT DOGS.  CORRECT?

19   A.  NO.  THERE WAS ANOTHER QUESTION BEFORE THAT ONE.

20   Q.  THERE'S A LOT WE DON'T KNOW ABOUT DOGS.  CORRECT?

21   A.  NOT THAT MUCH, NO.

22   Q.  YOU THINK WE KNOW A LOT ABOUT DOGS?

23   A.  SCIENTISTS HAVE DONE, UC-DAVIS IN PARTICULAR, AUBURN

24   UNIVERSITY, HAVE DONE A TON OF STUDIES ON DOGS.  SO, AS A

25   HUMAN RACE, I THINK WE KNOW A LOT ABOUT DOGS.

1    Q.  OKAY.  WE KNOW DOGS HAVE AN EXTREME SENSE OF SMELL,

2    THOUGH, RIGHT?

3    A.  THAT'S WHY WE'RE HERE.

4    Q.  OKAY.  YOU SAID IT COULD BE A MILLION TIMES GREATER THAN A

5    HUMAN, AND THEY HAVE AN EXTREME HEARING, MUCH GREATER THAN A

6    HUMAN.  CORRECT?

7    A.  YES.

8    Q.  OKAY.  AND WE KNOW THAT DOGS USE THEIR SCENT, AND AS YOU

9    SAID, OFTEN THEIR HEARING TO FIND THINGS.  CORRECT?

10   A.  YES.

11   Q.  OKAY.  IN THE CASE OF RESCUE DOGS, YOU KNOW, THE DOGS ARE

12   ABLE TO HEAR THINGS.  CORRECT?

13   A.  CORRECT.

14   Q.  AND IN THE CASE OF A HIDDEN PERSON, RIGHT, A HIDDEN PERSON

15   WHO'S SCARED, THERE MAY BE AN INCREASE IN HEARTBEAT.  THEY MAY

16   BE MOVING.  A DOG CAN ALSO HEAR THAT AND USE THAT IN

17   CONJUNCTION WITH ITS SENSE OF SMELL.  CORRECT?

18   A.  CORRECT.

19   Q.  AND ALSO A DOG HAS TO USE ITS EYES.  CORRECT?  BECAUSE IT

20   LOOKS WHERE IT'S SEARCHING.  CORRECT?

21   A.  NO, IT DOES NOT HAVE TO HAVE ITS EYES.  WE HAVE DOGS THAT

22   ARE BLIND THAT DO REALLY WELL IN DETECTION WORK.

23   Q.  WELL, A DOG CAN USE, USES ITS EYES TO SEE.  CORRECT?

24   A.  IT CAN.

25   Q.  OKAY.  AND THAT'S ANOTHER AID, BECAUSE A DOG USES ALL ITS

1    SENSES.  CORRECT?

2    A.  AT SOME POINT PROBABLY, YES.

3    Q.  AND WE KNOW THIS FROM OBSERVING THEM, RIGHT?

4    A.  YES.

5    Q.  OKAY.  AND WE KNOW THIS FROM STUDIES, BUT IN TERMS OF --

6    AND WE KNOW THAT A DOG, IN FOLLOWING A SCENT, IT'S FOLLOWING A

7    SCENT CONE, RIGHT?  IT HAS A CONE AND IT FOLLOWS TO THE

8    SOURCE.  CORRECT?

9    A.  THAT'S A SIMPLISTIC WAY OF PUTTING IT, BUT YES.

10   Q.  BUT IN TERMS OF THE EXACT SCIENCE OF HOW A DOG IS ABLE TO

11   DIFFERENTIATE ONE SMELL FROM ANOTHER, THAT'S THE SCIENCE.

12   YOU'RE NOT A SCIENTIST, RIGHT?  THAT IS SOMETHING THAT IS

13   BEYOND YOUR REALM, EVEN.  CORRECT?

14   A.  NO.  WE'VE SEEN ENOUGH.  I MEAN, ODORS, YOU CAN ACTUALLY

15   PUT IT ON A SPECTROGRAM AND EACH ODOR HAS ITS OWN FINGERPRINT,

16   AND THE DOG, AS OPPOSED TO US, HAS THE ABILITY TO

17   DIFFERENTIATE EACH ONE OF THOSE SMELLS IN ITS OLFACTORY

18   SYSTEM.  IT HAS TWO CHAMBERS.  THE NOSTRILS SMELL SEPARATELY.

19   THAT ALLOWS THE DOG TO FIND AND TURN RIGHT AND LEFT BASED ON

20   THE SCENT CONE AND STRENGTH AND WEAKNESS.  ALL OF THESE

21   FACTORS WORK TOGETHER TO ALLOW THE DOG TO DIFFERENTIATE

22   BETWEEN NARCOTICS, IF IT'S TRAINED PROPERLY, AND OREGANO,

23   BECAUSE IT'S THE SPECTROGRAM THAT WE'VE BEEN ABLE TO ACTUALLY

24   SEE THAT YOU CAN'T SEE WHEN WE'RE LOOKING AT ODOR.  SO THE

25   OLFACTORY SYSTEM OF A DOG, THE TWO CHAMBERS THAT WORK

1    TOGETHER, ALONG WITH THE PARTICULAR PART OF ITS BRAIN, HAS

2    THAT ABILITY.  IF YOU'RE ASKING ME TO EXPLAIN THE ROUTE THAT

3    IT TAKES AND THAT KIND OF STUFF, ABSOLUTELY NOT.

4    Q.  YES.  THAT'S WHAT I'M TALKING ABOUT, THE SCIENCE.  IN A

5    SIMPLISTIC WAY OF SAYING WHAT YOU SAID, THEY HAVE A VERY ACUTE

6    SENSE OF SMELL AND THEY USE IT.  CORRECT?

7    A.  CORRECT.

8    Q.  AND THAT'S NOT MAGIC.  CORRECT?

9    A.  NO.

10   Q.  OKAY.  AND BORDER PATROL IS RECOGNIZING THIS, TOO, THAT

11   THEY'RE SAYING, WE DON'T KNOW EXACTLY HOW THEY DO IT, BUT THEY

12   USE THEIR SENSE OF SMELL AND THEY CAN USE THEIR HEARTBEAT OR

13   SOUNDS TO FIND CONCEALED PERSONS.  YOU AGREE WITH THAT, RIGHT?

14   BECAUSE YOU'VE EXPERIENCED THAT IN YOUR OWN, IN YOUR OWN

15   TRAINING.  CORRECT?

16   A.  NO.

17   Q.  YOU'VE NEVER EXPERIENCED THAT IN YOUR OWN TRAINING?

18   A.  NO.  AT SOME POINT, WE CAN FIGURE IT OUT.  WE VIDEOTAPE

19   OUR TRAINING.  LIKE I SAID, I'VE DONE SCIENTIFIC STUDIES WITH

20   UC-DAVIS AND BEEN AN AUTHOR ON A SCIENTIFIC PAPER, THAT AT

21   SOME POINT, IF WE STUDY IT LONG ENOUGH, WE CAN FIGURE IT OUT.

22   THERE'S A HUMAN FACTOR THAT YOU'RE NOT INCLUDING IN THE MIX.

23   Q.  I'M SORRY TO INTERRUPT YOU.  YOU DID A SCIENTIFIC STUDY

24   YOURSELF?

25   A.  WITH UC-DAVIS.

1    Q.   WHAT SCIENTIFIC STUDY WAS THAT?

2    A.   IT'S CALLED SCENT, SCENT DETECTION DOGS, UC-DAVIS, SCENT

3    DETECTION DOG, FOOD SAFETY PROGRAM.  I THINK IT'S ON MY C.V.

4    Q.   IT WAS AN ACTUAL PAPER THAT WAS PUBLISHED?

5    A.   YES.

6    Q.   OKAY.  ALL RIGHT, AND DID THAT HAVE TO DO WITH FINDING

7    CONCEALED PEOPLE?

8    A.   IT'S ALL THE SAME.  IT'S --

9    Q.   YES OR NO.  DID IT HAVE TO DO WITH CONCEALED PEOPLE, SIR?

10   A.   NO.

11   Q.   FINE.  THANK YOU.

12        LET ME SHOW YOU AN EXHIBIT HERE.  LET ME SHOW YOU WHAT'S

13   MARKED EXHIBIT 15.  IT'S ENTITLED *SCENT DETECTION DOGS, AN*

14   *UNUSED TOOL FOR FOOD SAFETY*, AND IT CONTAINS YOUR NAME, ANDY

15   JIMENEZ, FALCO K9 ACADEMY, AND VARIOUS NAMES OF PEOPLE FROM

16   THE FOOD AND DRUG ADMINISTRATION, AS WELL AS (PAUSE) -- DO YOU

17   RECOGNIZE THIS?  IS THIS PART OF A PRESENTATION THAT YOU DID,

18   A JOINT PRESENTATION YOU DID?

19   A.   I WAS IN THE PICTURE.  YES.

20   Q.   AND IS THAT THE PAPER YOU'RE REFERRING TO?

21   A.   NO.  I MEAN, THIS IS PART OF A PRESENTATION WE GAVE TO

22   DOLE AND CHIQUITA TO DEMONSTRATE WHAT WE WERE ABLE TO DISCOVER

23   IN THAT STUDY.

24   Q.   YES, AND ESSENTIALLY -- BUT THIS SUMMARIZED THE STUDY OF

25   WHAT YOU WERE ABLE TO DISCOVER, RIGHT?

1    A.  THAT WAS BEFORE THE STUDY WAS COMPLETE.

2    Q.  OKAY.  BUT YOU SIMPLY FOUND THAT SCENT DETECTION DOGS CAN

3    EQUALLY BE TRAINED TO DETECT FECAL CONTAMINATION AND IT MAY BE

4    USEFUL IN CERTAIN FOOD-SAFETY INVESTIGATIONS, RIGHT?  IN

5    SUM --

6    A.  I'M SORRY.  I WAS GETTING READY TO SNEEZE.  I'VE BEEN

7    FIGHTING IT FOR ABOUT HALF AN HOUR.

8    Q.  ALL RIGHT.

9    A.  I'M SO SORRY.

10   Q.  NO PROBLEM.

11   A.  IT'S MAKING MY EYES WATER.  ASK ME THE QUESTION AGAIN.

12   Q.  ESSENTIALLY, THAT STUDY DEALT WITH THE EFFECT ON THE DOG

13   TO BE ABLE TO DETERMINE, SCENT DOGS TO BE ABLE TO IDENTIFY E.

14   COLI OR SALMONELLA.  CORRECT?  THAT WAS THE STUDY.

15   A.  YES.

16   Q.  OKAY.  AND IT DIDN'T INVOLVE CONCEALED PERSONS.  CORRECT?

17   A.  CORRECT.

18   Q.  OKAY.  I JUST WANT TO MAKE THAT CLEAR.  ALL RIGHT?  AND

19   YOU WEREN'T THE AUTHOR OF THE PAPER.  CORRECT?  YOU DIDN'T

20   ACTUALLY WRITE THE PAPER.

21   A.  I WAS A CO-AUTHOR.  I WROTE PART OF IT.

22   Q.  OKAY.  AND THAT DEALT WITH, ESSENTIALLY, YOUR STUDY ON THE

23   ABILITY OF A DOG TO DETECT E. COLI OR SALMONELLA.  CORRECT?

24   A.  YES, TRAINING METHODOLOGY FOR SCENT DETECTION DOGS.  IT

25   WAS A WIDE NUMBER OF THINGS.

1  Q.  RIGHT.  E. COLI AND SALMONELLA, RIGHT?

2  A.  SCENT DETECTION.

3  Q.  SCENT DETECTION FOR FOOD CONTAMINANTS.  CORRECT?

4  A.  SURE.

5  Q.  NOT CONCEALED PERSONS.

6  A.  NO.

7  Q.  OKAY.  AND YOU HAVE NEVER TRIED TO TRAIN A DOG TO DETECT

8  BETWEEN CONCEALED AND VISIBLE OCCUPANTS.  THAT'S NOT BEEN YOUR

9  JOB.  CORRECT?  YOU'VE BEEN DEALING WITH PATROL DOGS.

10  CORRECT?

11  A.  PATROL DOGS, SEARCH FOR HUMAN BEINGS WHETHER THEY'RE

12  HIDDEN OR RUNNING AMONGST PEOPLE THAT ARE VISIBLE, WHICH WOULD

13  BE S.W.A.T. TEAM MEMBERS, BACKUP OFFICERS, PEOPLE INSIDE A

14  VEHICLE WHILE WE'RE SEARCHING THE OUTSIDE OF THE VEHICLE.

15  Q.  AND IN THAT VEIN, DOGS, DOGS CAN ACTUALLY HAVE -- YOU

16  TALKED ABOUT HOW FINE A DOG'S ABILITY IS TO DISTINGUISH.  DOGS

17  CAN ACTUALLY DISTINGUISH BETWEEN ONE HUMAN PERSON'S SCENT AND

18  ANOTHER HUMAN PERSON'S SCENT.  CORRECT?

19  A.  THAT HAS NOT BEEN VERY EFFECTIVE.  I BELIEVE WE'VE

20  CHALLENGED IT.  WE'VE TRIED IT.  IT SIMPLY IS THAT A DOG LOOKS

21  FOR HUMAN ODOR.

22  Q.  WELL, SAY, FOR EXAMPLE, YOU'RE FAMILIAR WITH BLOODHOUNDS,

23  RIGHT?

24  A.  YES.

25  Q.  AND TRACKING WHERE THEY'RE GIVEN A SCENT, RIGHT?  AND THEN

1    THEY'RE ASKED TO FOLLOW, TRY TO LOCATE THE SCENT OF ONLY THAT

2    INDIVIDUAL.  CORRECT?

3    A.  I'VE HEARD OF THAT, YES.

4    Q.  OKAY.  AND YOU'VE TESTIFIED ABOUT IT BEFORE.  CORRECT?

5    A.  AND I'VE PARTICIPATED IN THE TRAINING OF THAT.

6    Q.  AND YOU TESTIFIED THAT'S BEEN DONE -- AND YOU HAVE

7    TESTIFIED IN PREVIOUS HEARINGS THAT, IN FACT, DOGS CAN

8    DIFFERENTIATE BETWEEN THE SMELL OF ONE PERSON AS OPPOSED TO

9    ANOTHER PERSON.

10   A.  IN TRACKING, NOT IN BLOODHOUND.

11   Q.  OKAY.  WELL, IN TRACKING.  I'M SORRY.  I USED BLOODHOUNDS

12   AS A TRACKING.  BUT MY BASIC POINT IS, AND I WANT TO SEE IF

13   IT'S A FAIR STATEMENT, THAT, IN YOUR EXPERIENCE, DOGS CAN

14   DIFFERENTIATE BETWEEN THE SMELL OF ONE PERSON AS OPPOSED TO

15   ANOTHER PERSON.

16   A.  NO.  I MEAN, THAT'S TOO BROAD OF A STATEMENT.

17   Q.  WELL, I DON'T WANT TO PUT WORDS IN YOUR MOUTH, BUT IN THE

18   TRACKING AREA WHERE DOGS ARE GIVEN A PERSONAL ITEM THAT'S

19   BELIEVED TO BELONG TO A SUSPECT, THEY SMELL THAT AND THEN

20   THEY'RE THEN ASKED TO TRY TO TRACK THAT VEHICLE, THAT PERSON

21   DOWN.  CORRECT?

22   A.  I KNOW THAT'S WHAT IT LOOKS LIKE IN THE MOVIES, BUT WHAT

23   HAPPENS IS THE DOG STARTS ON THE LOCATION WHERE THAT, THE

24   PERSON YOU'RE LOOKING FOR STARTED.  SO IN THE CASE OF A

25   BURGLARY, FOR INSTANCE, YOU'VE GOT A WINDOW SMASHED.  THE GUY

1    COMES OUT THE WINDOW.  YOU CAN SEE THERE'S EVIDENCE OF WHERE

2    HE CAME OUT BECAUSE THERE'S MAYBE BLOOD BECAUSE HE CUT

3    HIMSELF, OR A COMPUTER MOUSE BECAUSE IT GOT LEFT BEHIND.  THE

4    DOG WILL START ON THAT TRACK AND WILL STAY ON THAT TRACK.

5    IT'S NOT THAT WE GIVE THE DOG AN ARTICLE OF CLOTHING.  WE DO

6    THAT WITH LASSIE IN MOVIES.  BUT THE DOG GETS ON THE TRACK AND

7    THEN IT STARTS WITH AND THE DOG WILL STAY ON THAT TRACK.  IF

8    WE DECIDE THAT THAT'S NOT THE CORRECT TRACK, WE CAN EASILY PUT

9    THE DOG ON ANOTHER TRACK AND THEN FOLLOW THAT TRACK.

10   Q.  FAIR ENOUGH, THEN.  AND I APOLOGIZE, BUT --

11   A.  THAT'S OKAY.

12   Q.  -- THE POINT IS THAT THE DOG STARTS ON A SCENT.  IT'S

13   USING ITS NOSE, RIGHT?  WHEN IT FOLLOWS THAT TRACK.

14   A.  CORRECT.

15   Q.  AND SO WHETHER HE'S GIVEN A SOCK THAT BELONGED TO SOMEBODY

16   OR IT'S JUST THE AREA WHERE THAT PERSON WAS, THE DOG HAS TO

17   FOLLOW THAT SCENT.  CORRECT?

18   A.  THE STEPS YOU'RE STATING ABOUT GIVING HIM SOMETHING TO

19   LOCATE LATER ON HAS NOT BEEN PROVEN TO BE VERY EFFECTIVE.

20   Q.  NO.  THAT'S WHAT I'M SAYING.

21   A.  THERE ARE CASES IN TEXAS THAT I DON'T KNOW HOW MANY, 50

22   PEOPLE WERE RELEASED BECAUSE OF SOME FAULTINESS IN THAT

23   PARTICULAR THOUGHT PROCESS.

24   Q.  BUT WHAT I'M SAYING IS THE DOG, WHEN IT STARTS FROM POINT

25   OF ORIGIN, IT'S RELYING ON A SCENT.  CORRECT?  A UNIQUE SCENT.

1    A.  IT DOESN'T START WITH A SCENT.  IT'S LOOKING FOR THE SCENT

2    THAT IT'S GOING TO ALERT TO.

3    Q.  OKAY.  SO IT LOOKS FOR THE SCENT.  IT'S FOLLOWING A CONE.

4    CORRECT?

5    A.  I REALLY DON'T WANT TO MAKE THIS CONFUSING.  WHEN A DOG IS

6    GOING TOWARDS A VEHICLE, IT'S LOOKING TO SEE IF THERE'S HUMAN

7    ODOR COMING FROM A VEHICLE, AND THEN IT WILL TELL YOU IF IT

8    SMELLS A HUMAN ODOR.

9    Q.  RIGHT.  OKAY.

10         MR. HARRIGAN:  ONE MOMENT, YOUR HONOR.

11         BY MR. HARRIGAN:

12   Q.  ALL RIGHT, I JUST -- I DON'T WANT TO BELABOR THE POINT,

13   BUT I WANT TO DIRECT YOU TO -- IT'S TAB SEVEN, EXHIBIT 7, AND

14   DIRECT YOUR ATTENTION TO PAGE 177 THROUGH 179.  CAN YOU TAKE A

15   LOOK AT THAT?

16   A.  (THE WITNESS COMPLIES.)

17   Q.  AND AT THE TOP OF THE PAGE, PAGE ONE, YOU WERE ASKED A

18   QUESTION:  AND ISN'T THE PURPOSE OF A PATROL DOG TO IDENTIFY

19   AND DIFFERENTIATE DIFFERENT HUMAN SCENT TO LOCATE THAT

20   SPECIFIC HUMAN?  YES.  THAT'S YOUR TESTIMONY.  CORRECT?

21   A.  (PAUSE)

22   Q.  YOU WERE ASKED A QUESTION:  ISN'T THE PURPOSE OF A PATROL

23   DOG TO IDENTIFY AND TO DIFFERENTIATE BETWEEN DIFFERENT HUMAN

24   SCENT TO LOCATE THAT SPECIFIC HUMAN?

25   A.  YES.

1   Q.  OKAY.  AND IN THAT CASE, YOU WERE BEING ASKED QUESTIONS

2   ABOUT HOW A PATROL DOG GOES INTO A HOUSE TO LOOK FOR

3   INDIVIDUALS, RIGHT?  SOMEONE WHO'S RUN INTO A HOUSE.  YOU

4   DON'T KNOW IF IT'S OCCUPIED OR NOT OCCUPIED.  CORRECT?

5   A.  I'M SORRY.  I'M JUST READING.

6   Q.  OKAY.

7   A.  OKAY.  COULD YOU ASK THAT QUESTION AGAIN?

8   Q.  AND SO, BASICALLY, YOU'RE BEING QUESTIONED THAT, BY THE

9   ATTORNEY ABOUT THE ABILITY OF, TO TRAIN A DOG IN LOCATING A

10  CONCEALED PERSON.  CORRECT?

11  A.  IN THE CASE THAT'S IN THIS BOOK --

12  Q.  YES.

13  A.  -- THAT YOU REFERRED TO?  IT HAD TO DO WITH --

14  Q.  NO, NO.  THIS IS ASKING YOU -- THE QUESTION IS ABOUT THE

15  USE OF A PATROL DOG --

16  A.  YES.

17  Q.  -- IN FINDING A CONCEALED PERSON.  CORRECT?

18  A.  CORRECT.

19  Q.  IN THIS INSTANCE, IN A HOME.

20  A.  CORRECT.

21  Q.  AND YOUR TESTIMONY WAS THAT ONE OF THE PURPOSES OF A

22  PATROL DOG IN DOING SO IS TO IDENTIFY AND DIFFERENTIATE

23  DIFFERENT HUMAN SCENT TO LOCATE THAT SPECIFIC HUMAN.  CORRECT?

24  A.  INSIDE OF A HOME, YES.

25  Q.  YES.  SO, IN OTHER WORDS, THE DOG IS DIFFERENTIATING

1    BETWEEN THE SCENT OF THE PERSON YOU'RE LOOKING FOR AND OTHER

2    HUMAN SCENTS.  CORRECT?

3    A.  IN THE PEOPLE THAT LIVE THERE.

4    Q.  CORRECT.

5    A.  YES.

6    Q.  RIGHT?  AND, YOU KNOW, AT THE VERY END, AFTER YOU EXPLAIN

7    HOW THAT PROCESS GOES THROUGH, YOU WERE ASKED:  THEY ARE ALSO

8    TRAINED TO IGNORE THE SCENT ON A BED OF ANOTHER HUMAN TO

9    LOCATE THAT BAD GUY UNDER THE BED.  CORRECT?

10   A.  CORRECT.

11   Q.  CORRECT.  AND YOU SAID, CORRECT.  IT'S AT PAGE 179.  AND

12   YOU WERE ASKED:  AND SO BASED ON WHAT YOU WENT THROUGH WITH

13   US, UNDER THE SAME THEORY, IS IT POSSIBLE FOR A CANINE TO

14   IGNORE OTHER HUMAN SCENT TO LOCATE A SPECIFIC HUMAN, FOR

15   EXAMPLE, CONCEALED UNDER A BED?  CORRECT.  AND THAT WAS YOUR

16   TESTIMONY JUST A MINUTE AGO.  ISN'T THAT TRUE?  AND YOUR

17   ANSWER WAS, YES.  IS THAT RIGHT?

18   A.  CORRECT.

19          MR. HARRIGAN:  ALL RIGHT.  THANK YOU.

20          MR. ZUGMAN:  I HAVE A COUPLE OF BRIEF FOLLOW-UP

21   QUESTIONS.

22          THE COURT:  NO.  SURE.  GO AHEAD, MR. ZUGMAN.

23          FURTHER EXAMINATION BY MR. ZUGMAN:

24   Q.  SO THE TESTIMONY THAT YOU WERE JUST BEING ASKED ABOUT, WAS

25   THAT THE TESTIMONY IN FRONT OF JUDGE HAYES LAST YEAR?

1    A.  (PAUSE)

2    Q.  THE SUMMERS CASE.  DOES THAT RING A BELL?

3    A.  IT SOUNDS SIMILAR, BUT I THINK IT COULD BE.

4    Q.  AND THAT WAS THE CASE WHERE JUDGE HAYES RELIED UPON YOUR

5    TESTIMONY, FOUND YOU CREDIBLE AND SUPPRESSED THE EVIDENCE.  IS

6    THAT THAT ONE?

7    A.  CORRECT.

8    Q.  OKAY.  SO LET'S TALK A BIT ABOUT THIS TRAINED VS.

9    CONCEALED/UNCONCEALED PEOPLE.  NOW, I DON'T KNOW IF THIS IS A

10   CAREFULLY GUARDED SECRET, BUT IS THERE A SECRET SOURCE OF

11   CONCEALED HUMAN SMELL THAT BORDER PATROL HAS OR THAT SOME

12   POLICE AGENCY HAS THAT YOU CAN TRAIN A DOG ON?

13   A.  NO.

14   Q.  SO, WHEN YOU TRAIN DOGS TO IGNORE CERTAIN SCENTS, YOU

15   TRAIN THEM TO IGNORE THEM, RIGHT?

16   A.  CORRECT.

17   Q.  DID YOU SEE ANYTHING, ANYTHING, IN PECKY'S RECORDS THAT

18   INDICATED THAT SHE WAS BEING TRAINED TO IGNORE CERTAIN SCENTS?

19   A.  NO.

20   Q.  ANYTHING?

21   A.  (PAUSE)

22   Q.  NOTHING?

23   A.  NOTHING.

24   Q.  OKAY.  SO, WHEN YOU'RE TRAINING THEM TO SMELL, YOU CAN GET

25   THEM TO IGNORE SMELLS, BUT YOU'VE GOT TO TRAIN THEM ON IT,

1    RIGHT?

2    A.  YES, AND THE HANDLER'S ACTIONS WILL ALLOW THEM TO IGNORE

3    SEARCHING AT SPECIFIC TIMES.

4    Q.  IS THERE ANY WAY TO GET SAMPLES OF THE SCENTS, THE SCENTS

5    YOU WANT TO SUPPRESS THE DOG FROM SMELLING FROM PEOPLE WAITING

6    IN LINE AT A CHECKPOINT?

7    A.  IN REGARD TO HUMAN SCENT?

8    Q.  YES.

9    A.  NO.

10          MR. ZUGMAN:  THANK YOU, YOUR HONOR.

11          THE COURT:  OKAY.

12          MR. HARRIGAN, MISS AHUMADA, ANYTHING FURTHER YOU'D

13   LIKE TO ASK THIS WITNESS?

14          MR. HARRIGAN:  NO.  WE'RE DONE, YOUR HONOR.

15          THE COURT:  OKAY.

16          ARE YOU DONE, MR. ZUGMAN?

17          MR. ZUGMAN:  YES, YOUR HONOR.

18          THE COURT:  OKAY.  THANK YOU VERY MUCH.  YOU MAY STEP

19   DOWN, MR. JIMENEZ.  YOU'RE EXCUSED.

20          THE WITNESS:  THANK YOU.

21          (THE WITNESS STOOD ASIDE.)

22          THE COURT:  LET'S JUST TAKE A SHORT BREAK.

23          WHAT ARE WE LOOKING AT?  OUR NEXT WITNESS WILL BE?

24          MR. ZUGMAN:  SO I BELIEVE OUR NEXT WITNESS WILL BE

25   DEVANEY.

```
1              THE COURT:  OKAY.

2              MR. ZUGMAN:  BUT IT'S THE GOVERNMENT'S WITNESS.

3              THE COURT:  CORRECT.

4              MR. ZUGMAN:  AND THEN WE CAN PROBABLY STIPULATE.  I

5    MEAN, THE GOVERNMENT CAN HAVE MISS LOPEZ SAY SHE DROVE UP TO

6    THE CHECKPOINT.

7              THE COURT:  I MEAN, IF YOU CAN WORK THAT OUT, READING

8    IT INTO THE RECORD, COUNSEL.  IS THAT WHAT I'M EXPECTING, ONE

9    MORE EXPERT, THE GOVERNMENT'S WITNESS, AND THEN MAYBE SOME

10   STIPULATED FACTS, AND THEN WHAT?

11             MR. ZUGMAN:  AND THEN BARRAGAN, THE DOG HANDLER.

12             MR. HARRIGAN:  I THINK THAT IN TERMS OF STIPULATED

13   FACTS, I DON'T KNOW IF THAT'S GOING TO BE NECESSARY.  I THINK

14   AGENT BARRAGAN CAN PROBABLY TESTIFY TO THE FACTS.

15             THE COURT:  OH, OKAY.  PERFECT.

16             MR. HARRIGAN:  I THINK WHAT MR. ZUGMAN IS TALKING

17   ABOUT, WE TALKED ABOUT IF IT'S NECESSARY FOR US TO CALL THE

18   PRIMARY INSPECTOR, AND WE DON'T BELIEVE IT IS.  I'LL TALK TO

19   MR. ZUGMAN A LITTLE BIT MORE ABOUT THAT --

20             THE COURT:  OKAY.

21             MR. HARRIGAN:  -- BECAUSE, ESSENTIALLY, MR. BARRAGAN

22   WAS THERE WHEN THE (PAUSE) --

23             THE COURT:  AND CAN GIVE US ALL THE FACTS I'M GOING

24   TO NEED FOR MAKING A RULING.  OKAY.

25             MR. HARRIGAN:  WE BELIEVE THAT AND HOPEFULLY THERE'S
```

1    NO DISPUTE, BUT MAYBE WE SHOULD TALK TO MR. ZUGMAN.

2              MR. ZUGMAN:  I'M 99-PERCENT CERTAIN THAT'S CORRECT.

3              THE COURT:  OKAY.  AND I'M GOING TO HAVE TO RECESS AT

4    NOON, BUT WE CAN PICK UP AT 1:30, DEPENDING ON WHERE WE ARE.

5              OKAY.  THANK YOU.  TAKE A TEN-MINUTE BREAK.

6              (RECESS)

7              THE COURT:  OKAY.  THE GOVERNMENT MAY CALL THEIR

8    WITNESS.

9              MS. AHUMADA:  YOUR HONOR, THE UNITED STATES CALLS

10   MATTHEW DEVANEY.

11             THE DEPUTY CLERK:  SIR, PLEASE RAISE YOUR RIGHT HAND.

12             (WITNESS SWORN.)

