UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>MARIA DE JESUS LOPEZ,<br><br>　　　　Defendant. | Criminal No. 16CR1585-JLS<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**<br><br>[ECF No. 47] |

  Before the Court is Defendant's motion to suppress evidence seized as result of the stop of her vehicle at the Highway 86 Border Patrol checkpoint (ECF No. 47). The Court has considered Defendant's motion, the Government's response in opposition and supporting exhibits and declaration (ECF Nos. 57 and 59), the supplemental briefings submitted by each party following the evidentiary hearings (ECF Nos. 67 and 69), the second supplemental documents submitted by each party (ECF Nos. 70 and 71), and the evidence and testimony presented at the evidentiary hearings held on April 19 and 24, 2017. For the reasons set forth as follows, the Court concludes that the stop of Defendant's vehicle at the Highway 86 checkpoint was a permissible immigration inspection and that the subsequent search was supported by probable cause. Accordingly, Defendant's Motion to Suppress Evidence will be denied.

# FACTS

On June 10, 2016, at approximately 8:45 a.m., Defendant Lopez drove her red 1990 Honda Accord to the Highway 86 Immigration Checkpoint near Westmorland, California. Border Patrol Agent Barragan and his canine partner "Pecky" were inside the inspection booth where Agent Barragan was monitoring approaching vehicles using a license plate reading program.[1] Pecky is a concealed human/narcotics detection dog trained and certified by the canine program of Customs and Border Protection ("CBP").

The red Honda Accord driven by Defendant caught Agent Barragan's attention as it approached the inspection station because it appeared to be a 90's model vehicle with a newer-issued plate. Using the license plate reader, Agent Barragan determined that the vehicle had crossed from Mexico through the Calexico West Port of Entry approximately one hour earlier that morning.

As Defendant's vehicle approached the inspection point, Agent Barragan and Pecky exited the inspection booth and Agent Barragan informed Border Patrol Agent Meza, the primary inspection agent on duty, that Defendant's vehicle had a recent border crossing. Agent Meza approached Defendant and conducted an immigration inspection, asking her if she was a U.S. citizen. Defendant handed Agent Meza a U.S. passport, which Agent Meza inspected to determine whether it matched her. Agent Meza then received a signal from Agent Barragan to refer the vehicle to the secondary inspection station.

While Agent Meza was conducting the immigration inspection, Agent Barragan ran Pecky around the vehicle for 10 to 30 seconds and Pecky alerted to the rear bumper of the vehicle. Agent Barragan then signaled Agent Meza to send the vehicle to secondary

---

[1] Agent Barragan testified that the "LPR program" involves cameras which take pictures of license plates of vehicles approaching the inspection station. The images are fed into a computer program visible from a monitor inside the inspection booth. The agent described the program as follows: "as the vehicles are coming up, it's like a little scroll of cars and you see a picture of the car as it's coming around. And then if I want to look into the vehicle , ... and it piques my interest, I'll click on that plate and it pops up and it shows the crossing history, and it will show – sometimes, if it's not a blocked plate, it show where the vehicle's out of." ECF No. 62 at 180-81.

inspection. At the secondary inspection station, Agent Barragan questioned Defendant briefly and asked for permission to search the vehicle. Defendant was asked to exit the vehicle and Pecky again alerted and indicated toward the rear bumper. Agent Barragan searched the vehicle and discovered a metal compartment box containing methamphetamine beneath the bumper. Defendant was arrested and charged with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

## DISCUSSION

It has been long established, in the context of immigration control, that "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment" even in the absence of a search warrant or individualized suspicion that the particular vehicle contains illegal aliens. *United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976). However, it is also well established that checkpoints with the principal purpose of thwarting ordinary criminal activity–as opposed to purposes of policing the border–do not comport with the Fourth Amendment. *City of Indianapolis v. Edmond*, 531 U.S. 32, 38 (2000). More recently, in *United States v. Soto-Zuniga*, 837 F.3d 992, 999-1000 (9th Cir. 2016), the Ninth Circuit recognized that the constitutionality of an immigration checkpoint turns on "whether its "primary purpose" is to control immigration, ..., or rather is to interdict drug trafficking and other "ordinary criminal wrongdoing."" If a checkpoint's primary purpose is to detect evidence of drug trafficking, then the initial seizure of the vehicle and occupant would violate the Fourth Amendment and require suppression of drug evidence as fruit of the poisonous tree. *Id*.

In this case, Defendant contends that the Border Patrol agents impermissibly used the border checkpoint to search Defendant, a U.S. citizen, for drugs. Defendant argues that Agent Barragan would have known that no smuggled human being could have survived concealment in a trunk or compartment of defendant's vehicle during the one hour drive from the border to the checkpoint and the one hour average wait time at the Calexico Port of Entry. In addition, Defendant contends that no dog can be trained to

detect concealed humans in the conditions of the checkpoint because there is no "concealed person" scent to fix them on.

The Government responds that Defendant was lawfully stopped at a constitutionally permissible immigration checkpoint. The Government maintains that CBP trained dogs can be trained to detect and alert to concealed humans and that Pecky's alert was reliable and established probable cause for the search of Defendant's vehicle. The Government further argues that even if Pecky could not detect concealed humans, but only drugs, the search would nevertheless be permissible because the dog sniff did not extend the length of the immigration stop.