13             THE WITNESS:  I DO.

14             THE DEPUTY CLERK:  THANK YOU.  PLEASE HAVE A SEAT

15   OVER HERE.

16             PLEASE STATE YOUR FULL NAME FOR THE RECORD AND SPELL

17   YOUR LAST NAME SLOWLY.

18             THE WITNESS:  MATTHEW B., AS IN BOY, DEVANEY.

19   SPELLING, D-E-V AS IN VICTOR-A-N-E-Y.

20             MATTHEW B. DEVANEY, SWORN WITNESS, TESTIFIES:

21             DIRECT EXAMINATION BY MS. AHUMADA:

22   Q.  SIR, HOW ARE YOU PRESENTLY EMPLOYED?

23   A.  WITH CUSTOMS AND BORDER PROTECTION, WITHIN THE CANINE

24   PROGRAM.

25   Q.  ALL RIGHT.  AND CAN YOU TELL ME ABOUT THE MISSION OF THE

1    CUSTOMS AND BORDER PROTECTION CANINE PROGRAM?

2    A.  THE MISSION OF THE CUSTOMS AND BORDER PROTECTION CANINE

3    PROGRAM IS TO SUPPLY CANINE RESOURCES AND TRAINING, TO SUPPORT

4    THE OVERALL MISSION OF CBP, WHICH IS TO THWART TERRORISM AND

5    INTERDICT THE SMUGGLING AND IMPORTATION OF CONTROLLED

6    SUBSTANCES.

7    Q.  NOW, WHAT EXPERIENCE LED YOU TO GET THIS POSITION WITH THE

8    CUSTOMS AND BORDER PROTECTION CANINE PROGRAM?

9    A.  I STARTED IN CHILDHOOD.  I WAS RAISED IN A BREEDING

10   KENNEL.  MY MOTHER IS AN AMERICAN KENNEL CLUB JUDGE.  I SHOWED

11   AND TRAINED DOGS FROM CHILDHOOD.

12       I GOT INTO LAW ENFORCEMENT AND ACTUALLY SEGUED INTO

13   BECOMING A CANINE OFFICER WITHIN MY AGENCY.  I WENT THROUGH

14   VARIOUS HANDLER TRAINING, ULTIMATELY GOING TO AN INSTRUCTOR

15   TRAINING COURSE IN ALABAMA.  THAT WAS A PRIVATE ORGANIZATION

16   AT THE TIME, AND WITHIN ABOUT SIX MONTHS THAT SCHOOL WAS TAKEN

17   OVER BY THE STATE AND THEY ASKED ME TO BE AN INSTRUCTOR AT

18   THAT SCHOOL, AND THEN IT WAS TAKEN OVER BY THE STATE COLLEGE

19   SYSTEM AND WAS RENAMED THE ALABAMA CANINE LAW-ENFORCEMENT

20   OFFICERS TRAINING CENTER.  THAT WAS A STATE-RUN FACILITY,

21   COLLEGE-ACCREDITED CANINE PROGRAM.  I DO ALL THE CURRICULUM

22   TRAINING METHODOLOGY, AND SO FORTH, FOR THAT PROGRAM.  I

23   WORKED THERE FROM 1985 TO 1991, DURING WHICH TIME WE TRAINED

24   AGENCIES FROM ALL OVER THE WORLD, FOR THE STATE DEPARTMENT AND

25   ALL OVER THE COUNTRY, TO INCLUDE THE UNITED STATES BORDER

1    PATROL.

2        IN 1992, THE BORDER PATROL OPENED THEIR OWN TRAINING

3    FACILITY IN EL PASO, TEXAS, AND I APPLIED FOR THE POSITION OF

4    CANINE TRAINING SUPERVISOR, OR CANINE COORDINATOR, FOR THAT

5    PROGRAM AND WAS HIRED, AND THEN I DEVELOPED ALL THE TRAINING

6    PROTOCOLS, CERTIFICATION STANDARDS, ACADEMIC MATERIAL AND

7    STANDARDS FOR THE BORDER PATROL UP UNTIL 2010.  DURING THAT

8    PERIOD, I DEVELOPED THE TRAINING PROTOCOLS FOR

9    CONCEALED-HUMAN/NARCOTICS DETECTION, SEARCH AND RESCUE,

10   CADAVER, AND, IN 2008, PATROL.

11       OF COURSE, IN 2011, OR IN 2001, OF COURSE, WE HAD THE

12   EVENTS OF 9/11 AND THE BORDER PATROL WAS ASSIMILATED INTO

13   CUSTOMS AND BORDER PROTECTION, ALONG WITH THE LEGACY U. S.

14   CUSTOMS SERVICE.  IN 2010, THE CANINE PROGRAMS, RESPECTIVE

15   CANINE PROGRAMS OF THOSE TWO AGENCIES WERE CONSOLIDATED UNDER

16   ONE TRAINING DOCTRINE, AND I WAS THE PRINCIPAL AUTHOR IN

17   CONSOLIDATING THOSE TWO CANINE PROGRAMS TOGETHER TO CREATE THE

18   CURRENT CBP CANINE PROGRAM FOR CONCEALED HUMAN/NARCOTICS, AND

19   THEN LATER I ADDED AND WROTE THE PROTOCOL FOR CURRENCY AND

20   FIREARMS.  I ALSO WROTE THE PROTOCOLS AND TRAINING DOCTRINES

21   FOR THE INSTRUCTORS FOR ALL THESE DISCIPLINES.

22   Q.  ALL RIGHT.  SO LET'S BACK UP FOR A SECOND.  IN ALL THAT

23   EXPERIENCE, YOU'VE BEEN A CANINE HANDLER, RIGHT?

24   A.  EXCUSE ME?

25   Q.  YOU'VE BEEN A CANINE HANDLER IN THE PAST, RIGHT?

1    A.  CANINE HANDLER, YES, MA'AM.

2    Q.  WHERE DID YOU HANDLE THAT CANINE?

3    A.  I STARTED WITH THE POLICE DEPARTMENT IN ALBUQUERQUE, NEW

4    MEXICO.  I HANDLED FOR THAT AGENCY THREE DOGS, AND THEN

5    THROUGH MY VARIOUS EMPLOYMENT AFTER THAT I PROBABLY HANDLED

6    ANOTHER SIX OR SEVEN.

7    Q.  OKAY.  AND YOU'VE BEEN AN INSTRUCTOR BASED ON THAT

8    EXPERIENCE AND OTHER EXPERIENCES SINCE 1984?

9    A.  SINCE 1984 IS WHEN I WAS FURTHER CERTIFIED AS AN

10   INSTRUCTOR, YES, MA'AM.

11   Q.  ALL RIGHT.  AND WITH THE FEDERAL GOVERNMENT FOR 25 YEARS?

12   A.  I'VE BEEN WITH CBP, NEXT MONTH WILL BE 25 YEARS.  I'VE

13   BEEN IN CANINE FOR 37.

14   Q.  AND WHAT IS THE NORTH AMERICAN POLICE WORK DOG

15   ASSOCIATION?

16   A.  THE NORTH AMERICAN POLICE WORK DOG ASSOCIATION IS ONE OF

17   THE OLDEST AND LARGEST POLICE CANINE ORGANIZATIONS IN THE

18   COUNTRY.  IT NUMBERS ABOUT 2,900 MEMBERS, MADE UP OF POLICE

19   CANINE HANDLERS AND INSTRUCTORS FROM ALL OVER THE COUNTRY AND

20   THE WORLD.  ITS STATED MISSION IS TO ASSIST POLICE WORK DOGS

21   THROUGHOUT THE WORLD.

22   Q.  ALL RIGHT.  AND IS IT AN INDEPENDENT ORGANIZATION FROM

23   CUSTOMS AND BORDER PROTECTION?

24   A.  YES, MA'AM.

25   Q.  ALL RIGHT.  AND ARE YOU ACCREDITED UNDER THE NORTH

1   AMERICAN POLICE WORK DOG ASSOCIATION?

2   A.  YES, MA'AM.  I'M ACCREDITED AS A MASTER TRAINER, WHICH IS

3   EQUIVALENT TO AN EVALUATOR IN THE DISCIPLINES OF UTILITY,

4   WHICH IS PATROL DOGS, NARCOTICS DETECTION, ACCELERANT

5   DETECTION, AND HUMAN REMAINS DETECTION.

6   Q.  ALL RIGHT.  AND TELL ME, WHAT IS A MASTER TRAINER?  HOW

7   DOES IT COMPARE TO JUST TRAINERS OR OTHER POSITIONS THAT ARE

8   ASSOCIATED WITH NORTH AMERICAN?

9   A.  THE MASTER TRAINER IS THE ULTIMATE POSITION OF BEING ABLE

10  TO ISSUE NORTH AMERICAN POLICE WORK DOG ASSOCIATION

11  CERTIFICATIONS TO CANINE TEAMS.  A TRAINER IS A SUBSET OF

12  THAT.  THESE ARE USUALLY PEOPLE WORKING TOWARDS BECOMING

13  MASTER TRAINERS.  TO BECOME A MASTER TRAINER IS A SIX-YEAR

14  COMMITMENT TO ACHIEVE THAT ACCREDITATION.

15  Q.  AND HOW LONG HAVE YOU HAD THAT ACCREDITATION?

16  A.  OH, MY FIRST ACCREDITATION, I THINK, I THINK IT WAS BACK

17  IN 2005, BUT I CAN'T REMEMBER THE EXACT DATE.

18  Q.  AND THAT'S AS A MASTER TRAINER?

19  A.  AS A MASTER TRAINER.

20  Q.  AND HOW LONG HAVE YOU BEEN A TRAINER WITH THE NORTH

21  AMERICAN POLICE WORK DOG ASSOCIATION?

22  A.  AT THE TIME, I THINK I'D BEEN A TRAINER FOR FOUR OR FIVE

23  YEARS.

24  Q.  AND DO THEY HAVE CONTINUING-EDUCATION REQUIREMENTS TO BE,

25  CONTINUE TO BE A MASTER TRAINER FOR THE NORTH AMERICAN POLICE

1    WORK DOG ASSOCIATION?

2    A.  TO GET THE EDUCATION, TO GET THE ACCREDITATION AND

3    CONTINUING EDUCATION TO RETAIN IT, TO GET BOTH THE TRAINER AND

4    THE MASTER TRAINER TITLES, YOU HAVE TO HAVE A LETTER OF

5    RECOMMENDATION BY ANOTHER MASTER TRAINER WHO'S WORKED WITH YOU

6    FOR 100 HOURS.  YOU ALSO HAVE TO HAVE CONTINUING EDUCATION OR

7    OBSERVED HOURS WHERE OTHER MASTER TRAINERS WATCH YOU TEACH AND

8    TRAIN TEAMS.  DEPENDING UPON THE DISCIPLINE DICTATES THE

9    NUMBER OF OBSERVED HOURS YOU NEED.  AND THEN AFTER YOU BECOME

10   A MASTER TRAINER, YOU HAVE TO ATTEND AT LEAST EIGHT HOURS A

11   YEAR IN A CANINE, IN CANINE-RELATED SUBJECTS.  YOU HAVE TO, AS

12   A MASTER TRAINER, CERTIFY A MINIMUM OF FIVE DOG TEAMS A YEAR

13   AND ATTEND A STATE WORKSHOP EVERY YEAR AND A NATIONAL WORKSHOP

14   EVERY THREE YEARS.

15   Q.  ALL RIGHT.  AND DO YOU ATTEND THESE CANINE-RELATED

16   LECTURES AND SEMINARS AS AN INSTRUCTOR AND TEACHER?

17   A.  AS BOTH A STUDENT AND I ALSO INSTRUCT EXTENSIVELY IN, AT

18   THESE DIFFERENT EVENTS.

19   Q.  AND DO YOU HOLD ANY POSITIONS WITH THE NORTH AMERICAN

20   POLICE WORK DOG ASSOCIATION?

21   A.  YES, MA'AM.  I'M THE EDUCATION CHAIRMAN FOR THE

22   ORGANIZATION.

23   Q.  WHAT DOES THAT MEAN?

24   A.  THE EDUCATION CHAIRMAN IS RESPONSIBLE FOR RESEARCHING,

25   DEVELOPING AND REVIEWING CASE LAW, REVIEWING CRITICAL

1    INSTANCE, TRAINING DEVELOPMENTS, THINGS OF THAT NATURE, AND

2    BRINGING THESE FINDINGS BACK TO THE ORGANIZATION AND

3    INSTRUCTING IN IT.  I'M ALSO RESPONSIBLE FOR REVIEWING

4    CONTINUING EDUCATION SUBMITTED BY OTHER MASTER TRAINERS AND

5    PROVIDING ANY GUIDANCE TOWARD THE ORGANIZATION VS. TRAINING

6    TRENDS OR CHANGES THAT MAY NEED TO BE MADE TO THE

7    CERTIFICATION RULES.

8    Q.  SO I JUST WANT TO DISCUSS A COUPLE OF TERMS THAT YOU USE

9    IN CANINE TRAINING, ESPECIALLY THE ONES THAT ARE USED

10   DIFFERENTLY IN BORDER PATROL AND CBP.  CAN YOU TELL US WHAT AN

11   ALERT IS VS. AN INDICATION FOR CUSTOMS AND BORDER PROTECTION

12   AND BORDER PATROL?

13   A.  AN ALERT IS DEFINED AS A CHANGE IN BODY POSTURE AND

14   INCREASED RESPIRATION WHEN THE DOG FIRST ENCOUNTERS THE ODORS

15   HE HAS BEEN TRAINED TO DETECT.  THIS IS A NATURAL REACTION BY

16   THE DOG WHEN ENCOUNTERING A TRAINED ODOR.  SO WE'RE REFERRING

17   TO WHAT THE DOG DOES WITH HIS BODY, WHAT SIGNALS HE DISPLAYS

18   OR NATURAL REACTIONS HE DISPLAYS TO A TRAINED ODOR.  AN

19   INDICATION IS A TRAINED BEHAVIOR THAT PINPOINTS SOURCE.  NOW,

20   THERE ARE TWO INDICATIONS.  THERE ARE TWO THAT ARE TYPICALLY

21   TAUGHT IN THE INDUSTRY.  THE FIRST IS AN ACTIVE INDICATION,

22   WHICH IS DEFINED AS A SCRATCH OR BITE, AND THEN THERE'S A

23   PASSIVE INDICATION, WHICH IS DEFINED AS A SIT, DOWN, OR POINT.

24   THESE ARE BEHAVIORS THE DOG WILL DEMONSTRATE WHEN HE

25   IDENTIFIES THE STRONGEST SOURCE OF THE TRAINED ODOR.  SO WE

1   HAVE, FIRST, THE ALERT, THEN THE DOG TRACES THAT ODOR TO

2   SOURCE, AND AT THAT POINT THE INDICATION WOULD BE DISPLAYED.

3   Q.  ALL RIGHT.  SO -- AND I JUST WANTED TO DEFINE ONE OTHER

4   TERM, SINGLE BLIND.  WHAT DOES SINGLE BLIND MEAN?

5   A.  SINGLE BLIND REFERS TO A SITUATION IN WHICH A DOG TEAM IS

6   CONDUCTING AN EXERCISE AND THE HANDLER HAS NO KNOWLEDGE AS TO

7   THE LOCATION.  OBVIOUSLY, THE DOG DOESN'T EITHER, BUT THERE IS

8   SOMEONE PRESENT WHO DOES KNOW THE LOCATION OF THE FIND TO

9   EVALUATE THE TEAM AND DETERMINE IF A TEAM IS PERFORMING

10  CORRECTLY.

11  Q.  ALL RIGHT.  WITHIN THE CBP TRAINING PROGRAM, DOES THAT

12  TRAINING PROGRAM DO THE TRAINING FOR DOGS THAT ARE DEPLOYED AT

13  IMMIGRATION CHECKPOINTS FOR BORDER PATROL?

14  A.  DO WE DO TRAINING?  I'M SORRY.

15  Q.  DO YOU DO THE TRAINING AND CERTIFICATION FOR DOGS THAT ARE

16  DEPLOYED AT IMMIGRATION CHECKPOINTS FOR BORDER PATROL?

17  A.  YES, MA'AM.

18  Q.  AND WHO SETS THE CRITERIA FOR SELECTING WHICH CANINES GO

19  INTO THE PROGRAM?

20  A.  FOR SELECTING THEM?

21  Q.  YES.

22  A.  I SET THAT STANDARD BASED ON WEST GERMAN POLICE STANDARDS

23  WHEN WE STARTED THE ORIGINAL CANINE TRAINING PROGRAM FOR

24  BORDER PATROL IN 1992.

25  Q.  AND WHO SETS THE TRAINING CRITERIA?

1   A.  I DO, MA'AM.

2   Q.  ALL RIGHT.  SO I WANT TO MOVE ON TO THE DETECTION

3   CANDIDATE SELECTION PROCESS.  IS THE SELECTION PROCESS

4   IMPORTANT FOR SELECTING CANINE DETECTION DOGS?

5   A.  YES, MA'AM, IT'S VERY IMPORTANT.

6   Q.  WHY?

7   A.  IT'S PROBABLY THE MOST IMPORTANT TIME YOU SPEND WITH A

8   DOG.  IF YOU DO NOT SELECT THE CORRECT DOG, IT WILL BE MORE

9   DIFFICULT TO TRAIN, MORE DIFFICULT TO MAINTAIN AND MAY

10  ULTIMATELY FAIL IN THE FIELD.  SO THE SELECTION PROCESS IS

11  PROBABLY ONE OF THE MOST IMPORTANT PERIODS THAT YOU SPEND WITH

12  A DOG, IS PICKING THE RIGHT DOG.

13  Q.  ALL RIGHT.  AND WHAT ARE YOU LOOKING FOR DURING THAT

14  SELECTION PROCESS?

15  A.  WE'RE LOOKING FOR SEVERAL THINGS.  FIRST OF ALL, WE HAVE

16  TO LOOK FOR, DOES THE DOG HAVE SOUND TEMPERAMENT?  WHAT WE

17  MEAN BY THAT IS THEY'RE APPROACHABLE, NO UNWARRANTED

18  AGGRESSION.  WE ALSO WANT TO MAKE SURE THE DOG ISN'T FEARFUL,

19  PARTICULARLY IN CERTAIN SITUATIONS SUCH AS SLICK FLOORS, TIGHT

20  LOCATIONS LIKE INSIDE CARS, RUNNING CARS, LOUD NOISES, HOW

21  QUICKLY THE DOG'S STARTLE RECOVERY TIME IS, AND THINGS OF THAT

22  NATURE.  THEN WE HAVE TO LOOK FOR, DOES THE DOG HAVE WHAT WE

23  CALL GENETIC DRIVES SO BOTH THE TASK THAT WE'RE ASKING THE DOG

24  TO PERFORM AND THE SELECTED REWARD SYSTEM WILL FUNCTION?

25  Q.  WHAT'S A SELECTIVE REWARD SYSTEM, JUST SO WE CAN BREAK

1    THAT UP A LITTLE BIT?

2    A.  OKAY.  A SELECTIVE REWARD SYSTEM, CBP USES PRINCIPALLY FOR

3    DETECTION A TOY-BASED, REWARD-OBJECT-BASED SYSTEM WHERE THE

4    DOG IS REWARDED WITH SOME TYPE OF OBJECT TO PLAY WITH.

5    Q.  ALL RIGHT.  AND THEN YOU WERE TALKING ABOUT A DRIVE

6    OTHERWISE TO SEARCH FOR THE ITEM?

7    A.  YES.  SO WHAT WE ACTUALLY WANT IS, WE WANT DOGS WITH VERY

8    HIGH HUNT AND AIR SCENT.  THIS MEANS THAT THE DOG WANTS TO GO

9    LOOK FOR THINGS AND PRINCIPALLY USES HIS NOSE TO DO IT.  THEN,

10   BECAUSE OF THE REWARD SYSTEM, WE HAVE TO HAVE DOGS THAT HAVE A

11   VERY HIGH PREY DRIVE AND/OR RETRIEVE WHERE THEY ENJOY PLAYING

12   WITH REWARD OBJECTS.  WE THEN NEED TO MEASURE TO WHAT LEVEL

13   THESE DRIVES ARE PRESENT IN A DOG.  SO, TO DO THAT, WE THROW

14   MULTIPLE, DIFFERENT REWARD OBJECTS, BOTH HARD AND SOFT, AND WE

15   THROW THEM INTO TALL GRASS.  WE PLACE REWARD OBJECTS

16   UNDERNEATH HEAVY OBJECTS TO SEE IF THE DOG HAS WHAT WE REFER

17   TO AS THE PERSEVERANCE TO STAY WITH THAT TOY.  EVEN IF THE

18   HANDLER IS LEAVING AND HE ISN'T GETTING ANY ASSISTANCE, HE'LL

19   TRY TO WORK THE PROBLEM OUT.  WE WANT TO SEE IF THE DOG PUTS

20   THE TOY AHEAD OF OTHER DESIRABLE THINGS, SUCH AS FOOD WHEN

21   HE'S HUNGRY.  SO WE WILL THROW THE TOYS PAST FOOD.  IF THE DOG

22   WILL CONTINUE TO WORK AND GO AFTER THE TOY WHEN HE'S THIRSTY,

23   WE WILL THROW THE TOYS PAST WATER, AND THEN ULTIMATELY WE ALSO

24   NEED TO KNOW THAT THE DOG WILL FOLLOW HANDLER DIRECTION WHEN

25   BEING IN A DEPLOYMENT.  SO WE WANT TO SEE IF THE DOG -- IF HE

1    HUNTS OUT IN THE FIELD OKAY, WE ALSO NEED TO SEE IF HE WILL

2    HUNT ON A SHORT LEASE AT THE DIRECTION OF A HANDLER.  THAT'S

3    THE BASELINE OUTLINE OF THE SELECTION TEST.  THIS IS FOLLOWED

4    WITH AN EXTENSIVE MEDICAL EXAM.

5    Q.  AND WHERE DO YOU GET THESE DOGS?

6    A.  THESE DOGS ARE PROVIDED BY AMERICAN VENDORS THROUGH

7    MULTIPLE PURCHASE, MULTIPLE AWARD CONTRACTS.  AS A RESULT OF

8    THE SELECTION CRITERIA, A VAST MAJORITY OF THESE DOGS USUALLY

9    WIND UP COMING FROM EUROPEAN-BASED COUNTRIES.  SO THAT'S

10   PRETTY MUCH WHERE THEY COME FROM.

11   Q.  ALL RIGHT.  AND WOULD YOUR CONTRACTS PROVIDE FOR SOME

12   PROVISION TO ALLOW YOU TO RETURN THESE DOGS IF THEY'RE NOT

13   WORKING OUT?

14   A.  RETURNING THEM?

15   Q.  YES.

16   A.  OH, OKAY.  ONCE THEY PASS THE SELECTION AND HEALTH

17   CRITERIA, AND HEALTH INCLUDES RADIOGRAPHS AND VACCINATIONS,

18   BLOOD PANELS, UROLOGY, ALL THAT THING.  ONCE THEY PASS THAT,

19   WE HAVE A 15-DAY WINDOW WHERE WE CAN TAKE THE DOGS INTO

20   REALISTIC OPERATIONAL ENVIRONMENTS SO WE CAN DO ADDITIONAL

21   TESTING, AND IF THE DOG IS FOUND TO BE SUBSTANDARD DURING THAT

22   15-DAY WINDOW, WE RETURN THE DOG.  AFTER THE 15-DAY WINDOW, WE

23   HAVE A 180-DAY HEALTH GUARANTEE AGAINST ANY PRE-EXISTING

24   HEALTH CONDITION THAT WOULD RENDER THE DOG UNABLE TO WORK.

25   Q.  NOW, LET ME ASK YOU THIS.  WHAT DO YOU USE CANINES FOR,

1   THAT YOU'RE SELECTING FOR AT CHECKPOINTS AND POINTS OF ENTRY?

2   A.  AT CHECKPOINTS?

3   Q.  AND PORTS OF ENTRY, YES.

4   A.  AND PORTS OF ENTRY.  WELL, AT POINTS OF ENTRY AND

5   CHECKPOINTS.  AT THE PORTS OF ENTRY SPECIFICALLY, FIELD

6   OPERATIONS USES CURRENCY AND FIREARMS DETECTION CANINES AND

7   ALSO CONCEALED HUMAN AND NARCOTICS DETECTION CANINES.  THE

8   U. S. BORDER PATROL PRINCIPALLY USES CONCEALED HUMAN AND

9   NARCOTICS DETECTION CANINES AT THE CHECKPOINTS.

10  Q.  I KNOW IT'S KIND OF IN THE NAME, BUT WHAT CAN A CONCEALED

11  HUMAN/NARCOTICS DETECTION DOG SEARCH FOR?

12  A.  CONCEALED HUMAN AND NARCOTICS DETECTION DOGS ARE TRAINED

13  TO IDENTIFY THE LOCATION OF CONCEALED HUMANS AND THE ODORS OF

14  CERTAIN CONTROLLED SUBSTANCES, TO INCLUDE COCAINE, HEROIN,

15  MARIJUANA, METHAMPHETAMINE, AND ECSTASY.

16  Q.  AND HOW DO YOU BEGIN THE TRAINING PROCESS FOR ONE OF THESE

17  CONCEALED HUMAN/NARCOTICS DETECTION-TYPE DOGS?

18  A.  THE TRAINING PROCESS, AFTER SELECTION, THE DOGS ENTER INTO

19  A PRETRAINING PROCESS THAT LASTS APPROXIMATELY FOUR WEEKS.

20  DURING THIS PERIOD, EITHER COURSE DEVELOPMENT INSTRUCTORS THAT

21  ARE ASSIGNED TO THE SCHOOLS, DETAIL INSTRUCTORS THAT ARE

22  BROUGHT IN FROM THE FIELD, OR INSTRUCTOR STUDENTS THAT ARE

23  THERE TO LEARN FROM THE INSTRUCTORS HANDLE THE DOGS, AND THEY

24  ARE IMPRINTED ON THE SUBSTANCE ODORS.  THEY ARE ALSO

25  INTRODUCED TO CONCEALED HUMAN DETECTION, AND THE INDICATION

1    BEHAVIOR IS CONDITIONED, AND THEY ARE EXPOSED TO A MAJORITY OF

2    THE OPERATIONAL ENVIRONMENTS THAT THE DOGS WOULD BE EXPECTED

3    TO WORK IN FOR THAT FOUR-WEEK PERIOD.

4    Q.  ALL RIGHT.  SO LET'S BREAK DOWN A COUPLE OF THINGS.  YOU

5    MENTIONED INDICATION BEHAVIOR.  WHAT KIND OF INDICATION

6    BEHAVIOR ARE YOU LOOKING TO IMPRINT DURING THAT FOUR-WEEK

7    PERIOD?

8    A.  WITH THE CUSTOMS AND BORDER PROTECTION, WE TRAIN PASSIVE

9    INDICATION, WHICH IS DEFINED, AS I SAID EARLIER, AS A SIT,

10   DOWN, OR A POINT.

11   Q.  WHAT DO YOU MEAN BY POINT?  A DOG DOESN'T HAVE FINGERS,

12   SO.

13   A.  THE INDICATION BEHAVIOR, IDEALLY, WE'RE CONDITIONING THE

14   SIT, BUT THE DOGS ARE CONDITIONED TO EXPECT THEIR REWARD,

15   WHICH WOULD BE THE TOY, TO APPEAR FROM THE SOURCE OF ODOR.

16   OKAY?  SO, AS A RESULT, THEY TRY TO GET THEIR FACE AS CLOSE TO

17   THAT SOURCE AS THEY CAN BECAUSE THEY WANT TO CATCH THE TOY

18   WHEN IT COMES OUT, KIND OF LIKE CATCHING A WOLF GETTING UP

19   REAL CLOSE TO THE BUNNY HOLE BECAUSE THEY EXPECT THAT TOY TO

20   COME OUT OF THAT CRACK IN THE CAR, OR WHEREVER IT MAY BE.  SO,

21   AS A RESULT OF THIS, THE LOCATION OF SOURCE MAY CAUSE THEM TO

22   DO ONE OF THE THREE DIFFERENT INDICATION BEHAVIORS.  SO, FOR

23   EXAMPLE, IF IT'S DOWN UNDERNEATH A CAR, THE DOG MAY ROLL INTO

24   A DOWN, CRAWL UNDER THE CAR IN A DOWN POSITION AND PUT ITS

25   FACE CLOSE TO SOURCE.  IF IT'S NOSE-LEVEL STRIKE ZONE OR MAYBE

1    HIGHER, THE DOG WILL ASSUME A SIT.  IF IT'S VERY HIGH, THE DOG

2    MAY, LIKE HE CAN'T GET HIS NOSE RIGHT TO SOURCE, LIKE IT'S UP

3    IN THE CEILING, BUT HE CAN SMELL IT IN A CORNER, HE MAY GET UP

4    ON HIS REAR LEGS AND JUST POINT.  IF YOU HAVE A VERY LARGE DOG

5    AND A VERY LITTLE CAR AND IT'S IN THE DASH, FOR EXAMPLE, THE

6    DOG MAY ALERT TO THE DASH, AND WHEN HE TRIES TO INDICATE, HE

7    FEELS HIS BUTT HIT THE BACK OF THE SEAT AND SO HE WINDS UP

8    JUST POINTING.

9    Q.  ALL RIGHT.  AND I WANT TO ALSO ASK YOU ABOUT THE FOUR-WEEK

10   PERIOD.  YOU TALKED ABOUT INSTRUCTOR STUDENTS AND INSTRUCTORS.

11   ARE THESE INDIVIDUALS ALL INDIVIDUALS WHO HAVE PREVIOUSLY

12   WORKED WITH DOGS DURING THIS FOUR-WEEK PERIOD?

13   A.  YES.

14   Q.  WHY IS THAT IMPORTANT?

15   A.  THE PRETRAINING PERIOD ENABLES US TO WORK ON ONE END OF

16   THE LEASH AT A TIME, BASICALLY.  RIGHT WHEN IT'S THE MOST

17   CRITICAL, WHEN IT'S THE MOST CRITICAL FOR A DOG TO HAVE A GOOD

18   HANDLER IS WHEN HE'S LEARNING ODOR, BECAUSE A NEW HANDLER

19   MIGHT PULL HIM OFF THAT ODOR AT THE WRONG TIME JUST BECAUSE HE

20   DOESN'T KNOW ANY BETTER.  SO WE USE THE INSTRUCTORS AND THE

21   INSTRUCTOR STUDENTS AND, OF COURSE, THE DOG INSTRUCTORS WHO

22   HANDLE THE DOGS DURING THAT CRITICAL PERIOD IN THE DOG'S

23   TRAINING.  ONCE THE DOG HAS GONE THROUGH THAT FOUR-WEEK

24   PERIOD, HE'S PRETTY MUCH BULLETPROOF, FOR LACK OF A BETTER

25   TERM.  HE'S GOT ALL HIS ODORS, HE KNOWS WHAT HE'S DOING, AND

1    THEN WE BRING IN THE HANDLERS, AND THEN WE CAN KIND OF

2    CONCENTRATE ALL OF OUR ATTENTION ON GETTING THEM TO DO

3    EVERYTHING RIGHT AND NOT HAVE TO WORRY ABOUT THEM SO MUCH.  WE

4    WORRY ABOUT IT, BUT NOT SO MUCH WORRYING ABOUT THEM DAMAGING

5    THE DOG'S TRAINING.

6    Q.  ALL RIGHT.  AND YOU TALKED ABOUT IMPRINTING THE DOGS AT

7    THIS POINT WITH CONTROLLED SUBSTANCES AND THEN LATER ON

8    CONCEALED PEOPLE.  CAN YOU EXPLAIN HOW THAT PROCESS WORKS OVER

9    THAT FOUR-WEEK PERIOD?

10   A.  IT STARTS OUT AS FAR AS WE START WITH THE CONTROLLED

11   SUBSTANCES, AND WE JUST GET THEM TO MAKE A DIRECT ASSOCIATION

12   OF THE ODORS OF THOSE CONTROLLED SUBSTANCES WITH A REWARD

13   OBJECT.  THIS IS SIMPLY DONE BY PLACING THOSE SUBSTANCES

14   WITHIN THE REWARD OBJECT FOR THE FIRST COUPLE OF DAYS, DOING

15   THROWS IN TALL GRASS AND THINGS OF THAT NATURE, AND THEN WE

16   HAVE APPARATUS AT THE SCHOOL WE CAN PLACE SAMPLES OF THE

17   ACTUAL SUBSTANCE, AND ONCE THE DOG IDENTIFIES THAT LOCATION,

18   FROM BEHIND THE WALL, SHOVE A REWARD OBJECT OUT SO HE MAKES

19   THAT DIRECT ASSOCIATION OF THESE ODORS ARE THE SMELL OF MY

20   REWARD.

21   Q.  ALL RIGHT.  AND THEN FOR CONCEALED HUMANS, HOW DOES THAT

22   WORK?

23   A.  SO CONCEALED HUMAN HAPPENS AFTER THE DOG HAS SUBSTANCE

24   ODORS IMPRINTED AND WE HAVE STARTED SOME OF THE INDICATION

25   WORK, AND AGAIN WE JUST NEED THE DOG TO MAKE A DIRECT

1    ASSOCIATION OF THE REWARD WITH FINDING A CONCEALED HUMAN.  SO,

2    FOR EXAMPLE, WE USUALLY, HOW I USUALLY DO IT IS I HAVE THE

3    HANDLER HOLD THE DOG, IF THE INSTRUCTOR IS HANDLING THE DOG,

4    HOLD THE DOG IN FRONT OF A VEHICLE, SHOW THE DOG A REWARD

5    OBJECT, THE DECOY SHOWS THE DOG A REWARD OBJECT, AND THERE'S A

6    VISIBLE PERSON SITTING ON THE HOOD OF THE VEHICLE, AND THEN

7    THE PERSON WHO HAS THE TOY RUNS PAST THAT VISIBLE PERSON AND

8    AROUND, CONCEALS HIMSELF IN THE BACK OF THE CAR SOMEWHERE, AND

9    THEN THE HANDLER PUTS THE DOG ON A SEARCH COMMAND FROM THE

10   FRONT OF THE VEHICLE, WORKS HIM PAST THE VISIBLE PERSON,

11   AROUND TO WHERE THE PERSON IS CONCEALED.  AND, OF COURSE, ONCE

12   THE DOG SHOWS ALERT BEHAVIOR, AN INDICATION MAY NEED TO BE

13   PROMPTED AT THAT STAGE, BECAUSE HE'S JUST LEARNING, AND THEN

14   THE PERSON BECOMES VISIBLE AND REWARDS THE DOG.  FROM THEN,

15   WE'RE PRETTY MUCH OFF AND RUNNING.  WE JUST KEEP PUTTING THE

16   VISIBLE PEOPLE OUT REGULARLY THROUGHOUT THE SEARCH AREAS AND

17   HAVING THE DOG SEARCH BY VISIBLE PEOPLE AND FIND EITHER

18   CONTROLLED-SUBSTANCE FINDS OR CONCEALED-PEOPLE FINDS.

19   Q.  ALL RIGHT.  AND DO YOU VARY THE LOCATION WITHIN THE

20   VEHICLE FOR THE CONCEALED PERSON?

21   A.  YES.  WE PUT THEM EITHER IN THE PASSENGER COMPARTMENT.  WE

22   PUT THEM IN THE TRUNK.  WE PUT THEM WITHIN CARGO, MAYBE IN THE

23   BED OF A PICKUP.  WE EVEN HAVE A CONTROLLED -- WELL, WE EVEN

24   HAVE A COUPLE OF VEHICLES WE PULL THE ENGINE BLOCK FROM SO WE

25   CAN ACTUALLY PUT A PERSON IN WHERE THE ENGINE WOULD BE.

1   Q.  ALL RIGHT.  AND WHEN YOU'RE RUNNING SOME OF THESE

2   CONCEALED-HUMAN EXERCISES, ARE THERE SOMETIMES VEHICLES THAT

3   ONLY HAVE VISIBLE OCCUPANTS?

4   A.  THAT -- EXCUSE ME?

5   Q.  THAT ONLY HAVE VISIBLE OCCUPANTS.  WHEN YOU'RE RUNNING

6   SOME OF THESE CONCEALED FINDS, DO YOU SOMETIMES HAVE, FOR

7   EXAMPLE, ONE CAR THAT HAS A VISIBLE PERSON AND ANOTHER CAR

8   THAT HAS A CONCEALED PERSON?

9   A.  YES, MA'AM, FREQUENTLY.

10   Q.  AND WHAT HAPPENS WHEN THAT SITUATION COMES ABOUT?

11   A.  WELL, IF THE DOG'S JUST LEARNING, OF COURSE, HE'S BEEN

12   EXPOSED TO VISIBLE PEOPLE QUITE A BIT ALL THROUGH THE

13   TRAINING.  BUT IF HE WOULD HAPPEN TO HESITATE AT THE VISIBLE

14   PERSON, HE'S GIVEN A SLIGHT CORRECTION AND DIRECTED TO MOVE

15   ON, AND WE KEEP DOING THIS UNTIL SUCH TIME AS THE DOG GOES UP,

16   SEES THE PEOPLE IN THE VEHICLE AND CARRIES ON SEARCHING AND

17   DOESN'T SLOW DOWN OR SHOW ANY INTEREST IN THEM.

18   Q.  ALL RIGHT.  NOW, LET'S MOVE ON FROM AFTER THIS INITIAL

19   FOUR-WEEK PERIOD.  WHAT HAPPENS?  ONCE THE CANINE HAS BEEN

20   WORKING WITH THE HANDLER, THE INSTRUCTOR HANDLERS, AND THE,

21   YOU AND OTHER PEOPLE THAT ARE INSTRUCTING DURING THAT

22   FOUR-WEEK PERIOD, WHAT HAPPENS?

23   A.  THE HANDLERS ARRIVE AND THEY ARE PAIRED UP AND ASSIGNED

24   THEIR DOG.  NOW, FOR THE FIRST THREE WEEKS OF THIS HANDLER

25   SCHOOL, IT'S ABOUT 75-PERCENT ACADEMICS, WHERE THEY GET

1   EXTENSIVE LECTURES ON CANINE PSYCHOLOGY, TRAINING METHODOLOGY,

2   DEPLOYMENT PRACTICES IN ALL THE ENVIRONMENTS, CARE OF THE

3   DOGS, FIRST AID FOR THE DOG, DIET, THINGS LIKE THAT, FEEDING

4   PROCEDURES.  THEY ALSO GET EXTENSIVE BLOCKS IN THE LAW,

5   TESTIMONY, AND SO FORTH.  SO THIS IS AN EXTENSIVE ACADEMIC

6   BLOCK.  NOW, INTERMINGLED INTO THAT ACADEMIC BLOCK IS

7   ACCLIMATION DAYS WHERE THEY WILL GO OUT FOR ONE DAY -- I THINK

8   IN THE FIRST WEEK THEY MAY GO OUT FOR ONE DAY AND GET TO KNOW

9   THEIR DOGS AND WORK WITH THEIR DOGS, AND THE SUCCESSIVE TWO

10  WEEKS THERE'S USUALLY ABOUT TWO WEEKS OF ACCLIMATION THERE.

11  THIS IS JUST GETTING TO KNOW YOUR DOG AND LEARN HOW TO SEARCH

12  THE DOG BEFORE WE ACTUALLY START GRADING THEM, WHICH COMES IN

13  THE NEXT PHASE.

14  Q.  ALL RIGHT.  AND HOW ARE CANINES PAIRED UP WITH THEIR

15  HANDLERS DURING THIS INITIAL PERIOD?

16  A.  IT'S MOSTLY BASED ON TWO FACTORS.  BY THE END OF THAT FOUR

17  WEEKS, WE'VE GOT A PRETTY GOOD IDEA WHERE EACH DOG'S STRONG

18  AND WEAK POINTS ARE.  OKAY?  AND FOR EXAMPLE, IF A DOG ISN'T

19  REALLY STRONG, HE'S COMPETENT IN VEHICLE SEARCH, BUT HE'S NOT

20  REAL, REAL STRONG IN IT, WE MAY ELECT TO ASSIGN THAT DOG TO A

21  BRUSH-UP STATION, IF WE'RE TALKING ABOUT THE BORDER PATROL,

22  AND THESE ARE THE DOGS THAT ARE GOING OUT, AND MOST OF WHAT

23  THEY DO IS GO OUT DOING LARGE-AREA SEARCHES FOR EITHER

24  CONTRABAND OR PEOPLE SNEAKING INTO THE COUNTRY.  OUR STRONGER

25  DOGS, WHICH ARE THE ONES THAT ARE REALLY STRONG AND HIGHLY

1    DRIVEN, USUALLY ARE ASSIGNED TO THE CHECKPOINT STATIONS

2    BECAUSE THAT'S THE HIGHEST VOLUME OF WORK, CONTINUOUS WORK,

3    AND ADVERSE CONDITIONS IS USUALLY AT THE CHECKPOINTS.  SO WE

4    TRY TO ASSIGN OUR STRONGEST DOGS TO THE CHECKPOINTS.  SO WE

5    KNOW WHAT THE DOGS ARE, AND THEN WE SIMPLY LOOK AT OUR BATTERY

6    OF HANDLERS AND SAY, OKAY, WHO'S WORKING WHERE AND WHO'S DOING

7    WHAT?  BECAUSE SOME OF THESE STATIONS ARE LIKE HALF-BRUSH,

8    HALF CHECKPOINT, INTERMINGLED LIKE THAT, AND WE MAKE THE BEST

9    PAIRINGS WE CAN BASED ON THE DOG VS. THE ANTICIPATED

10   OPERATIONAL ENVIRONMENT.

11   Q.  AND, NOW, ONCE YOU'VE PASSED THAT INITIAL PERIOD WHERE

12   YOU'VE MATCHED THE DOG AND THE CANINE HANDLER, WHAT'S THE NEXT

13   PERIOD OF TRAINING?

14   A.  WELL, AT THE END OF THE ACADEMICS, THEY HAVE TO TAKE A

15   WRITTEN EXAMINATION WHERE THEY HAVE TO SCORE, HANDLERS HAVE TO

16   SCORE AN 80 PERCENT TO PASS.  ONCE THEY PASS THAT, THEN THEY

17   SEGUE INTO THE NEXT STAGE, AND THE NEXT STAGE IS THE

18   PERFORMANCE STANDARDS SCORING PROCESS, AND THIS IS WHERE WE

19   ARE TAKING THE TEAMS OUT INTO ALL PRACTICAL EXERCISES IN

20   VARIOUS ENVIRONMENTS THROUGHOUT THE TRAINING AREA, EITHER

21   FRONT ROYAL OR EL PASO.  SO WE GO ALL OVER -- SAY, LET'S TALK

22   ABOUT EL PASO.  WE GO ALL OVER EL PASO TO VARIOUS TRAINING

23   SITES WE HAVE ARRANGED, AND THE TEAMS DO PRACTICAL

24   SINGLE-BLIND EXERCISES WHERE THE HANDLERS HAVE TO WORK THEIR

25   DOGS THROUGH AND LOCATE THE FINDS, BE THEY EITHER CONTROLLED

1   SUBSTANCES OR CONCEALED PEOPLE.  NOW, IN THIS PERFORMANCE

2   STANDARDS SCORING PROCESS, THEY ARE GRADED IN EACH EXERCISE ON

3   CERTAIN CRITICAL ELEMENTS THAT A HANDLER HAS TO BE PROFICIENT

4   IN.

5   Q.  SO LET'S TALK ABOUT THAT.  LET'S BREAK THAT DOWN.

6   A.  OKAY.

7   Q.  SO TELL ME, WHAT'S THE RATING SYSTEM LIKE FOR THE

8   PERFORMANCE STANDARDS SCORING SYSTEM?

9   A.  THE RATING SYSTEM IS BASED ON A WEST GERMAN POLICE DOG

10  RATING SYSTEM OF ONE THROUGH SIX, ONE BEING THE BEST, SIX

11  BEING THE WORST.  SO ONE IS EXCELLENT.  TWO IS ABOVE AVERAGE.

12  THREE IS AVERAGE.  FOUR IS MINIMAL.  FIVE IS INSUFFICIENT, AND

13  SIX IS UNACCEPTABLE.  SO THAT'S THE GRADING SYSTEM.

14  Q.  WHAT'S A PASSING GRADE?

15  A.  THE PASSING GRADE AFTER -- IF I CAN BACK UP A LITTLE BIT.

16  SO THEY'RE GRADED ON EACH ELEMENT.

17  Q.  ALL RIGHT.  LET'S TALK ABOUT THE ELEMENTS FIRST.

18  A.  OKAY.

19  Q.  SO, ARE THERE ELEMENTS FOR CANINES AND ARE THERE ELEMENTS

20  FOR HANDLERS?

21  A.  YES, MA'AM.  THE CRITICAL ELEMENTS THAT EACH HANDLER IS

22  GRADED ON IN HIS, EVERY TIME HE HANDLES THE DOG IS RITUAL,

23  WHICH IS HOW HE PREPARES THE SEARCH AREA, HOW HE PLANS THE

24  SEARCH PATTERN, AND DOES HE INSPECT THE SEARCH AREA FOR SAFETY

25  HAZARDS, THINGS OF THAT NATURE.  SEARCH SKILLS.  IT'S

1    BASICALLY HOW HE DESIGNED THE SEARCH OF THE AREA AND HOW HE

2    PRESENTS AND DOES HE PRESENT PRODUCTIVE AREAS AND THINGS OF

3    THAT NATURE.  SEARCH SKILLS.  LEASH HAND IS HOW HE HANDLES HIS

4    LEASH.  IS IT TOO TIGHT, TOO LOOSE?  IF IT'S GOT TOO MUCH

5    LEASH OUT, DOES HE GET THE DOG TANGLED TOO MUCH?  IS HE TRYING

6    TO STEER THE DOG TOO MUCH?  THINGS LIKE THAT.  VOICE TONES IS

7    THE TONES HE USES TO MOTIVATE THE DOG AND DIRECT THE DOG

8    THROUGH THE PATTERN, AND THE COMMANDS HE USES INCLUDES THE

9    VOICE TONES.  SPEED IS, DOES HE STAY AT THE PROPER SPEED IN

10   FRONT OF THE DOG?  EVERY DOG MOVES AND SEARCHES AT A LITTLE

11   BIT DIFFERENT SPEED, SO THE HANDLER HAS TO MATCH THAT SPEED

12   AND MOVE THE DOG AT A SPEED TO KEEP THE DOG ENGAGED IN THE

13   SEARCH AND STILL COVER EVERYTHING.  AND THEN, OF COURSE,

14   READING, WHICH IS PROBABLY THE MOST IMPORTANT PART, AND THAT

15   IS, DOES THE HANDLER FIRST RECOGNIZE WHEN HIS DOG IS NOT IN

16   ODOR AS EVIDENCED BY HE DOESN'T LINGER THERE?  DOES HE

17   RECOGNIZE WHEN HIS DOG IS IN ODOR AND DISPLAYING ALERT

18   BEHAVIOR, AND DOES HE RESPOND ACCORDINGLY?  BY RESPONDING

19   ACCORDINGLY, WE MEAN, DOES THE HANDLER CONTINUE WORKING AND

20   NOT PROVIDE ANY CHANGE IN HIS VOICE TONALITY OR HIS BODY

21   ACTIONS WHEN HE SEES HIS DOG ALERT TO PREVENT FROM PROVIDING

22   ANY TYPE OF SUBCONSCIOUS CUES TO THE DOG?  AND THEN THE REWARD

23   IS THE LAST ISSUE THAT'S JUDGED, AND THAT IS, DOES THE HANDLER

24   PROVIDE THE REWARD TO THE DOG IN ACCORDANCE WITH THE

25   PHILOSOPHY?  IN OTHER WORDS, DOES HE MAKE THAT REWARD LOOK

1    LIKE IT CAME FROM SOURCE?  WHAT HE DOES WITH THE DOG AFTER THE

2    DOG HAS THE TOY, HOW HE ACTIVELY PLAYS WITH THE DOG, THINGS

3    LIKE THAT.  AND LASTLY, IS HE EFFICIENT IN REACQUIRING THAT

4    REWARD OBJECT FROM THAT DOG?

5    Q.  ALL RIGHT.

6    A.  SO EVERY SEARCH IS GRADED ON THESE ELEMENTS ON THAT

7    ONE-THROUGH-SIX SCALE.

8    Q.  AND THAT'S FOR THE HANDLER, RIGHT?

9    A.  THAT'S THE HANDLER.

10   Q.  HOW ABOUT THE CANINE?

11   A.  THE DOG IS GRADED ON THE SAME ONE-THROUGH-SIX SCALE ON THE

12   CONTROL.  IS THE DOG UNDER CONTROL AND RESPONDING TO

13   DIRECTIONS FROM THE HANDLER?  HIS HUNT.  OKAY.  HOW WELL HE

14   USES HIS NOSE, AND DOES HE ACTIVELY SNIFF?  AND THEN WE COME

15   INTO THE ALERT, WHICH IS, DOES THE DOG DISPLAY CORRECT ALERT

16   BEHAVIOR IN THE PRESENCE OF A TRAINED ODOR?  AND THEN THE

17   INDICATION IS HOW PROFICIENT THE DOG IS OF SUPPLYING THAT

18   INDICATION BEHAVIOR WHEN HE REACHES THE SOURCE OF ODOR, AND

19   THEN THE DOG'S CONFIDENCE, OVERALL CONFIDENCE IN THE

20   ENVIRONMENT DURING THE EXERCISE.

21   Q.  ALL RIGHT.  AND IS THIS GRADING SYSTEM USED FOR EVERY

22   FIND?

23   A.  YES, MA'AM.

24   Q.  INCLUDING CONCEALED HUMANS?

25   A.  YES, MA'AM.

1    Q.   SO THEY ARE GRADED FOR SEARCHING FOR CONCEALED HUMANS

2    DURING THIS PERFORMANCE STANDARDS SCORING PROCESS?

3    A.   YES, MA'AM, CONSTANTLY.

4    Q.   AND CAN YOU DESCRIBE SOME OF THE ENVIRONMENTS DURING THIS

5    PERFORMANCE STANDARDS SCORING PROCESS WHERE THEY'RE SEARCHING

6    FOR CONCEALED HUMANS?

7    A.   VEHICLES, OF COURSE.   THE PRINCIPAL THING, ESPECIALLY WITH

8    A CHECKPOINT DOG, WOULD BE SEARCHING VEHICLES, BUT WE ALSO PUT

9    CONCEALED HUMANS WITHIN FREIGHT IN A WAREHOUSE.   WE'VE PUT

10   THEM EVEN, BELIEVE IT OR NOT, IN LUGGAGE WITH A LUGGAGE

11   LINEUP.   WE PUT THEM OUT IN THE OPEN FIELD BECAUSE WE FIND

12   PEOPLE IN OPEN FIELDS, AND WE'VE ACTUALLY FOUND PEOPLE

13   SECRETED IN LUGGAGE AND BUS BINS.   SO WE PUT THEM IN ALL THE

14   DIFFERENT ENVIRONMENTS CONTAINING CONCEALED HUMAN FINDS, IF

15   IT'S LOGISTICALLY POSSIBLE TO DO SO.

16   Q.   ALL RIGHT.   AND ARE THERE MANDATED DISTRACTIONS DURING

17   SOME OF THESE TRAININGS?

18   A.   YES.   DISTRACTIONS COME IN, FOR EXAMPLE, WE MAY LEAVE

19   REWARD OBJECTS SECRETED SO WE HAVE THE ODOR OF THE REWARD

20   OBJECTS.   WE MAY BE WORKING WITH DOGS IN DIFFERENT

21   ENVIRONMENTS.   I MENTIONED WE GO OVER IN EL PASO.   SO WORKING

22   IN ACTIVE FREIGHT WAREHOUSES WHERE YOU HAVE FORKLIFTS AND

23   MACHINERY NOISE AND THINGS OF THAT NATURE.   WE DO SIMULATED

24   CHECKPOINTS WHERE THE DOGS ARE SEARCHING MULTIPLE VEHICLES

25   CONTAINING VISIBLE PEOPLE AS THEY'RE RUNNING AND ROLLING BY,

1    THINGS OF THAT NATURE.  SO DISTRACTIONS IS ALL PART OF THE

2    TRAINING.

3    Q.  ALL RIGHT, AND LET ME ASK YOU THIS.  I DID WANT TO COME

4    BACK TO THE PERFORMANCE STANDARDS SCORING SYSTEM.  WHY IS IT

5    IMPORTANT TO SCORE THE CANINE SEPARATELY FROM THE HANDLER?

6    A.  WELL, AND THAT'S WHY OUR CERTIFICATION IS SET UP AS THE

7    CANINE SCORED SEPARATELY FROM THE HANDLER, SIMPLY BECAUSE A

8    STRONG DOG CAN CARRY A WEAK HANDLER.  IF YOU HAVE AN

9    EXCEPTIONALLY STRONG DOG, YOU CAN HAVE AN INCOMPETENT HANDLER

10   AND THEY'LL STILL MAKE FINDS.  THE DOG JUST CARRIES THE GUY.

11   AND VICE VERSA.  IF YOU'VE GOT A REALLY STRONG, POSSIBLY EVEN

12   EXPERIENCED HANDLER, HE MAY BE ABLE TO GET A WEAK DOG TO LOOK

13   OKAY.  SO THAT'S THE IMPORTANCE OF ALWAYS SPLITTING AND

14   LOOKING AT THE TWO INDIVIDUALLY AND SCORING THEM INDIVIDUALLY,

15   TO MAKE SURE BOTH ENDS OF THE LEASH ARE CARRYING THEIR WEIGHT.

16   Q.  ALL RIGHT.  AND DURING THIS PERFORMANCE STANDARDS SCORING

17   SYSTEM, ARE RECORDS KEPT OF HOW THE DOG IS DOING SO THAT THEY

18   CAN, YOU CAN DETERMINE WHETHER THE DOG SHOULD BE ALLOWED TO

19   TAKE THE CERTIFICATION EXAM?

20   A.  YES.  OF COURSE, THAT'S ON -- THE DOG IS, OF COURSE,

21   SCORED ON THE PERFORMANCE STANDARDS SCORE SHEET WITH THE

22   HANDLER.  ALSO, AS PART OF THEIR EDUCATION, THE HANDLERS ARE

23   TAUGHT TO MAINTAIN TRAINING RECORDS ON THEIR DOGS, BECAUSE

24   SOME AREAS, LIKE FIELD OPERATIONS, REQUIRE HANDLERS TO

25   MAINTAIN SEPARATE TRAINING RECORDS.  SO, IN SO DOING, THE

1    HANDLERS ARE KEEPING NARRATIVE RECORDS ON THEIR DOGS.  DURING

2    THE PRETRAINING PERIOD, THE INSTRUCTOR STUDENTS ARE ALSO

3    KEEPING RECORDS ON THE DOG DURING THE PRETRAINING PERIOD.

4    Q.  ALL RIGHT.  AND IS THERE A MINIMUM SCORE FOR BOTH THE

5    HANDLER AND THE CANINE TO GO ON TO CERTIFICATION?

6    A.  YES.  FOR HANDLERS, YES.  THE MINIMUM STANDARD FOR

7    HANDLERS IS THEY HAVE TO, AT THE END OF ALL THIS PROCESS, ALL

8    THE SCORES, THAT THREE-WEEK PERIOD OF PERFORMANCE STANDARDS

9    SCORE SHEETS, ALL THE SCORES FOR EACH OF THOSE ELEMENTS I'VE

10   LISTED ARE AVERAGED INDIVIDUALLY, AND THEY HAVE TO OBTAIN AN

11   OVERALL AVERAGE OVER THAT PERIOD OF 3.50 OR BELOW IN EVERY

12   ELEMENT TO QUALIFY FOR CERTIFICATION.  NOW, THE DOGS, THAT'S

13   JUST AN OVERALL ASSESSMENT.  WE DON'T TOTAL SCORES ON DOGS.

14   WE JUST LOOK AT THE DOG AND SAY, YES, THIS DOG IS DOING WELL,

15   AND, OF COURSE, THAT'S REFLECTED IN THE MERIT SCORES.

16   Q.  NOW, HAVE YOU EVER HAD TO REMOVE A DOG BECAUSE IT WASN'T

17   DOING WELL DURING THE CERTIFICATION PROCESS?

18   A.  OH, YES.  USUALLY, WE CATCH IT BEFORE THE HANDLERS ARRIVE,

19   BUT WE HAVE HAD SITUATIONS.  SO IF A DOG IS NOT PERFORMING UP

20   TO STANDARD AT THAT POINT, IT IS PULLED FROM THE CLASS AND

21   ANOTHER DOG IS USED TO, FOR THAT PARTICULAR HANDLER.  IF

22   DURING THE PROCESS, ONCE THE HANDLERS ARRIVE, WE HAVE TO PULL

23   A DOG, THEN AT THAT POINT WE HAVE TO CANCEL THE HANDLER

24   TRAINING, SEND THAT HANDLER HOME AND BRING HIM BACK, BECAUSE

25   WE HAVE TO HAVE THE PRESCRIBED NUMBER OF THOSE PERFORMANCE

1   STANDARDS SCORE SHEETS.  NOW, IF WE CATCH IT, LIKE I SAID, IN

2   THE FIRST THREE WEEKS BEFORE THE PERFORMANCE STANDARDS SCORING

3   PROCESS HAS STARTED, WE CAN MAKE A DOG SWAP.  AFTER THAT, WE

4   USUALLY HAVE TO SEND THE HANDLER HOME AND BRING HIM BACK FOR

5   ANOTHER COURSE, AND THAT RARELY, RARELY HAPPENS, BECAUSE

6   USUALLY WE'VE CAUGHT IT DURING THE PRETRAINING.

7   Q.  ALL RIGHT, AND LET'S TALK ABOUT THE CERTIFICATION PROCESS.

8   WHAT'S THE PURPOSE OF CERTIFICATION?

9            THE COURT:  COUNSEL, MAYBE THIS WOULD BE A GOOD

10  STOPPING POINT FOR THE NOON RECESS BEFORE WE GO INTO THE

11  CERTIFICATION.

12           MS. AHUMADA:  SURE.

13           THE COURT:  OKAY.

14           MS. AHUMADA:  THANK YOU, YOUR HONOR.

15           THE COURT:  THANK YOU.

16           LET'S RESUME AT 1:30, AND WE'LL CONTINUE WITH YOUR

17  TESTIMONY AT THAT TIME, SIR.  THANK YOU.

18           THE WITNESS:  OKAY.  THANK YOU, MA'AM.

19           (LUNCHEON RECESS FROM 12:05 P.M. TO 1:30 P.M.)

20           THE COURT:  PLEASE GO AHEAD, COUNSEL.

21           BY MS. AHUMADA:

22  Q.  I BELIEVE WE WERE AT CERTIFICATION.  SO I THINK THE LAST

23  QUESTION I ASKED YOU THAT WE DIDN'T QUITE GET THE ANSWER TO,

24  WHAT IS THE PURPOSE OF CERTIFICATION?

25  A.  THE PURPOSE OF CERTIFICATION OF ANY POLICE DOG IS TO

1    ESTABLISH A BASELINE LEVEL OF PERFORMANCE BEFORE DEPLOYMENT

2    INTO A FIELD ENVIRONMENT AND MAKE SURE THAT THE SKILLS WITHIN

3    THAT CERTIFICATION, REPRESENTED WITHIN THAT CERTIFICATION.

4    ARE MAINTAINED THROUGHOUT THE DOG'S CAREER.  AND BY BASELINE

5    LEVEL PERFORMANCE, I MEAN THAT THE DOG IS, THE DOG AND HANDLER

6    ARE VIABLE AND PERFORMING TO AN ESTABLISHED STANDARD.

7    Q.  DOES THE CBP CANINE PROGRAM CERTIFY CANINES?

8    A.  EXCUSE ME?

9    Q.  DOES THE CBP CANINE PROGRAM CERTIFY CANINES?

10   A.  YES, MA'AM.

11   Q.  AND CAN YOU DESCRIBE THE CERTIFICATION PROCESS?

12   A.  THE DETECTION CERTIFICATION, OF COURSE, TO BE ELIGIBLE TO

13   PARTICIPATE IN THAT CERTIFICATION, A HANDLER HAS TO HAVE

14   SUCCESSFULLY COMPLETED EVERYTHING WE DISCUSSED THUS FAR.  THE

15   DETECTION CERTIFICATION IS MADE UP OF 17 SEARCHES IN A VARIETY

16   OF ENVIRONMENTS WITH ONLY 15 FINDS, MEANING THERE ARE TWO

17   MANDATORY BLANKS INTERMINGLED IN THOSE 17 SEARCHES.  THE

18   HANDLER DOES NOT KNOW THE EXISTENCE OR LOCATION OF ANY

19   TRAINING AIDS DURING THE CERTIFICATION PROCESS.  THE

20   CERTIFICATION IS RUN ON A SINGLE-BLIND FORMAT.

21       THE SEARCH ENVIRONMENTS REPRESENTED ARE VEHICLE EXTERIORS,

22   VEHICLE INTERIORS, FREIGHT, OCCUPIED BUILDINGS, WHICH CAN BE

23   RESIDENCES, OFFICES, ANYTHING ALONG THAT LINE, LUGGAGE, OPEN

24   FIELD AREAS, AND WITHIN THE BORDER PATROL A LIVESTOCK

25   ENVIRONMENT, BARN, CATTLE TRUCK, SOMETHING THAT'S GOING TO

1    HAVE STRONG ANIMAL ODORS PRESENT IN THE SEARCH AREA.  IN ALL

2    THESE 17 SEARCHES, THE SAME ONE-THROUGH-SIX SCORING SYSTEM

3    DISCUSSED PREVIOUSLY IS USED, AND THE TEAM IS GRADED ON THREE

4    ELEMENTS.  THE DOG IS GRADED ON INTENT, WHICH IS INCLUSIVE OF

5    THE DOG'S CONTROL AND HUNT, AND RESPONSE, WHICH IS INCLUSIVE

6    OF THE DOG'S ALERT AND INDICATION, AND THEN THE HANDLER IS

7    GRADED, AND THAT'S INCLUSIVE OF ALL THE ELEMENTS THAT WE

8    DISCUSSED WHEN WE WERE TALKING ABOUT THE PERFORMANCE STANDARDS

9    SCORING SYSTEM.  THE TEAM CAN ONLY MISS ONE FIND AND STILL

10   CERTIFY, AND THE TEAM CAN ONLY HAVE ONE INCORRECT OR FALSE

11   INDICATION.  AT THE END OF THE PROCESS, ALL OF THE INTENT,

12   RESPONSE, AND HANDLER SCORES ARE AVERAGED, AND THOSE

13   CUMULATIVE AVERAGES MUST FALL AT OR BELOW 3.50 FOR THE TEAM TO

14   CERTIFY.

15   Q.  ALL RIGHT.  AND I JUST WANT TO GO REALLY QUICKLY.  WHEN

16   YOU SAY A FIND, DOES THAT MEAN EITHER A CONTROLLED SUBSTANCE

17   THEY'VE BEEN TRAINED TO ALERT TO OR A CONCEALED HUMAN?

18   A.  YES, MA'AM.  THERE ARE THREE CONCEALED HUMAN FINDS WITHIN

19   THE CERTIFICATION, AND THERE IS ONE MANDATORY VISIBLE PERSON

20   WITHIN THE VEHICLE SCREENS.

21   Q.  ALL RIGHT.  AND IS THAT WHAT YOU MEAN BY MANDATED

22   DISTRACTIONS EARLIER, THAT THAT'S A MANDATED DISTRACTION?

23   A.  YES.  THERE ARE MANDATED DISTRACTIONS IN THE SEARCH AREA.

24   Q.  ALL RIGHT.  AND HOW DOES THIS PROCESS COMPARE TO, FOR

25   EXAMPLE, THE NORTH AMERICAN POLICE WORK DOG ASSOCIATION

1    CERTIFICATION PROCESS?

2    A.  IT'S SIGNIFICANTLY MORE DIFFICULT.

3    Q.  WHY?

4    A.  TO START OUT WITH, THE NORTH AMERICAN, IF WE WANT TO USE

5    THAT AS AN EXAMPLE, IS A PASS/FAIL-TYPE CERTIFICATION, WHEREAS

6    IF A TEAM COMES INTO A CERTIFICATION EXERCISE AND IF THEY FIND

7    THE TRAINING AID, THEY PASS, WHEREAS THE CBP IS A NUMERICALLY

8    SCORED CERTIFICATION, WHICH ENABLES US TO SET HIGHER STANDARDS

9    WITH REGARD TO THE BEHAVIOR OF THE TEAM, NOT JUST WHETHER THEY

10   FIND SOMETHING OR NOT.  IT'S ABOUT HOW WELL THEY DO IT.

11        IN ADDITION, THE NORTH AMERICAN CERTIFICATION IS JUST A

12   TEAM CERT.  IF THE TEAM COMES IN AND MAKES A FIND, BOTH THE

13   HANDLER AND DOG PASS THAT EXERCISE.  WITH THE CBP

14   CERTIFICATION, THE HANDLER AND DOG ARE BEING SCORED

15   SEPARATELY, THE DOG ON THE TWO ELEMENTS OF INTENT AND RESPONSE

16   AND THE HANDLER SEPARATELY.  THIS WAY, AGAIN, AS WE KIND OF

17   MENTIONED A LITTLE BIT WITH THE PERFORMANCE STANDARDS SYSTEM,

18   A STRONG DOG CAN'T CARRY A WEAK HANDLER, AND VICE VERSA.

19        THE NORTH AMERICAN CERTIFICATION ONLY TESTS THREE

20   ENVIRONMENTS:  VEHICLES, BUILDINGS, AND OTHER ENVIRONMENTS

21   THAT CAN BE ONE OF THREE OR FOUR THINGS.  THE CBP

22   CERTIFICATION TESTS MULTIPLE ENVIRONMENTS THAT I'VE ALREADY

23   LISTED, LIVESTOCK, FREIGHT, A LOT OF THINGS THAT THE CBP, OR

24   THAT THE NORTH AMERICAN CERT. DOES NOT TEST.  AND THE REASON

25   WE NEED TO DO THIS IS THESE REPRESENT THE ACTUAL DEPLOYMENT

1    LOCATIONS AND ENVIRONMENTS THAT CBP CANINES ALL OVER THIS

2    COUNTRY MAY BE TASKED AND DEPLOYED ON.

3         SO, FOR THOSE REASONS, THE CBP CERTIFICATION IS

4    SIGNIFICANTLY MORE DIFFICULT THAN THE NORTH AMERICAN POLICE

5    DOG.

6    Q.  OKAY.  NOW, AFTER A TEAM IS CERTIFIED, WHAT ARE THE TEAM'S

7    TRAINING REQUIREMENTS?

8    A.  THEY ARE REQUIRED TO ATTEND 16 HOURS A MONTH OF SUPERVISED

9    MAINTENANCE TRAINING WITHIN THE BORDER PATROL, DURING WHICH

10   TIME THEY AGAIN FALL UNDER THE PERFORMANCE STANDARDS SCORING

11   SYSTEM, AND THOSE SCORES ARE TABULATED AT A MINIMUM OF EVERY

12   SIX MONTHS.  SOME AREAS DO IT QUARTERLY, AND ANY DEFICIENCIES

13   WILL TRIGGER REMEDIAL TRAINING.

14   Q.  ALL RIGHT.  AND WHAT ABOUT CERTIFICATION?  ONCE YOU'RE

15   DONE WITH YOUR INITIAL CERTIFICATION, ARE TEAMS DONE?

16   A.  NO.  THEY ARE REQUIRED TO RECERTIFY EVERY YEAR, ANNUALLY,

17   THROUGH THE SAME CERTIFICATION PROCESS I'VE DESCRIBED.

18   Q.  AND ARE THEY ALSO EVALUATED ON THE PERFORMANCE STANDARDS

19   SCORING SYSTEM?

20   A.  YES.  WITH EACH TRAINING DAY, THERE'S USUALLY, DEPENDING

21   ON HOW SECTOR SETS IT UP, THERE'S USUALLY TWO TRAINING DAYS A

22   MONTH, AND THEY ARE UNDER THE PERFORMANCE STANDARDS SCORING

23   SYSTEM DURING THOSE DAYS.

24   Q.  ALL RIGHT.  AND ARE THE EXERCISES THAT ARE CONDUCTED

25   DURING THE TRAINING AND CERTIFICATION, ARE THEY THE SAME

1    EXERCISES THAT YOU PREVIOUSLY DISCUSSED DURING THE INITIAL

2    CERTIFICATION PROCESS?

3    A.   YES.

4    Q.   AND IN THIS PARTICULAR CASE, HAVE YOU REVIEWED THE RECORDS

5    FOR PECKY?

6    A.   YES, MA'AM.

7    Q.   AND DID SHE COMPLETE ALL THESE REQUIREMENTS?

8    A.   YES, MA'AM.

9    Q.   ALL RIGHT.  NOW, ONE OF THE THINGS THAT I WANT TO TALK

10   ABOUT IS WITH RESPECT TO THE PROCESS FOR RUNNING A DOG AT A

11   CHECKPOINT.  CAN YOU DESCRIBE THE PROCESS FOR RUNNING A DOG

12   AROUND A VEHICLE AT A CHECKPOINT?

13   A.   DOGS ARE TYPICALLY DEPLOYED IN THE PRIMARY OR PRE-PRIMARY

14   AREA.  IF AN ALERT OCCURS, THE VEHICLE IS REFERRED TO

15   SECONDARY INSPECTION, AT WHICH TIME THE VISIBLE OCCUPANTS ARE

16   REQUESTED TO STEP FROM THE VEHICLE.  WE DO THIS FOR TWO

17   REASONS, THE FIRST REASON BEING, OF COURSE, OFFICER SAFETY,

18   AND THE SECOND REASON, AND MORE IMPORTANTLY, IS TO REMOVE THE

19   VISIBLE OCCUPANTS AND CONDUCT ANOTHER SNIFF.  THE HANDLER THEN

20   WILL CONDUCT ANOTHER SNIFF OF THE VEHICLE, AND IF THE DOG

21   ALERTS IN SECONDARY NOW WITH THE VISIBLE OCCUPANTS OUT OF THE

22   VEHICLE, IT SERVES TO ESTABLISH AND CONFIRM THAT THE CANINE

23   WAS NOT RESPONDING TO THE VISIBLE OCCUPANTS WHEN THE DOG

24   ALERTED IN THE PRIMARY POSITION.

25   Q.   NOW, I WANT TO TALK ABOUT SOMETHING FROM EARLIER.  SO I'M

1    JUST GOING TO PUT DEFENDANT'S EXHIBIT 1 ON HERE.  ARE YOU

2    FAMILIAR WITH THIS?

3    A.  YES, MA'AM.

4    Q.  AND YOU'VE READ IT BEFORE?

5    A.  YES, MA'AM.  I WROTE IT.

6    Q.  ALL RIGHT, AND I WANTED TO ASK YOU A LITTLE BIT ABOUT THIS

7    PORTION WRITTEN RIGHT HERE.  CAN YOU EXPLAIN WHAT YOU MEAN BY

8    THIS SECTION?  CAN YOU SUMMARIZE WHAT YOU MEAN BY THIS

9    SECTION, THE PINK?

10   A.  WHAT PORTION ARE YOU REFERRING TO?

11   Q.  THE PINK, *IN TRAINING CBP CANINES*.

12   A.  STARTING WITH *THE EXACT METHOD*?

13   Q.  YES, THE EXACT METHOD USED.  CAN YOU TALK ABOUT THE EXACT

14   METHOD AND THE ISSUES ASSOCIATED WITH THE DISTINCTION BETWEEN

15   A CONCEALED AND A VISIBLE PERSON AND WHAT YOU MEANT BY THAT?

16   DO YOU REALLY HAVE NO CLUE AT ALL HOW THEY FIND A CONCEALED

17   PERSON?

18   A.  WE KNOW THE SENSES THEY ARE PROBABLY USING.  WE KNOW

19   THEY'RE DOGS.  AS HAS BEEN MENTIONED BEFORE THIS MORNING, DOGS

20   PRINCIPALLY USE OLFACTION AS THEIR PRIMARY SENSE.  WE KNOW

21   THEY MAY USING OTHER SENSES, SUCH AS HEARING.  WHAT WE DON'T

22   KNOW IS THE EXACT SCIENTIFIC METHOD BY WHICH A DOG IS ABLE TO

23   DISTINGUISH BETWEEN VISIBLE AND CONCEALED PEOPLE.  THAT

24   REMAINS UNKNOWN TO US, BUT WE KNOW THAT THEY CAN DO IT AND WE

25   CAN TEST IT, WE CAN TRAIN IT, AND IT HAS BEEN PROVEN A VERY

1    SUCCESSFUL OPERATION.

2    Q.   AND GIVEN THAT, HOW DID TRAINING FOR CONCEALED HUMANS AND

3    LOOKING FOR CONCEALED HUMANS COME ABOUT WITH THE BORDER

4    PATROL?

5    A.   WELL, THE ORIGINAL DOGS WERE TRAINED IN CONCEALED HUMAN

6    DETECTION, AND WE'RE TALKING BACK IN 1984, WHEN THE CURRENT

7    PROGRAM STARTED.  THEY WERE TRAINED IN CONCEALED HUMANS AND

8    CONTROLLED SUBSTANCE DETECTION, BUT BACK THEN THE CANINE

9    OPERATIONS WERE PRETTY MUCH CONFINED TO SECONDARY AFTER

10   REASONABLE SUSPICION HAD BEEN DEVELOPED IN PRIMARY AND THE

11   CARS WERE REFERRED TO THESE CANINE TEAMS.  NOW, THE

12   CONFIGURATION OF A LOT OF OUR CHECKPOINTS IS SUCH THAT

13   SECONDARY IS IMMEDIATELY NEXT TO AND PROXIMATE TO PRIMARY AND

14   FREQUENTLY DOWNWIND FROM PRIMARY.  SO WHAT WAS HAPPENING IS,

15   HANDLERS WOULD BE STANDING BY IN SECONDARY, WAITING FOR CARS

16   TO BE REFERRED TO THEM, AND THE DOGS WOULD SUDDENLY ALERT AND

17   TAKE THEIR HANDLERS INTO PRIMARY AND BEGIN RUNNING PRIMARY,

18   AND WHEN THIS HAPPENED, THE DOGS IDENTIFIED THE LOCATION OF

19   BOTH CONCEALED HUMANS SECRETED IN THE VEHICLES AND CONTROLLED

20   SUBSTANCES.  SO THIS PROMPTED CERTAIN INDUSTRIOUS HANDLERS TO

21   BEGIN TO WORK THEIR DOGS IN PRIMARY.  SO THE DOGS -- AND THEY

22   WERE SUCCESSFUL.  SO THE DOGS SHOWED US THAT THEY COULD MAKE

23   THIS DISTINCTION.  THEY DEMONSTRATED THEY HAD THE ABILITY.  SO

24   WE BEGAN DEVELOPING SPECIFIC TRAINING PROTOCOLS THAT WE FOLLOW

25   TO INTRODUCE AND MAINTAIN THE CONCEALED HUMAN DETECTION TO

1    BOLSTER AND SHOW AND ENSURE THAT THESE DOGS ARE PERFORMING

2    CORRECTLY.  AND WE ALSO INSTITUTED THE AFOREMENTIONED

3    PROCEDURE WHEREBY, FOLLOWING A PRIMARY ALERT, THE OCCUPANTS

4    ARE REMOVED FROM THE VEHICLE AND ANOTHER SNIFF IS CONDUCTED TO

5    VERIFY THAT THE DOGS ARE NOT RESPONDING TO VISIBLE VEHICLE

6    OCCUPANTS, BUT THE EXACT SCIENTIFIC METHOD THAT THESE DOGS ARE

7    USING TO MAKE THESE DISTINCTIONS REMAINS UNKNOWN TO US.

8    Q.  ALL RIGHT.  AND I ALSO WANTED TO TALK TO YOU ABOUT

9    SOMETHING THAT MR. JIMENEZ DISCUSSED, RESIDUAL ODOR IN THE

10   VEHICLES.  DO YOU TRAIN TO, WITH RESIDUAL ODORS IN VEHICLES

11   AND CONCEALED HUMANS?

12   A.  YOU'RE REFERRING TO RESIDUAL HUMAN SCENT?

13   Q.  CORRECT.  RESIDUAL HUMAN SCENT.

14   A.  YES.  FIRST OF ALL, RESIDUAL HUMAN SCENT IS EVERYWHERE.

15   ALL OF US ARE SLOUGHING OFF THOUSANDS OF SKIN CELLS EVERY

16   MINUTE.  SO, CAN YOU ENVISION HOW MUCH RESIDUAL HUMAN SCENT IS

17   IN THIS ROOM?  SO RESIDUAL HUMAN SCENT IS EVERYWHERE.  SO DOGS

18   NATURALLY DO NOT RESPOND TO RESIDUAL HUMAN SCENT.  BUT BEYOND

19   THAT, WITHIN OUR TRAINING PROTOCOLS, WE ALSO PLACE HUMAN SCENT

20   SAMPLES, SUCH AS SWEATY CLOTHING, THINGS OF THAT NATURE, IN

21   SEARCH AREAS AND ENSURE THE DOGS ARE NOT RESPONDING TO THOSE

22   SPECIFIC PLACEMENTS.

23   Q.  AND ARE YOU ABLE TO TRAIN AROUND THAT RESIDUAL ODOR?

24   A.  YES.

25   Q.  AND ARE YOU ABLE TO TRAIN AROUND RESIDUAL ODOR, FOR

1  EXAMPLE, OF HUMANS THAT HAVE JUST EXITED A VEHICLE AND HAVE A

2  DOG ALERT TO WHATEVER THEY'RE SUPPOSED TO BE TRAINED TO FIND?

3  A.  OH, YES.  THE RESIDUAL HUMAN SCENT IS PRESENT, AS I SAID,

4  IN ANY ENVIRONMENT IN WHICH A HUMAN HAS SAT FOR ANY PERIOD OF

5  TIME, SO THE DOGS DO NOT NATURALLY RESPOND TO IT, AND WE CAN

6  TRAIN DOGS AND ENSURE -- WE TAKE CERTAIN STEPS TO ENSURE THAT

7  THEY DO NOT RESPOND TO RESIDUAL HUMAN SCENT.

8  Q.  ALL RIGHT.  AND CAN DOGS DIFFERENTIATE BETWEEN DIFFERENT

9  HUMAN SCENTS AS WELL?

10  A.  SPECIALLY-TRAINED DOGS CAN DIFFERENTIATE BETWEEN

11  DIFFERENT, THE HUMAN SCENT FROM DIFFERENT INDIVIDUALS.  IT

12  TAKES -- IT'S A VERY EXTENSIVE TRAINING PROGRAM.  USUALLY, YOU

13  SEE THIS IN THE DISCIPLINES OF TRACKING, AND YOU ALSO SEE IT

14  EXTENSIVELY IN EUROPE IN SCENT I.D. WORK, SCENT IDENTIFICATION

15  PROGRAMS IN THE EUROPEAN POLICE DEPARTMENTS.

16  Q.  AND ARE YOU FAMILIAR WITH WHETHER THOSE PRACTICES HAVE

17  BEEN ADMITTED IN COURTS IN THE UNITED STATES, THE SCENT I.D.

18  THAT YOU'RE DISCUSSING IN EUROPE?

19  A.  YES.  THE SCENT I.D. SYSTEMS IN, I BELIEVE, THE

20  NETHERLANDS AND GERMANY HAVE BEEN UPHELD BY COURTS AS BEING

21  VIABLE.

22  Q.  AND HOW DO THOSE SCENT I.D. SYSTEMS WORK?  CAN YOU

23  EXPLAIN?

24  A.  YES.  IT WOULD BE -- LET'S TAKE A SITUATION THAT

25  EVERYBODY'S FAMILIAR WITH.  SAY WE HAD THE BLOODY GLOVE FROM

1    THE O. J. SIMPSON CASE.  OKAY.  WHAT WOULD HAPPEN WITH A SCENT

2    I.D. IS, THEY WOULD, UNDER COURT ORDER, MANDATE THAT MR.

3    SIMPSON HOLD A PIECE OF SQUARE STEEL, AND THESE ARE SQUARE

4    TUBES ABOUT A QUARTER-INCH SQUARE, AND HE WOULD BE

5    COURT-ORDERED TO HOLD IT, AND THEN THEY WOULD ORDER OTHER

6    INDIVIDUALS OF THE SAME RACE, SEX, AGE TO ALSO HOLD THE, HOLD

7    STEEL SQUARES, DIFFERENT PIECES OF SQUARE STEEL AS BLANKS.

8    THEN USING LONG TONGS, THEY PLACE THIS SQUARE STEEL ON A

9    SPECIFIC TABLE THAT IS PNEUMATICALLY CONTROLLED, AND WHEN THEY

10   HIT A BUTTON, IT LOCKS THAT SQUARE STEEL DOWN.  AND THE TABLE

11   HAS BEEN WASHED AND SANITIZED, AND SO FORTH.  AND THEN THEY

12   BRING IN TEAMS OF DOGS AND THE HANDLERS BASICALLY DIRECT THE

13   DOGS, AND STAY AWAY FROM THE DOGS, DIRECT THE DOGS TO SNIFF

14   ALL THE SQUARE STEELS.  SO THEY PRE-SCENT THE DOG ON THE

15   BLOODY GLOVE AND THEN THEY DIRECT THE DOG TO SEARCH THE LINE,

16   AND THE DOG WILL RUN DOWN AND THEN HE'LL CRY AN ACTIVE

17   INDICATION -- THAT'S WHY THEY LOCK THE STEEL DOWN -- HE'LL

18   PROVIDE AN ACTIVE INDICATION THAT HE SMELLS A SCENT THAT IS

19   THE SAME AS THE SCENT HE JUST SMELLED ON THE GLOVE.  AND THEY

20   USUALLY USE TEAMS OF DOGS TO DO THIS, USUALLY THREE DOGS, AND

21   THEY'LL THROW, ARBITRARILY THROW A BLANK IN THERE, THREE

22   DIFFERENT HANDLERS, THREE DIFFERENT DOGS, AND THEY'LL

23   ARBITRARILY THROW A BLANK IN THERE WHERE THE SUSPECT IS NOT

24   REPRESENTED IN THE LINEUP.  AND THIS HAS PROVEN VERY

25   SUCCESSFUL AND ACTUALLY ASTOUNDING AS TO HOW LONG SCENT WILL

1  RETAIN ON SOMETHING AND HOW LITTLE SCENT IS REQUIRED FOR A DOG

2  TO MAKE SUCH A DISTINCTION.

3  Q.  ALL RIGHT.  NOW, ONE OF THE THINGS WE WERE TALKING ABOUT

4  EARLIER, TOO, WAS THE FACT THAT YOU'RE NOT SCIENTIFICALLY SURE

5  HOW DOGS ARE ABLE TO DETECT BETWEEN CONCEALED HUMANS AND

6  VISIBLE HUMANS.  ARE THERE OTHER DISCIPLINES WITH RESPECT TO

7  CANINES THAT WE DON'T KNOW QUITE HOW THE CANINES ARE DOING IT,

8  YET WE KNOW THEY'RE EFFECTIVE AT DOING IT?

9  A.  YES.  I CAN THINK OF THREE EXAMPLES OFF THE TOP OF MY

10  HEAD.  THE SEIZURE DETECTION DOG.  THESE ARE DOGS THAT ARE

11  PAIRED WITH PEOPLE THAT HAVE SEIZURE DISORDERS, AND THESE DOGS

12  WILL PROVIDE SOME TYPE OF BEHAVIORAL ALERT TO THEIR HANDLER,

13  SOMETIMES HOURS BEFORE THE PERSON HAS A, HAS A SEIZURE.  THERE

14  ARE ALSO DIABETIC DOGS THAT DO THE SAME THING WHEN THEY SENSE

15  BLOOD SPIKES IN DIABETICS.  THEY DON'T KNOW HOW THEY DO THAT.

16      GOING OR TURNING NOW TO JUST LAW-ENFORCEMENT DOGS OR

17  TRACKING DOGS, IN TRACKING, THEY HAVE DONE EXTENSIVE

18  STUDIES -- FOUR, OFF THE TOP OF MY HEAD -- AS TO HOW A TRAINED

19  TRACKING DOG, WHEN BROUGHT INTO A TRACK AT A 90-DEGREE ANGLE,

20  DETERMINES WHICH WAY THAT TRACK GOES.  THEY DO KNOW THIS:

21  THAT DOGS DON'T NATURALLY DO THIS UNLESS YOU SPECIFICALLY

22  TRAIN THEM TO DO THIS.  MCKENZIE DID A STUDY WHERE THE CORRECT

23  DECISION IF A DOG WASN'T TRAINED TO DO IT WAS ABOUT 60

24  PERCENT, A LITTLE BETTER THAN CHANCE.  BUT SUBSEQUENT STUDIES

25  WITH DOGS THAT WERE TRAINED TO DO IT HAVE REVEALED CERTAIN

1   STAGES THE DOG GOES THROUGH IN MAKING THAT DECISION.  FIRST,

2   HE SEARCHES.  HE CAN ANALYZE AND THEN DECIDES.  THROUGH

3   SUBSEQUENT STUDIES THAT WERE DONE IN BELFAST, IRELAND, THEY

4   HAVE LEARNED THAT THE DOG USES THE UNIQUE SCENT IN EACH

5   FOOTPRINT TO MAKE THAT DECISION.  IN OTHER WORDS, HE DOES NOT

6   USE SCENT FALLING FROM THE BODY.  THEY'VE LEARNED THAT THE DOG

7   NEEDS FIVE SEQUENTIAL STEPS TO MAKE THAT DECISION.  BUT HOW A

8   DOG IS ABLE TO SIT THERE AND DECIDE WHICH WAY A TRACK GOES

9   BETWEEN FIVE FOOTSTEPS THAT WERE LAID FIVE TO TEN SECONDS

10  APART REMAINS A MYSTERY.

11  Q.  ALL RIGHT.  NOW, GOING BACK TO TRAINING, WHY IS IT

12  IMPORTANT FOR A DOG LIKE PECKY TO BE TRAINED TO ALERT TO

13  CONCEALED INDIVIDUALS AND NOT JUST EVERY INDIVIDUAL AT A

14  CHECKPOINT THAT IS IN A VEHICLE?

15  A.  WELL, IF A DOG ALERTED TO EVERYBODY AT A CHECKPOINT, SHE

16  WOULD ALERT TO EVERY CAR IN THE PRE-PRIMARY POSITION.  BECAUSE

17  EVERY CAR, WHEN THE DOG CONDUCTS THE SNIFF, EVERY CAR,

18  OBVIOUSLY, HAS SOMEBODY IN IT, DRIVERS AND OCCUPANTS.  SO

19  IT'S -- WE'D BE SENDING EVERY CAR INTO SECONDARY BASED ON

20  PECKY'S ALERT IF SHE WAS JUST RESPONDING TO ANY HUMAN SCENT

21  EMITTING FROM A VEHICLE.

22  Q.  NOW, IN THIS CASE YOU SAID YOU REVIEWED PECKY'S RECORDS,

23  RIGHT?

24  A.  YES, MA'AM.

25  Q.  AND YOU REVIEWED BOTH THE CERTIFICATIONS --

1    A.   YES, MA'AM.

2    Q.   -- AND THE TRAINING RECORDS?

3    A.   YES, MA'AM.

4    Q.   AND IS THERE A DETAIL ABOUT WHERE A LOT OF THESE FINDS ARE

5    PLACED, ESPECIALLY THE TRAINING RECORDS?

6    A.   YES.   THERE'S THE ENVIRONMENT IT'S PLACED IN, THE TYPE OF

7    SEARCH THAT IS BEING DONE, WHETHER IT'S BY SEARCH TYPE,

8    WHETHER IT'S A LONG SEARCH WITH A QUICK REWARD OR A SHORT

9    SEARCH WITH A LONG INDICATION BEFORE THE REWARD.   OBVIOUSLY,

10   THE PLACEMENT WHERE IT'S IN THE VEHICLE, WAREHOUSE, OPEN

11   FIELDS, WHAT HAVE YOU.   THE AMOUNT OF SUBSTANCE THAT WAS

12   PLACED AND THE SUBSTANCE ITSELF, OF COURSE.   THE HEIGHT OF

13   THAT SUBSTANCE OFF THE GROUND, AND THE DEPTH THAT SUBSTANCE

14   FROM THE DOG'S NOSE, AND THEN OVER IN THE LOCATION BLOCK A

15   SPECIFIC LOCATION, SUCH AS IN A DRAWER, OR IN THE BLUE SEDAN,

16   OR WHAT HAVE YOU.   SO THE SEARCH IS PRETTY ACCURATELY

17   DESCRIBED.   OTHER DESCRIPTIVES MAY BE INCLUDED IN THE COMMENTS

18   AT THE DISCRETION OF THE INSTRUCTOR.

19   Q.   AND YOU REVIEWED ALL OF THESE FOR PECKY?

20   A.   YES.

21   Q.   AND WHAT IS YOUR OPINION ABOUT PECKY'S RELIABILITY BASED

22   ON WHAT YOU REVIEWED?

23   A.   BASED ON MY REVIEW OF PERFORMANCE STANDARDS SCORE SHEETS

24   AND CERTIFICATION DOCUMENTATION SPANNING A PERIOD OF OVER SIX

25   YEARS, FIVE MONTHS, THE DOG, TALKING ABOUT PECKY FIRST, IN

1    THAT PERIOD SHE WOULD OCCASIONALLY RECEIVE A LOW SCORE OF

2    FOUR, USUALLY IN THE AREA OF CONTROL, FREQUENTLY IF IT WAS THE

3    FIRST SEARCH OF THE DAY, OR SOMETHING OF THAT NATURE.  SHE

4    RECEIVED A COUPLE OF LOW SCORES IN ALERT AND INDICATION WHEN

5    SHE WAS FIRST EXPOSED TO MEXICAN BROWN HEROIN, THE FIRST TIME

6    SHE'D EVER EXPERIENCED IT.  SO SHE GOT A LITTLE BIT -- AND

7    AGAIN THOSE WERE JUST FOURS, WHICH INDICATES THAT SHE

8    RECOGNIZED IT, SHE GAVE AN ALERT BEHAVIOR, BUT IT WASN'T AS

9    STRONG AS WE WOULD LIKE TO SEE.

10        TURNING NOW TO THE HANDLER, THE HANDLER OCCASIONALLY WOULD

11   RECEIVE LOW SCORES IN THE AREA OF SEARCH SKILLS, AND THE NOTES

12   INDICATE THAT THAT WAS BECAUSE HE DIDN'T PRESENT ALL THE WAY

13   TO THE FLOOR, OR HE DIDN'T PRESENT ABOVE, SUFFICIENTLY ABOVE

14   PECKY'S CAPABILITY TO ACCURATELY COVER THE SEARCH AREA.  HE

15   OCCASIONALLY RECEIVED SOME FOURS IN LEASH HANDLING,

16   PARTICULARLY RIGHT AFTER HE GOT OUT OF SCHOOL, AND

17   OCCASIONALLY IN SPEED.

18        OTHER THAN THESE, WHICH ARE REMARKABLE TO ME, RARE

19   OCCASIONS, THIS TEAM SCORED TWOS AND THREES OVER A PERIOD OF

20   SIX-AND-A-HALF YEARS, OR JUST UNDER SIX-AND-A-HALF YEARS, ON

21   ALL SEARCH ENVIRONMENTS, MULTIPLE EVALUATORS, OVER AN EXTENDED

22   PERIOD OF TIME.  BASED ON THIS, I THINK I AM SAFE IN

23   FORMULATING THE OPINION THAT THIS IS A VERY RELIABLE TEAM THAT

24   HAS PROVEN THEIR RELIABILITY OVER TIME.

25             MS. AHUMADA:  ALL RIGHT.

1           THANK YOU, YOUR HONOR.

2           THE COURT:  OKAY.

3           CROSS-EXAMINATION.

4           MR. ZUGMAN:  THANK YOU, YOUR HONOR.

5           CROSS-EXAMINATION BY MR. ZUGMAN:

6    Q.  GOOD AFTERNOON.

7    A.  GOOD AFTERNOON.

8    Q.  SO YOU HAVE WORKED IN THE AREA OF POLICE DOG CANINE

9    TRAINING FOR 30 YEARS?

10   A.  37.

11   Q.  37 YEARS.  A LONG TIME.

12   A.  YES, SIR.

13   Q.  ENTIRELY ON THE GOVERNMENT'S SIDE, RIGHT?

14   A.  WHAT DO YOU MEAN BY *ON THE GOVERNMENT'S SIDE*?

15   Q.  YOU'RE BEING CALLED BY PROSECUTORS.

16   A.  OH, ARE YOU TALKING ABOUT TESTIFYING?

17   Q.  YES.

18   A.  NO.  I DID TESTIFY ON ONE OCCASION FOR A DEFENSE MOTION.

19   Q.  ONE TIME IN 37 YEARS?

20   A.  YES, BUT I'VE ONLY TESTIFIED, IN GENERAL, THIS IS MAYBE MY

21   EIGHTH TIME.

22   Q.  OKAY.  AND MOST OF -- THAT'S BEEN VERY RECENT, RIGHT?

23   A.  NO.  THE MOST RECENT, OF COURSE, WAS A COUPLE WEEKS AGO IN

24   TUSCON.  PRIOR TO THAT, I THINK IT WAS ON BACK IN THE -- I

25   CAN'T EVEN REMEMBER.  IT WAS, LIKE, 2005 OR '6.  I TESTIFIED

1    IN A COUPLE OF CASES IN THE TENTH CIRCUIT IN LAS CRUCES, NEW

2    MEXICO, AND BEFORE THAT BY A COUPLE YEARS -- I CAN'T REMEMBER

3    THE DATES -- I ALSO WAS DOWN IN THE FIFTH CIRCUIT, IN THE

4    DISTRICT COURT IN LAREDO.

5    Q.   OKAY.  AS I UNDERSTAND YOUR TESTIMONY, THOUGH, YOU'RE THE

6    GUY FOR BORDER PATROL, RIGHT?

7    A.   WELL, I'M THE ONE WHO DEVELOPED THE PROGRAM, YES, SIR.

8    Q.   YOU DEVELOPED THE PROGRAM.  YOU'RE THE ONE WHO DECIDES

9    WHAT THE PROGRAM IS, RIGHT?

10   A.   WITH INPUT FROM OTHER ADVISERS IN THE FIELD AND COUNSEL,

11   YES, SIR.

12   Q.   SO WHAT THESE FOLKS ARE DOING OUT AT THE CHECKPOINT,

13   THAT'S -- IT'S SUPPOSED TO BE WHAT YOU INSTRUCT THEM TO DO

14   THROUGH THE MANUAL.

15   A.   YES, SIR.

16   Q.   OKAY.  SO YOU WILL ADMIT THAT THE DOGS ARE SEARCHING IN

17   PRE-PRIMARY BEFORE THE PERSON REACHES THE IMMIGRATION

18   INSPECTION.

19        MS. AHUMADA:  OBJECTION; LACK OF KNOWLEDGE.  HE'S NOT

20   AT THE CHECKPOINT.

21        THE COURT:  REPHRASE THAT AND ASK HIM IF HE KNOWS.

22        BY MR. ZUGMAN:

23   Q.   DO YOU KNOW IF THE DOGS SEARCH IN THE PRE-PRIMARY AREA

24   BEFORE THE PERSON GETS ASKED THE IMMIGRATION QUESTIONS?

25   A.   IN SOME AREAS, YES.  THAT'S OPERATIONAL, BUT, AND IT

1   DEPENDS UPON THE LOCATION AND HOW THE CHECKPOINT IS RUN.

2   Q.   OKAY.  BUT THEY'RE SEARCHING IN THE PRE-PRIMARY AREA,

3   RIGHT?

4   A.   YES, SIR.

5   Q.   FAIR ENOUGH.  AND YOU DESCRIBE THAT AS A NECESSITY, RIGHT?

6   A.   NECESSITY?  YES, SIR.

7   Q.   BECAUSE THE DOGS ARE PULLING.  THEY'D BE DOWNWIND FROM THE

8   DRUGS OR THE PEOPLE AND THEY'D GET PULLED.

9   A.   THE DOGS WOULD TAKE THEIR HANDLERS INTO PREPRIMARY, YES.

10   Q.   OKAY.  BUT THAT'S NOT A PROBLEM IN, AT HIGHWAY 86, RIGHT?

11   A.   I'M NOT FAMILIAR WITH THE HIGHWAY 86 CHECKPOINT.  I'VE

12   NEVER BEEN THERE.

13   Q.   DO CHECKPOINTS -- I MEAN, ARE THERE DIFFERENT DESIGNS FOR

14   THEM?

15   A.   NO.  IF YOU CAN REPHRASE THE QUESTION.

16   Q.   DON'T ALL CHECKPOINTS KIND OF LOOK THE SAME?  THE ONLY

17   THING THAT VARIES IS THE NUMBER OF LANES, RIGHT?

18   A.   OKAY.  YEAH, I WOULD AGREE WITH THAT.

19   Q.   AND THERE'S THE YELLOW LINE OR THE WHITE LINE THAT YOU

20   STOP AT AND THE AGENT ASKS YOU, YOU KNOW, IF YOU'RE A CITIZEN

21   OR NOT, RIGHT?

22   A.   YES, SIR.

23   Q.   AND YOU'VE GOT DOGS SEARCHING THE CARS BEFORE THEY GET

24   THERE, RIGHT?

25   A.   IN SOME LOCATIONS, YES, SIR.

1    Q.  FAIR ENOUGH.  ALL RIGHT.  LET'S TALK ABOUT -- SO I'M GOING

2    TO GIVE YOU A SOFTBALL.  YOU DO WITH IT WHAT YOU WILL.  HOW IS

3    MR. FALCO WRONG?  HOW IS MR. FALCO-JIMENEZ INCORRECT?  WHAT

4    PART OF THE SCIENCE IS HE GETTING WRONG?

5    A.  WHAT PART OF THE SCIENCE IS HE GETTING WRONG?  HE HAS NO

6    DIRECT EXPERIENCE OF DOING THIS.  HE HAS NO DIRECT KNOWLEDGE

7    OF HOW WE CONDUCT THIS TRAINING AND THE CHECKS AND BALANCES

8    WE'VE PUT IN PLACE TO ENSURE THAT THE DOGS ARE BEING

9    PRODUCTIVE AND CORRECT, AND HE'S BASING HIS ASSERTIONS ON

10   THOSE ASSUMP -- BASICALLY, ON INACCURATE OR INCOMPLETE

11   INFORMATION.

12   Q.  OKAY.  YOU HAVE A LOT OF DOG-TRAINING EXPERIENCE, RIGHT?

13   A.  YES, SIR.

14   Q.  37 YEARS.

15   A.  YES, SIR.

16   Q.  AND COUNTING MORE IF YOU COUNT WHAT YOU DID AS A KID,

17   RIGHT?

18   A.  YES, SIR.

19   Q.  AND -- BUT YOU'RE NOT A SCIENTIST, RIGHT?

20   A.  I WILL ADMIT THAT, YES, SIR.

21   Q.  YES.  NO DEGREE IN SCIENCE?

22   A.  EXCUSE ME?

23   Q.  NO DEGREE IN SCIENCE.

24   A.  NO.

25   Q.  OKAY.  YOU ARE AWARE THAT THERE ARE SCIENTIFIC STUDIES

1    ABOUT DOGS, RIGHT?

2    A.  YES, SIR.

3    Q.  AND THAT EVERYTHING ABOUT THEIR OLFACTION HAS BEEN

4    SCIENTIFICALLY VALIDATED.  CORRECT?

5    A.  I WOULDN'T SAY EVERYTHING, NO.

6    Q.  OKAY.  THEIR ABILITY TO FIND DRUGS USING THEIR NOSE,

7    THAT'S BEEN SCIENTIFICALLY VALIDATED, HASN'T IT?

8    A.  YES, SIR, I BELIEVE SO.

9    Q.  OKAY.  AND YOU WORK FOR CUSTOMS, OR -- I'M SORRY.  DO YOU

10   WORK FOR HOMELAND SECURITY?

11   A.  CUSTOMS AND BORDER PROTECTION, YES, SIR.

12   Q.  OKAY.  I'M SO TEMPTED TO ASK YOU HOW MUCH YOU MAKE, BUT

13   I'M NOT GOING TO DO THAT.  LET'S TALK ABOUT, DO YOU GET ANY

14   HONORARIUMS FROM THESE OTHER ORGANIZATIONS THAT YOU WORK FOR,

15   THE POLICE (PAUSE) --

16   A.  THE NORTH AMERICAN POLICE WORK DOG?

17   Q.  YES.

18   A.  NO.

19   Q.  ALL VOLUNTARY?

20   A.  ALL VOLUNTARY.

21   Q.  HATS OFF.  SO LET'S TALK ABOUT -- YOU AGREE THAT YOU DON'T

22   KNOW HOW ANY DOG FINDS A CONCEALED HUMAN, RIGHT?

23   A.  I AGREE WE DO NOT KNOW THE SCIENCE OR HOW THE DOG IS ABLE

24   TO DISTINGUISH CONCEALED VS. VISIBLE.

25   Q.  AND WHEN YOU FIRST STARTED YOUR TESTIMONY, YOU SAID THAT

1    THE MISSION OF THE BORDER PATROL AND THE DOG-TRAINING PROGRAM

2    IS TOWARDS THOSE VERY IMPORTANT GOALS OF STOPPING TERRORISM,

3    STOPPING DRUGS, AND I'M SURE IMMIGRATION IS GOING TO BE IN

4    THERE, TOO, RIGHT?

5    A.  YES, SIR.

6    Q.  OKAY.  AND YOU HAVE LOTS OF RESOURCES, RIGHT?

7    A.  YES, SIR.

8    Q.  OKAY.  SO IF THE DOG WAS USING OLFACTION TO FIND THESE

9    CONCEALED PEOPLE, IF CONCEALED PEOPLE REALLY DO SMELL

10   DIFFERENT, YOU'D BE ABLE TO FIND THAT OUT, RIGHT?

11   A.  AS YOU'VE ALREADY MADE THE POINT, I'M NOT A SCIENTIST.  I

12   DON'T KNOW HOW A SCIENTIST WOULD SET SOMETHING LIKE THAT UP TO

13   CONDUCT SUCH A STUDY.

14   Q.  BUT YOU'VE TRAINED SO MANY DOGS ON SCENT, RIGHT?

15   A.  YES, SIR.

16   Q.  SO IF YOU HAD A SCENT THAT WAS CONCEALED-PERSON SCENT AND

17   YOU TRAINED THE DOG ON THAT AND IT WAS UNIQUE TO CONCEALED

18   PEOPLE, THAT WOULD BE AN INCREDIBLY USEFUL THING, RIGHT?

19   A.  IF IT WAS FEASIBLE AND SCIENTIFICALLY AVAILABLE TO DO SO,

20   YES.

21   Q.  EXCELLENT.  SO YOU FILED A DECLARATION IN THIS CASE,

22   RIGHT?

23   A.  YES, SIR.

24   Q.  AND THERE WAS AN EXHIBIT THAT WAS INCLUDED WITH IT, RIGHT?

25   EXHIBIT A.

1    A.  YES, SIR.

2    Q.  AND IT WAS PECKY'S RECORDS, RIGHT?

3    A.  YES, SIR.

4    Q.  OKAY.  NOW, AS I READ YOUR DECLARATION, YOU SAID THAT

5    FINDING FALSE POSITIVES WAS INCREDIBLY IMPORTANT BECAUSE YOU

6    DON'T WANT TO WASTE TIME ON A DOG THAT'S FALSELY ALERTING TO

7    STUFF.

8    A.  CORRECT.

9    Q.  I LOOKED THROUGH HER RECORDS, THE 300 PAGES.  I DIDN'T SEE

10   A SINGLE INSTANCE OF A FALSE ALERT NOTED.  DID I JUST MISS

11   THAT?

12   A.  QUITE FRANKLY, I LOOKED THROUGH THEM, TOO.  I DID NOT

13   SEE -- AND THE CORRECT TERM WOULD BE FALSE INDICATIONS,

14   BECAUSE WE'RE TALKING ABOUT A CONTROLLED TRAINING ENVIRONMENT.

15   NO, I DIDN'T SEE ONE, EITHER.

16   Q.  SO HOW IS PECKY NOT THE BEST DOG EVER?  SHE NEVER FALSELY

17   ALERTS.

18   A.  I (PAUSE) -- REFERRING TO THE RECORDS, IT APPEARS NOT.

19   Q.  SO -- BUT HER GRADES, I MEAN, SHE'S GETTING A 2.84.  I

20   MEAN, THAT'S, I'M SURE THAT'S A FINE SCORE FOR MOST DOGS, BUT

21   PECKY SOUNDS LIKE THE BEST.

22   A.  NO.  PECKY -- THE RECORDS JUST REFLECT THAT SHE DIDN'T

23   HAVE ANY FALSE INDICATIONS.

24   Q.  OKAY.  LET'S LOOK AT THE RECORDS THAT YOU ATTACHED TO

25   EXHIBIT A.  I'M GOING TO SHOW YOU -- THIS LOOKS LIKE AEO73,

1    AND I'VE GOT WHAT?  TWO, FOUR, SIX, EIGHT, TEN, 12, 14, 16, 17

2    ATTEMPTED SCREENS.  I'LL ZOOM THAT OUT.  BUT I PRESUME YOU'RE

3    FAMILIAR WITH THIS BECAUSE --

4    A.  17 WHAT, SIR?  I'M SORRY.  I DIDN'T HEAR YOU.

5    Q.  TESTS, 17 TESTS.

6    A.  TESTS.

7    Q.  YES.

8    A.  YES, SIR.

9    Q.  AND AS FAR AS I CAN TELL, THERE'S ONLY ONE THAT INVOLVED

10   LOOKING FOR A PERSON IN A VEHICLE, RIGHT?  THAT'S THIS ONE

11   RIGHT HERE.

12   A.  ACTUALLY, IT'S THE NEXT ONE DOWN, VEHICLE SCREENING.

13   Q.  OH, RIGHT, RIGHT, RIGHT.  THAT WAS THE COCAINE VEHICLE

14   SCREENING.  THE PERSON VEHICLE SCREENING --

15   A.  YES.

16   Q.  -- IS THE NEXT ONE DOWN --

17   A.  UH-HUH.

18   Q.  -- RIGHT?  AND THAT'S THE ONLY "P."  I MEAN, THE OTHER "P"

19   WE HAVE IS IN THE WAREHOUSE, RIGHT?

20   A.  YES.  ANOTHER ONE HAPPENED IN A WAREHOUSE AND ANOTHER

21   HAPPENED IN AN OPEN FIELD, BOTTOM LINE.

22           MS. AHUMADA:  OBJECTION, YOUR HONOR.

23           THE COURT:  WAS THERE AN OBJECTION?

24           MS. AHUMADA:  NO.  I WITHDRAW IT.

25           THE COURT:  OKAY.

1          GO AHEAD, MR. ZUGMAN.

2          MR. ZUGMAN:  THANK YOU, YOUR HONOR.

3          BY MR. ZUGMAN:

4   Q.  SO ONE PERSON VEHICLE SCREENING OUT OF THE FIRST WHATEVER.

5   WE'LL ROUND IT OFF TO 15.  RIGHT?  THEN WE GO TO THE NEXT

6   PAGE.  I GOT IT IN THE SAME POSITION.  THERE'S ONE OF THE,

7   WHATEVER THE NUMBER IS, FIF -- OR 17.  YES.  ONE OF THE 17 IS

8   FOR PEOPLE IN A VEHICLE, RIGHT?

9   A.  YES, SIR.

10  Q.  OKAY.  AND CAN WE AGREE THAT'S WHAT ALL OF THESE RECORDS

11  SHOW:  THERE'S GOING TO BE ONE ATTEMPT FOR THE CONCEALED

12  PERSON IN A VEHICLE?

13  A.  THE CERTIFICATION MANDATES THAT THERE BE A MINIMUM OF

14  THREE PEOPLE FINDS IN THE CERTIFICATION PROCESS.

15  Q.  DURING THE PERIOD.

16  A.  DURING THE PERIOD, AND THOSE CERTIFI -- AND THE

17  CERTIFICATION PROCESS IS SIMPLY MEANT TO REPRESENT ONE

18  OCCURRENCE, AND THE OTHER ODORS THAT WE HAVE TO TEST, EVERY

19  ODOR HAS TO BE REPRESENTED A MINIMUM OF TWO TIMES.

20  Q.  OKAY.

21  A.  SO, GIVEN THE 17 SEARCHES, TYPICALLY, THE PERSON FINDS ARE

22  LOCATED ONE IN THE VEHICLE SCREENING AND POSSIBLY ONE IN A

23  BUILDING OR FREIGHT AND ONE IN AN OPEN FIELD.

24  Q.  SO, WILL YOU AGREE THAT WELL OVER 80 PERCENT OF PECKY'S

25  TRAINING IS ON DRUGS?

1    A.  NO.  THE RECORDS I REVIEWED THAT THE PEOPLE FINDS ARE

2    INCLUDED PRETTY REGULARLY WITHIN THE TRAINING DOCUMENT.

3    Q.  SO YOU REVIEWED ALL THESE RECORDS, RIGHT?

4    A.  YES, SIR.

5    Q.  AND YOU KNEW WHAT I WAS GOING TO ARGUE IN THIS CASE,

6    RIGHT?  YOU WERE PROVIDED WITH THE MOTION I FILED, RIGHT?

7    A.  I DON'T RECALL THAT I WAS, BUT WHATEVER.

8    Q.  OKAY.  WELL, IT'S THE SAME -- WELL, OKAY.  FAIR ENOUGH.

9    IS IT FAIR TO SAY THAT MOST OF PECKY'S TRAINING IS ON DRUGS,

10   ON DRUG SMELLS?

11   A.  WELL, YOU'VE GOT AT LEAST -- LET'S GO OVER IT.  COCAINE,

12   HEROIN, MARIJUANA, METHAMPHETAMINE, POSSIBLY ECSTASY, BUT I

13   DON'T THINK PECKY'S ON ECSTASY.  SO THAT'S FOUR, THAT'S FOUR

14   SUBSTANCES, AND THEN YOU ADD A CONCEALED PERSON.  BUT WE HAVE

15   TO MAKE SURE THE DOG IS, ENCOUNTERS ALL THESE SUBSTANCES AS

16   MUCH AS POSSIBLE.  SO WE'VE GOT FOUR NARCOTIC SUBSTANCES AND

17   THE CONCEALED PEOPLE.

18   Q.  BUT WHAT EXHIBIT IN THE EVIDENCE --

19   A.  SO, YES.  IN ANSWER TO YOUR QUESTION, YES, THERE WILL BE

20   MORE REPRESENTATION OF CONTROLLED-SUBSTANCE ODORS SIMPLY

21   BECAUSE OF THE NUMBER OF ODORS WE'RE HAVING TO MAINTAIN.

22   Q.  YOU WERE SITTING HERE FOR MR. JIMENEZ'S TESTIMONY, RIGHT?

23   A.  YES, SIR.

24   Q.  OKAY.  AND YOU HEARD HIM DESCRIBE -- DID YOU HEAR THE

25   DISCUSSION ABOUT A DEFAULT BEHAVIOR OF THE DOG VS. A COMMANDED

1    BEHAVIOR OF THE DOG?

2    A.   YES.   I DIDN'T REALLY UNDERSTAND WHAT HE WAS SAYING, BUT I

3    REMEMBER HEARING IT.

4    Q.   WELL, HERE'S WHAT WE WERE TRYING TO GET AT.   SO THE DOG

5    CAN BE TAUGHT TO ALERT TO METHAMPHETAMINE WHENEVER IT

6    ENCOUNTERS IT IN THE AIR, RIGHT?   THAT'S -- THERE'S NO DANGER

7    OF ANYTHING, YOU KNOW, UNFORESEEN.   LIKE, YOU WANT THE DOG TO

8    BE NOT TOO SENSITIVE, BUT SENSITIVE TO THAT SMELL, RIGHT?

9    A.   YES, SIR.

10   Q.   SO YOU NEVER HAVE TO TRAIN TO IGNORE THAT METH.   YOU JUST

11   GET IT TO WHATEVER APPROPRIATE LEVEL SO THAT IT ALERTS, RIGHT?

12   A.   YES, SIR.

13   Q.   SO THAT'S DIFFERENT THAN A DOG FINDING A CONCEALED PERSON,

14   THOUGH, RIGHT?

15   A.   YES, SIR.   THE DOG MUST BE CONDITIONED TO IGNORE

16   HUMAN-SCENT SAMPLES AND VISIBLE PEOPLE.

17   Q.   RIGHT.   YOU COULDN'T HAVE HIM, LIKE, ATTACKING A KID IN A

18   SIDECAR IN A MOTORCYCLE, OR SOMETHING LIKE THAT, WHAT MIGHT

19   APPEAR TO BE, TO THE DOG, A CONCEALED INSTANCE.

20   A.   I'M SORRY.   OUR DOGS AREN'T TRAINED IN APPREHENSION WORK.

21   Q.   OKAY.   BUT, I MEAN, YOU KNOW WHAT CHECKPOINTS LOOK LIKE,

22   RIGHT?

23   A.   YES, SIR.

24   Q.   SO YOU KNOW THAT SOMETIMES THERE ARE THESE LINES OF CARS,

25   RIGHT?

1    A.  YES, SIR.

2    Q.  AND THOSE CARS ARE SATURATED WITH HUMAN SMELLS, JUST LIKE

3    EVERYWHERE ELSE, RIGHT?

4    A.  THERE ARE OCCUPANTS IN THE VEHICLE, YES, SIR.

5    Q.  AND SO YOU CAN'T HAVE A DOG -- WHATEVER THE DOG IS,

6    HOWEVER THE DOG IS DETERMINING THE CONCEALED PERSON, IT'S NOT

7    DOING IT BASED ON SMELL.

8    A.  AS I'VE TESTIFIED PREVIOUSLY, WE ARE NOT 100-PERCENT SURE

9    SCIENTIFICALLY HOW THE DOG IS DELINEATING BETWEEN CONCEALED

10   AND VISIBLE PEOPLE.

11   Q.  SO THERE ARE, IS IT FAIR TO SAY, DOZENS OF STUDIES THAT

12   SHOW THAT, HOW DOGS ALERT TO SMELLS THAT THEY'RE TRAINED ON,

13   LIKE DRUGS AND CADAVERS AND EXPLOSIVES?

14   A.  YES, SIR, THERE ARE STUDIES OUT THERE.

15   Q.  IT'S AN ACCEPTED SCIENTIFIC FACT, ISN'T IT?

16   A.  YES, SIR.

17   Q.  AND -- BUT THERE'S NOTHING LIKE THAT FOR THIS

18   CONCEALED-PERSON STUFF THAT YOU'RE BRINGING UP, THAT YOU'RE

19   SAYING YOU TRAIN ON.

20   A.  NO, THERE'S NO STUDIES, SIR.

21   Q.  SO, IS -- HOW IMPORTANT IS THE RECORD-KEEPING TO YOU FOR

22   THE DOG?

23   A.  WELL, TRAINING RECORDS IS VITAL TO MAKING SURE THE TEAMS

24   ARE BEING PROPERLY MAINTAINED AND THAT BOTH THE DOGS AND

25   HANDLERS ARE MEETING ESTABLISHED STANDARDS BY THE AGENCY.

1    Q.  OKAY.  AND IT'S VERY IMPORTANT THAT BORDER PATROL TAKE

2    CARE OF THEIR DOGS, RIGHT?

3    A.  YES, SIR.

4    Q.  SO I AM SURE YOU SAW THE PART OF THE DISCOVERY WHERE MR.

5    BARRAGAN LOST PECKY.

6    A.  YES, SIR.

7    Q.  CAN YOU DESCRIBE WHAT HAPPENED THERE?

8    A.  I LEARNED YESTERDAY -- IT WAS THE FIRST TIME I GOT A

9    CHANCE TO HEAR MR. BARRAGAN'S ACCOUNT OF WHAT OCCURRED IN THAT

10   INSTANCE.  SO WHAT I HEARD AS OF YESTERDAY WAS THAT PECKY HAS

11   THUNDERSTORM PHOBIA.  SHE'S VERY FEARFUL OF THUNDERSTORMS, AND

12   THERE WAS A BAD THUNDERSTORM GOING ON, AND MR. BARRAGAN, AND

13   AGAIN I'M PARAPHRASING FROM MEMORY YESTERDAY, WENT OUT AND

14   OPENED THE GARAGE DOOR TO MOVE HER EITHER INTO HER KENNEL OR

15   INTO THE HOUSE, OR SOMETHING LIKE THAT, AND SHE BOLTED OUT THE

16   DOOR IN FEAR, AND HE WENT TO CALL HER BACK AND SHE BEGAN

17   RESPONDING AND WAS COMING BACK TO HIM WHEN ANOTHER THUNDERCLAP

18   HIT, AND SHE WAS GONE IN FEAR.  SO A SEARCH WAS COMMENCED,

19   DURING WHICH TIME MR. BARRAGAN NOTIFIED THE INSTRUCTORS IN THE

20   AREA.  FLIERS WERE IMMEDIATELY PRINTED, AS PER OUR PROCEDURES,

21   AND THEY BEGAN DISTRIBUTING THESE FLIERS IN THE NEIGHBORHOODS,

22   AND SO FORTH.  AND IN SO DOING, THEY RAN ACROSS A NEIGHBOR WHO

23   SAID, OH, YES, THAT DOG, I FOUND HER COWERING AND QUIVERING

24   UNDERNEATH MY CAR IN THE GARAGE AND I CALLED ANIMAL CONTROL.

25   AND SO ANIMAL CONTROL CAME AND GOT PECKY AND TOOK HIM TO HER

1    OFFICE.  NOW, MR. BARRAGAN WAS VERY UPSET AND HE TRIED TO

2    CONTACT ANIMAL CONTROL THAT EVENING, BUT ANIMAL CONTROL

3    WOULDN'T RELEASE THE DOG UNTIL THE FOLLOWING MORNING, AND SO

4    THE FOLLOWING MORNING THE DOG WAS RECOVERED FROM THE ANIMAL

5    CONTROL OFFICE.

6    Q.  HAVE YOU GUYS CONSIDERED CHIPPING THOSE DOGS?

7    A.  THEY ARE CHIPPED.

8    Q.  OKAY.  SO THIS IS THE REPORT ON THE LOSS OF PECKY, RIGHT?

9    AND YOU SEE I'VE HIGHLIGHTED JULY 9, RIGHT?

10   A.  YES, SIR.

11   Q.  IT WASN'T ON JULY 9, THOUGH, WAS IT?  IT WAS ON JULY 19TH,

12   RIGHT?

13   A.  SIR, I, I CAN'T TALK TO THIS.  THIS IS -- I'M WITH THE

14   OFFICE OF TRAINING DEVELOPMENT AT THE SCHOOL IN EL PASO, IN

15   HEADQUARTERS.

16   Q.  I BELIEVE YOUR EXPERTISE IS IMPORTANT IN THIS REGARD.

17   A.  I HAVE NO KNOWLEDGE OF THESE DOCUMENTS.  I HAVEN'T

18   REVIEWED THEM.

19   Q.  WELL, LET ME ASK YOU THIS.  MR. BARRAGAN TOLD YOU THAT HE

20   HEARD THUNDERCLAPS, THAT THE DOG HEARD A THUNDERSTORM AND

21   THAT'S WHY SHE TOOK OFF, RIGHT?

22   A.  THAT WAS MY UNDERSTANDING FROM THE CONVERSATION YESTERDAY,

23   YES, SIR.

24   Q.  AND WE KNOW WHAT TIME HE CONTACTED THE AGENTS, RIGHT?

25   HERE'S THE MEMORANDUM.

```
 1              MR. HARRIGAN:  OBJECTION, YOUR HONOR.  IT'S IMPROPER

 2   IMPEACHMENT.  MR. BARRAGAN WILL BE TESTIFYING.

 3              MR. ZUGMAN:  I'D ASK FOR A LITTLE LEEWAY, YOUR HONOR.

 4              THE COURT:  OKAY.  LET ME SEE WHERE YOU'RE GOING.

 5              YOU'RE NOT WAIVING ANY FUTURE OBJECTIONS, MR.

 6   HARRIGAN.

 7              MR. ZUGMAN:  THREE MORE QUESTIONS.

 8              THE COURT:  OKAY.  GO AHEAD.

 9              BY MR. ZUGMAN:

10   Q.  HE LOST HER AT ABOUT THREE O'CLOCK, RIGHT?

11   A.  FROM THIS DOCUMENT, YES, AT 3:40 P.M. IS WHAT I SEE.

12   Q.  YES.  THAT'S WHEN HE CONTACTED VALDIVIA, RIGHT?

13   A.  OKAY.

14   Q.  AND THAT WAS AFTER HE'D LOST PECKY FOR A WHILE.  SO I

15   HAVEN'T AUTHENTICATED THIS, BUT I DON'T THINK IT'S GOING TO BE

16   OPEN TO REASONABLE DISPUTE.  THIS IS A WEATHER REPORT FOR JULY

17   19TH.  IT COMES FROM TIMEANDDATE.COM.  I THINK THEY GET THEIR

18   STUFF FROM THE WEATHER SERVICE, BUT I'M ASSUMING IT'S NOT

19   GOING TO BE OPEN TO REASONABLE DISPUTE.  THERE WERE THUNDER

20   SHOWERS THAT DAY.  DO YOU SEE THAT?

21   A.  HMM.

22   Q.  DO YOU SEE THAT AT 4:53?

23   A.  OH, YES.  PUSH IT UP, PLEASE.  THANK YOU.

24   Q.  YES.

25   A.  YES.
```

1    Q.  DO YOU SEE THAT?

2    A.  UH-HUH.

3    Q.  DO YOU SEE THE TWO INDICATIONS ABOVE IT?

4    A.  YES, SIR.

5    Q.  SUNNY, RIGHT?

6    A.  HMM.  ACCORDING TO THAT REPORT, YES.

7    Q.  OKAY.

8          MR. HARRIGAN:  I'D OBJECT TO THE ADMISSION OF THAT.

9    THAT COVERS IMPERIAL COUNTY, WHICH IS A (PAUSE) --

10         THE COURT:  WELL, HE HASN'T MOVED ANYTHING.  HE

11   HASN'T MOVED IT INTO EVIDENCE.  HE'S ASKED A QUESTION.

12         MR. ZUGMAN:  THAT'S CORRECT.  AT SOME POINT, I

13   SUPPOSE WE CAN TAKE JUDICIAL NOTICE OF THE TEMPERATURE.

14         MR. HARRIGAN:  I WOULD OBJECT TO JUDICIAL NOTICE,

15   YOUR HONOR, UNLESS HE ESTABLISHES WHERE ACTUALLY MR. BARRAGAN

16   WAS, WHERE HIS RESIDENCE WAS.  WE HAVE THE GENERAL REPORT FROM

17   IMPERIAL COUNTY, WHICH COVERS A VERY LARGE AREA, AS YOUR HONOR

18   KNOWS.

19         THE COURT:  I DON'T THINK IT, WITHOUT MORE, IT WOULD

20   BE SUBJECT TO JUDICIAL NOTICE, MR. ZUGMAN, BUT LET'S TRY TO

21   CONTINUE.

22         MR. ZUGMAN:  FAIR ENOUGH.

23         THE COURT:  I AGREE WITH THE GOVERNMENT ON THIS.

24         MR. ZUGMAN:  OKAY.

25         BY MR. ZUGMAN:

1    Q.  DID YOU EXAMINE PECKY'S MEDICAL RECORDS?

2    A.  ACTUALLY, I DID NOT.  I BREEZED OVER A COUPLE OF THEM, BUT

3    I DIDN'T GO INTO THEM IN DEPTH.  THAT'S NOT MY AREA OF

4    EXPERTISE.

5    Q.  WELL, WOULD IT MATTER TO YOU IF -- ACTUALLY, IT'S NOT THAT

6    IMPORTANT.  I WITHDRAW THAT.

7        SO YOU DON'T HAVE ANY PARTICULAR KNOWLEDGE ABOUT AGENT

8    BARRAGAN AS A HANDLER OTHER THAN WHAT YOU'VE REVIEWED ON THE

9    RECORDS.

10   A.  NO DIRECT KNOWLEDGE, NO, SIR.

11   Q.  OKAY.  AND DO HANDLERS EVER TAKE THEIR DOGS INTO THE

12   BOOTH?

13   A.  OCCASIONALLY.

14   Q.  OKAY.  I MEAN --

15   A.  IT'S NOT UNCOMMON.  THEY'RE OUT THERE WITH THE DOGS AND

16   THE DOG IS AT THEIR SIDE.  SO IF THEY NEED TO GO INTO THE

17   BOOTH FOR SOMETHING, I IMAGINE THE DOG IS WITH THEM.

18   Q.  READING YOUR MANUAL, THOUGH, IT SOUNDED LIKE THE DOGS,

19   YOU'RE NOT SUPPOSED TO BRING THE DOGS INTO PLACES WHERE THEY

20   MIGHT ENCOUNTER OTHER PEOPLE OR OTHER DOGS.

21   A.  THEY'RE NOT ALLOWED IN PUBLIC PLACES.

22   Q.  OKAY.  BUT THE BOOTH WOULD BE FINE?

23   A.  YES, SIR.

24   Q.  OKAY.  AND YOU DON'T HAVE ANY PARTICULAR KNOWLEDGE ABOUT

25   THE 86 CHECKPOINT.

1    A.  NO, SIR.  I'VE NEVER BEEN THERE.

2    Q.  OKAY.

3         MR. ZUGMAN:  SO I THINK THAT MIGHT BE EVERYTHING.

4    JUST GIVE ME A SECOND.

5         OH, OH.

6         BY MR. ZUGMAN:

7    Q.  SO YOU WERE TALKING ABOUT THE DOGS HAVE MIRACULOUS

8    ABILITIES TO SMELL SEIZURES, OR DETECT.  NOW, THE THEORY ON

9    THE BLOOD IS THE RISE IN THE INSULIN, RIGHT?

10   A.  THAT'S THE THEORY.

11   Q.  BECAUSE IT MIGHT SMELL A LITTLE BIT DIFFERENT.  EVEN

12   THOUGH WE CAN'T SMELL IT, THEY CAN SMELL IT.  AND THEN THE

13   THEORY ON THE SEIZURES IS THAT THE DOG IS A VERY EMOTIONAL

14   ANIMAL, RIGHT?

15   A.  THAT'S THE THEORY.

16   Q.  PACK ANIMALS.

17   A.  YES, SIR.

18   Q.  AND THEY CAN TELL WHEN SOMEONE'S IN DISTRESS.

19   A.  UH-HUH.

20   Q.  ESPECIALLY IF THEY SPEND A LOT OF TIME WITH THAT PERSON,

21   RIGHT?

22   A.  YES, SIR.

23   Q.  OKAY.

24        MR. ZUGMAN:  OKAY.  THANK YOU.

25        THE WITNESS:  THANK YOU.

```
 1              THE COURT:  REDIRECT.

 2              MS. AHUMADA:  JUST BRIEFLY, YOUR HONOR.

 3              REDIRECT EXAMINATION BY MS. AHUMADA:

 4    Q.  SO, HOW MANY YEARS HAVE YOU BEEN RUNNING THE CBP CANINE

 5    PROGRAM?

 6    A.  HOW MANY YEARS HAVE I WHAT, MA'AM?

 7    Q.  RUN THE CBP CANINE PROGRAM.

 8    A.  I'VE BEEN IN THE CBP CANINE PROGRAM OR ITS PRIOR

 9    ORGANIZATION, U. S. BORDER PATROL, A TOTAL OF 25 YEARS.

10    Q.  AND THROUGHOUT THAT TIME, HOW MANY DOGS HAVE GONE THROUGH

11    THE PROGRAM?

12    A.  OH.  I WOULD HAZARD A GUESS.  THOUSANDS.  I DON'T HAVE A

13    FIRM FIGURE ON THAT.  WE STARTED IN '92.  WE'VE TRAINED,

14    TYPICALLY, BETWEEN THE TWO TRAINING FACILITIES, FRONT ROYAL,

15    VIRGINIA, AND EL PASO, WE TRAINED ANYWHERE FROM 150, 200 DOGS

16    AT EACH OF THOSE FACILITIES A YEAR.

17    Q.  AND YOU WORK OUT OF ONE OF THOSE FACILITIES, RIGHT?

18    A.  EXCUSE ME?

19    Q.  YOU WORK OUT OF ONLY ONE OF THOSE FACILITIES, OR DO

20    YOU WORK OUT OF BOTH?

21              THE COURT:  SPEAK BETWEEN THE MICROPHONES.  YOU'RE

22    MISSING EVERYTHING, MA'AM.

23              MS. AHUMADA:  I APOLOGIZE.

24              THE COURT:  IT WILL MAKE IT EASIER.  THANK YOU.

25    A.  I WORK AT -- I WORK IN EL PASO, BUT I'M ATTACHED TO THE
```

1    HEADQUARTERS OF THE CANINE PROGRAM AND SUPPLY INFORMATION

2    CURRICULA TO BOTH TRAINING FACILITIES.

3    Q.   AND ARE YOU ACTIVELY INVOLVED WITH THE TRAINING OF THE

4    DOGS THAT ARE GOING ON AT THE EL PASO TRAINING FACILITY WHILE

5    YOU'RE THERE?

6    A.   ON A PRETTY REGULAR BASIS, YES, MA'AM.

7    Q.   AND ARE YOU ACTIVELY INVOLVED IN TRAINING HANDLERS?

8    A.   YES.  WE HAVE, OF COURSE, DEVELOPER INSTRUCTORS THAT

9    HANDLE MOST OF THAT, BUT THEY WILL BRING ME IN TO WORK WITH A

10   GROUP, OR GIVE A LECTURE, AND THINGS LIKE THAT.

11   Q.   AND DO YOU ALSO WORK WITH THE PEOPLE THAT ARE, THE

12   HANDLERS THAT ARE BEING TRAINED TO BE INSTRUCTORS?

13   A.   OH, YES, MA'AM.

14   Q.   AND WHEN YOU'RE WORKING WITH THEM, DO YOU OFTEN WORK WITH

15   DOGS?

16   A.   YES, MA'AM, ON A PRETTY REGULAR BASIS.

17   Q.   HOW MUCH DO YOU WORK WITH DOGS?

18   A.   WELL, I HAVE MY OWN DOG.  SHE'S A FEMALE WE USE FOR OUR

19   PUPPY PROGRAM, AND SO I'M ASSIGNED AND I WORK WITH HER AT

20   LEAST TWO OR THREE TIMES A WEEK.  I'M ALSO RAISING TWO PUPPIES

21   AT THE PRESENT TIME, AND I WORK WITH THOSE PUPPIES TWO OR

22   THREE TIMES A WEEK.  AND THEN WHEN I GO OUT, OF COURSE, AND

23   ASSIST IN THE PRACTICAL FIELD TRAINING, I'M WORKING WITH SIX

24   TO EIGHT DOGS AT A TIME IN A GROUP.

25   Q.   AND WHAT PERCENTAGE OF THE DOGS THAT YOU'VE TRAINED OR

1   HELPED PARTICIPATE IN THE TRAINING OF, HELPED WITH THE

2   TRAINING OF, ARE TRAINED DETECTION DOGS THAT LOOK FOR

3   CONCEALED HUMANS?

4   A.  OH, WHAT PERCENTAGE?

5   Q.  RIGHT.  AS COMPARED TO EXPLOSIVES, OR CURRENCY, OR

6   WHATEVER ELSE.

7   A.  WITHIN THE, WITHIN THE LAST SEVERAL YEARS, WITH THE

8   EXCEPTION OF MY PUPPIES, WHICH I'M RAISING AS PATROL DOGS,

9   THEY ALL ARE.

10  Q.  AND ARE ALL OF THEM TRAINED IN CONCEALED HUMANS?

11  A.  YES, MA'AM.

12  Q.  AND WHAT PERCENTAGE OF THOSE DOGS ARE ABLE TO SUCCESSFULLY

13  BE TRAINED TO DETECT CONCEALED HUMANS?

14  A.  WELL, BARRING THE ONES THAT WASH OUT OF THE PROGRAM FOR

15  SOME REASON OR ANOTHER, ALL OF THEM.

16  Q.  SO YOU'VE TRAINED THOUSANDS OF DOGS IN HOW TO DETECT

17  CONCEALED HUMANS?

18  A.  YES, MA'AM.

19  Q.  AND JUST SO THAT I UNDERSTAND, YOU VARY THE ENVIRONMENTS

20  WHEN YOU TRAIN THEM FOR THE CONCEALED HUMANS, RIGHT?

21  A.  YES, MA'AM.  WE PLACE CONCEALED-HUMAN FINDS IN ALL

22  ENVIRONMENTS THAT WILL LOGISTICALLY ALLOW FOR IT.

23  Q.  AND SO FOR THESE THOUSANDS OF DOGS, YOU'VE TRAINED THEM

24  WITH HUMAN, VISIBLE OCCUPANTS IN THE CARS, RIGHT?

25  A.  YES, MA'AM.  IT'S PART OF THE PROTOCOL.

1   Q.   AND IT'S BEEN PART OF THE PROTOCOL FOR HOW LONG?

2   A.   PART OF THE PROTOCOL PROBABLY SINCE -- OH, LET ME THINK

3   BACK.   I'D SAY WE BEGAN ACTIVELY WORKING IN DESIGNING AND

4   BUILDING THE PROTOCOL ON THE VISIBLE-PERSON ASPECT PROBABLY

5   ABOUT 2007-'08, IN THERE.

6   Q.   SO IT'S BEEN ABOUT A DECADE SINCE YOU'VE BEEN ACTIVELY

7   INCLUDING CONCEALED OCCUPANTS WHEN YOU'RE TRAINING THEM TO

8   DETECT CONCEALED OCCUPANTS?

9   A.   YES, I WOULD SAY IT'S PROBABLY BEEN THAT LONG NOW.

10   Q.   AND DO YOU OFTEN TRAIN WITH BLANKS, TOO?

11   A.   OH, YES, MA'AM.   THAT'S A REQUIREMENT.   WE THROW BLANK

12   SEARCHES ON A REGULAR BASIS.

13   Q.   DO SOME OF THOSE BLANK SEARCHES EVEN INCLUDE VISIBLE

14   HUMANS?

15   A.   YES, MA'AM.

16   Q.   WHERE THERE'S NO CONCEALED PERSON OR DRUG TO FIND?

17   A.   CORRECT.

18   Q.   AND THE DOGS SUCCESSFULLY COMPLETE THOSE?

19   A.   YES, MA'AM.

20           MS. AHUMADA:   THANK YOU.

21           MR. ZUGMAN:   BRIEFLY.

22           THE COURT:   MR. ZUGMAN, GO AHEAD.

23           MR. ZUGMAN:   THANK YOU, YOUR HONOR.

24           RECROSS-EXAMINATION BY MR. ZUGMAN:

25   Q.   YOU DESCRIBED THE PROCESS OF HOW YOU TRAIN THE DOGS TO

1    FIND THE CONCEALED PEOPLE.  DO YOU RECALL THAT?

2    A.  YES, SIR.

3    Q.  AND IS IT FAIR TO SAY YOU TAKE, YOU HAVE A PERSON WHO'S

4    VISIBLE SO THAT THE DOG DOESN'T WINK ON THAT PERSON, AND YOU

5    HAVE A PERSON WITH A TOY, AND SLOWLY YOU PUT INTO THE DOG'S

6    MIND, OR WHATEVER SENSE, THAT IT'S SUPPOSED TO FIND SOMETHING

7    IN THE VEHICLE?

8    A.  IT'S SUPPOSED TO FIND A CONCEALED PERSON, YES, SIR.

9    Q.  OKAY.  AND IS IT JUST ONE VEHICLE?

10   A.  THAT FIRST EXERCISE WOULD BE ONE VEHICLE, BUT IT WOULD BE

11   EXPANDED DRAMATICALLY AFTER THAT.

12   Q.  HOW WOULD IT BE EXPANDED DRAMATICALLY?  WHAT DOES THAT

13   MEAN?

14   A.  WE WOULD MOVE -- AS THE DOG BECOMES MORE PROFICIENT, WE

15   WOULD THEN BEGIN TO INCORPORATE CONCEALED-HUMAN FINDS IN THE

16   REST OF THE TRAINING EXERCISES, BECAUSE THE DOG ALREADY KNOWS

17   CONTROLLED SUBSTANCES BY THIS POINT.  SO THOSE EXERCISES MAY

18   INCLUDE ANYWHERE FROM THREE TO FIVE TO SIX VEHICLES, AND WE'D

19   JUST BEGIN PLACING CONCEALED PEOPLE IN THE TRAINING REGIME

20   INTERMINGLED WITH VISIBLE PEOPLE AND HUMAN-SCENT SAMPLES.

21   Q.  ALL RIGHT.  AND YOU'RE SAYING THERE'S NO COMMAND THAT YOU

22   GIVE THE DOG PRIOR TO THE SEARCH OF THE VEHICLE TO FIND THE

23   CONCEALED PERSON.  THAT'S WHAT YOU'RE SAYING.

24   A.  NO COMMAND SPECIFIC TO THE TARGET OF THE SEARCH.  THE DOGS

25   DO HAVE A SEARCH COMMAND, YES, SIR.

1           MR. ZUGMAN:  THANK YOU.

2           NOTHING FURTHER.

3           THE COURT:  ANYTHING FURTHER FROM THE GOVERNMENT?

4           MR. HARRIGAN:  NOT OF THIS WITNESS, YOUR HONOR.

5           THE COURT:  OKAY.

6           THANK YOU VERY MUCH, SIR.

7           THE WITNESS:  THANK YOU.

8           THE COURT:  YOU MAY STEP DOWN.  YOU'RE EXCUSED.

9           (THE WITNESS STOOD ASIDE.)

10          THE COURT:  NEXT WITNESS.

11          MS. AHUMADA:  YOUR HONOR, WE'D CALL AGENT BARRAGAN,

12   AND IF YOU COULD GIVE US A SECOND TO BRING HIM INTO THE

13   COURTROOM.

14          THE COURT:  CERTAINLY.

15          THE DEPUTY CLERK:  SIR, PLEASE RAISE YOUR RIGHT HAND.

16          (WITNESS SWORN.)

17          THE WITNESS:  I DO.

18          THE DEPUTY CLERK:  THANK YOU.  PLEASE HAVE A SEAT

19   OVER HERE.

20          STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR

21   LAST NAME SLOWLY.

22          THE WITNESS:  GOOD MORNING, OR GOOD AFTERNOON.

23          GABRIEL BARRAGAN.  G-A-B-R-I-E-L, B-A-R-R-A-G-A-N.

24          GABRIEL BARRAGAN, SWORN WITNESS, TESTIFIES:

25          DIRECT EXAMINATION BY MS. AHUMADA:

1    Q.  SIR, HOW ARE YOU PRESENTLY EMPLOYED?

2    A.  I WORK FOR THE UNITED STATES BORDER PATROL.

3    Q.  AND WHAT'S YOUR TITLE WITH THE BORDER PATROL?

4    A.  I'M A CANINE HANDLER.

5    Q.  AND HOW LONG HAVE YOU BEEN WITH BORDER PATROL?

6    A.  NEXT MONTH WILL BE 15 YEARS.

7    Q.  AND HOW MUCH OF THAT TIME WERE YOU JUST A REGULAR LINE

8    AGENT?

9    A.  WELL, I'VE BEEN A CANINE HANDLER FOR EIGHT YEARS, SO.

10   Q.  EVERYTHING BEFORE THAT?

11   A.  YES, MA'AM.

12   Q.  ALL RIGHT.  AND WHAT YEAR DID YOU BECOME A CANINE AGENT?

13   A.  2009.

14   Q.  AND WHEN YOU BECAME A CANINE HANDLER, DID YOU HAVE TO BE

15   TRAINED?

16   A.  YES, MA'AM.

17   Q.  AND CERTIFIED?

18   A.  YES, MA'AM.

19   Q.  CAN YOU DESCRIBE THE TRAINING THAT YOU INITIALLY WENT

20   THROUGH?

21   A.  IT WAS IN EL PASO, TEXAS, AND IT WAS 45 DAYS.

22   Q.  AND WHAT DID YOU DO DURING THE TRAINING PROGRAM?

23   A.  THEY TEACH YOU A LOT OF DEFINITIONS FOR CANINE

24   NOMENCLATURE AND TEACH YOU HOW TO TAKE CARE OF THE DOG AND HOW

25   TO READ THE DOG.

1   Q.  DID THEY ALSO HAVE YOU GO THROUGH EXERCISES?

2   A.  YES, MA'AM.

3   Q.  DO THOSE EXERCISES -- ARE THEY SUPPOSED TO MIMIC WHAT

4   HAPPENS AT A CHECKPOINT OR A BORDER?

5   A.  YES, MA'AM.  THEY DO A LOT OF TRAINING EXERCISE.

6   Q.  AND DID THEY, IN FACT, MIMIC WHAT YOU ARE SUPPOSED TO DO

7   IN THE LINE?

8   A.  YES, MA'AM.

9   Q.  AND ARE YOU GRADED THROUGHOUT THAT TIME?

10  A.  EXCUSE ME?

11  Q.  ARE YOU GRADED THROUGHOUT THAT TIME, AT LEAST PART OF THE

12  TIME WHEN YOU'RE AT THE PROGRAM?

13  A.  YES, MA'AM.

14  Q.  AND GIVEN FEEDBACK ON HOW TO IMPROVE?

15  A.  YES.

16  Q.  AND AFTER YOU'RE DONE WITH THE PROGRAM, DID YOU COMPLETE A

17  CERTIFICATION TEST?

18  A.  YES, MA'AM, I DID.

19  Q.  AND DID YOU PASS?

20  A.  YES, MA'AM.

21  Q.  AND WHICH DOG DID YOU COMPLETE THIS WITH?

22  A.  WITH MY CURRENT CANINE, PECKY.

23  Q.  HAVE YOU EVER HAD ANOTHER CANINE?

24  A.  NO, MA'AM.

25  Q.  AND SINCE YOU'VE BEEN CERTIFIED INITIALLY, HAVE YOU BEEN

1    RECERTIFIED ANNUALLY?

2    A.   EVERY YEAR.

3    Q.   HAVE YOU EVER HAD ANY PROBLEMS PASSING THE TEST?

4    A.   NO, MA'AM.

5    Q.   HAS PECKY EVER FAILED ANY OF THESE, HER TRAININGS?

6    A.   NO, MA'AM.

7    Q.   NOW, I WANT TO TALK REALLY QUICKLY ABOUT YOUR EXPERIENCE.

8    HAVE YOU BEEN WORKING WITH PECKY IN THE FIELD, AT CHECKPOINTS,

9    FOR, SINCE YOU BASICALLY GOT HER?

10   A.   YES, MA'AM.

11   Q.   AND WHENEVER YOU'RE WORKING AT CHECKPOINTS, DO YOU USUALLY

12   HAVE HER?

13   A.   YES.

14   Q.   AND WHEN YOU HAVE HER, DO YOU RUN HER AROUND VEHICLES AND

15   DO, CONDUCT SEARCHES WHILE YOU'RE OUT THERE?

16   A.   YES, MA'AM.

17   Q.   EVERY DAY YOU'RE OUT IN THE FIELD?

18   A.   YES.

19   Q.   DOES PECKY ALERT EVERY SINGLE DAY YOU'RE OUT THERE?

20   A.   NO, MA'AM.

21   Q.   DOES SHE INDICATE EVERY SINGLE DAY YOU'RE OUT THERE?

22   A.   NO, MA'AM.

23   Q.   AND CAN YOU TELL ME WHAT THE DIFFERENCE IS, TO YOU,

24   BETWEEN ALERTING AND INDICATING?

25   A.   WELL, THE DEFINITION OF ALERT IS A CHANGE IN BODY POSTURE

1    AND INCREASED RESPIRATION WHEN THE DOG FIRST ENCOUNTERS THE

2    ODORS THAT SHE HAS BEEN TRAINED TO DETECT, AND THAT'S THE

3    DEFINITION OF ALERT.  BUT INDICATE, WHEN MY DOG INDICATES, SHE

4    JUST SITS AND POINTS, OR SHE'LL CRAWL UNDER THE VEHICLE AND

5    POINT RIGHT AT THE SOURCE.

6    Q.  AND WHAT'S PECKY'S SPECIFIC ALERT BEHAVIOR TO YOU?  CAN

7    YOU DESCRIBE PECKY'S ALERT BEHAVIOR?

8    A.  YES, MA'AM.  SHE CLOSES HER MOUTH AND BEGINS TO BREATHE

9    REALLY HEAVY THROUGH HER NOSE.  HER EARS PERK UP, AND HER

10   BODY, SHE STARTS TO DIVE RIGHT UNDER THE VEHICLES.

11   Q.  NOW, I WANT TO FOCUS SPECIFICALLY ON EITHER CASES WHERE,

12   SITUATIONS WHERE PECKY HAS EITHER ALERTED OR INDICATED.  HAS

13   PECKY ALERTED AND INDICATED TO MANY VEHICLES THROUGHOUT YOUR

14   TIME WITH HER?

15   A.  YES, MA'AM.

16   Q.  HUNDREDS?

17   A.  CLOSE TO THAT, YEAH.

18   Q.  AND OF THE ALERTS THAT SHE'S HAD OR INDICATIONS THAT SHE'S

19   HAD, HOW MANY OF THEM ARE NONPRODUCTIVE, DON'T RESULT IN SOME

20   KIND OF EXPLANATION FOR SOME KIND OF TRAINED ODOR?

21   A.  WELL, IF YOU'D SAY OUT OF 50 ALERTS, MAYBE OUT OF THOSE

22   50, FIVE, ONE TO FIVE.

23   Q.  WHERE YOU JUST CAN'T FIND OUT WHAT, WHY SHE WAS ALERTING?

24   A.  YES, MA'AM.

25   Q.  AND IN THE OTHER CASES, DO YOU USUALLY FIND SOME KIND OF

1    TRAINED ODOR THAT SHE'S BEEN TRAINED TO ALERT AND YOU'VE

2    ASSOCIATED WITH THAT AND YOU KNOW THAT'S WHY SHE ALERTED?

3    A.  YES, MA'AM.

4    Q.  NOW, IS PECKY TRAINED TO DETECT CONCEALED HUMANS?

5    A.  YES, MA'AM, SHE IS.

6    Q.  AND HAS SHE EVER ALERTED TO RESIDUAL HUMAN ODOR, LIKE

7    LITTLE BOOTIES, OR THINGS IN THE VEHICLE, OR CLOTHES, OR GYM

8    BAGS?

9    A.  NO, MA'AM.

10    Q.  NOW, THROUGHOUT YOUR TIME WITH PECKY, HAS SHE EVER HAD ANY

11    PROBLEMS THAT YOU HAD TO TRAIN AROUND AND FIX?

12    A.  YES, JUST ONE PROBLEM.

13    Q.  WHEN?

14    A.  IT WAS EITHER 2010 OR 2011.

15    Q.  AND WHAT WAS THE PROBLEM?

16    A.  SHE WAS ALERTING TO SILICONE.

17    Q.  ALL RIGHT.  AND HOW DID YOU FIX HER ISSUE?

18    A.  THE INSTRUCTORS HELPED ME TO FIX THE PROBLEM.

19    Q.  THROUGH TRAINING?

20    A.  THROUGH TRAINING, YES, MA'AM.

21    Q.  AND DID THAT TRAINING ACTIVELY INCLUDE GOING OUT AND

22    RUNNING TRAINING EXERCISES?

23    A.  YES, MA'AM.

24    Q.  NOW, LET'S GO REALLY QUICKLY.  YOU'VE BEEN DISCIPLINED

25    ONCE FOR YOUR TIME WITH PECKY, RIGHT?

1    A.   CORRECT.

2    Q.   AND CAN YOU TELL US WHAT LED TO THAT DISCIPLINE?

3    A.   SHE GOT OUT, SHE ESCAPED FROM THE HOUSE.   YES, MA'AM.

4    Q.   ALL RIGHT.   AND CAN YOU TELL US WHY SHE ESCAPED?

5    A.   THERE WAS REAL BAD THUNDER GOING ON, AND I OPENED THE

6    GARAGE, AND RIGHT AS I WAS OPENING THE GARAGE DOOR, SHE BOLTED

7    OUT, AND SHE WAS TERRIFIED OF THE THUNDER, AND I ALMOST GOT

8    HER TO STOP, BUT THEN RIGHT AS I WAS GETTING HER TO STOP,

9    ANOTHER THUNDERBOLT HIT AND SHE TOOK OFF.

10   Q.   ALL RIGHT.   DID YOU EVENTUALLY FIND PECKY?

11   A.   YES, MA'AM, WE DID, THAT NIGHT.

12   Q.   HOW LONG DID IT TAKE?

13   A.   ABOUT SIX HOURS.

14   Q.   AND HOW DID YOU FIND PECKY?

15   A.   ANIMAL CONTROL HAD PICKED HER UP.

16   Q.   HOW DID YOU FIND OUT ANIMAL CONTROL HAD PICKED HER UP?

17   A.   THEY DIDN'T NOTIFY US, UNFORTUNATELY.   ONE OF THE

18   NEIGHBORS HAD CALLED ANIMAL CONTROL BECAUSE SHE WAS INSIDE HER

19   GARAGE.   I GUESS THAT NEIGHBOR KEPT HER GARAGE HALF-OPEN, AND

20   SHE WAS SCARED UNDERNEATH HER CAR, AND SHE CALLED ANIMAL

21   CONTROL.   AND WHEN WE GOT TO HER HOUSE, SHE'S LIKE, OH, YEAH,

22   I SAW THAT DOG.   THAT'S THE DOG THAT ANIMAL CONTROL JUST

23   PICKED UP.   AND THAT'S HOW WE FOUND OUT.

24   Q.   AND WHAT HAPPENED AS A RESULT OF PECKY'S ESCAPE?   DID YOU

25   RECEIVE ANY KIND OF REPRIMAND?

```
 1   A.  YES, MA'AM, A LETTER OF REPRIMAND.

 2   Q.  HAS SHE EVER ESCAPED SINCE?

 3   A.  NO, MA'AM.

 4   Q.  IS THAT YOUR ONLY LETTER OF REPRIMAND?

 5   A.  YES, MA'AM.

 6   Q.  AND WHEN SHE ESCAPED, DID THEY ALSO CHECK HER HEALTH?

 7   A.  YES, MA'AM.

 8   Q.  DOES PECKY HAVE ANY KIND OF DAMAGE TO HER TEETH?

 9   A.  YES, MA'AM, SHE DOES.

10   Q.  WHY?

11   A.  WHEN I REWARD HER, SHE CHEWS ON HER TOY AND SHE GETS

12   REALLY AGGRESSIVE WITH HER TOY, SO SHE WEARS DOWN HER TEETH

13   PRETTY GOOD.

14   Q.  OKAY.  BUT YOU HAVEN'T RECEIVED ANY DISCIPLINARY ACTION

15   FOR THAT?

16   A.  NO, MA'AM.

17   Q.  IS THAT TYPICAL IN A LOT OF THE DOGS THAT YOU SEE OUT IN

18   THE FIELD?

19   A.  FROM WHAT I HEAR, YES, MA'AM.

20   Q.  AND YOU WORK WITH OTHER AGENTS WHO HANDLE CANINES, RIGHT?

21   A.  CORRECT.

22   Q.  AND YOU'VE SEEN IT, TOO?

23   A.  I'VE SEEN IT IN THEIR DOGS AS WELL, YES, MA'AM.

24   Q.  NOW, I WANT TO TALK REALLY QUICKLY ABOUT THE HIGHWAY 86

25   CHECKPOINT.  DO YOU WORK AT THAT CHECKPOINT?
```

1    A.  YES, MA'AM, I DO.

2    Q.  ARE YOU PRETTY FAMILIAR WITH IT?

3    A.  YES.

4    Q.  NOW, CAN YOU DESCRIBE IT REAL QUICK FOR ME?

5    A.  IT'S A NORTH-AND-SOUTH HIGHWAY, HIGHWAY 86, AND YOU'VE GOT

6    THE CHECKPOINT.  AS THE VEHICLES ARE COMING IN TOWARDS THE

7    CHECKPOINT, THE CONES FUNNEL THE VEHICLES INTO THE CHECKPOINT

8    AS THEY COME UP TO THE PRIMARY INSPECTION BOOTH, AND THEN

9    THERE'S A PRIMARY OFFICER THERE.

10   Q.  ALL RIGHT.  AND WHERE DO YOU TYPICALLY SIT WHEN YOU'RE AT

11   A CHECKPOINT?

12   A.  I SIT INSIDE THE INSPECTION BOOTH.

13   Q.  WHY?

14   A.  FOR A NUMBER OF REASONS.  IT'S A LOT EASIER ON MY DOG.

15   THE A.C.'S IN THERE AND IT GIVES HER GOOD A.C.  I'M ABLE TO

16   SEE THE VEHICLES COMING AS THEY COME UP TO THE INSPECTION

17   LINE, AND I CAN SIT ON THE COMPUTER AND LOOK AT THE VEHICLES

18   AS THEY'RE COMING IN.

19   Q.  AND JUST TO BE CLEAR, WHERE IS THE HIGHWAY 86 CHECKPOINT

20   IN TERMS OF WITHIN THE DISTRICT OF, THE SOUTHERN DISTRICT OF

21   CALIFORNIA?  WHAT IS IT CLOSE TO?

22   A.  WESTMORLAND, CALIFORNIA.  IT'S THE NEAREST CITY.

23   Q.  WHAT'S THE ENVIRONMENT?  IS IT DESERT?  IS IT FOREST?

24   WHERE IS IT?

25   A.  IT'S OUT IN THE MIDDLE OF THE DESERT.

1    Q.   AND IN JUNE, WHAT'S THE WEATHER LIKE?

2    A.   EXTREMELY HOT.

3    Q.   WHAT ABOUT EVEN AT EIGHT IN THE MORNING?  HOT?

4    A.   IT'S NOT TOO BAD, BUT IF IT'S -- BY EIGHT O'CLOCK IN THE

5    MORNING, IT'S GETTING HOT, REALLY HOT.

6    Q.   AND CAN THAT AFFECT YOUR DOG?

7    A.   WHAT'S THAT?

8    Q.   CAN THAT WEATHER AFFECT YOUR DOG, PECKY?

9    A.   OH, A LOT.  YES, MA'AM.

10   Q.   WHAT HAPPENS?

11   A.   THE DOG BECOMES REALLY TIRED.  IF YOU'RE OUT THERE RUNNING

12   EVERY VEHICLE IN THAT KIND OF WEATHER, THAT DOG WILL ONLY LAST

13   ABOUT TEN TO 15 MINUTES.

14   Q.   ALL RIGHT.  I'M GOING TO PUT UP WHAT HAS BEEN PREVIOUSLY

15   MARKED GOVERNMENT'S EXHIBIT 1.

16          MS. AHUMADA:  AND, YOUR HONOR, MAY I INQUIRE FROM THE

17   CLERK OF THE COURT, IS AGENT BARRAGAN ABLE TO MARK THE SCREEN?

18          THE DEPUTY CLERK:  YES.

19          MS. AHUMADA:  ALL RIGHT.

20          BY MS. AHUMADA:

21   Q.   SO, AGENT BARRAGAN, DRAWING ON THE SCREEN, FROM WHAT YOU

22   SEE IN THE GOVERNMENT'S EXHIBIT, AND I'LL PUT IT RIGHT SIDE UP

23   HERE.  I DON'T KNOW WHAT HAPPENED.  THE SCREEN TURNED OFF.

24   A.   THERE IT IS.

25   Q.   CAN YOU SHOW ME WHERE THE PRIMARY AREA IS AT THE

1    CHECKPOINT?

2    A.  YES, MA'AM.

3    Q.  CAN YOU CIRCLE IT?

4    A.  YES.

5    Q.  ON THE SCREEN.

6    A.  I'LL TRY.

7    Q.  ALL RIGHT.  AND TELL ME, WHERE'S THE SECONDARY AREA?

8    A.  RIGHT OVER HERE.

9    Q.  ALL RIGHT.  AND WHAT ARE THE OTHER BUILDINGS YOU SEE?  FOR

10   EXAMPLE, THE RECTANGULAR WHITE BUILDING THAT HAS A LINE ON

11   TOP, WHAT'S THAT?

12   A.  THIS ONE HERE?

13   Q.  UH-HUH.

14   A.  THAT'S THE CHECKPOINT ITSELF.  THAT'S WHERE WE PROCESS ANY

15   ILLEGALS OR ANY KIND OF EVENTS THAT WE GET.  THAT'S WHERE WE

16   PROCESS OUR STUFF.  AND THEN THIS RIGHT HERE IS WHERE WE'VE

17   GOT THE CANINE KENNELS, AND THIS IS OUR VEHICLE LIFT OVER

18   HERE.

19   Q.  ALL RIGHT.  AND ARE YOU ABLE TO USE THE CANINE KENNELS

20   DURING THE SUMMER WHEN IT'S REALLY HOT?

21   A.  NOT WHEN IT GETS REALLY HOT.  WHEN IT GETS REALLY HOT, WE

22   HAVE TO PUT THE CANINE IN THE TRUCK OR INSIDE THE CHECKPOINT.

23   Q.  WHY IS THAT?

24   A.  BECAUSE OF THE HEAT.

25   Q.  HOW HOT DOES IT GET?

1    A.  THE HOTTEST, PROBABLY ABOUT 126.

2    Q.  ALL RIGHT.  AND I'M GOING TO SHOW YOU --

3           MS. AHUMADA:  CAN WE CLEAR THE SCREEN?  I'M NOT QUITE

4    SURE HOW TO DO IT MYSELF, OR I WOULD.

5           THANK YOU.

6           BY MS. AHUMADA:

7    Q.  LET ME SHOW YOU WHAT'S BEEN PREVIOUSLY MARKED AS

8    GOVERNMENT'S EXHIBIT 2.  WHAT'S THAT A PHOTOGRAPH OF?

9    A.  THAT'S A PHOTOGRAPH OF THE HIGHWAY 86 CHECKPOINT.

10   Q.  ALL RIGHT.  CAN YOU SHOW ME WHERE THE BOOTH IS THAT YOU

11   WERE TALKING ABOUT?

12   A.  RIGHT HERE.

13   Q.  AND WHERE'S THE CHECKPOINT BUILDING WHERE YOU DO ALL THE

14   PROCESSING?

15   A.  THE CHECKPOINT BUILDING?

16   Q.  UH-HUH.

17   A.  RIGHT HERE.

18   Q.  AND IN WHICH DIRECTION IS THIS FACING:  NORTH TO SOUTH OR

19   SOUTH TO NORTH?

20   A.  SOUTH TO NORTH.

21   Q.  AND REALLY QUICKLY, I'M SHOWING YOU GOVERNMENT'S EXHIBIT

22   3.  WHAT IS THIS A PHOTOGRAPH OF?

23   A.  THE HIGHWAY 86 CHECKPOINT.

24   Q.  AND CAN YOU SEE THE BOOTH IN THERE AGAIN?

25   A.  YES, MA'AM.

1    Q.  CAN YOU CIRCLE THAT?

2    A.  (THE WITNESS COMPLIES.)

3    Q.  AND WHAT ABOUT THE SECONDARY INSPECTION AREA?  WHERE'S

4    THAT?

5    A.  IT'S RIGHT OVER HERE.

6    Q.  NOW, WITH THIS PHOTOGRAPH STILL UP, LET'S TALK A LITTLE

7    BIT ABOUT HOW YOU TYPICALLY PROCEED AT THIS HIGHWAY 86

8    CHECKPOINT.  DO YOU INSPECT EVERY VEHICLE THAT COMES THROUGH

9    HERE WHEN YOU'RE THE CANINE HANDLER THAT'S OUT?

10   A.  NO, MA'AM, I DON'T.

11   Q.  WHAT DO YOU DO?

12   A.  I LOOK FOR VEHICLES.  AS THEY COME UP, I SIT IN THAT

13   BOOTH.  IT ALLOWS ME TO SEE THE VEHICLES AS THEY'RE COMING UP.

14   I LOOK AT THE LICENSE PLATE OF THE VEHICLE, THE MAKE AND MODEL

15   OF THE VEHICLE.  I LOOK FOR THE OCCUPANTS IN THE VEHICLE, AND

16   THEN AS THEY'RE COMING UP, I'LL LOOK AT THE COMPUTER, AND MY

17   COMPUTER HAS A LICENSE-PLATE READER.  IT ALLOWS ME TO SEE

18   THEIR CROSSING HISTORY, AND THIS IS QUICK BECAUSE, AS IT'S

19   COMING UP, I'M JUST DOING ALL THAT.

20   Q.  AND THEN WHAT HAPPENS IF YOU SEE A VEHICLE THAT YOU'RE

21   INTERESTED IN?

22   A.  IF I SEE A VEHICLE THAT I'M INTERESTED IN, I'LL OPEN THE

23   DOOR AND I INFORM THE AGENT THAT, IF HE COULD HOLD THAT

24   PARTICULAR VEHICLE, AND I'LL USE PECKY TO SNIFF THE VEHICLE.

25   Q.  ALL RIGHT.  AND WHAT'S THE AGENT DOING WHO'S OTHERWISE

1    INTERACTING WITH THE PERSON?

2    A.   THE AGENTS ARE THERE TO TALK TO THE PUBLIC.   THEY ASK

3    IMMIGRATION QUESTIONS AS THEY COME UP.

4    Q.   LIKE WHAT?

5    A.   THEY IDENTIFY THEMSELVES AS A BORDER PATROL AGENT.   THE

6    VEHICLE COMES UP.   STOP THE VEHICLE, I.D. THEMSELVES, AND THEN

7    ASK THEIR CITIZENSHIP, THE CITIZENSHIP OF THE PEOPLE IN THE

8    CAR, WHERE THEY'RE COMING FROM, WHERE THEY'RE GOING, HOW LONG

9    THEY'VE HAD THE VEHICLE FOR, QUESTIONS LIKE THAT.

10   Q.   ALL RIGHT.   NOW, HOW LONG DO THESE INSPECTIONS TYPICALLY

11   TAKE IF YOU HAD TO TAKE A GUESS?

12   A.   ANYWHERE BETWEEN FIVE SECONDS AND 30 SECONDS.   SOMETIMES,

13   A MINUTE.

14   Q.   AND HOW LONG DOES IT TAKE YOU TO RUN PECKY AROUND A

15   VEHICLE?

16   A.   NO MORE THAN 30 SECONDS.

17   Q.   AND DO YOU TYPICALLY DO THIS WHILE THE AGENT IS SPEAKING

18   TO THE PERSON IN THE IMMIGRATION INSPECTION?

19   A.   YES, MA'AM.

20   Q.   DO YOU OFTEN RUN AROUND IN PRE-PRIMARY AND JUST SEARCH IN

21   THE LONG LINE OF CARS WAITING TO BE CHECKED?

22   A.   WHAT'S THAT?

23   Q.   SO, OFTENTIMES AT THE CHECKPOINT, IS THERE A LINE?

24   A.   YES, SOMETIMES THERE IS, JUST DEPENDING ON THE DAY.

25   Q.   AND HOW LONG DOES THAT LINE GET?

1    A.  LIKE I SAID, SOMETIMES, THERE'S ONLY ONE CAR.  SOMETIMES,

2    THERE'S A WHOLE LINE OF THEM.  SO IT JUST DEPENDS ON THE

3    AMOUNT OF TRAFFIC ON THAT DAY.

4    Q.  AND DO YOU GO UP AND DOWN THE LINE WHEN THERE'S A WHOLE

5    LINE OF CARS?

6    A.  NO, I DO NOT.

7    Q.  WHY NOT?

8    A.  TO CONSERVE THE ENERGY OF MY DOG.

9    Q.  ALL RIGHT.  AND IS THERE AN INCENTIVE FOR YOU TO STAY

10   UNDERNEATH THAT COVERED AREA?

11   A.  YES, MA'AM, THERE IS.

12   Q.  WHY?

13   A.  WELL, LIKE I SAID, IT CONSERVES THE ENERGY OF MY DOG, AND

14   MY MAIN REASON IS, A LOT OF THE NARCOTICS TRAFFICKERS, BEFORE

15   THE ACTUAL LOAD VEHICLE COMES UP, THEY'LL SEND OUT SCOUT

16   VEHICLES TO LOOK TO SEE WHO'S OUT THERE, AND I TRY TO STAY AS

17   OUT OF SIGHT AS POSSIBLE FROM THOSE GUYS.

18   Q.  WHAT ABOUT HUMAN SMUGGLERS?  DO THEY OFTEN SEND LOOKOUT

19   VEHICLES AS WELL?

20   A.  YES, THEY DO.

21   Q.  AND IS IT LESS HOT UNDERNEATH THE COVERED AREA?

22   A.  OH, A LOT.  YOU'VE GOT THAT BIG, OLD A.C. ON TOP OF THAT

23   SHACK.

24   Q.  AND JUST UNDER THE COVERED PORTION OF THE PRIMARY, THE

25   PRIMARY INSPECTION AREA, THAT BIG WHITE MOUND, IS IT A LITTLE

1    BIT LIGHTER AND NOT AS HOT IN THE SHADE?

2    A.  IT'S -- YEAH, IT'S NOT AS HOT IN THE SHADED AREA.

3    Q.  NOW, I WANT TO TALK ABOUT JUNE 10TH, 2016.  WERE YOU

4    WORKING THAT MORNING ON JUNE 10TH, 2016?

5    A.  YES, MA'AM, I WAS.

6    Q.  AND AROUND 8:45 IN THE MORNING?

7    A.  YES, MA'AM.

8    Q.  AND DO YOU REMEMBER WHO WAS WORKING IN PRIMARY AT THE

9    TIME?

10   A.  YES, MA'AM.  THAT WAS AGENT MEZA.

11   Q.  AND WHAT WERE YOU DOING AT THE CHECKPOINT?

12   A.  I WAS INSIDE THE SHACK WITH MY CANINE PARTNER.

13   Q.  AND DID ANY VEHICLE AROUND THAT TIME COME TO YOUR

14   ATTENTION, CATCH YOUR EYE?

15   A.  YES, MA'AM.

16   Q.  WHY?

17   A.  IT WAS THAT RED HONDA ACCORD.  IT WAS A NEWER-ISSUED

18   PLATE.

19   Q.  ALL RIGHT.  AND HOW COULD YOU TELL THAT IT WAS A

20   NEWER-ISSUED PLATE?

21   A.  THE SEQUENCE OF THE PLATE THE DMV ISSUES OUT, AND DURING

22   THAT TIME OF THE YEAR -- IT WAS JUNE, 2016 -- THAT WAS THE

23   MOST NEWEST-ISSUED PLATE, WAS THE SEVEN ROMEO.

24   Q.  ALL RIGHT.

25            MS. AHUMADA:  CAN I CLEAR THE SCREEN REAL QUICK?

1          THANKS.

2          BY MS. AHUMADA:

3   Q.  I'M GOING TO SHOW YOU WHAT'S BEEN PREVIOUSLY MARKED AS

4   GOVERNMENT'S EXHIBIT 5.  IS THAT THE PLATE THAT CAUGHT YOUR

5   ATTENTION?

6   A.  YES, MA'AM, IT WAS.

7   Q.  AND DID ANYTHING ELSE CATCH YOUR ATTENTION ABOUT THIS

8   VEHICLE?

9   A.  WELL, IT WAS AN OLDER VEHICLE.  IT LOOKED LIKE A NINETIES

10  MODEL VEHICLE WITH A BRAND-NEW-ISSUED PLATE, AND THAT'S WHAT

11  CAUGHT MY EYE.

12  Q.  WHAT ABOUT THE CROSSING HISTORY?  DID YOU ALSO LOOK AT THE

13  PLATE AND USE THE CROSSING HISTORY FOR THE VEHICLE?

14  A.  YES, MA'AM, I LOOKED AT THE CROSSING HISTORY, AND IT HAD

15  CROSSED THE CALEXICO WEST PORT OF ENTRY THAT MORNING, EARLIER.

16  Q.  ABOUT HOW MUCH EARLIER?

17  A.  ABOUT ONE HOUR.

18  Q.  AND HOW LONG DOES IT TAKE TO DRIVE FROM THE CALEXICO WEST

19  PORT OF ENTRY UP TO THE CHECKPOINT?

20  A.  ONE HOUR, GIVE OR TAKE.

21  Q.  SO WHAT DID YOU DO AFTER YOU NOTICED THAT YOU HAD AN OLDER

22  VEHICLE WITH NEWER PLATES THAT HAD CROSSED THE BORDER ABOUT

23  ONE HOUR EARLIER?

24  A.  I INFORMED AGENT MEZA THAT THE VEHICLE HAD A POSITIVE LANE

25  CROSSING, AND HE STOPPED THE VEHICLE, AND I RAN PECKY AROUND

1    THE VEHICLE.

2    Q.  AND WAS HE CONDUCTING AN IMMIGRATION INSPECTION WHILE YOU

3    WERE RUNNING PECKY AROUND THE VEHICLE?

4    A.  YES.

5             MR. ZUGMAN:  OBJECTION; HEARSAY.

6             THE COURT:  SUSTAINED.

7             BY MR. AHUMADA:

8    Q.  COULD YOU HEAR AGENT MEZA TALKING WITH THE DRIVER OF THE

9    VEHICLE?

10   A.  I COULD HEAR HIM TALKING.

11            MR. ZUGMAN:  HEARSAY.

12            THE COURT:  WELL, WE JUST KNOW THAT THEY WERE

13   TALKING.  WE HAVEN'T HEARD ANYTHING ELSE YET.  SO HE HEARD A

14   CONVERSATION.

15            GO AHEAD.

16            BY MS. AHUMADA:

17   Q.  AND WHILE AGENT MEZA WAS TALKING WITH THE DRIVER OF THE

18   VEHICLE, DID YOU RUN THE CANINE AROUND THE VEHICLE?

19   A.  YES, MA'AM, I DID.

20   Q.  ABOUT HOW LONG DID IT TAKE?

21   A.  NO, NO MORE THAN 30 SECONDS.  MAYBE TEN SECONDS.

22   Q.  AND WHAT HAPPENED IN THAT PERIOD OF TIME WHEN YOU WERE

23   RUNNING THE CANINE AROUND THE VEHICLE, PECKY?

24   A.  PECKY ALERTED TO THE REAR BUMPER OF THE VEHICLE.

25   Q.  ALL RIGHT.  AND WHEN YOU SAY ALERTED, WHAT DO YOU MEAN?

1   A.  SHE STARTED CLOSING HER MOUTH.  SHE DOVE RIGHT UNDER THAT

2   BUMPER, AND SHE STUCK HER HEAD RIGHT UNDERNEATH THAT REAR

3   BUMPER AND JUST STARTED TO POINT RIGHT AT THE BUMPER FROM

4   UNDERNEATH, LOOKING UP.

5   Q.  WHEN YOU SAY POINTED AT THE BUMPER, IS THAT AN INDICATION?

6   A.  YES, MA'AM, THAT IS.

7   Q.  SO DID SHE ALERT AND INDICATE?

8   A.  YES, MA'AM, SHE DID.

9   Q.  NOW, I'M GOING TO ASK YOU SOMETHING.  DID YOU PUT THAT IN

10  YOUR REPORT?

11  A.  NO, MA'AM, I DID NOT.

12  Q.  ALL RIGHT.  BUT DO YOU REMEMBER WHAT HAPPENED ON THAT

13  PARTICULAR DAY?

14  A.  YES, MA'AM, I DO.

15  Q.  WHY?  WHY DOES THIS CASE STAND OUT TO YOU?

16  A.  WELL, THIS CASE STANDS OUT TO ME BECAUSE THAT WOMAN OVER

17  THERE, SHE CRIED FOR ALMOST AN HOUR AND A HALF STRAIGHT.  FROM

18  WHEN WE TOOK HER INTO CUSTODY AND PUT HER INSIDE, SHE WOULD

19  NOT STOP CRYING.  AT FIRST, IT WAS KIND OF -- YOU KNOW, THE

20  FIRST 15 MINUTES WERE OKAY, UNDERSTANDABLE, BUT THEN AFTER

21  ABOUT AN HOUR AND A HALF OF NONSTOP CRYING, IT GOT A LITTLE

22  ANNOYING.

23  Q.  ALL RIGHT.  NOW, AFTER -- WELL, LET ME ASK YOU THIS.

24  AFTER PECKY ALERTED, WHAT DID YOU DO?

25  A.  I INFORMED AGENT MEZA TO REFER THE VEHICLE TO SECONDARY.

1    Q.   HOW DID YOU DO THAT?

2    A.   I USED MY HAND, HAND AND ARM SIGNALS.

3    Q.   WHY DO YOU USE A HAND AND ARM SIGNAL TO REFER SOMEBODY TO

4    SECONDARY?

5    A.   FOR OFFICER SAFETY.  WE DON'T WANT THE DRIVER OF THE

6    VEHICLE TO GET SPOOKED OR THINK THAT -- YOU KNOW, IF I'D SAY

7    ALERT OR, YOU KNOW, SOMETHING VERBAL, THE DRIVER MIGHT GET

8    SCARED AND HIT THE GAS AND INJURE ONE OF US.

9    Q.   OKAY.  IS THERE ANYTHING STOPPING SOMEBODY FROM JUST

10   DRIVING STRAIGHT ON THROUGH IF THERE'S AN ALERT?

11   A.   NO, THERE'S NOT.

12   Q.   SO, WAS AGENT MEZA STILL TALKING WITH THE DRIVER OF THE

13   VEHICLE WHEN YOU PUT UP THE HAND SIGNAL WITH THE TWO FINGERS?

14   A.   YES, MA'AM, HE WAS.

15   Q.   ALL RIGHT.  AND DID THE DEFENDANT, DID THE DRIVER ACTUALLY

16   GO OFF TO SECONDARY?

17   A.   YES, THE VEHICLE PULLED INTO THE SECONDARY INSPECTION

18   AREA.

19   Q.   AND WHAT DID YOU DO?

20   A.   I FOLLOWED THE VEHICLE INTO THE SECONDARY AREA.

21   Q.   AND ONCE YOU FOLLOWED THE VEHICLE INTO THE SECONDARY AREA,

22   DID YOU TAKE YOUR DOG, PECKY?

23   A.   YES, MA'AM.  I HAD THE DOG ON MY LEASH.

24   Q.   AND DO YOU SEE ANYBODY HERE WHO WAS IN THAT SECONDARY AREA

25   AT THAT POINT IN TIME IN COURT TODAY?

1    A.  YES, MA'AM, I DO.

2    Q.  CAN YOU IDENTIFY HER BY WHERE SHE'S SITTING AND AN ARTICLE

3    OF CLOTHING THAT SHE'S WEARING?

4    A.  SHE'S RIGHT THERE, WEARING THE GREEN JUMPSUIT.

5         MS. AHUMADA:  MAY THE RECORD REFLECT THAT AGENT

6    BARRAGAN HAS IDENTIFIED THE DEFENDANT?

7         THE COURT:  YES.

8         BY MS. AHUMADA:

9    Q.  NOW, ONCE YOU WERE IN SECONDARY, DID YOU INTERACT WITH THE

10   DEFENDANT?

11   A.  YES, MA'AM, I DID.

12   Q.  WHAT DID YOU DO WHEN YOU FIRST GOT TO SECONDARY, WHEN YOU

13   TALKED TO HER?

14   A.  I DID THE SAME THING THAT I ALWAYS DO.  I ASKED HER A

15   LITTLE LINE OF QUESTIONING THAT I ALWAYS LIKE TO ASK.  I ASKED

16   HER IF SHE WAS THE OWNER OF THE VEHICLE, HOW LONG SHE HAD

17   OWNED THE VEHICLE FOR, IF SHE HAD DONE ANY WORK TO THE VEHICLE

18   SINCE SHE'S OWNED THE VEHICLE, AND IF SHE HAD CROSSED RECENTLY

19   FROM MEXICO INTO THE U. S.

20   Q.  WELL, LET'S TAKE EACH OF THOSE QUESTIONS ONE AT A TIME.

21   WHAT DID SHE SAY TO THE QUESTION OF WHETHER SHE OWNED THE

22   VEHICLE?

23   A.  SHE SAID, YES, SHE HAD OWNED THE VEHICLE FOR FOUR MONTHS.

24   Q.  AND WHAT WAS HER RESPONSE WITH RESPECT TO DOING THE WORK

25   ON THE VEHICLE?

1   A.   SHE SAID SHE HAD NOT DONE ANY WORK TO THE VEHICLE IN THOSE

2   FOUR MONTHS.

3   Q.   AND DID SHE SAY WHETHER SHE'D CROSSED RECENTLY?

4   A.   YEAH.   SHE SAID SHE WAS COMING FROM MEXICALI, VISITING HER

5   BOYFRIEND.

6   Q.   AND AFTER YOU GOT THOSE ANSWERS, WHAT DID YOU DECIDE TO

7   DO?

8   A.   AT THAT POINT, I ASKED IF I COULD SEARCH THE VEHICLE, AND

9   SHE SAID YES.

10   Q.   ALL RIGHT.   AND AFTER SHE SAID YES, WHAT DID YOU DO?

11   A.   I ASKED HER TO EXIT THE VEHICLE.   SHE EXITED THE VEHICLE

12   AND SHE HEADED TOWARDS THE LITTLE SEATING AREA THAT WE HAVE

13   THERE WITH SEVERAL OTHER AGENTS.

14   Q.   AND WHAT DID YOU DO AFTER SHE WAS IN THE SEATING AREA?

15   A.   I CONDUCTED ANOTHER CANINE SNIFF AROUND THE VEHICLE.

16   Q.   AND DID PECKY ALERT OR INDICATE?

17   A.   SHE DID BOTH.   SHE ALERTED AGAIN TO THE REAR BUMPER AND

18   INDICATED.   SHE DOVE RIGHT UNDERNEATH AGAIN AND POINTED RIGHT

19   UNDERNEATH, FROM UNDERNEATH THE BUMPER.

20   Q.   WHEN YOU SAY SHE ALERTED, WHAT DOES IT MEAN FOR PECKY TO

21   ALERT IN THIS CASE?

22   A.   WHEN SHE ALERTS, LIKE I SAID, THERE'S NO MISSING IT.

23   SHE'S LIKE A LITTLE TORPEDO.   SHE GOES RIGHT UNDERNEATH THAT

24   VEHICLE IF THE ODOR IS COMING OUT FROM UNDERNEATH, AND SHE'LL

25   CRAWL UNDER THERE AND STICK HER NOSE RIGHT IN THERE AND START

1  LOOKING UP, POINTING IN THE DIRECTION WHERE SHE'S SMELLING THE

2  ODOR, AND IN THE SECONDARY I ALMOST HAD TO DRAG HER OUT FROM

3  UNDERNEATH THERE BECAUSE SHE WAS, SHE HUNKERED DOWN IN THERE.

4  SHE DIDN'T WANT TO COME OUT.

5  Q.  AND WHEN YOU SAID SHE INDICATED, WHAT DO YOU MEAN BY THE

6  INDICATION WHEN YOU SAID SHE INDICATED A SECOND AGO?

7  A.  SHE WAS LOOKING RIGHT AT THE BUMPER FROM DOWN, LOOKING UP,

8  POINTING AT IT WITH HER NOSE.

9  Q.  AND AFTER SHE BOTH ALERTED AND INDICATED A SECOND TIME IN

10 THE SECONDARY INSPECTION AREA, WHAT DID YOU DO?

11 A.  I DRAGGED HER.  I HAD TO DRAG HER OUT, AND THEN I PUT HER

12 BACK IN THE KENNELS, AND THEN I APPROACHED MRS. LOPEZ AGAIN

13 AND I INFORMED HER THAT MY CANINE PARTNER HAD ALERTED TO THE

14 VEHICLE AND IF I COULD SEARCH THE VEHICLE, TO WHICH SHE SAID

15 YES.

16 Q.  ALL RIGHT.  AND WHAT DID YOU DO AFTER SHE SAID YES?

17 A.  I SEARCHED THE VEHICLE, THE SUSPECTED AREA.

18 Q.  ALL RIGHT.  AND BY SUSPECTED AREA, DO YOU MEAN THE REAR

19 BUMPER?

20 A.  YES, MA'AM, I DID.

21 Q.  HOW DID YOU SEARCH IT?

22 A.  I CRAWLED UNDERNEATH IT TO LOOK, TO TAKE A LOOK.

23 Q.  WHAT DID YOU SEE?

24 A.  IT HAD A HUGE BLACK, LIKE A METAL COMPARTMENT BOX THAT IS

25 NOT SUPPOSED TO BE IN THAT BUMPER AREA, AND IT WAS KIND OF

1    LIKE SPRAY-PAINTED BLACK SO IT GLOWED A LITTLE BIT, YOU KNOW,

2    DIFFERENT THAN THE OTHER STUFF, AND YOU COULD SEE, LIKE,

3    FINGERPRINTS ON THE COMPARTMENT.

4    Q.  AND WHAT DID YOU DO AFTER YOU SAW THAT BLACK METAL BOX?

5    DID YOU USE ANYTHING ELSE TO INSPECT THE BLACK METAL BOX?

6    A.  YES, MA'AM.  I USED THE DENSITY READER THAT WE CALL THE

7    BUSTER AND PUT THAT UP TO IT, AND IT GAVE ME A REALLY HIGH

8    READING OF ABOUT 65.

9    Q.  LET'S TALK ABOUT THE BUSTER.  WHAT DOES THE BUSTER DO?

10   A.  IT'S LIKE A --

11          MR. ZUGMAN:  YOUR HONOR, I'M GOING TO OBJECT ON

12   RELEVANCE.  THIS CASE IS GOING TO TURN ON WHAT HAPPENED BEFORE

13   THEY EVEN GOT TO SECONDARY.  WE ALL AGREE ON THAT.

14          THE COURT:  IS THERE A REASON TO GO INTO THIS,

15   COUNSEL?

16          MS. AHUMADA:  NO.  IT WAS JUST TO DESCRIBE WHAT WAS

17   HAPPENING IN THE SECONDARY AREA.  BUT IF WE'VE REACHED THE

18   POINT WHERE COUNSEL IS FINE, I'M HAPPY TO MOVE ON.

19          THE COURT:  OKAY.

20          MR. ZUGMAN:  I WILL CONCEDE THAT THEY RECOVERED THE

21   CONTRABAND AFTER THE SECONDARY SEARCH.

22          THE COURT:  OKAY.  WAIT UNTIL THEY'RE LISTENING.  SEE

23   IF THEY AGREE AND ACCEPT THAT.

24          (OFF-THE-RECORD DISCUSSION BETWEEN GOVERNMENT

25   COUNSEL)

1          MS. AHUMADA:  SO --

2          THE COURT:  MR. ZUGMAN SAID WHILE YOU BOTH WERE

3   CONFERRING -- STATE IT AGAIN, MR. ZUGMAN.

4          MR. ZUGMAN:  I'M WILLING TO CONCEDE THAT THEY

5   RECOVERED THE CONTRABAND AFTER THE SECONDARY SEARCH.

6          MS. AHUMADA:  ALL RIGHT, THAT'S FINE.

7          THE COURT:  OKAY.  GO AHEAD.

8          BY MS. AHUMADA:

9   Q.  SO LET ME ASK YOU THIS.  IN YOUR EXPERIENCE, WHEN PECKY

10  ALERTS AND INDICATES AS YOU JUST DESCRIBED IN THE PRIMARY

11  AREA, HAVE YOU CONSISTENTLY FOUND A TRAINED ODOR ASSOCIATED

12  WITH THAT ALERT?

13  A.  YES, MA'AM.

14  Q.  AND WITH THE INDICATION?

15  A.  YES, MA'AM.

16  Q.  AND THE SAME WITH SECONDARY.  WHEN SHE DID THAT ALERT AND

17  INDICATION IN SECONDARY, YOU'VE CONSISTENTLY FOUND EITHER

18  DRUGS THAT SHE'S TRAINED TO FIND OR CONCEALED PEOPLE?

19  A.  YES, MA'AM.

20  Q.  NOW, I WANT TO GO BACK REALLY QUICKLY TO THE LICENSE

21  PLATE.  YOU'VE WORKED A LONG TIME AT THE CHECKPOINT, RIGHT?

22  A.  YES, I HAVE.

23  Q.  HAVE YOU DEVELOPED KIND OF A SIXTH SENSE, IN YOUR OPINION,

24  ABOUT WHICH VEHICLES YOU WANT TO SEARCH?

25  A.  WELL, IT'S NOT A SIXTH SENSE, MA'AM.  IT'S JUST AFTER SO

1    MANY TIMES OF BUSTING THESE GUYS, YOU START TO SEE THE

2    PATTERN, AND IT'S A REAL EASY PATTERN.

3    Q.  SO WHAT ARE THE PATTERNS THAT YOU SAW HERE?

4    A.  LIKE I SAID, THE NEWER-ISSUED PLATE.

5    Q.  NEWER-ISSUED PLATE WITH AN OLDER VEHICLE?

6    A.  YES.

7    Q.  AND HAVE YOU PREVIOUSLY FOUND LOADS OF EITHER CONCEALED

8    HUMANS OR CONTROLLED SUBSTANCES IN OLDER-MODEL VEHICLES WITH

9    NEWER PLATES?

10   A.  YES, I HAVE, BECAUSE WHAT THEY TRY TO DO IS THEY TRY TO

11   WASH AWAY ANY KIND OF NEGATIVE REMARKS THAT THE OLDER PLATE

12   MIGHT HAVE HAD, SO THAT WHEN THEY COME TO THE PORT OR WHEN THE

13   VEHICLE IS RAN, THE INFORMATION IS RAN, ALL THAT INFORMATION

14   IS GONE.

15   Q.  AND HAVE YOU LEARNED THIS THROUGHOUT YOUR TIME AS A BORDER

16   PATROL AGENT?

17   A.  YES, I HAVE.

18   Q.  HAVE YOU TALKED WITH DEFENDANTS THAT YOU'VE PREVIOUSLY

19   APPREHENDED AND CONFIRMED THAT THIS IS ACTUALLY IN FACT WHAT

20   THEY'RE DOING?

21   A.  WELL, I DON'T TALK TO THE DEFENDANTS, BUT I TALK TO MY

22   OTHER COWORKER, AND THROUGH THEIR EXPERIENCE, THROUGH MY

23   EXPERIENCE, THIS IS WHAT I SEE ALL THE TIME.

24   Q.  ALL RIGHT.  AND WHAT ABOUT RECENT CROSSING HISTORIES?  WHY

25   IS THAT SIGNIFICANT TO YOU?

1    A.  WELL, BECAUSE THEY TYPICALLY BRING DRUGS FROM MEXICO INTO

2    THE UNITED STATES.

3    Q.  WHAT ABOUT CONCEALED PEOPLE?

4    A.  AND CONCEALED PEOPLE AS WELL.

5    Q.  ALL RIGHT.  AND DOES A MORE RECENT CROSSING MAKE IT MORE

6    LIKELY, IN YOUR EXPERIENCE, THAT A VEHICLE HAS EITHER

7    NARCOTICS, A CONTROLLED SUBSTANCE, OR A CONCEALED PERSON?

8    A.  YES, MA'AM.

9    Q.  ALL RIGHT.

10           MS. AHUMADA:  THANK YOU, YOUR HONOR.

11           THE COURT:  OKAY.

12           GO AHEAD, MR. ZUGMAN.  CROSS-EXAMINATION.

13           MR. ZUGMAN:  THANK YOU, YOUR HONOR.

14           MS. AHUMADA:  ACTUALLY, CAN I DO ONE MORE EXHIBIT,

15    YOUR HONOR?

16           THE COURT:  CERTAINLY.

17           MR. ZUGMAN:  A PICTURE OF PECKY HAS TO COME IN.

18           FURTHER DIRECT EXAMINATION BY MS. AHUMADA:

19    Q.  WHAT IS THAT A PHOTOGRAPH OF?

20    A.  MY DOG, PECKY.

21           MS. AHUMADA:  AND THAT'S GOVERNMENT'S EXHIBIT 6.

22           AND THEN CAN I DO ONE MORE?  IF THE COURT WILL

23    INDULGE ME.

24           BY MS. AHUMADA:

25    Q.  WHAT IS GOVERNMENT'S EXHIBIT 15 AN EXHIBIT OF?

1    A.  MY DOG, PECKY.

2    Q.  DID YOU TAKE THAT PHOTOGRAPH?

3    A.  YES, I DID.

4    Q.  ALL RIGHT.

5         MS. AHUMADA:  NO FURTHER QUESTIONS.

6         MR. ZUGMAN:  THANK YOU.

7         CROSS-EXAMINATION BY MR. ZUGMAN:

8    Q.  SO THERE'S A LITTLE DISAGREEMENT AMONG US.  HOW OLD IS

9    PECKY RIGHT THERE?

10   A.  RIGHT THERE?

11   Q.  YEAH.  HOW OLD IS SHE?

12   A.  OH, I THINK THAT PICTURE IS ABOUT A YEAR OLD.

13   Q.  SHE'S ABOUT A YEAR OLD AT THAT POINT?

14   A.  NO, NO, NO.  THE PICTURE IS A YEAR OLD.

15   Q.  OKAY.

16   A.  SO RIGHT THERE SHE'S PROBABLY ABOUT EIGHT.

17   Q.  AND THAT'S HER KONG RIGHT THERE, RIGHT?

18   A.  YES, SIR.

19   Q.  AND THAT'S HER TOY?

20   A.  YES.

21   Q.  OKAY.  SHE'S GETTING NEAR THE END OF HER USEFUL WORKING

22   LIFE, RIGHT?

23   A.  YES, SHE IS, UNFORTUNATELY.

24   Q.  YOU'RE GOING TO KEEP HER, THOUGH, RIGHT?

25   A.  ABSOLUTELY.

1    Q.   EXCELLENT.  OKAY.  LET'S TALK ABOUT THIS CASE.  SO YOU'RE

2    IN THE BOOTH WHEN MISS LOPEZ IS APPROACHING.  IS THAT RIGHT?

3    A.   YES, SIR.

4    Q.   OKAY.  DO YOU REMEMBER THAT DAY PRETTY WELL?

5    A.   YES, I DO.

6    Q.   OKAY.  WAS THERE A LINE?  WHAT ARE WE TALKING?

7    A.   HMM.  THERE HAD TO HAVE BEEN A FEW CARS BECAUSE -- SO,

8    YEAH, THERE WAS A LINE.

9    Q.   WHERE ARE THE CAMERAS?  WHERE DO YOU GET THIS INFO?

10   A.   THE CAMERAS?

11   Q.   SO THAT YOU CAN SEE WHO'S ABOUT TO CROSS, OR IS IT YOU'RE

12   JUST LOOKING AT THE PERSON AT PRIMARY?

13   A.   YEAH.  NO.  FROM THE BOOTH, I'M LOOKING DOWN RANGE, SO

14   DOWN AT THE LINE OF CARS AS IT'S COMING UP.

15   Q.   RIGHT.  BUT YOU'RE GETTING INFORMATION ON THE CARS, RIGHT?

16   LIKE, THAT'S WHAT THIS IS.  WE'LL MARK THIS AS DEFENSE 2, I

17   GUESS.  THAT'S WHAT YOU SEE, RIGHT?  THAT'S THE -- I MEAN,

18   IT'S A TERRIBLE COPY OF IT, BUT THAT IS, YOU KNOW, WHAT YOU

19   SEE ON THE, WHAT COMES UP.

20   A.   NO, SIR, THAT'S NOT WHAT I SEE.

21   Q.   WHAT DO YOU SEE, THEN?

22   A.   WE HAVE A SYSTEM CALLED THE LPR.  IT'S A LICENSE-PLATE

23   READER.

24   Q.   OKAY.

25   A.   IT'S NOT THAT.

1    Q.  IT DOESN'T TELL YOU THAT THE PERSON HAS CROSSED?

2    A.  YEAH.  IT SHOWS ME THE VEHICLE INFORMATION, THE CROSSINGS

3    OF THE VEHICLE.

4    Q.  BUT NOT ABOUT THE PERSON?

5    A.  NO, SIR.

6    Q.  SO THE FACT THAT MISS LOPEZ IS A U. S. CITIZEN, YOU DIDN'T

7    KNOW THAT.

8    A.  I DID NOT, SIR.

9    Q.  OKAY.  AND YOU DID KNOW THAT THE VEHICLE HAD CROSSED AN

10   HOUR EARLIER, THOUGH, RIGHT?

11   A.  YES, I DID, SIR.

12   Q.  OKAY.  AND THAT SEEMS SUSPICIOUS TO YOU, RIGHT?  TO GO

13   STRAIGHT FROM THE, THE BORDER TO THE CHECKPOINT WITH THIS, ALL

14   THESE OTHER SUSPICIOUS FACTS.

15   A.  WHEN YOU COMPILE THE WHOLE, EVERYTHING TOGETHER.

16   Q.  THE LICENSE PLATE, YOU KNOW, THE MODEL OF THE CAR, RIGHT?

17   A.  YES, SIR.

18   Q.  OKAY.  AND YOU'RE THINKING DRUGS, RIGHT?

19   A.  NO, SIR.

20   Q.  HOW MANY ALIEN-SMUGGLING CASES HAVE YOU DONE?

21   A.  SHE'S GOTTEN A FEW, SIR.

22   Q.  OH, I HAVE NO DOUBT.  HOW MANY OF THOSE DO THE PEOPLE STAY

23   IN THE VEHICLE FOR AN HOUR FROM THE BORDER TO THE CHECKPOINT?

24   A.  NOT THAT I CAN RECALL.

25   Q.  RIGHT, BECAUSE YOU'D HAVE TO BE HIDDEN SOMEWHERE,

```
 1    CONCEALED SOMEWHERE IN THE BORDER AND DO AN HOUR IN THE

 2    VEHICLE AFTER WHATEVER AMOUNT OF TIME YOU SPENT WAITING TO

 3    CROSS.

 4            MR. HARRIGAN:  OBJECTION; LACK OF FOUNDATION.  THIS

 5    QUESTION, HE'S GOT TO ESTABLISH THAT HE'S GOT SOME KNOWLEDGE

 6    OF THAT.

 7            THE COURT:  OKAY.  LAY THE FOUNDATION FOR HIS

 8    KNOWLEDGE, MR. ZUGMAN.

 9            BY MR. ZUGMAN:

10    Q.  YOU JUST TESTIFIED THAT YOU'VE DONE A FAIR NUMBER OF

11    ALIEN-SMUGGLING CASES, RIGHT?

12    A.  I'VE HAD ALIEN-SMUGGLING CASES, YES, SIR.

13            MR. HARRIGAN:  APPREHENSIONS, I THINK IT WAS.

14            MR. ZUGMAN:  HOWEVER YOU DESCRIBE IT.

15            BY MR. ZUGMAN:

16    Q.  IS IT FAIR TO SAY THAT ALL OF YOUR EXPERIENCE AS AN AGENT

17    OVER THE LAST EIGHT YEARS IS WITH PECKY AS A DOG HANDLER?

18    A.  YES, SIR.

19    Q.  THAT'S WHAT YOU'RE DOING, RIGHT?  YOU'RE THERE WITH PECKY.

20    A.  YES, SIR.

21    Q.  AND WHEN SHE ALERTS, SOMETIMES, YOU FIND DRUGS.

22    SOMETIMES, YOU FIND PEOPLE.

23    A.  YES, SIR.

24    Q.  ARE YOU FAMILIAR WITH HOW ALIEN-SMUGGLING CASES WORK?

25    A.  YES, SIR.
```

1   Q.   OKAY.  SO YOU KNEW THAT SHE CROSSED IN THE VEHICLE AN HOUR

2   EARLIER, RIGHT?

3   A.   YES.

4   Q.   AND YOU KNEW THAT, YOU KNOW, EVEN (PAUSE) -- IT'S LIKE 92

5   MILES, I THINK, FROM THE CHECKPOINT.  I DON'T KNOW THE EXACT

6   NUMBER.  YOU PROBABLY KNOW BETTER THAN I.  BUT IT'S LIKE 90

7   MILES FROM THE, AT LEAST ACCORDING TO GOOGLE MAPS, FROM

8   CALEXICO TO THE HIGHWAY 86 CHECKPOINT.

9   A.   NO, SIR, IT'S NOT 90 MILES.

10  Q.   WHAT DO YOU THINK IT IS?

11  A.   IT'S LESS THAN 52 MILES.

12  Q.   OH, THAT'S INCORRECT, BUT I WON'T GO INTO THAT.  OKAY.

13  SO, WHEN DID YOU FIRST SEE -- WHEN DID YOUR ATTENTION GET

14  PIQUED ON THE HONDA ACCORD?

15  A.   AS THE VEHICLE WAS APPROACHING INTO THE INSPECTION BOOTH.

16  Q.   OKAY.  SO A COUPLE OF CARS BACK, OR WHAT ARE WE TALKING?

17  A.   MAYBE FOUR, FOUR CARS BACK.

18  Q.   OKAY.  AND YOU'VE SIGNALED MEZA THAT THERE WAS, YOU

19  THOUGHT THERE MIGHT BE SOMETHING UP WITH THIS ONE?

20  A.   NO.  ALL I DID WAS INFORM HIM THAT THE VEHICLE HAD A

21  POSITIVE LANE CROSSING, AND HE TOOK IT UPON HIMSELF TO STOP

22  THE VEHICLE.

23  Q.   FOR THE IMMIGRATION INSPECTION, RIGHT?

24  A.   YES, SIR.

25  Q.   TO ASK HER WHETHER SHE'S A U. S. CITIZEN OR NOT.

1    A.  CORRECT.

2    Q.  RIGHT?  AND AT THAT POINT YOU THEN -- YOU'RE SAYING THAT

3    YOU DIDN'T SAY ANYTHING TO MEZA TO MAKE HIM SAY, HEY, THIS IS

4    THE CAR I WANT TO GO OVER.

5    A.  I INFORMED HIM THAT THE VEHICLE HAD A POSITIVE LANE

6    CROSSING.

7    Q.  THE WHOLE POINT WAS THAT YOU THOUGHT THERE WAS SOMETHING

8    UP WITH THIS CAR AND YOU WANTED TO RUN PECKY ON IT, RIGHT?

9    A.  I WANTED TO RUN PECKY ON IT, YES, SIR.

10   Q.  OKAY.  AND THIS IS A HONDA ACCORD, RIGHT?

11   A.  CORRECT.

12   Q.  NOT A BIG VEHICLE.

13   A.  NO.

14   Q.  AND YOU KNEW THAT IT HAD JUST CROSSED THE BORDER.

15   A.  YES, SIR.

16   Q.  7:45 A.M.

17   A.  AROUND THAT TIME.  I'M NOT EXACTLY SURE.

18   Q.  OKAY.  AND DID YOU REALLY SUSPECT THAT THERE COULD BE

19   CONCEALED PEOPLE IN THAT VEHICLE?

20   A.  WELL, SIR, I, I LOOK FOR, I LOOK FOR, LIKE I SAID, THE

21   LICENSE PLATE, THE MAKE OF THE VEHICLE, THE NUMBER OF

22   OCCUPANTS, AND IF THE DOG ALERTS, THEN I'LL LOOK FURTHER INTO

23   IT.

24   Q.  IS THERE A RECORD -- CAN I GET A COPY OF WHAT YOU SAW, THE

25   DISPLAY THAT THEY HAVE AT THE CHECKPOINT, SO I CAN KNOW

1    WHAT -- DO YOU HAVE, LIKE, PRINTOUTS OR ANYTHING LIKE THAT

2    WHEN YOU GET THIS FEED THAT TELLS YOU THIS CAR JUST CROSSED?

3    A.  I'M NOT SURE, SIR.

4    Q.  IT'S ON A COMPUTER, ISN'T IT?

5    A.  YES, IT'S ON A COMPUTER.

6    Q.  SO IS THERE, LIKE, A FILE THAT SAYS YOU SAVE IT AND SAY,

7    HEY, THAT WAS THAT RED ACCORD ON JUNE 10TH, 2016, AT 8:45 IN

8    THE MORNING?

9         MS. AHUMADA:  YOUR HONOR, I'M NOT SURE THAT THIS IS

10   THE PERSON WHO'S ADEQUATELY INDICATED TO KNOW HOW THIS SYSTEM

11   WORKS.  HE USES IT, BUT I DON'T KNOW THAT HE KNOWS.

12        THE COURT:  YES, I KNOW, BUT IT'S WHAT HE SAW.

13        MR. ZUGMAN:  RIGHT.

14        THE COURT:  SO I'M GOING TO LET MR. ZUGMAN INQUIRE A

15   LITTLE MORE.  IT'S WHAT HE SAW AND WHAT HE ACTED ON.  I DON'T

16   KNOW.  I UNDERSTAND YOUR POINT.  HE MAY NOT BE THE PERSON WHO

17   HAS THE KNOWLEDGE ABOUT THE SYSTEM AND PRINTOUTS.

18        BUT GO AHEAD, MR. ZUGMAN.

19        BY MR. ZUGMAN:

20   Q.  SO, CAN YOU DESCRIBE WHAT THE COMPUTER SCREEN SHOWS YOU?

21   A.  OH, YEAH, ABSOLUTELY.

22   Q.  PLEASE DO.

23   A.  AS I SAID, THERE'S A LICENSE-PLATE READER.  SO THERE'S

24   CAMERAS, AS THE VEHICLES ARE COMING UP, THAT TAKES PICTURES OF

25   THE LICENSE PLATE AND IT FEEDS INTO THAT PROGRAM.  IT'S AN LPR

1  PROGRAM.  AND AS THE VEHICLES ARE COMING UP, IT'S LIKE A

2  LITTLE SCROLL OF CARS AND YOU SEE A PICTURE OF THE CAR AS IT'S

3  COMING AROUND.  AND THEN IF I WANT TO LOOK INTO THE VEHICLE,

4  LIKE I SAY, I LIKE THE VEHICLE, THE LICENSE PLATE, AND IT

5  PIQUES MY INTEREST, I'LL CLICK ON THAT PLATE AND IT POPS UP

6  AND IT SHOWS THE CROSSING HISTORY, AND IT WILL SHOW --

7  SOMETIMES, IF IT'S NOT A BLOCKED PLATE, IT WILL SHOW WHERE THE

8  VEHICLE'S OUT OF.  I BELIEVE HER, MRS. LOPEZ'S VEHICLE WAS OUT

9  OF SOMEWHERE IN SAN BERNARDINO.

10  Q.  OKAY.  AND IT DOESN'T SHOW YOU WHO CROSSED IN THE VEHICLE?

11  A.  NO, IT DOES NOT.

12  Q.  IT DOESN'T TELL YOU IF THEY'RE A U. S. CITIZEN OR NOT?

13  A.  NO, IT DOES NOT.

14  Q.  OKAY.  I WANT TO TALK TO YOU ABOUT THE TRAINING.  SO

15  WHEN -- YOU'RE THE ONLY HANDLER FOR PECKY, RIGHT?

16  A.  YES, SIR.

17  Q.  SO IT'S FAIR TO SAY THAT YOU'VE BEEN THERE AT EVERY SINGLE

18  TRAINING, RIGHT?

19  A.  YES, SIR, FOR PECKY.

20  Q.  YES.  YOU TRAIN WITH HER.

21  A.  YES, SIR, I DO.

22  Q.  OKAY.  CAN YOU DESCRIBE HOW THE TRAINING WORKS FOR DRUGS,

23  HOW YOU GET HER TO LOCK ONTO A SCENT AND (PAUSE) -- I MEAN,

24  YOU'RE THE EXPERT, SO TELL US HOW THE TRAINING GOES.

25  A.  WELL, WE TRAIN 16 HOURS A MONTH, AND SO THAT'S TWO DAYS A

1    MONTH, GIVE OR TAKE, AND WE SHOW UP, AND IN THOSE EIGHT HOURS

2    IT'S EVERYTHING FROM WASHING YOUR VEHICLE, GROOMING YOUR DOG.

3    Q.   MAYBE I CAN FOCUS YOU.   WHAT I'M REALLY INTERESTED IN IS

4    THE ACTUAL TRAINING OF PECKY.   WHEN YOU GET TO THE FACILITY,

5    YOU GIVE HER THE SCENT.   YOU PLAY --

6    A.   THE INSTRUCTORS WILL --

7    Q.   -- WITH HER.

8    A.   I'M SORRY ABOUT THAT.

9    Q.   GO AHEAD.

10   A.   THE INSTRUCTORS WILL SET UP THE TRAINING AIDS.   THEY USE

11   TRAINING AIDS.   SOME OF THOSE TRAINING AIDS ARE HUMAN TRAINING

12   AIDS.   SO THEY'LL HIDE IN THE TRUNK.   THEY'LL HIDE IN THE

13   CLOSET.   SOME OF THEM --

14   Q.   CAN WE START WITH THE DRUGS, THOUGH?

15   A.   YES, SIR.

16   Q.   CAN YOU TELL ME ABOUT THE DRUG TRAINING?

17   A.   I WAS GETTING TO THAT.   THEY'LL SET UP THE VEHICLES WITH

18   THE TRAINING AIDS, WITH DRUGS, AND THEY'LL HIDE THEM IN

19   SPECIFIC SPOTS WHERE THEY SEE MORE PRODUCTIVE FOR THE DOGS.

20   I'M NOT AN INSTRUCTOR, SO I DON'T KNOW HOW, YOU KNOW, WHAT

21   THEY CHOOSE TO PLACE THEIR AIDS, THE TRAINING AIDS, AND THEN

22   ONCE THEY -- HAVE YOU GOT A QUESTION?

23   Q.   YOU'VE BEEN DOING THIS FOR EIGHT YEARS, RIGHT?

24   A.   YES, SIR.

25   Q.   AND YOU'VE BEEN TRAINING TWICE A MONTH FOR EIGHT YEARS,

1    RIGHT?

2    A.  YES, SIR.

3    Q.  SO YOU GIVE PECKY A SCENT.

4    A.  WELL, NO, I WAS GETTING TO THAT, BUT I JUST SAW YOUR

5    CONFUSED LOOK AND I WAS WONDERING ABOUT THAT.

6    Q.  THAT'S JUST HOW I LOOK.  DON'T WORRY ABOUT IT.

7    A.  SO ONCE I SET UP THE TRAINING AIDS, I'LL COME OUT.  THEY

8    GIVE ME THE FIRST SEARCH AREA.  IT WILL BE ANYWHERE FROM A

9    NUMBER OF THREE VEHICLES TO FOUR VEHICLES, AND EVEN ON SOME OF

10   THE SEARCHES THEY'LL THROW OUT A BLANK.  YOU KNOW, SOME OF

11   THEM WON'T HAVE ANYTHING.  AND THEN THEY'LL, THEY'LL SAY, ALL

12   RIGHT, THESE THREE VEHICLES, EXTERIOR SEARCH.  SOME OF THEM

13   ARE INTERIOR SEARCHES.  SO THEN I LOOK AT THE VEHICLES.  I

14   LOOK AT THE WHOLE TERRAIN OF EVERYTHING, THE WIND, WHICH WAY

15   THE WIND'S BLOWING, AND I USE ALL THAT TO FACTOR IN SO, THAT

16   WAY, I CAN PRESENT THE CANINE TO THE MOST ADVANTAGEOUS

17   POSITION, AND THEN I'LL RUN THE VEHICLES AND THE CANINE WILL

18   DETECT THE TRAINING AID OF THE DRUGS.

19   Q.  YOU KNOW WHY YOU TRAIN, RIGHT?

20   A.  DO I KNOW WHY I TRAIN?

21   Q.  YES.

22   A.  YES, SIR.  TO KEEP THE DOG PROFICIENT.

23   Q.  SO YOU TRAIN THE DOG TO FIND THE SMELL, RIGHT?

24   A.  CORRECT.

25   Q.  AND THAT'S WHAT YOU DO WITH DRUGS.  YOU TRAIN THEM TO FIND

1    THE SMELL, RIGHT?

2    A.  WE DO THAT WITH DRUGS AND HUMANS.

3    Q.  TELL ME ABOUT THE HUMANS PART.  WE WERE GETTING THERE.  SO

4    HOW DO YOU TRAIN THEM?  DESCRIBE THE TRAINING METHODOLOGY FROM

5    THE BEGINNING.  WHAT HAPPENS WHEN YOU GET THE DOG TO TRY TO

6    FIND THE CONCEALED PERSON?

7    A.  WELL, I TRY TO KEEP EVERYTHING SIMPLE.  SO THEY TEACH THE

8    DOGS HOW TO FIND CONCEALED HUMANS, AND THEY TEACH THE DOGS TO

9    ALERT TO CONCEALED HUMANS, AND THEY TEACH THE DOGS NOT TO

10   ALERT TO VISIBLE HUMANS.  THAT'S ABOUT AS SIMPLE AS I CAN PUT

11   IT.

12   Q.  THAT'S TRUE, BUT I'M REALLY INTERESTED IN HOW.  I'D LIKE

13   TO HEAR ABOUT HOW THE TRAINING OCCURS FOR FINDING CONCEALED

14   HUMANS.

15        MS. AHUMADA:  OBJECTION, YOUR HONOR.  AS WE

16   PREVIOUSLY DISCUSSED --

17        THE COURT:  I CAN'T HEAR YOU.  WOULD YOU PULL THE

18   MICROPHONE?  YOU HAVE A MICROPHONE THERE.

19        MS. AHUMADA:  YES.  AS PREVIOUSLY DISCUSSED, AGENT

20   BARRAGAN CAME IN ONCE PECKY'S ALREADY BEEN IMPRINTED.  THAT'S

21   THE WHOLE POINT.  THIS WAS DEVANEY'S TESTIMONY.  HE DOESN'T

22   HAVE KNOWLEDGE ON HOW THE DOGS ARE IMPRINTED.  THAT'S OUR

23   EXPERT'S AREA OF EXPERTISE, NOT THE HANDLER.  HE'S NOT TRAINED

24   AS AN INSTRUCTOR, AND THERE HASN'T BEEN ENOUGH FOUNDATION

25   LAID.

1          THE COURT:  WELL, HE TRAINS WITH PECKY TWICE A MONTH,

2    SO I'M GOING TO PERMIT SOME INQUIRY.  BUT I AGREE WITH YOU,

3    COUNSEL.

4          MR. HARRIGAN:  MAYBE IF I COULD HELP, AND I DON'T

5    WANT TO --

6          THE COURT:  CERTAINLY.  GO AHEAD.

7          MR. HARRIGAN:  I THINK THERE'S A LITTLE CONFUSION

8    HERE.  I THINK THE TESTIMONY WAS, IS THAT THEY DON'T TRAIN

9    SEPARATELY FOR DRUGS AND PEOPLE.  THE TRAINING OCCURS AND

10   THERE ARE EITHER DRUGS OR PEOPLE HIDDEN ON ANY GIVEN EXERCISE.

11   THEY HAVE TO -- THEY'RE REQUIRED TO HAVE MAYBE -- IN EACH

12   CASE, MAYBE THEY'LL HIDE ONE OR TWO PEOPLE ON A GIVEN TRAINING

13   DAY, BUT THEY RUN ABOUT SIX OR SEVEN EXERCISES AS SET FORTH,

14   AND MAYBE IF HE SHOWS HIM A GREEN SHEET WHERE THEY GO THROUGH

15   THAT, THAT'S HOW MANY TESTS THEY RUN, HE CAN EXPLAIN.  BUT

16   IT'S NOT, OKAY, NOW WE'RE GOING TO DO PEOPLE; NOW WE'RE GOING

17   TO DO DRUGS.  IT'S DONE OVERALL, AND THEY'RE BLIND WHERE THE

18   AGENT DOES NOT KNOW WHERE OR WHAT, WHETHER ANYTHING'S HIDDEN,

19   OR WHETHER IT'S DRUGS, OR WHETHER IT'S A PERSON.  THAT'S -- SO

20   THERE'S NOT SEPARATE.  I THINK THAT MAY BE THE CONFUSION IN

21   THE QUESTIONS.

22         THE COURT:  BUT HE'S ENTITLED TO ASK SEPARATELY IF HE

23   WANTS TO.

24         SO WITH THAT UNDERSTANDING, GO AHEAD, MR. ZUGMAN.

25         MR. ZUGMAN:  THANK YOU, YOUR HONOR.

1           BY MR. ZUGMAN:

2    Q.  IN THESE TRAINING SITUATIONS WHERE YOU'RE DOING A VEHICLE

3    SCREENING, YOU'VE DONE THAT ON MANY OCCASIONS, RIGHT?

4    A.  YES, SIR.

5    Q.  AND YOU DON'T KNOW WHERE THE CONTRABAND OR THE PERSON IS,

6    RIGHT?

7    A.  CORRECT.

8    Q.  AND THERE MAY NOT BE ANY.

9    A.  CORRECT.

10   Q.  AND YOUR JOB IS TO TAKE THE DOG AND SEE IF SHE ALERTS.

11   A.  YES, SIR.

12   Q.  OKAY.  DO YOU GIVE A COMMAND TO THE DOG TO GET HER TO

13   SEARCH FOR PEOPLE?  DO YOU SAY, GO FIND?

14   A.  YES.  YES, SIR, THAT'S *VORAUS GEH*, TO SEARCH FOR.  BUT

15   THAT'S JUST A SEARCH.  THAT'S NOT A SEARCH FOR PEOPLE OR

16   ANYTHING SPECIFIC.  THAT'S JUST THE COMMAND TO SEARCH.

17   Q.  WHEN YOU TOOK PECKY AROUND MISS LOPEZ'S CAR, DID YOU NEED

18   TO GIVE HER A SEARCH COMMAND?

19   A.  I ALWAYS DO.  WHENEVER WE COME OUT, I'LL SAY *VORAUS GEH*.

20   THAT'S JUST A HABIT OF WORKING WITH THE DOG.

21   Q.  BUT PECKY'S A REALLY GOOD DOG, RIGHT?

22   A.  CORRECT.

23   Q.  SHE DOESN'T FALSELY ALERT, RIGHT?

24   A.  CORRECT.

25   Q.  AND SHE GETS VERY GOOD SCORES, RIGHT?

1    A.  YES, SIR.

2    Q.  AND WHENEVER SHE SMELLS COCAINE, METHAMPHETAMINE,

3    MARIJUANA, SHE KNOWS THAT THAT MEANS REWARD PLAY BEHAVIOR,

4    RIGHT?

5    A.  AND HUMANS AS WELL.  YES, SIR.

6    Q.  YEAH.  IT'S FUN FOR YOU AS WELL, RIGHT?  IT'S GOOD WHEN

7    YOU MAKE A SEIZURE BECAUSE YOU THEN GET TO PLAY WITH THE DOG.

8    IT'S A GOOD THING.

9    A.  CORRECT.

10   Q.  OKAY.  PECKY CANNOT BE ALERTING TO THE HUMAN SMELL ON

11   THESE CARS AT PRIMARY AT THE HIGHWAY 86 CHECKPOINT, RIGHT?

12   A.  I DON'T UNDERSTAND THE QUESTION.

13          MR. HARRIGAN:  OBJECTION; LACK OF KNOWLEDGE.

14          THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.  JUST

15   CLARIFY THE QUESTION.  I'M NOT SURE IF IT WAS CLEAR.

16          MR. ZUGMAN:  FAIR ENOUGH.

17          BY MR. ZUGMAN:

18   Q.  IF YOU TRAIN PECKY TO ALERT TO HUMAN SMELL, WILL SHE JUST

19   ALERT TO HUMAN SMELL?

20   A.  SHE WOULD BE ALERTING TO EVERY VEHICLE, SIR, BECAUSE

21   THERE'S DRIVERS IN EVERY VEHICLE.

22   Q.  EXACTLY.

23   A.  BUT SHE DOESN'T DO THAT.

24   Q.  NO, SHE DOESN'T.

25          MR. ZUGMAN:  OKAY.  THANK YOU.

1           THAT'S ALL I HAVE.

2           THE COURT:  OKAY.

3           DOES THE GOVERNMENT HAVE FURTHER QUESTIONS?

4           MR. HARRIGAN:  NO FURTHER QUESTIONS, YOUR HONOR.

5           THE COURT:  OKAY.

6           THANK YOU VERY MUCH, SIR.  YOU MAY STEP DOWN.  YOU'RE

7    EXCUSED.

8           THE WITNESS:  THANK YOU, MA'AM.

9           (THE WITNESS STOOD ASIDE.)

10          THE COURT:  DO WE HAVE FURTHER WITNESSES TODAY?

11          MR. HARRIGAN:  NO, YOUR HONOR.

12          THE COURT:  OKAY.  VERY WELL.  PEOPLE HAVE REFERENCED

13   A NUMBER OF EXHIBITS, HAVE NOT MOVED ANYTHING INTO EVIDENCE.

14   IF PEOPLE WOULD LIKE TO DO THAT, THAT MIGHT BE SOMETHING WE

15   SHOULD DO AT THIS POINT.

16          MS. AHUMADA:  YES, YOUR HONOR.  CAN WE MOVE EXHIBITS

17   1 THROUGH 15 INTO EVIDENCE?

18          THE COURT:  OKAY.  I'M --

19          MR. ZUGMAN:  NO OBJECTION.

20          THE COURT:  I'M SORRY.  ONE THROUGH?

21          MS. AHUMADA:  15.

22          THE COURT:  15, MA'AM?

23          MS. AHUMADA:  YES.

24          THE COURT:  DO YOU SEE THE MICROPHONE THERE?  PULL IT

25   OVER.

```
1              MS. AHUMADA:  I APOLOGIZE, YOUR HONOR.  1 THROUGH 15.

2              THE COURT:  DO I HAVE THOSE?

3              MS. AHUMADA:  YOU DON'T HAVE THOSE.

4              THE COURT:  I HAVE ONE THROUGH (PAUSE) --

5              MS. AHUMADA:  NINE.

6              THE COURT:  NINE.

7              MR. HARRIGAN:  I THINK, YOUR HONOR -- LET'S CORRECT

8    IT.  WE'VE GOT ONE THROUGH SIX, AND THEN WE HAVE SEVEN, EIGHT,

9    NINE ARE THE TRANSCRIPTS.

10             THE COURT:  AND THEN THERE'S TEN, 11, 12, 13, 14.

11             MR. HARRIGAN:  AS TO SEVEN, EIGHT, AND NINE, I THINK

12   WE ONLY REFERRED TO EXHIBITS 7 AND 9 FOR IMPEACHMENT PURPOSES.

13             THE COURT:  OKAY.

14             MR. HARRIGAN:  SO I DON'T THINK EXHIBIT NO. 8, AND

15   MR. ZUGMAN CAN CORRECT ME IF I'M WRONG, WAS USED AT ALL.  SO

16   TO THAT EXTENT WE'D, YOU KNOW, AND WE HAVE A RECORD OF IT IF,

17   IF -- WE'LL MAINTAIN ALL OF THE EXHIBITS.

18             THE COURT:  SO NOT THOSE TWO.

19             MR. HARRIGAN:  SEVEN AND NINE WERE JUST FOR

20   IMPEACHMENT PURPOSES.  RIGHT.

21             THE COURT:  ALL RIGHT.

22             MR. ZUGMAN:  YOUR HONOR, THE DEFENSE WOULD MOVE IN

23   NUMBER ONE AND NUMBER TWO.

24             THE COURT:  I CAN'T HEAR YOU, MR. ZUGMAN.

25             MR. ZUGMAN:  OH, SORRY.
```

1           THE COURT:  GIVE ME JUST A SECOND.

2           SO ONE THROUGH WHAT NUMBER FOR THE GOVERNMENT?

3           MR. HARRIGAN:  ONE THROUGH SIX.  SEVEN AND EIGHT, NO.

4    BUT I THINK -- NO.  EXCUSE ME, YOUR HONOR.  SEVEN AND NINE, WE

5    WANT THOSE AS PART OF THE RECORD, JUST AT LEAST FOR THE

6    PURPOSES OF HE WAS CROSS-EXAMINED ON THOSE.  THE WHOLE

7    TRANSCRIPTS DON'T NEED TO BE ADMITTED.  AND THEN TEN

8    THROUGH -- THE FINAL ONE WAS 15, I BELIEVE.

9           MS. AHUMADA:  OR 16.

10          MR. HARRIGAN:  IT WAS 16.  THE LAST TWO ARE OF PECKY.

11   SO TEN, 11 AND 12, I BELIEVE, WERE THE CASES REFERRED TO, AND

12   13 WAS A PHOTOGRAPH.  AND WHAT WAS 14?  OH, IT WAS (PAUSE) --

13   14 WAS AN OPINION.  I APOLOGIZE, YOUR HONOR.  IT WOULD BE 11

14   THROUGH 16, AND I CAN IDENTIFY THOSE.

15          THE COURT:  TEN THROUGH 16.

16          MR. HARRIGAN:  TEN THROUGH 16.

17          THE COURT:  SO ONE THROUGH SIX, NOT SEVEN AND NINE.

18   WHAT ABOUT EIGHT?  IS EIGHT ADMITTED?

19          MR. HARRIGAN:  NO, YOUR HONOR.

20          THE COURT:  NO EIGHT.  OKAY.

21          MR. HARRIGAN:  WE DIDN'T CROSS-EXAMINE ON THAT.

22          THE COURT:  OKAY.  ONE THROUGH SIX, TEN THROUGH 16.

23          ANY OBJECTION?

24          MR. ZUGMAN:  NO, YOUR HONOR.

25          THE COURT:  OKAY.  SO THOSE ARE ADMITTED FOR THE

1    GOVERNMENT.

2              FOR THE DEFENSE.

3              MR. ZUGMAN:  YOUR HONOR, I MOVE IN DEFENSE EXHIBITS 1

4    AND 2.  ONE IS THE MANUAL.  NUMBER TWO IS THE RECORD THE

5    GOVERNMENT PRODUCED TO ME ABOUT MISS LOPEZ'S BORDER CROSSING.

6              MR. HARRIGAN:  WE'D OBJECT TO THE ADMISSION, THE

7    RELEVANCE OF DEFENDANT'S EXHIBIT 2.  IT HASN'T BEEN SOMETHING

8    THAT THE WITNESS SAW.  IT'S NOT THE PRINTOUT.  IT SHOWS THAT

9    SHE'S A U. S. CITIZEN.  I THINK MR. ZUGMAN WANTS TO ARGUE

10   THAT, BASED ON THIS, AGENT BARRAGAN KNEW THAT SHE WAS A U. S.

11   CITIZEN AT THE TIME.

12             THE COURT:  BUT THE AGENT DIDN'T SEE THAT ON THAT

13   DAY.

14             MR. HARRIGAN:  HE DIDN'T SEE IT, SO I DON'T SEE THE

15   RELEVANCE.

16             THE COURT:  SO IT'S NOT THE COMPUTER SCREEN THAT HE

17   SAW.

18             MR. ZUGMAN:  I MOVE THE PRODUCTION OF THE COMPUTER

19   RECORD THAT MR. BARRAGAN REFERRED TO.  I THINK I'M ENTITLED TO

20   THAT SINCE HE'S MAKING THE CLAIM THAT HE HAD NO IDEA THAT SHE

21   WAS A U. S. CITIZEN.

22             THE COURT:  OKAY.  BUT THAT'S NOT IT?

23             MR. ZUGMAN:  CORRECT.  THAT IS NOT IT.

24             THE COURT:  THAT'S NOT IT.  SO WE'RE NOT GOING TO

25   ADMIT NO. 2.  WHAT YOU'RE ENTITLED TO IS ANOTHER ISSUE.

1          ANY OBJECTION TO NO. 1?

2          MR. HARRIGAN:  NO, YOUR HONOR.

3          THE COURT:  OKAY.  SO THAT'S ADMITTED.  NOT NUMBER

4    TWO.  BUT WHAT ABOUT PRODUCING THE PRINTOUT OR WHAT WAS

5    VISIBLE ON THE SCREEN THAT WAS SEEN?

6          MR. HARRIGAN:  YOUR HONOR, I'M GOING TO HAVE TO DO

7    SOME DIGGING.  I HAVE FAMILIARITY.  THERE ARE LIMITATIONS

8    WHERE THEY CAN KEEP THE INFORMATION ON THAT AND FOR HOW LONG

9    THEY CAN KEEP THAT INFORMATION IN TERMS OF THAT.  WE HAVE

10   PRODUCED TO HIM INFORMATION SEPARATELY -- I THINK IT'S FROM

11   THEIR ATF SYSTEM -- WHICH SHOWS THE CROSSING, WHICH IS

12   CONSISTENT WITH WHAT THE AGENT SAW, AND WE'LL LOOK INTO IT.

13   IF THERE IS -- IF WE CAN GET A PRINTOUT OF THAT, WE'LL DO THAT

14   FOR MR. ZUGMAN.  I JUST DON'T WANT TO PROMISE THAT WE CAN GET

15   THAT.  WE DO HAVE RECORDS FOR CROSSING.

16         THE COURT:  YOU COULD REPRODUCE IT.  I MEAN YOU COULD

17   RECREATE IT, CERTAINLY.

18         MS. AHUMADA:  WE'D HAVE TO TAKE THE CAR AND DRIVE THE

19   CAR IN.  WE COULD DO THAT, OR ALTERNATIVELY, YOUR HONOR, WE

20   COULD JUST BLANK OUT THE IDENTIFYING INFORMATION OF A

21   PARTICULAR VEHICLE THAT HAS CROSSED RECENTLY AND JUST SHOW

22   WHAT AREAS WOULD BE AVAILABLE TO THE AGENT TO SEE.  WHAT I

23   THINK THE DEFENSE, THE DEFENSE ATTORNEY, MR. ZUGMAN, WANTS IS

24   TO SHOW, SEE WHETHER OR NOT THE BORDER PATROL AGENT IS ABLE TO

25   SEE THE CITIZENSHIP OF THE PERSON DRIVING THE VEHICLE.  IF

1    THAT INFORMATION IS JUST NOT AVAILABLE ON THE SCREEN, THAT, I

2    THINK, WOULD IDENTIFY MR. ZUGMAN'S REQUEST.

3            THE COURT:  ALL RIGHT.  I DON'T --

4            MR. ZUGMAN:  IF IT'S NOT THERE, IT'S NOT THERE.

5    THAT'S CERTAINLY TRUE.  I ASSUME THAT WE ARE TALKING ABOUT THE

6    PROGRAM THAT MR. BARRAGAN TALKED ABOUT.  SO I ASSUME THAT WE

7    COULD FIGURE OUT WHETHER HE CAN PRINT IT OUT OR NOT.

8            THE COURT:  OKAY.  SO, I MEAN, YOU'RE GOING TO LOOK

9    INTO THAT.

10           MR. HARRIGAN:  WE CAN WORK THIS OUT.  WE'LL WORK THIS

11   OUT.

12           THE COURT:  OKAY.

13           MR. HARRIGAN:  WE CAN WORK THIS OUT AND FIGURE IT

14   OUT, YOUR HONOR.  IF NOT, WE'LL COME BACK TO THE COURT.

15           THE COURT:  OKAY.  SO I NEED THE EXHIBITS.  I HAVE A

16   BINDER THAT HAS GOVERNMENT'S 1 THROUGH 9.  I NEED THE BALANCE

17   OF THOSE.  I NEED DEFENDANT'S 1 AND 2.  SO MAKE SURE THAT ALEX

18   HAS THOSE.

19           MR. ZUGMAN:  JUST ONE, JUST ONE.

20           THE COURT:  JUST ONE AND NOT TWO.  THAT'S CORRECT.

21   TWO I DIDN'T ADMIT.

22           NOW, FROM HERE, WOULD PEOPLE LIKE TO DO A CLOSING

23   ARGUMENT IN WRITTEN FORM?

24           YOU NEED TO HEAR IF YOU'RE GOING TO FIND OUT

25   ANYTHING, MR. ZUGMAN, ABOUT THE SCREEN THAT AGENT BARRAGAN

1    SAW.

2              MR. ZUGMAN:  THE CASE ENTIRELY COMES DOWN TO THIS

3    PARTICULAR, FOCUSED ISSUE.  SO, I MEAN, IT SEEMS LIKE I WOULD

4    LIKE TO PUT IT IN WRITING, IF POSSIBLE.

5              THE COURT:  OKAY.  THANK YOU.  HOW MUCH TIME DO YOU

6    NEED TO DO THAT?

7              MR. ZUGMAN:  I'D LIKE THE TRANSCRIPT, OF COURSE,

8    WHICH IS GOING TO BE THE CENTRAL QUESTION THERE.

9              THE COURT:  THE TRANSCRIPT'S GOING TO BE HELPFUL TO

10   ALL OF US.

11             MR. ZUGMAN:  YES.

12             THE COURT:  SO, HOW MUCH TIME?

13             THE COURT REPORTER:  ONE WEEK.

14             THE COURT:  SO ONE WEEK AND YOU'LL HAVE THE

15   TRANSCRIPT.

16             MR. ZUGMAN:  I CAN FILE IN TWO WEEKS, THEN.

17             THE COURT:  OKAY.  SHOULD WE FILE SIMULTANEOUSLY?

18             MR. ZUGMAN:  I'LL FILE FIRST.

19             THE COURT:  PARDON?  YOU'RE WILLING TO FILE FIRST?

20             MR. ZUGMAN:  SURE.

21             MR. HARRIGAN:  THAT'S FINE, YOUR HONOR.

22             THE COURT:  OKAY.  FOLLOWED BY THE GOVERNMENT A WEEK

23   AFTER OR TWO WEEKS AFTER?

24             MR. HARRIGAN:  YES, WE CAN DO THAT, YOUR HONOR.

25             THE ONLY AREA I WANT TO CLEAR UP JUST SO --

1          THE COURT:  CERTAINLY.  GO AHEAD.

2          MR. HARRIGAN:  AND IT DEALS WITH, WE DIDN'T HAVE THE

3    TESTIMONY OF THE PRIMARY INSPECTOR, AND I DIDN'T -- IF THERE'S

4    SOME ALLEGATION THAT THERE WAS OTHER THAN AN IMMIGRATION

5    INQUIRY CONDUCTED AT THAT TIME, THAT I NEED TO KNOW.

6          MR. ZUGMAN:  YES, THERE'S DEFINITELY THAT ISSUE.

7          MR. HARRIGAN:  WELL, BUT, SEE, THERE'S THE PROBLEM,

8    BECAUSE I THINK WE'RE NOT COMMUNICATING WELL, BECAUSE OUR

9    POSITION HAS ALWAYS BEEN THAT, OUR MAIN ARGUMENT -- FORGET

10   ABOUT CONCEALED VS. HUMAN -- THAT THE AMOUNT OF DETENTION

11   DIDN'T LAST LONGER THAN THE IMMIGRATION REQUIRED.  IT COULD

12   HAVE BEEN A BOMB DOG.  IT COULD HAVE BEEN SEARCHING FOR

13   ANYTHING ELSE OUT THERE.  MISS DE JESUS WAS NOT DETAINED

14   LONGER THAN NECESSARY TO CONDUCT THE IMMIGRATION INQUIRY, AND

15   WE WERE TRYING TO ELICIT THAT FROM MR. BARRAGAN.  WE'VE

16   INTERVIEWED THE PRIMARY INSPECTOR.  THAT'S WHAT HE WOULD SAY.

17   I WAS HOPEFUL WE COULD REACH A STIPULATION, BUT.

18         MR. ZUGMAN:  THAT'S NOT HOW I HEARD HIS TESTIMONY,

19   YOUR HONOR.  I DISAGREE ABOUT THAT FACTUAL CONTENT.

20         THE COURT:  IS THERE MORE EVIDENCE TO BE HEARD?

21         MR. HARRIGAN:  WE DIDN'T HEAR ANY TESTIMONY BECAUSE

22   NO QUESTIONS WERE ASKED.  THAT'S THE PROBLEM.

23         MR. ZUGMAN:  AS I RECALL, HE SAID TO MR. MEZA, HEY,

24   HOLD UP, AND IT'S MY BELIEF THAT, GIVEN THE CIRCUMSTANCES,

25   THIS WAS OBVIOUSLY A DRUG SEARCH.  BUT WE CAN DISAGREE ABOUT

1    THAT.  WE CAN SAY WE'LL GET THE TRANSCRIPT AND SEE WHAT IT

2    SAYS.

3              THE COURT:  OKAY.  BUT IS THE RECORD COMPLETE, IS MY

4    QUESTION AT THIS JUNCTURE.

5              MR. ZUGMAN:  I'D LOVE TO HAVE MR. MEZA.  THAT WOULD

6    BE FINE WITH ME, BUT I KNOW WHAT HE'S GOING TO SAY.

7              THE COURT:  LET ME ASK THE GOVERNMENT.  DID YOU WISH

8    TO CALL HIM?  I KNOW HE'S NOT HERE TODAY, APPARENTLY.

9              MR. HARRIGAN:  I NEED AN ANSWER FROM DEFENSE COUNSEL.

10   IF WE CAN REACH A STIPULATION WHERE WE SAY SHE WAS ASKED THESE

11   QUESTIONS, THIS IS WHAT WAS CONDUCTED AT THE TIME, THEN WE'RE

12   FINE.  BUT IF NOT, THEN WE'LL CALL MR. MEZA AND WE'LL BRING

13   HIM OUT.

14             THE COURT:  THEN WE'LL CONTINUE THIS HEARING.

15             MR. HARRIGAN:  YEAH.  I DON'T KNOW IF I'M GOING TO

16   GET THAT STIPULATION.  I THOUGHT WE HAD THAT EARLIER.  SO IT'S

17   JUST A MISUNDERSTANDING.

18             THE COURT:  COME UP TO THE MIKE AND RESPOND, MR.

19   ZUGMAN.

20             MR. HARRIGAN:  AND, MR. ZUGMAN, I DON'T TAKE OFFENSE.

21   HE HAS TO DO WHAT HE HAS TO DO.  I JUST WANT TO MAKE SURE WE

22   HAVE A COMPLETE RECORD.

23             THE COURT:  THE COURT, TOO.  I WANT BOTH SIDES TO BE

24   SATISFIED BEFORE WE DO THE FINAL BRIEFING.

25             GO AHEAD, MR. ZUGMAN.

1          MR. ZUGMAN:  YOUR HONOR, I BELIEVE I HEARD MR.

2    BARRAGAN'S TESTIMONY THE WAY THAT I HEARD IT, BUT IT IS TRUE

3    THAT MR. MEZA COULD GET UP THERE AND SAY, NO, HE DIDN'T SIGNAL

4    TO ME AT ALL, HE DIDN'T DO ANYTHING AT ALL, I DID ORDINARY

5    STUFF, BUT I DON'T THINK THAT WOULD BE THE TESTIMONY BASED ON

6    WHAT MR. BARRAGAN SAID.

7          THE COURT:  SO THE SIMPLE ANSWER IS, MR. HARRIGAN

8    JUST ASKED YOU, DO YOU HAVE AN AGREEMENT AS TO WHAT WAS SAID

9    AND WHAT WAS DONE AT PRIMARY?  AND THE ANSWER IS NO.

10          MR. ZUGMAN:  NO, DEFINITELY NOT.

11          THE COURT:  SO, WITH THAT, WHAT DO YOU WANT TO DO,

12   MR. HARRIGAN?

13          MR. HARRIGAN:  WE'LL HAVE AGENT MEZA COME DOWN AND

14   TESTIFY.

15          THE COURT:  OKAY.  NOW --

16          MR. HARRIGAN:  I DON'T THINK IT SHOULD TAKE LONG.

17   IT'S RELATIVELY SHORT.  HE WAS THERE FOR -- SHE WAS THERE FOR

18   LESS THAN A MINUTE, IF NOT LIKE 30 SECONDS, SO.

19          THE COURT:  OKAY.  WELL, IT'S AMAZING HOW WE CAN TAKE

20   A MOMENT'S EVENT AND MAKE IT LONGER WHEN WE DIRECT AND CROSS.

21   SO WE'LL SEE.

22          MR. HARRIGAN:  OKAY.

23          THE COURT:  HOW SOON COULD WE GET -- CAN WE SET

24   THAT -- WHEN CAN WE SET THAT?  WHAT'S THE EARLIEST WE COULD

25   SET THAT, ALEX?

1                (OFF-THE-RECORD DISCUSSION BETWEEN THE COURT AND THE

2     COURTROOM CLERK)

3                THE COURT:  WE HAD SOMETHING PULL OFF TOMORROW'S

4     CALENDAR, BUT TOMORROW IS PROBABLY NOT GOOD.

5                MS. AHUMADA:  WE JUST NEED A COUPLE DAYS TO NOTIFY

6     HIM, BUT IT WOULDN'T TAKE LONG.

7                THE COURT:  OKAY.

8                MS. AHUMADA:  WE COULD DO IT NEXT WEEK.

9                THE COURT:  OKAY.

10               WHAT DO WE HAVE NEXT WEEK, ALEX?

11               (OFF-THE-RECORD DISCUSSION BETWEEN THE COURT AND THE

12    COURTROOM CLERK)

13               THE COURT:  WE COULD DO MONDAY OR TUESDAY, OR MONDAY.

14               MR. ZUGMAN:  IF WE COULD DO IT IN THE AFTERNOON ON

15    MONDAY.  I'VE GOT THREE SENTENCINGS IN THE MORNING, SO I

16    WOULDN'T WANT TO DO IT THEN.

17               THE COURT:  WE CAN DO IT IN THE AFTERNOON.  I CAN'T

18    START UNTIL TWO O'CLOCK ON MONDAY AFTERNOON,

19               MR. HARRIGAN:  MONDAY IS FINE.  WE JUST NEED TO

20    CONTACT AGENT MEZA, AND WE'LL LET THE COURT KNOW IF THAT'S NOT

21    GOING TO WORK.  BUT I'VE BEEN INFORMED HE WORKS MONDAY THROGH

22    FRIDAY, DAY SHIFTS, SO THAT MAKES IT PRETTY EASY FOR US.  A

23    LOT OF TIMES, THEY WORK NIGHT SHIFTS.

24               THE COURT:  SO WE COULD DO IT MONDAY, AT TWO O'CLOCK.

25               MR. HARRIGAN:  THAT WORKS FOR US.

1           THE COURT:  AND WE'LL HAVE ENOUGH TIME TO FINISH HIM

2    IN TWO OR THREE HOURS?

3           MR. HARRIGAN:  YES.

4           THE COURT:  EXCELLENT.  WE'LL SEE YOU THEN.  THANK

5    YOU.  THE MATTER'S CONTINUED.

6           ALEX IS GOING TO HOLD ON TO ALL THE EXHIBITS THAT

7    HAVE BEEN ADMITTED.

8           OKAY.  THANK YOU.

9           MR. HARRIGAN:  YES.  THANK YOU, YOUR HONOR.

10           MR. ZUGMAN:  THANK YOU, YOUR HONOR.

11           THE COURT:  THANK YOU.

12           (PROCEEDINGS ADJOURNED AT 3:18 P.M.)

13    --------------------------------------------------------------

14                     (END OF TRANSCRIPT)

15

16           I, FRANK J. RANGUS, OFFICIAL COURT REPORTER, DO

17    HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

18    ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

19

20           S/FRANK J. RANGUS_____

21           FRANK J. RANGUS, OCR

22

23

24

25