Having considered all of the evidence, the Court agrees that the stop of Defendant's vehicle at the checkpoint was a permissible immigration stop. The Court has been presented with no evidence to suggest that the primary purpose of the Highway 86 Checkpoint is not to control immigration. The testimony established that typically all vehicles traveling on the highway are funneled into the checkpoint and subjected to an immigration inspection which involves questioning about citizenship, review of immigration documents, and a look inside the vehicle by agents in case someone might be hiding. ECF No. 61 at 5-7. Then, if everything is clear, the vehicle is free to proceed. *Id*. at 7.

The Court has been provided with no arrest or search statistics related to the Highway 86 Checkpoint, but in another case in this District, a case cited by Defendant in support of her motion, the Court found, for the period between 2012 and 2015, that there were approximately 1,746 apprehensions at the checkpoint, approximately 1,579 were immigration related and approximately 167 were drug related. *United States v. Summers,* California Southern District Case No. 15CR717-WQH, ECF No. 47, Exhibit 2. Thus, the Court has no reason to question that the primary purpose of the checkpoint is other than immigration control.

Nor is the Court persuaded by Defendant's argument that the agents in this case had no legitimate immigration related purpose in conducting the stop and used the

checkpoint merely as a pretext to search for drugs. First of all, the agents did not know Defendant was a U.S. citizen and that factor alone supported her brief detention to determine her immigration status. Defendant argues that because Agent Barragan was able to determine the vehicle's crossing history and registration information through the license plate reader, he must have also known her citizenship status. However, the evidence does not support this argument. Agent Barragan testified that he did not know Defendant Lopez was a U.S. citizen and that the license plate reader program does not reveal this information. In the absence of any contrary evidence, the Court finds this testimony to be credible. The Court also rejects as speculative and lacking in foundation Defendant's assertion that the failure of the United States government to provide more detailed border crossing information to agents inside inspection stations demonstrates that checkpoint inspections are purposely designed to last longer than necessary.

Second, the suspicions harbored by Agent Barragan with respect to Defendant's vehicle were applicable to both drug smuggling *and* alien smuggling. Agent Barragan's suspicions were first drawn to Defendant because she was driving an older-model car with newer license plates, a pattern Agent Barragan had observed in other apprehensions involving both concealed humans and controlled substances. Agent Barragan also was suspicious because the vehicle had recently entered the United States from Mexico, another indication to him of possible alien or narcotics smuggling. Although, as Defendant argues, the odds of aliens being concealed within the vehicle for a potential 2-hour period on a June morning may have been lessened due to the weather conditions, this district has encountered numerous cases involving aliens being picked up in the United States near the border and then transported within the United States. Unfortunately, this district has also encountered cases involving concealed persons smuggled during extreme temperatures.

Furthermore, the Court is persuaded that Pecky is able to detect concealed humans. Testimony by Matthew Devaney, the Research and Development Coordinator for the CBP canine program established that Pecky, and other dogs trained through the

CBP canine program, are trained to detect concealed humans while simultaneously ignoring visible people within the search area. Although Mr. Devaney acknowledges that the exact method a canine uses the make the distinction between concealed and visible people is unknown, he maintains that the canines are able to do it, and the CBP is able to test it.

The CBP certification process requires dogs and their handlers to be able to complete a formal evaluation including multiple search scenarios including mandatory concealed person searches in which the ability to bypass visible people is required. The testing process is single blind, neither the dog nor the handler know the location of the object to be found. In addition, mandatory "blanks," searches with no finds, are incorporated into the scenarios. After the initial certification process, canines and their handlers are required to be recertified on a yearly basis using the same requirements. In addition, canines and their handlers are required to complete monthly maintenance training sessions, for which records are kept. With respect to Pecky and Agent Barragan, Mr. Devaney testified that, other than a few remarkable occasions, the team scored well on all search environments, with multiple evaluators, over an extend period of time, establishing them to be a very reliable team.

In light of Mr. Devaney's testimony and the certification and training records submitted by the Government, the Court is persuaded that Pecky is reliable and is able to detect concealed humans. Although Defendant's expert opines that it is not possible for a dog to distinguish between the smells of people they can see and people that are hidden, the Court cannot ignore the fact Pecky has in fact passed her certification and annual recertifications which specifically test for concealed humans as well as controlled substances. Moreover, between October 2009 and September 2016, Pecky's alerts have led to 82 controlled substance seizures and 46 events of human smuggling involving a total of 65 concealed humans. If Pecky were truly not able to distinguish between concealed humans and visible humans, she would either be alerting to every vehicle passing through the inspection station, or she would never alert to concealed humans and

alert only to controlled substances. Neither of these scenarios is borne out by the evidence in this case. Although it is conceded that the science behind Pecky's concealed human detection ability is unknown, the fact remains that the ability is tested and well-documented and, thus, the Court accepts it as reliable.

That being said, even if Pecky could not reliably detect concealed humans, there has no been no showing that she is not reliable in terms of controlled substance detection. The alert in this case happened while Defendant was lawfully stopped for an immigration inspection and thus Pecky's alert did not implicate any legitimate privacy interest. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Accordingly, the Court finds that Pecky's alert, combined with the factors initially observed by Agent Barragan, established probable cause to search Defendant's vehicle.

## CONCLUSION

For the reasons set forth above, Defendant's motion to suppress evidence seized from the stop of Defendant's vehicle at the Highway 86 checkpoint is **Denied**.

IT IS SO ORDERED.

DATED: June 13, 2017

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge